```
 1              IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
 2                    WESTERN DIVISION

 3   IAN POLLARD, on behalf of himself   )
     and all others similarly situated,  )
 4                                        )
                       Plaintiffs,      )Case No.
 5           vs.                        )13-CV-00086-ODS
                                        )
 6   REMINGTON ARMS COMPANY, LLC, et al.,)
                       Defendants.      )
 7
                TRANSCRIPT OF MOTIONS HEARING
 8         BEFORE THE HONORABLE ORTRIE D. SMITH
                    FEBRUARY 4, 2015
 9               KANSAS CITY, MISSOURI

10                    APPEARANCES

11   For the Plaintiffs:        MR. JON D. ROBINSON
                                Bolen Robinson & Ellis, LLP
12                              202 S. Franklin, 2nd Floor
                                Decatur, Illinois 62523
13
                                MR. RICHARD J. ARSENAULT
14                              Neblett Beard & Arsenault
                                PO Box 1190
15                              Alexandria, Louisiana 71315

16   For the Defendants:        MR. JOHN K. SHERK
                                MR. BRENT DWERLKOTTE
17                              Shook, Hardy & Bacon, LLP-KCMO
                                2555 Grand Boulevard
18                              Kansas City, Missouri 64108

19                              MR. DALE G. WILLS
                                Swanson, Martin & Bell, LLP
20                              330 North Wabash, Suite 3300
                                Chicago, Illinois 60611

21

22            Gayle M. Wambolt, RMR, CRR
           U.S. Court Reporter, Room 7552
23         Charles Evans Whittaker Courthouse
                400 East Ninth Street
24         Kansas City, MO 64106 (816) 512-5641

25                         1
```

WEDNESDAY, FEBRUARY 4, 2015

2          THE COURT:  We set this time for a hearing on the

3     parties' joint motion for preliminary approval of the amended

4     complaint in Ian Pollard v. Remington Firearms Company, LLC.

5     The case number is 13-CV-00086.

6          I see some familiar faces and some unfamiliar faces,

7     so I will allow counsel to introduce themselves to the court

8     and the record at this time.

9          MR. SHERK:  Your Honor, John Sherk, Shook, Hardy &

10    Bacon here in Kansas City, Missouri.  Joining me is my

11    colleague Dale Wills from the Swanson Martin firm in Chicago,

12    Illinois.

13          MR. WILLS:  Morning, Your Honor.

14          THE COURT:  Good morning.

15          MR. ROBINSON:  Your Honor, I'm Jon Robinson, Bolen,

16    Robinson & Ellis, Decatur, Illinois.  I have with me Richard

17    Arsenault of Neblett, Beard & Arsenault in New Orleans.

18          THE COURT:  Welcome.  There are a number of items

19    that I will suggest that are worthy of consideration this

20    morning.  First and foremost is why the proposed settlement

21    should receive preliminary approval by the court and what

22    makes it fair, reasonable, and adequate.

23          Secondly, there were several items mentioned in this

24    court's order of December the 11th, Document No. 70, where I

25    had some initial concerns, and I would ask that those be

                                    2

Case 4:13-cv-00086-ODS   Document 84   Filed 02/27/15   Page 2 of 36

1  addressed by counsel this morning in connection with their

2  remarks.

3            Thirdly, the joint motion recites that there are no

4  objections, and, of course, yesterday I received

5  correspondence from Mr. Belk who did express opposition to the

6  settlement.

7            Is Mr. Belk here this morning?

8            MR. BELK:  Yes, I am, Your Honor.

9            THE COURT:  All right.  Mr. Belk, I do not intend

10  for this to be an evidentiary hearing this morning.  In light

11  of the fact that you have traveled some distance to be here, I

12  will give you a few minutes to make some remarks and express

13  your opposition if you choose to do that.

14            Then I will ask the attorneys to address Mr. Belk's

15  concerns in their remarks.  At this stage I am not necessarily

16  approving the settlement.  This is a preliminary hearing in

17  which the parties seek only preliminary approval, and

18  following that, all of the members of the class -- the

19  attorneys will attempt to notify and contact all of the

20  members of the class to be sure that the class understands

21  what's going on here.

22            And then at some time in the future, most likely

23  this year, there will be another hearing at which time the

24  parties will ask me to finally approve, and at that point in

25  time if you choose to be sworn and take the witness stand and

3

1    offer testimony, I'll hear that testimony.

2             MR. BELK:  I appreciate that, Your Honor.  I will

3    wait until that hearing.

4             THE COURT:  All right.  For the record, Mr. Belk, I

5    have read your letter and the attachments to that letter.

6    Additionally, late yesterday the parties filed a response to

7    your letter, and I have also read that letter and viewed the

8    exhibits attached to that letter.

9             All right.  Who would like to go first?

10            MR. SHERK:  Your Honor, John Sherk.  I would be

11   happy to start the proceeding.

12            THE COURT:  Go right ahead.

13            MR. SHERK:  Your Honor, I kind of sketched out a

14   game plan for this morning, and the good news is I think my

15   game plan pretty much lines up precisely with yours.

16            I'd like to give the court a little bit of

17   background about what this case is about, how we got here, how

18   we arrived at this settlement by way of introduction, and I

19   think Mr. Robinson probably will have a couple thoughts from

20   the plaintiffs' vantage point in that regard as well.

21            Mr. Arsenault this morning is prepared to talk about

22   the Rule 23 criteria and how, based on the submissions of the

23   parties and the arguments of counsel here today, the criteria

24   for preliminary approval are met.

25            Finally, Mr. Arsenault and I will deal with the
                                    4

court's five questions that were contained in the court's
December 11th order. I would then like to present the court
with a minor clarification to the definition of class B that
we think that will be helpful. We've got some slightly
modified dates for notice, fairness hearings, some suggestions
based on the date of today's hearing and the publications
which will need to be spun out over the course of the summer.

And, finally, I believe that Mr. Robinson can
respond to Mr. Belk's letter.

So why are we here? Well, this hearing is the
culmination of two years of litigation and some very vigorous
negotiation and mediation, Your Honor. I'm really very
pleased to be here to present this settlement. I think this
is a strong settlement. It's fair, reasonable, and adequate
to say the least. I think that Remington's providing real
value to the class members.

This started a few years ago when Mr. Robinson,
Mr. Arsenault, and their colleagues filed four class action
lawsuits. One was in Miami, Florida; one was here in Kansas
City, Missouri, before Your Honor. There was another one in
Washington in Seattle in front of Judge Coughenour and then a
final one in Montana.

All of these cases announced a similar theory and
sought similar class action relief. They contended that the
Walker trigger mechanism of the Model 700 Remington rifle

5

utilized a component part known as a trigger connector, that
that was defectively designed, and it was prone to have an
accidental discharge without the trigger pull.

It's important to keep in mind, Your Honor, that
these are economic loss cases. No claims for personal injury
or property damage have been made. None of those claims are
being released under this settlement agreement.

One thing I must emphasize as counsel for Remington,
though, is these were hotly-contested cases. Make no mistake,
there was no lay down liability here, Your Honor. There were
disputes about the alleged defect, which Remington denies,
disputes about the existence of any economic losses
whatsoever. There were also important individualized defenses
that Remington was ready to put forth if the case is then
going on, and, frankly, Your Honor, Remington's position is
there's nothing wrong with the Remington Model 700 rifles.
They think they're safe and they think they work well.

And in fact, as Remington stated in its brief, and I
quote, in past personal injury lawsuits, neither Remington nor
the plaintiffs' firearms experts have ever been able to
duplicate an accidental firing without a trigger pull on a
rifle in proper working condition. So, again, to say these
were hotly-litigated cases is to put it mildly.

We engaged immediately in motion practice, in some
discovery, and I think in conversations with my plaintiffs'

6

colleagues here, we decided that if these cases were ever
going to be resolved, we had to take a break, and we had to
see if we could work something out.  So despite Remington's
position that the guns were safe and that they worked fine and
that there was nothing wrong with them, we decided to see if
we could put this issue behind it and craft something that
worked for the class members, the putative class members, and
for Remington.

So after, you know, quite a bit of analysis about a
mediator, we settled on a gentleman named John Perry.  I
believe he's in Baton Rouge, Louisiana.  He ended up being a
wonderful mediator for us, very skilled, very astute.  He dug
into the issues.

Mr. Robinson assembled a crew of highly-experienced
plaintiffs class action litigators from across the country,
not just these two gentlemen sitting at counsel table today,
but also Mark Lanier in Houston, Charlie Schaffer in
Philadelphia, John Climaco in Cleveland just to name a few,
Your Honor.  So there was a formidable group involved in these
mediations.  I think we had at least four or five in-person
mediation sessions, innumerable telephone conferences.

To say that these were bareknuckle negotiations,
again, is to put it mildly.  They were spirited.  A lot of --
a lot of very difficult issues were worked through under the
guidance of the mediator, John Perry, very much arm's length,

7

very much conflict, brought together this resolution.

So we entered into a basic structure, Your Honor, and we agreed at that time that the X-Mark Pro mechanism would be an appropriate retrofit for the Walker Fire Control, which was the subject of the lawsuits.

Then what happened, Your Honor?  Well, we discovered that there was a problem with the X-Mark Pro.  Here's what happened, there was a gentleman that put a video on YouTube demonstrating an unintentional firing of the X-Mark Pro. Essentially when the safety was moved to the off or to the on position, in a very narrow temperature range band, the gun would fire.

Well, the company took immediate action and I mean immediate.  They got the gun back.  They inspected it.  They were unable to have this unintentional firing at room temperature, at 30 degrees, at negative 20 degrees, but when you got in this narrow band of temperature range of about 10 degrees, the company was able to duplicate it.

So with that in mind, Mr. Wills and I literally got on a plane and we flew down to meet with Mr. Arsenault and Mr. Lanier, plaintiffs' lawyers.  We alerted them immediately of this issue and of Remington's determination to as quickly as possible institute a voluntary recall of which the company did to figure out what was wrong and to make it right.  And that's exactly what happened.

8

1    The company engaged in an exhaustive analysis of the
2    X-Mark Pro trigger mechanism.  The company, and I'm
3    simplifying things, Your Honor, but the company essentially
4    found out that in certain circumstances too much of a bonding
5    agent called Loctite was squeezed into the trigger mechanism,
6    and it oozed into places within the mechanism where it
7    shouldn't have been.

8        Well, when that happened, the agent could literally
9    touch the trigger and the safety such that at that narrow
10   temperature range, putting the safety to the off position
11   would be sufficient to create a trigger pull.  A rare
12   instance.  No instances of personal injuries do we know about
13   at all, and the recall has been going on since, I believe,
14   April 11th of last year.

15       But, more importantly, the company figured out the
16   problem.  It instituted measures at the factory such that that
17   could never happen again.  We involved Mr. Arsenault and
18   Mr. Robinson's experts.  We invited them to the factory.  They
19   took a look at the issue.  They took a look at the specialty
20   cleaning inspection and testing process that the company had
21   engaged in.

22       They also looked at the new way that the X-Mark Pros
23   were manufactured and, more importantly, assembled so that
24   they could assure themselves that the new X-Mark Pro
25   mechanism, as it was assembled, was safe and reliable, and the

9

1    court has expert declarations on file now by both parties

2    attesting to that.  So with that bump in the road resolved, we

3    continued on with the process.

4          I'd like to talk a little bit now about the benefits

5    of the settlement because I think the benefits are very real,

6    very tangible, and if you compare -- if you took that

7    complaint that was filed in Pollard and you compare it with

8    the settlement that we've crafted here that we're talking

9    about today, you'll see a striking similarity in overlap.  I

10   mean in essence the thrust of the complaint was we want you to

11   retrofit those guns, and the company said, yes, we're going to

12   do it.  And that's what -- and that's what -- do we have it?

13   We've got a little slide here that I want to show the court.

14         There we go.  This is a schematic, Your Honor, I

15   hope you can read it, of the way that this settlement is laid

16   out.  Our proposed settlement, class A we call the trigger

17   connector class.  The bulk of it is in the middle.  That's the

18   Model 700s.  The 715, 710s, 770s are in the pink.  The much

19   older guns, the 600s, 721s, those are in blue.

20         And then class B, as the court is aware, is the XMP

21   recall class which we will fold into this proposed settlement

22   if and when the court were to grant preliminary approval.

23         This next slide, Judge, slide 2, shows the breakdown

24   of the model firearms implicated in the settlement, and the

25   court can see that the retrofitting component of this proposed

10

settlement encompasses over 90 percent of the guns that are involved, so that's, again, just a graphic illustration of the fact that we crafted a settlement that really meets the demands of Mr. Robinson and Mr. Arsenault in filing these cases.

We also have a component, Your Honor, of refund. There were certain Remington rifle owners who chose to retrofit their Walker Fire Controls with X-Mark Pros. Some of these people did that at their own cost, and I'm not sure exactly why, Your Honor, but some people were charged differently than others. Some people were charged 50 percent of the amount. Some people were charged less. Some people were charged as much as $119. That's the maximum that any individual ever had to pay who would fall in this category.

So that's why we capped that amount there. It's -- and it's in no way a limitation. It's just the most that the company ever paid, and the company will pay these people back. We'll write them checks. That's our plan here.

Finally, Your Honor, as part of the settlement benefit, we are in the process of preparing and are well along in preparation of a safety instructional DVD. This will be -- it's professionally produced, high production values. We think it will be of real interest and value to gun owners in terms of the Ten Commandments of Firearm Safety, also the cleaning of the rifles, taking care of them. I think that

11

1    will be a worthy benefit.

        2            So that kind of outlines where we are today, and I'd

        3    like to turn over the floor to Mr. Robinson for additional

        4    comments from the plaintiffs' perspective.

        5            THE COURT:  Thank you, Mr. Sherk.

        6            Mr. Robinson, in your remarks if you can touch on

        7    the differences between the original complaint and the first

        8    amended complaint, that might be helpful to the court.

        9            MR. ROBINSON:  Thank you, Your Honor.

       10            THE COURT:  Uh-huh.

       11            MR. ROBINSON:  The centerpiece of this settlement is

       12    clearly the replacement of the Walker Fire Control, the

       13    retrofitting of these with the X-Mark Pro, and out of that, of

       14    course, has arisen the question about the X-Mark Pro and

       15    whether or not it's a suitable replacement.  We believe we

       16    have the answer for that, and we have filed documents to that

       17    effect.  I actually will be handling and would like to handle

       18    the court's questions if I could.

       19            THE COURT:  Sure.

       20            MR. ROBINSON:  Mr. Sherk has, I believe, adequately

       21    described the details of the settlement.  Your Honor had five

       22    questions.  The first one was whether or not we should have

       23    additional subclasses.  We have not proposed any additional

       24    subclasses, Your Honor, beyond class A and B, and we do not

       25    believe that Rule 23 requires any further subclasses.  We say

                                        12

1    that because we do not think that there are any divergent

2    interests among the treatment of the owners of the rifles

3    within the subclasses or within the classes A and B.

4         This is true for both because the difference in the

5    relief, we believe, among these groups is justified by the

6    different circumstances.  The court has obviously discretion

7    under Rule 23(c)(5) to create subclasses when it's

8    appropriate, and there's several decisions that conclude that

9    subclasses are necessary, however, and appropriate only when

10   members of the class have divergent interests.

11        John Coffee, a professor at Columbia Law Review,

12   made the following comment:  If subclassing is required for

13   each material legal or economic difference that distinguishes

14   class members, the balkanization of class action is

15   threatened.  Such a fragmented class might be unmanageable.

16   It certainly would reduce the economic incentives for legal

17   entrepreneurs to act as private attorneys general, and it

18   could be extremely difficult to settle any of these cases if

19   subclasses -- if a subclass and its attorney had an incentive

20   to hold out for more.

21        The Eighth Circuit decisions also indicate that a

22   conflict of interest requiring a subdivision of classes is not

23   created simply because some class members receive more than

24   other class members.  In Petrovic v Amoco Oil Co, 200 F.3d

25   1140, at 1146, the Eighth Circuit said in denying an

                                13

```
 1    objector's argument that a conflict of interest was created

 2    because some class members would receive more than others

 3    where there were different circumstances.  We believe that the

 4    different circumstances in this case would not -- among the

 5    class members would not require any subclasses.

 6              THE COURT:  There are three subcategories in class

 7    A?

 8              MR. ROBINSON:  That is true.  In this case, though,

 9    Your Honor, there are -- there is little difference in the

10    remedy among the class A members.

11              THE COURT:  The difference between the first

12    subcategory is that members of the class can either take or

13    ship their firearms.  The second class, members must ship

14    their firearms.  And the third category receives monetary

15    compensation of $12.50 in one instance and $10 in the other.

16              MR. ROBINSON:  I think I can explain that.  You want

17    to --

18              MR. SHERK:  Maybe I could pick off one or two of

19    these, Your Honor, speaking for Remington because I've got

20    maybe a little bit more of an inside track about why it is the

21    people -- that some people can take their guns to a Remington

22    authorized repair center and others need to ship them back to

23    the factory.

24              The fact is with the 700s, Seven's, Sportsman 78s,

25    673s, those guns are engineered such that the Walker can be
```

                                  14

taken out and the X-Mark Pro can pretty much just be dropped
in. Very little modification is required there, and that's
why Remington decided to the extent possible that it would
spread out the work to these authorized repair centers. And
that then alleviates, you know, a glut of firearms waiting to
be retrofitted at the factory, and instead master gunsmiths at
these RARCs, Remington Authorized Repair Centers, can do the
work.

They're especially trained to do it. Remington
provides them with the new triggers. It's faster for the
customers. They get better service. It's a little bit more
expensive for Remington, but it gets the job done quickly.

The issue with the 710s, 715s, and 770s is there's a
little bit more work that's got to go into the process of
dropping in the X-Mark Pro. Parts have got to be put in the
receiver of the gun such that the X-Mark Pro fits in there,
you know, with the exacting specifications that the company
requires.

To get that -- believe me, we looked at whether or
not we could do that at RARCs, Your Honor, and if we would
have been able to do it, if we could have figured out how to
do it, we would have done it, but we weren't able to come up
with a way that it would be fast and efficient and economical
to get that done. So we thought that we'll send this category
of gun back to the factory. They'll be ready to handle them.

15

Case 4:13-cv-00086-ODS   Document 84   Filed 02/27/15   Page 15 of 36

1   They'll do it there.

2          Can we look at this next slide, slide two.  Yeah.

3          You'll see that those are comparatively not that

4   many guns, so I think we can do this at the factory.  The

5   company takes care of the shipping, the cost of that, supplies

6   the boxes, so I think it's relatively painless for class

7   members.

8          Jon, all apologies for injecting.

9          MR. ROBINSON:  No problem.  They know more about

10  those issues than we do, I think, at this point.

11         THE COURT:  Mr. Robinson, maybe the third category

12  is one more suitable to be addressed by you in any event.

13  These older firearms are not going to be repaired.  They get

14  either $10 or $12.50 in either the voucher or coupon.  It

15  looks like a voucher to me, but you may choose to address

16  that.

17         If the guns are defective, why are they still out

18  there?

19         MR. ROBINSON:  Your Honor, we believe that, first of

20  all, there are very few of those.  Most of those guns are at

21  least 30 -- the newer ones of the groups are 30 plus years

22  old.  The older ones average probably 50 or 60 years old.

23         If they've lasted this long, if they're still being

24  used and a risk, a safety risk, they are probably going to

25  continue to be okay.  They're probably going to continue to be

                                    16

1    safe.

2          They cannot be repaired practically just from what

3    we know.  They cannot be retrofitted, as like the other 700s

4    can be, and so when we look at -- the court -- we've called

5    them a voucher.  We believe that they are like cash.  They are

6    transferable.  Remington has a website with lots of products

7    on it that have a value of -- within the values of these

8    vouchers.

9          Remington will allow them to be combined with other

10   offers, with other vouchers, with other credits and premiums,

11   so they are like cash and, again, can be transferable.  We

12   believe it's a real value for these gun owners.

13         In addition, because they are so old, there are

14   problems, I think, timing wise in making claims.  Statutes of

15   limitations may come -- become a problem.

16         The other --

17         THE COURT:  The settlement agreement ignores the

18   statute of limitations?

19         MR. ROBINSON:  It does, it does.  That's true.

20         The settlement does not waive a right for personal

21   injury or property damage, though, so if there is an issue

22   with one of the 600s or the 715s or the early 770s --

23         THE COURT:  The problem with that approach,

24   Mr. Robinson, is somebody actually has to get hurt.  If the

25   guns are defective and they're still out there, there is the

17

possibility that somebody is going to be severely injured or killed by one of those weapons.

Was there a discussion about a repurchase or a buyback of those weapons?

MR. ROBINSON: We discussed this honestly, Your Honor, many times during the mediation and both before and since. The -- Mr. Sherk may have comments from their perspective, but I believe that from the plaintiffs' point of view that this is a reasonable resolution for those folks. They are getting warnings as well as the Ten Commandments of Gun Safety.

Mr. Sherk, do you --

MR. SHERK: Maybe I can address the court's questions from Remington's perspective. Let me start with the question you posed about five minutes ago, Your Honor, and that's what's the difference between the original Pollard complaint and the amended Pollard complaint, and I think the court was probably referring to the fact that we brought in additional models of firearms that were not originally implicated in the Pollard complaint.

And I'll tell you what, that was arrived at in the crucible of the mediation and negotiation largely at the insistence of Remington because, Your Honor, we wanted to bring in, if we were going to do this, we wanted to bring all the models of firearms possible that had either the Walker

18

1   Fire Control or the trigger connector, the component that the

2   plaintiffs allege is the design defect.

3          So we brought in the 710s, the 715s, and the 770s.

4   We also brought in these much, much older guns.  Your Honor,

5   these guns, many of these guns, as Mr. Robinson said, are 50,

6   70 years old.  Some of them are 30 and 40 years old.  As to

7   those guns, as Mr. Robinson said, they cannot be readily

8   retrofitted.

9          In fact, there has -- to do that, to drop in an

10  X-Mark Pro requires massive changes to the stock and barrel.

11  It ruins the integrity of the gun to the extent that they are

12  valuable because they're old.  It's expensive and time

13  consuming, and about the court's concern about the triggers,

14  you know, Your Honor, again, Remington thinks there is nothing

15  wrong with these guns and that they fire appropriately and

16  that they're safe.  And, you know, to the extent there would

17  have been an issue, one would think presumably we would have

18  learned about it by now given the age of these guns.

19         I want to think about the court's BPA decision here

20  too when we talk about the value of the relief because in that

21  decision, the court recognized that one thing you've got to

22  look at is what is the real value of these claims versus, you

23  know, what you could get if they were litigated individually

24  versus the settlement amount.  And here, Your Honor, I

25  respectfully put it to the court that these claims would not

                                19

survive motions based on statute of limitations and other
defenses.

You know, the longest statute of limitations I
believe is 15 years. These guns long -- are much older than
that rather. These are economic loss claims. They would have
expired a long time ago. Moreover, if these claims were
litigated either individually or on a proposed class action
basis, the plaintiffs would, frankly, encounter a world of
problems.

I mean, these cases are complex. There's difficult
proof problems. Reliance and materiality, as this court
mentioned in its BPA decision, would be implicated.
Scientific issues would be implicated about the trigger
mechanisms involved. Again, we've got defenses. So we
believe that the individuals, the gun owners in this category
who get to keep their guns, which are essentially heirlooms at
this point, also get a voucher, and these are properly
considered in our view, Your Honor, to be vouchers rather than
nothing.

And in doing this, our thought for Remington, Your
Honor, was we've got this category of claimants -- of
individuals. We don't think any claim they would have would
be viable, but in a gesture of customer satisfaction, brand
loyalty, the company thought it would be good to bring them
into the fold. So that was the impetus for doing that.

20

Case 4:13-cv-00086-ODS   Document 84   Filed 02/27/15   Page 20 of 36

1    Again, Your Honor, we think given all these factors, that

2    they've had decades of use of these guns, claims not worth

3    anything or very little, difficult to prosecute, that this is

4    a fair, reasonable, and adequate settlement for this slim

5    category of older guns.

6         As you'll see, Your Honor, we're talking about a

7    universe -- about 600,000 guns as compared to, you know, five,

8    six million other guns.  As Mr. Robinson intimated, this was a

9    hotly-negotiated component of the settlement.  I think

10   everybody ended up in a good place with it.

11        To reiterate, these vouchers are transferable.

12   Unused portions revert to the owner.  They won't expire.  They

13   can be used on a lot of Remington products without the

14   expenditure of any additional money, and in fact if you look

15   at Remington's website, Your Honor, there are about 300 items

16   that you can get for under ten bucks.

17        I mean, in fact $10 is the threshold category, and

18   there's tons of stuff.  I mean, I was just looking actually

19   before I came over here this morning.  You can get, you know,

20   a trigger block gun lock for 6.95, 7.95.  There's specials

21   every now and then.  They could even be cheaper than that.

22        You can get cleaning supplies.  I found one for

23   Remington silicone treated gun socks.  Believe it or not, Your

24   Honor, these are big socks that go over rifles to protect

25   them.  There's Remington LED bore lights which are kind of a

                              21

1    cool little thing, 6.95.

2           So there's all kinds of things you can get for those

3    vouchers, Your Honor, that I think are valuable.  They go to

4    safety.  They go to gun maintenance.  And there's other things

5    too, other components as well if a customer wanted to use, you

6    know, this voucher to trick out their firearm in some form or

7    fashion.

8           Finally, as we said earlier, these individuals do

9    get the instructional safety DVD.  I mean, think about what a

10   70 year old gun owner's manual would have looked like, you

11   know, printed, probably pretty spartan.  They're getting a

12   high-production value DVD about safety, gun maintenance that I

13   think is of value, Your Honor.

14          So based on all that, we thought it was a fair,

15   reasonable, and adequate program for this group.

16          MR. ROBINSON:  Judge, you also asked about class B,

17   and, again, we do not believe there's any substantive

18   difference or conflict between those who get a new X-Mark Pro

19   trigger and those who have already paid Remington for one and

20   are going to get a refund of up to $119, depending on what

21   they paid.

22          They all will have new triggers at no cost to them,

23   and, as I said at the beginning, this -- the centerpiece of

24   this entire settlement is the fact that at no cost -- it's not

25   a common fund settlement.  We won't be parsing out a

                                22

percentage of the purchase price for a new trigger. They're going to be getting the triggers 100 percent covered, no shipping, no handling, no labor cost, and we believe after all the years and history with the Walker triggers and those like them, the ones that have the connectors, that's a tremendous benefit that anyone who can, we need to replace those.

The second question you asked, Your Honor, is to explain why the owners of the Model 700, the model -- the Sportsman 78 and the 673 could choose to take them to a dealer, and I think Mr. Sherk has already explained that from Remington's point of view. We -- there's a significant difference in the technology and the work that has to be done to justify that.

Your third question related to the coupons. We've discussed that. We think that these vouchers are not coupons. They are basically like cash. They're transferable. Mr. Sherk has just described how many products are available, and, once again, the guns that those vouchers apply to are the 721, the 722, and the 725 rifles, which are going to receive a $10 voucher, are all over 50 years old. Many much older. The Model 600, 660, and the XP-100 rifles are all over 30 years and some much older than that.

Once again, regarding safety, we believe that the guns that are still there, the universe is much smaller for those than it is for the Model 700s, that they are not likely

23

Case 4:13-cv-00086-ODS   Document 84   Filed 02/27/15   Page 23 of 36

1    at this point to be a problem if they've lasted this long to

2    the extent that they are still being used.  I suspect that

3    most of them are probably in a closet somewhere if they even

4    still exist.

5            But one final note is, as Mr. Sherk mentioned, they

6    do not have to give up their guns.  People these days don't

7    want to give up their guns for any reason, and so they're

8    getting basically cash plus the notice plus the safety ten

9    commandments.

10           Your fourth question dealt with the long form

11   notice, the claim forms, the settlement website.  I think

12   Mr. Sherk probably will respond more to this, but -- and

13   they're better equipped to answer that question.  However, we

14   understand on behalf of the plaintiffs that Remington will

15   have a link on its website to the settlement website, and,

16   once again, Mr. Sherk I think or Mr. Wills will address that

17   further.

18           Your fifth question related to opt-outs.

19           MR. SHERK:  I think that's mine, Jon.

20           MR. ROBINSON:  Pardon?

21           MR. SHERK:  That's probably one I ought to cover.

22           MR. ROBINSON:  I'd be glad for you to do that.  From

23   my perspective we join with the request to have that kept

24   either in camera or not to be disclosed.  We believe that the

25   defendants in this case are in good faith and that they want

                              24

1    to settle this.

2           We know, however, that in this day and age there are

3    those who might just attempt to recruit enough folks to object

4    to any settlement regardless of how good the terms were, and,

5    once again, we believe the terms of this settlement, the

6    centerpiece are 100-percent relief for the Walker and

7    Walker-like connector triggers.

8           I'm prepared at this point to save some time to deal

9    with Mr. Belk's objections.  Mr. Arsenault will be handling

10   the Rule 23 matters.  It's up to you if you are willing to

11   hear me out on that.

12          THE COURT:  Let's postpone that.  I have, as I've

13   said, read the written materials.  None of it is sworn except

14   your affidavits that are attached to yours, but if I conclude

15   that it's necessary to go into that, we'll do it at the

16   hearing for final approval.

17          MR. ROBINSON:  Okay.  Thank you, Your Honor.

18          MR. SHERK:  Excuse me, Your Honor.  Let me follow up

19   on a couple of Mr. Robinson's responses about questions four

20   and five.

21          Remington's website absolutely will contain a link

22   to the settlement documents, and, Your Honor, frankly, in

23   working through issues of the website, we've joined hand in

24   hand with plaintiffs' group.  They've done many, many, many of

25   these, and also we've relied a great deal on our notice

                                    25

administrator who is also handling the claims, a company
called Angeion. What everyone has recommended is you get a
link to -- on the Remington website. It will go right to the
settlement website. There will be all these settlement
documents in full, and that way class members get a uniform
vision of what it is that the settlement is about.

The message is controlled. They're not seeing
different messages on different plaintiffs' lawyers' websites
and on Remington's websites, no editorials. They get the real
scoop in a way that's professionally managed by the claims
administrator.

THE COURT: And I assume the link will be
prominently displayed on Remington's website?

MR. SHERK: You bet, Your Honor.

And believe me the claims administration claim form
website process has been exhaustively engineered. We're
putting the finishing touches on it right now. In fact,
there's a meeting scheduled for this afternoon and tomorrow,
so the process is well under way and highly orchestrated.

Going to the question about the blow-up provision,
as Mr. Robinson said, it was agreed to by the parties. I
would say that Remington is committed to this settlement.
It's expended a considerable, significant amount of time,
resources, and energy and manpower to try to pull this off.

Frankly, the company wants to put these economic

26

loss claims behind it once and for all.  It also wants to
demonstrate a commitment to its customers.  It wants to foster
brand loyalty and customer satisfaction, and that's a part of
the settlement too, Your Honor.  Make no mistake about it.

          The provision about walking away from the settlement
is premised upon good faith, which we have.  There's also a
provision in the settlement, Your Honor, which indicates that
if the parties disagree about how the settlement provisions
should be interpreted, we're obligated to go to John Perry,
the mediator, who is at the center of putting together this
compromise.  So that's another layer of checks and balances
that we would need to go through before we would ever walk
away, assuming the plaintiffs didn't agree with our view of
it.

          The Manual for Complex Litigation at Section 21.631
recognizes that these provisions are often used and that they
are -- they are of value.  That's how we got to the decision
to put the provision in the agreement.  If the court wants
more information, more detailed thought about what it would
take in terms of a percentage or a figure, I would echo
Mr. Robinson's request to do that in camera.

          What we don't want to do here today is set a
benchmark, a figure or something where a third-party objector
could seize upon that, try to amass an inventory of opt-outs,
and create either a competing class action or go to

27

```
 1   Mr. Arsenault and Mr. Robinson and say, You need to deal with
 2   me on this.  We think that would be disruptive to the
 3   settlement, and that's why we would want to talk to you about
 4   it in camera because I think actually those issues have
 5   nothing to do with why someone would opt out or not.  So it's
 6   not a lack of transparency.  It's just knowing the rules of
 7   the road here, Your Honor, and being cognizant of the factors
 8   that can come into play when you settle a large, big deal
 9   class action like this one.
10            THE COURT:  Okay.
11            MR. SHERK:  I'll turn it over to Mr. Arsenault to
12   talk about Rule 23.
13            THE COURT:  Mr. Arsenault.
14            MR. ARSENAULT:  Good morning, Your Honor.
15            THE COURT:  Good morning.
16            MR. ARSENAULT:  I'll be addressing this for the
17   conditional certification of the settlement classes and the
18   preliminary approval of the proposed class, so the first topic
19   with Your Honor's permission will be the conditional
20   certification of the settlement classes.  What we're seeking
21   here, Your Honor, is class certification pursuant to Rule
22   23(b)(3).
23            As Your Honor knows, Rule 23 governs the issue of
24   class certification, whether it's a litigation or a settlement
25   class.  Of course, with a settlement class, the court need not
```
                                  28

1    determine whether a trial would present intractable management

2    problems.

3              As Your Honor is aware, and I hesitate to go through

4    some of these rules, I've read Your Honor's opinions and I

5    know you're painfully aware of them.  So I'll go through them

6    quickly.  But the -- you know, we're charged with the burden

7    of demonstrating to the court that 23(a) has been satisfied.

8    That includes numerosity, members of the proposed class are so

9    numerous, that joinder is impracticable; commonality, common

10   issues of law or a fact exist among the class members;

11   typicality, the claims of the proposed class representatives

12   are typical of the claims of the absent class members; and

13   adequacy, that the proposed class representatives will fairly

14   and adequately represent the interests of the classes.  And,

15   Your Honor, we respectfully suggest that all four elements

16   have been satisfied here.

17             In terms of numerosity, it's estimated that each of

18   the proposed settlement classes will have tens of thousands of

19   members, and that clearly satisfies the numerosity

20   requirement.

21             In terms of commonality, the central issue, as

22   Mr. Robinson indicated, in this litigation is whether the

23   allegedly defective trigger mechanisms resulted in economic

24   loss to the class members.  That's common to all the class

25   members.

                              29

In terms of typicality, the class representatives'
claims are typical to the claims of the proposed class
members.  They are uniform and arise from the same alleged
conduct of the defendants.

             And, finally, Your Honor, in terms of adequacy, now,
the named plaintiffs and class members are equally interested
in demonstrating the alleged defective nature of the trigger
mechanisms, and the named plaintiffs are committed to
obtaining appropriate repairs or compensations for the
repairs.  Additionally, the named plaintiffs have demonstrated
a commitment to prosecuting this matter by supplying central
factual information concerning legal claims, making their
firearms available for inspections and testing, and willing to
testify if necessary at depositions or at trial.

             Additionally, Your Honor, the requirement of
representation by qualified counsel has also been met.  The
proposed class counsel have extensive experience handling
complex class actions and have demonstrated a willingness to
vigorously pursue the class actions as outlined in the
declarations that I submitted along with Mr. Jon Robinson.

             Likewise, Your Honor, Rule 23(b) has been satisfied
here for purposes of certifying the settlement classes.  More
particularly, the questions of the law or fact common to class
members predominate over any questions affecting individual
members, and a class action is superior to other available

                                    30

1    methods for fairly and efficiently adjudicating the

2    controversy.  So those are the predominance and superiority

3    requirements under 23(b)(3).

4         More specifically, Judge, in connection with

5    predominance, the requirement is met where there exists

6    generalized evidence that proves or disproves an element on a

7    simultaneously -- simultaneous classified basis.  Here we have

8    common questions that do in fact predominate over the

9    individual issues since the liability issues are common for

10   all the class members.  The claims for each class member

11   center on the design, the manufacturer, the marketing, and the

12   sale of the allegedly defective firearms.

13        In terms of superiority, class treatment here is

14   superior, is a superior form of litigation because it

15   addresses the rights of the claimants who individually would

16   be without the strength collectively to litigate these claims.

17   In this case the expenses and burden of the individual

18   litigation makes it impracticable for members of the proposed

19   class to seek redress individually.

20        Moreover, seeking redress through individual

21   litigation might not occur until trial and appellate remedies

22   have been exhausted.  In contrast, this proposed settlement

23   provides class members with real benefits under a

24   straight-forward claims framework while preserving their due

25   process rights.

                              31

```
 1              Turning now, Your Honor, to the preliminary approval
 2   of the proposed settlement, Rule 23(e) provides the guidance
 3   here, and it governs the settlement of class actions, and
 4   although the procedure for approval is not specifically
 5   articulated under Rule 23(e), we know from the Manual for
 6   Complex Litigation and interpretative jurisprudence that
 7   essentially what we have here is a two-step process.
 8              First step is to determine whether the settlement
 9   appears to fall within the range of reasonableness.  The
10   second step is to determine whether the proposed notice plan
11   meets due process so class members can know about this and
12   appear at the final fairness hearing, as Your Honor indicated
13   at the beginning of this hearing, where there will be a full
14   airing of any issues.
15              There's a variety of instructive jurisprudence, some
16   of which Your Honor has created, with regard to how to assist
17   courts in making this analysis.  There's a presumption of
18   fairness, which exists, Your Honor, if certain criteria are
19   met, and those have in our opinion been met in this particular
20   case.  Those include, number one, that a settlement is reached
21   through arm's length bargaining, and the plaintiffs and the
22   defendants are here along with the declaration of the mediator
23   -- the mediation team actually, John Perry and Randy Ellis,
24   establish unquestionably that this was hard fought and at
25   arm's length.
                                  32
```

Case 4:13-cv-00086-ODS   Document 84   Filed 02/27/15   Page 32 of 36

Number two, that the investigation and discovery have been efficient to allow -- efficient enough to allow counsel and the court to act intelligently. We think that certainly has been the case with the two years of active litigation.

Number three, counsel is experienced in similar litigation. Our declarations speak to that, Your Honor.

And that the percentage of objections is small, and, as Your Honor indicated early in this proceeding, thus far we have one objection.

Three other quick controlling, instructive themes with regard to this process, Your Honor. The court need only determine whether the proposed settlement is within the range of possible approval at this juncture. A class action settlement, and Your Honor has noted this in earlier cases, is a private contract negotiated between the parties at Rule 23(e) and requires the court -- and the jurisprudence talks about the court intruding. I hesitate to use that word. I don't think the court is intruding. It's carrying out its part of the three obligations and Rule 23 obligations. But the jurisprudence speaks to the court intrude on the private consensual agreement, and that intrusion is merely to ensure that the agreement is not the product of fraud or collusion and that taken as a whole, it's fair, adequate, and reasonable to all concerned.

33

And lastly, Your Honor, there's a strong judicial policy favoring settlements, particularly in class actions where substantial resources can be conserved by avoiding the time, costs, and rigor of prolonged litigation.

And there's been some dialogue, Your Honor, with regard to mediators and the negotiations, and with regard to mediators, courts additionally consider whether the settlement was reached with the experience and the assistance of a mediator. And here the negotiations were overseen by an experienced mediation team. John Perry has impeccable credentials. He's been appointed by Article III judges in a variety of MDLs and mass torts to serve as a special master. In my opinion he's widely recognized as one of the top mediators in the country, and he watched this unfold in realtime.

There was a notice of the settlement that was filed in this case on July 2nd, 2014, and, again, the parties have only received one objection.

So in conclusion, Your Honor, we believe that this is an excellent settlement, and we thank the court for its consideration.

THE COURT: Thank you, Mr. Arsenault.

MR. SHERK: Please the court, I've got just a couple follow-up issues while I've got your attention. I alluded earlier, Your Honor, to a slight clarification of the class

34

definition for class B.  It's up on the monitor here.

We just want to make it abundantly clear who is in or out of the class.  I think that the agreement did that, but I -- in an abundance of caution and for the purpose of making sure that we don't create any confusion, we propose to add this clause to the class B definition that's agreed to by the plaintiffs' counsel.

That will require, Your Honor, that we file some amended documents, including a revised amended complaint, motion, settlement agreement, long form, and possibly short form notices and proposed order.  We would hope to do that by this Friday if that sat well with the court.

THE COURT:  That will be fine.

MR. SHERK:  Okay.  In addition, Your Honor, as I mentioned earlier, we are continuing to work very thoroughly with Angeion, the claims administrator.  They'll take yet another look at the long form and short form notices, and if there's anything additional we need to do to make it as simple and as clear as possible, we'll get that done as well.  We'll get those things on file.

Finally, based upon today's hearing, the date of it, and then what we know about getting publications, getting the different media publications set so that we can get the notices orchestrated correctly, we would respectfully propose these dates.  There's no magic, but they do generally fit what

35

```
 1    we think would be the right kind of timeframes for the
 2    appropriate media plan, giving people enough time to learn
 3    about and respond to the proposed settlement, and then have a
 4    final approval hearing.
 5              THE COURT:  Okay.  Anything else from you,
 6    Mr. Sherk?
 7              MR. SHERK:  That covers it all for me, Your Honor.
 8              THE COURT:  Thank you.
 9              From the plaintiffs?
10              MR. ARSENAULT:  No, Your Honor.
11              THE COURT:  All right.  So all present will know, I
12    intend to take the motions under advisement and will enter a
13    written order fairly quickly.  I'm going to ask the spectators
14    now to leave the courtroom so I can talk to the attorneys
15    about the blow-up provision in the agreement.  With that, you
16    are excused.
17    (The remaining portion of the transcript is filed under seal
18    in Document No. 83.)
19                   REPORTER'S CERTIFICATE
20
21          I certify that the foregoing pages are a correct
22    transcript from the record of proceedings in the
23    above-entitled matter.
24    _____        _____
25      Date                 Registered Merit Reporter
                             36
```