# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### KANSAS CITY DIVISION

Ian Pollard, William G. Moodie,
James W. Waterman, Wallace Brown,
Rodney Barbre, Mitchell Winterburn,
Gordon Hardaway, Chase Delperdang,
Gary Otis, Roger Keesy,
Dylan Anderson, John Corsi
and William Massie
on behalf of themselves and
all others similarly situated,

       Plaintiffs,

vs.

REMINGTON ARMS COMPANY, LLC.,
SPORTING GOODS PROPERTIES, INC.
and E.I. DU PONT NEMOURS AND
COMPANY,

       Defendants.

**Case No.: 4:13-cv-00086-ODS**

**CLASS ACTION COMPLAINT
JURY TRIAL DEMANDED**

## FIRST AMENDED CLASS ACTION COMPLAINT[1]

Plaintiffs, Ian Pollard, William G. Moodie, James W. Waterman, Wallace Brown,

Rodney Barbre, Mitchell Winterburn, Gordon Hardaway, Chase Delperdang, Gary Otis, Roger

Keesy, , Dylan Anderson, John Corsi, and William Massie, by and through undersigned counsel,

on behalf of themselves and all other entities and persons similarly situated, sue Defendants

---

[1] Plaintiffs Moodie, Waterman and Hardaway are also plaintiffs in 2:13-cv-00172-JCC, *Moodie et al. v. Remington et al.* (W.D. Wash., Coughenour, J.) (the "Moodie Action" or "Washington Action"). Pursuant to the terms of the Settlement Agreement entered here, the parties have agreed to file a joint motion to stay the Moodie Action until the Effective Date of the Settlement. The parties have further agreed that if the Settlement Agreement is not approved and/or does not become effective, the Plaintiffs, Defendants, and the Settlement Class Members in both the Moodie Action and the present case will be restored without prejudice to their respective positions as if the Settlement Agreement, any application for its approval by the Court and the filing of the amended complaint in this action had not been made, submitted or filed. Defendants further agreed that they will not seek to dismiss the Moodie action or the Moodie class representatives on the account that the Moodie class representative were named as class representatives in the present amended complaint.

Remington Arms Company, LLC. ("Remington"), Sporting Goods Properties, Inc. ("SGPI") and E.I. du Pont de Nemours and Company ("DuPont") (collectively "Defendants") and for their First Amended Class Action Complaint allege, upon information and belief and based on the investigation to date of their counsel, as follows:

## INTRODUCTION AND SUMMARY OF ACTION

1. This is a class action asserting unfair and deceptive trade practices in violation of Missouri Statutes § 407.010 *et seq.*, fraudulent concealment, unjust enrichment and seeking damages and declaratory relief in connection with all Model 700, 721, 722, 725, Seven, Sportsman 78, 600, 660, 673, XP-100, 710, 715 and 770 firearms manufactured by Defendants that contain trigger mechanisms that utilize a trigger connector, including the patented Walker Fire Control, and all Model 700 and Seven bolt-action rifles containing X-Mark Pro trigger mechanisms that are subject to an April 2014 voluntary recall by Defendants.

2. The patented Walker Fire Control was introduced in 1948 and is found in excess of 5,000,000 Remington brand firearms.

3. Defendants designed, manufactured marketed, advertised, warranted and sold the Remington Model 700 bolt action rifle with the patented Walker Fire Control (the "Product"), to Plaintiffs and the Class as well as the general public. In conjunction with each sale, Defendants advertised that the Product was fit for the ordinary purpose for which such goods were used and was free from defects in materials and workmanship.

4. As discussed below, Defendants' knowledge of design flaws associated with the Walker Fire Control trigger assembly dates back to before the assembly was ever placed into the stream of commerce. Defendants' knowledge of the defects associated with the fire control continued to grow. Indeed, Defendants have known since 1979 that at least one percent of all

Model 700 Rifles at that time would "trick," allowing them to fire unexpectedly without a trigger pull.  On information and belief, Plaintiffs contend that this percentage is vastly understated and that all Model 700 Rifles are subject to unexpected firing without a trigger pull. This is because of the design defects inherent in the Walker Fire Control trigger assembly which are common to all Models that employ this fire control.  Further, as explained in more detail in this Amended Complaint, the "trick condition" which results in a fire on safe release ("FSR") malfunction is only but one common form of malfunction associated to this design.

5.    Despite decades of knowledge related to the various dangerous conditions of the Model 700 Rifle, Defendants never issued an adequate warning or recall of the Model 700 Rifles, and Remington continues to falsely represent to the public that the Model 700 is a trusted, safe and reliable Rifle.

6.    Following one of the largest settlements ever awarded to an accident victim by a firearm manufacturer's insurance carrier in 1978 (the "*Coates* settlement"), Remington opted to recall the Model 600 series rifles once the alleged malfunctions associated to the Walker Fire Control and the settlement amount were given wide publicity by the media. In 1975, Remington determined that the Model 600 series rifles exhibited a 55.9% failure rate according to their internal testing sample of 615 rifles that were audited. The Model 600 series exhibited the exact forms of safety-related malfunctions as claimed herein as the Model 700 bolt action rifle due to the similarity of construction of the fire control systems built under the Patent for the Walker Fire Control. However, Remington, true to form, had failed to warn, retrofit or recall these affected rifles until after the *Coates* settlement in 1978, three (3) years after their internal audit finding. Despite the fact that the Model 600 rifle employed the same Fire Control system developed and

Case 4:13-cv-00086-ODS   Document 97-1   Filed 04/16/15   Page 34 of 45

protected by the Walker-Haskell Patent (Walker Fire Control), it is still used by Defendants in the Model 700 Rifles, and Defendants have not recalled all, or any of the Model 700 Rifles.

7.    Further, as discussed below, the fire control system that Remington began using to replace some of the Walker Fire Controls, the X-Mark Pro trigger, has a manufacturing defect. Remington has voluntarily chosen to recall firearms with the X-Mark Pro trigger, but that recall should be subject to court approval and supervision.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) (diversity jurisdiction) and the Class Action Fairness Act, in that (i) there is complete diversity (Plaintiff Pollard is a citizen of Missouri; Plaintiff Moodie is a citizen of Washington; Plaintiff Brown is a citizen of Florida; Plaintiff Barbre is a citizen of Michigan; Plaintiff Waterman is a citizen of North Carolina; Plaintiff Winterburn is a citizen of Washington; Plaintiff Hardaway is a citizen of Montana; Chase Delperdang is a citizen of Arizona; Gary Otis is a citizen of Pennsylvania; Roger Keesy is a citizen of Ohio; Dylan Anderson is a citizen of Texas; John Corsi is a  citizen of Florida; William Massie is a citizen of Mississippi; and Defendant Remington Arms, LLC is a Delaware corporation with its headquarters/principal place of business in Madison, N.C.; Defendant Sporting Goods Properties, Inc. is a Delaware corporation headquartered in Wilmington, Delaware; and Defendant, E.I. du Pont de Nemours and Company is a Delaware corporation headquartered in Wilmington, Delaware), (ii) the amount in controversy exceeds $5,000,000.00 (Five Million Dollars) exclusive of interests and costs, and (iii) there are 100 or more members of the proposed Plaintiff classes.

9.    Defendants conduct substantial business in Missouri, including the sale and distribution of the Remington firearms, and have sufficient contacts with Missouri or otherwise

intentionally avail themselves of the laws and markets of Missouri, so as to sustain this Court's jurisdiction over Defendants.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, *et seq.* because a substantial part of the events or omissions giving rise to this claim occurred in the state of Missouri. Additionally, venue is appropriate for the claims arising out of Missouri's Consumer Protection Act because the statute applies to any company engaging in any of the activities regulated by the Act within the State of Missouri.

## PARTIES

11.     Plaintiff, Ian Pollard, purchased his Remington Model 700 new in the year 2000 from Osage Thrift Shop in Sedalia, Missouri. Pollard resides in Concordia, Lafayette County, Missouri. Since, 2010, Plaintiff has experienced three episodes of unintended firing of his Model 700.  On two occasions, Pollard experienced what Remington terms a "fire on safety release" or "FSR".  In such circumstances, Remington has notice that Model 700 rifles will fire as the safety lever is moved from the "safe" to the "fire" position without any pull of the trigger.  In short, the safety lever acts like a "second trigger" for the rifle.  On the third occasion, Pollard experienced what Remington terms a "fire on bolt opening" or "FBO."  Such events occur with the safety in the "off" or "fire" position as one opens the bolt without any pull of the trigger.  Plaintiff experienced an FBO as he attempted to unload his rifle. He paid to have the trigger mechanism replaced with an X-Mark Pro trigger mechanism at his own cost.

12.     Plaintiff, William G. Moodie, is and, at all relevant times hereto was, a citizen and resident of Washington. Specifically, Plaintiff resides in Bothell, Snohomish County, Washington. In or around 1992, Plaintiff purchased a Remington Model 700 Bolt Action Rifle from Kesselring's Gun Shop in Burlington, Washington. In January 2012, Plaintiff was hunting in

Case 4:13-cv-00086-ODS   Document 89-1   Filed 04/16/15   Page 5 of 44

Island County, Washington. As Plaintiff was moving the safety from the safe position to the fire position, the rifle suddenly and unexpectedly fired without a pull of the trigger.

13. Plaintiff, James W. Waterman, is and, at all relevant times hereto was, a citizen and resident of North Carolina. Specifically, Plaintiff resides in Gastonia, North Carolina. In or around 1996, Plaintiff purchased a Remington Model 700 Bolt action Rifle from Castle Sports Unlimited in Baton, North Carolina. In December 2012, Plaintiff was hunting near Charlotte, North Carolina. As Plaintiff was moving the safety from the safe position to the fire position, the rifle suddenly and unexpectedly fired without a pull of the trigger.

14. Plaintiff Wallace Brown resides in St. Johns, St. Johns County, Florida. Brown purchased his Remington Model 700 rifle new in September 2010 at a Gander Mountain retailer. Brown's Remington firearm contains an X-Mark Pro Trigger. While on a hunting trip in Crowder, Oklahoma, Brown's firearm misfired. Specifically, on November 26, 2010, while he was unloading his rifle, the rifle fired hitting the floor and ultimately going through the side of a residence.

15. Plaintiff Rodney Barbre resides in Dundee, Monroe County, Michigan. Barbre owns a Model 721 rifle.

16. Plaintiff Mitchell Winterburn resides in Bellingham, Whatcom County, Washington. Winterburn purchased a Model 700 rifle new in November 2012 from www.importguns.com. The rifle was delivered to Yeager Sporting Goods in Bellingham, Washington.

17. Plaintiff Gordon Hardaway resides in Belgrade, Gallatin County, Montana. Hardaway purchased a Model 700 rifle new in 2007 at Gallatin Outfitters, Belgrade Montana.

6

18.     Chase Delperdang resides in Marana, Pima County, Arizona.    He purchased a Model 710 rifle new on November 7, 2005.  He went target shooting within days after the purchase in 2005, and the rifle fired upon releasing the safety.  He then went to load the rifle a second time, and as he was pushing the bolt in, the rifle fired.  He sent the rifle into Remington, and while the trigger assembly was replaced, it still contained a  connector-based trigger connector.

19.     Gary Otis resides in Wyalusing, Bradford County, Pennsylvania.  He owns a Model 600 Rifle.

20.     Roger Keesy resides in Willard, Huron County, Ohio.  He owns a model 600 Rifle.

21.     Dylan Anderson resides in White Oak, Gregg County, Texas.  He purchased a Model 700 Rifle From 3 W Trading Co. in Overton, Texas in 2004.  In 2012, while hunting, he loaded the rifle and closed the bolt.  When he pushed the safety off, the rifle fired.  He then unloaded the rifle and cycled the bolt, and it continued to fire just by closing the bolt.  He paid to have the trigger mechanism replaced with an X-Mark Pro trigger mechanism at his own cost.

22.     John Corsi resides in Cape Coral, Lee County, Florida.  He purchased a new Model 700 Rifle manufactured in 1996.  While hunting in December 2010, the rifle fired when the safety was released.  He was subsequently able to duplicate the event.  He paid to have the trigger mechanism replaced with an X-Mark Pro trigger mechanism at his own cost.

23.     William Massie resides in Gulf Port, Harrison County, Mississippi.  He owns a Model 700 which purchased in approximately 2000.  While hunting with his son-in-law in December 2010, the rifle was loaded, and fired when the safety was released.  He paid to have the trigger mechanism replaced with an X-Mark Pro trigger mechanism at his own cost.

7

24. Defendant, Remington Arms, LLC ("Remington"), is a Delaware corporation with its headquarters/principal place of business, in Madison, N.C.

25. Defendant Sporting Goods Properties, Inc. ("SGPI") is a Delaware corporation with its headquarters/principal place of business in Wilmington, Delaware.

26. Defendant, E.I. du Pont de Nemours and Company ("DuPont"), is a Delaware corporation headquartered in Wilmington, Delaware. DuPont is a citizen of the State of Delaware. DuPont's principal place of business is located in Delaware, and all misrepresentations and omissions made to Plaintiffs arise from a scheme or artifice devised and orchestrated primarily in Delaware. The defective Product was designed primarily in Delaware, New York and Connecticut.

27. Defendant Remington, was, and is now engaged in the business of designing, manufacturing, assembling, distributing and selling firearms, and in this regard did design, manufacture, distribute, sell and, place into the stream of commerce, the Remington Model 700, Bolt Action Rifles including the action, fire control system, and safety, knowing and expecting that said rifle would be used by consumers and around members of the general public.

28. Prior to November 30, 1993, DuPont owned 100% of the stock in the company known as Remington Arms Company, Inc., now known as Sporting Goods Properties, Inc. ("SGPI"). On or about November 30, 1993, RACI (Remington Arms Acquisition Corporation, Inc.) purchased from DuPont substantially all of the income producing assets of Remington Arms Company, Inc. (now known as SGPI), including the corporate name. The company formerly known as Remington Arms Company, Inc. changed its name to Sporting Goods Properties, Inc., and RACI changed its name to Remington Arms Company, Inc. SGPI retained certain non-income producing assets, some with significant environmental and other liabilities such that its

8

net worth was reduced to a small fraction of its former so that SGPI may not be able to pay reasonable judgments in this and similar litigation.

29.     At all times pertinent to this action, SGPI and DuPont were and are the alter ego of each other and in essence constitute one legal entity in which SGPI operates as a division of DuPont.  The separate incorporation of SGPI is a sham in that it is merely a corporate veil which insulates DuPont from liability for products manufactured and sold by SGPI.  DuPont exerted, and currently exerts extreme influence, complete dominion and/or absolute control over the corporate activity and function of SGPI.  DuPont's continued operation of SGPI as a separate legal entity is a subterfuge designed to defeat public convenience, justify a wrong, perpetrate a fraud and/or otherwise work an injustice on Plaintiffs herein and the general public.  The conduct of DuPont and/or SGPI has harmed or will harm Plaintiffs and the general public, justifying piercing of the corporate veil resulting in DuPont being liable for the acts and omissions of SGPI as they are in reality one legal entity.

30.     Defendant Remington, SGPI and DuPont are so intertwined contractually for the liabilities, past, present and future, of each other that they are, in fact, one entity and therefore, the corporate veils of each company should be pierced to properly ascertain the responsible parties for the allegations contained herein.  The Asset Sale/Purchase Agreement transferring the assets of SGPI to Remington and various revised or supplemental agreements spreads responsibility and authority for product liability claims among the three entities as it is unclear who bears the contractual liability for this claim.

31.     Remington and/or DuPont expressly and impliedly agreed to assume certain debts and responsibilities, including the product liability of SGPI by the terms of the Asset/Sale Purchase Agreement as well as the continuing relationship between Remington, DuPont and

SGPI. Consequently, DuPont and/or Remington are the corporate successors to the product liability claims asserted, now and in the future, against SGPI, including this particular lawsuit.

32. Remington continues in the design, manufacture, distribution and sale of all Remington Arms product lines including the Remington Model 700 bolt action rifle, without any significant changes. Remington maintains the same plants, employees, organization, contracts, customers, suppliers, advertising, products and name acquired in the asset purchase. Remington acquired the entire company from SGPI through an asset/sale purchase in order to avoid and/or limit the liability resulting from an outright purchase of the stock from DuPont. Consequently, DuPont and/or Remington are the corporate successors to the product liability claims asserted, now and in the future, against SGPI, including this particular lawsuit.

33. Remington, DuPont and SGPI acted fraudulently with respect to the asset/sale purchase in that its purpose was to avoid and/or limit the responsibility of DuPont and/or Remington for the debts of SGPI, particularly its product liability. Consequently, DuPont and/or Remington are the corporate successors to the product liability claims asserted, now and in the future, against SGPI, including this particular lawsuit.

34. At all times pertinent to this action SGPI was an agent of DuPont acting in the course and scope of its agency relationship thereby making its principal, DuPont, liable for all of SGPI's acts and omissions, either by exercising direct control over SGPI, or by adopting and ratifying SGPI's acts or omissions.

35. At all times pertinent to this action, agents of DuPont, acting within the course and scope of their agency relationship, controlled SGPI, thereby making SGPI's acts and omissions those of their principal, DuPont, either by exercising direct control over SGPI, or by adopting and ratifying SGPI's acts or omissions.

## COMMON FACTUAL ALLEGATIONS

### WALKER FIRE CONTROL TRIGGER ASSEMBLY DEFECT

36.     The Walker Fire Control Trigger Assembly is unique to the world of firearms and is exclusive to Remington brand products.  The design utilizes an internal component known as a trigger "connector." This design feature uses this additional part which in practice and in effect creates a unique trigger design comprised of two distinctly different parts. The Trigger Connector design has not been adopted by any other rifle manufacturer.  The connector floats on top of the trigger and is not physically attached to the trigger in any fashion but rather is held in place by tension from a spring and the side plates which create a fully enclosed housing.  (See Illustration 1).  Upon pulling the trigger the connector is pushed forward by the upper member of the trigger body, which allows the sear to fall and rifle to fire.  (See Illustration 2).



Illustration 1



Illustration 2

37.     The connector sits under the sear with a specified overlap of as little as 20/1000ths of an inch, which is approximately equal to one-half of the width of a dime or eight human hairs. When a rifle is fired the connector repeatedly separates from the trigger body, creating a gap between the two parts.  Because of the gap created between the trigger body and trigger connector upon firing, field debris, manufacturing scrap, burrs from the manufacturing process, lubrication applied at the factory, other lubrication build up, or moisture can foreseeably become trapped inside the enclosed fire control housing and restrict the return of the trigger connector to proper engagement under the sear, thus predisposing the rifle to malfunction in the absence of a trigger pull. The above described conditions have been further enhanced by various interferences created between other parts that are used to comprise this fire control during their assembly. These conditions have been created as the result of tolerances that Remington has adopted for "ease of manufacture" including loose inspection practices of parts prior to their assembly as a cost saving measure on the part of the company.  (Illustration 3).  Binding created by interference with other

12

parts of the fire control can also interfere with the return of the trigger connector to proper engagement under the sear which will create the same dangerous condition.



**Illustration 3**

38.     When the gap between the connector and trigger is large enough, thereby diminishing the engagement (overlap) of the two parts, the connector will no longer reliably support the sear, allowing the rifle to fire without a trigger pull.  These unintended firings have been so persistent and commonplace that Remington has adopted acronyms for the various most common forms of malfunction that Remington itself has observed to occur, *i.e.,* Fire on Bolt Closure "FBC"; Fire on Bolt Opening "FBO"; Fire on Safe Release "FSR"; Jar off "JO", Fire Off Safe "FOS" and "Fails to Fire."

39.     Remington engineers have testified in product liability litigation throughout the country that materials can lodge between the connector and trigger, resulting in the connector being unable to return to a reliable position to support the sear.  Indeed, Remington undertook several redesign efforts in the 1940s, 1970s, 1980s and 1990s to try to eliminate the functional

13

deficiencies associated with materials becoming lodged between the connector and trigger, or binding of the connector with other parts of the fire control.

40.     There is no sound engineering reason to employ a separate connector that is not physically connected to the trigger. This is evidenced by the fact that at no time has any other firearm manufacturer in the world utilized such a device. Many after-market manufacturers have also created replacement triggers that could be used to replace the defective Walker Fire Control system that did not include trigger connectors. Indeed, Mr. Walker himself confirmed in January 2011 that the extra connector served no engineering purpose other than to make operation of the trigger pull smoother for the user, and to reduce the manufacturing cost of the fire control.

41.     Finally acting upon information that it has had for years, in 2006 Remington created and began utilizing a new fire control system called the X-Mark Pro. This design eliminated the use of a two piece trigger design and a separate trigger connector that is not affixed to the trigger body. Yet despite all of the information Remington has related to the thousands of complaints associated with the Walker Fire Control trigger assembly, it has not undertaken a recall to replace the Walker Fire Control system with the X-Mark Pro or another safe design. And making matters even worse, Remington has continued to utilize the Walker Fire Control trigger assembly in some rifles after the design of the X-Mark Pro was released to the public in 2006, in spite of an agreement reached with the family of Gus Barber in 2002 to discontinue production of the Walker fire control after the release of the X Mark Pro.

## DEFENDANTS' KNOWLEDGE OF THE DEFECT

42.     Defendants designed the Walker Fire Control trigger assembly and began manufacturing and distributing firearms containing that trigger assembly in March of 1948. Internal Remington documents show that almost immediately following the production of these

14

early Walker Fire Control system firearms, Remington became aware that the firearms were firing without a trigger pull as a result of communications to Remington by consumers.

43. Defendants produced several models of firearms containing the Walker Fire Control. The vast majority of these firearms are part of the Model 700 bolt action rifle series, with over five million of these rifles having been placed into the stream of commerce since 1962.

44. Defendants have made hundreds of millions of dollars over the last six decades through the sale of their Model 700 bolt action rifles.

45. Defendants designed, manufactured, distributed, sold and, placed the Rifles into the stream of commerce knowing and expecting that they would be used by consumers and around members of the general public.

46. Just six years after introducing the Model 700 bolt action Rifles to the consuming public, in March 1968 Consumer Reports wrote an article describing inadvertent discharges in the Model 700 Rifle:

> The sixth-ranked rifle, the Remington 700, exhibited a potentially dangerous flaw as first tested. There was so little clearance between the trigger and the trigger guard that when the trigger was pulled with the safety on (something you or a friend might do when sighting down the rifle or trying it for feel), the trigger sometimes failed to return to its forward position. And with the trigger in the back position, the rifle would fire without warning the next time the safety was moved to the fire position. The malfunction persisted for more than 100 firings before the trigger wore in and performed normally. An unwary buyer might have caused a serious accident by then.

47. According to an internal Remington memorandum, upper management at Remington expressed "extreme displeasure" to the Consumer Reports article.

48. The warnings outlined by Consumer Reports proved true and over the past fifty years, Defendants received thousands of complaints in the form of letters, telephone calls and emails that Remington Model 700 rifles containing the Walker Fire Control fired without a trigger pull.

49.     In 1978, Remington's insurance company settled a personal injury case brought by John Coates for $6.8 million when he was paralyzed by an unintended firing of a Model 600 rifle. Shortly after the settlement, Remington made the decision to recall all of its Model 600 series rifles.  The Model 600 series utilizes a trigger connector that is the functional equivalent of the Walker Fire Control.  The Model 600 rifle was not nearly as popular as the Model 700 rifles, with far fewer firearms in commerce.

50.     At the same time Defendants recalled the Model 600 rifles, and recognizing that similar unintended firings in the absence of a trigger pull were occurring across the country with its more popular Model 700 bolt action rifles, Remington contemplated conducting a similar recall of the Model 700 rifles.  Internal documents show that Remington, using self-serving conjecture and assumptions, opted not to recall the Model 700 Rifles because, of the 2,000,000 firearms that were in commerce at the time, Remington concluded that "the recall would have to gather 2,000,000 rifles 'just' to find 20,000 affected rifles" in the hands of the public at that time. To put this into perspective, this number would indicate that about 1 out of every 100 rifles in the hands of the public were affected with a condition that would potentially result in the rifle firing on safety release, according to Remington's own estimate at that time when they were considering this recall. This decision was made in light of full knowledge that: "A common source of accidents with firearms is accidental discharge." In the same company document Remington also acknowledges that: "A safety is provided to prevent accidental discharge."

51.     Rather than take the responsible action and recall the Model 700 rifles at the same time it recalled the Model 600 rifles, Remington focused its efforts on distancing the recalled models from other models it continued to produce containing the Walker fire control.  Remington also focused on creating a safe gun handling defense to product liability claims that Remington

16

expected due to incidents of unintended firings that resulted in personal injury or death. Remington modified the "10 Commandments of Gun Safety" to shift responsibility for personal injuries or death to the gun handler. This was the beginning of a trend that Remington has followed for over forty years – blame the consumer and hide any knowledge of the Walker Fire Control trigger assembly design defect.

52.     Throughout the 1970s Remington continued to consider safer alternative designs and enhancements to the Walker Fire Control system. An internal memo dated November 16, 1978 states:

> The following design requirements for a new fire control for bolt action rifles were tentatively established – Eliminate the 'trick' condition. At this point the best solution appears to be adding a trigger block to the safety cam mechanism. This would prevent the trigger from moving in the 'safe' position – eliminating the 'fail to reset' possibility.

The document goes on to recommend that the new fire control should be "retrofittable" to the Model 700. A 1980 - 1981 Firearms Research Division programs schedule lists as a "necessity" "fire control improvement" because it was "necessary to reduce product liability". These new designs all centered on the concept of removing the floating connector and incorporating a trigger block to force full engagement of the trigger and sear. Remarkably, when it appeared that Remington was going to pull the proverbial trigger and change the defective design by including a safety that blocked both the trigger and the sear, Remington decided to put its financial interests over the health and safety of the consuming public. On December 30, 1985, an internal document states "R & D is working on improved safety and security features which should have <u>marketable value</u>. (If they don't, we ought to stop the work.)." Unfortunately, work on the new design stopped shortly after the issuance of this memorandum. Instead, internal handwritten notes from an October 19, 1993 document titled ("Liability Point of View") demonstrate that Remington is

17

not concerned about safety, but rather having a "readily defensible reason for departure from current design."

53.    In 1994, a jury rendered a $17 million verdict against Remington related to the Model 700 design defect.   After the verdict internal Remington documents pose a simple question: "IS THE RIFLE SAFE?"  Accountants ultimately did the math and determined that if only 30% of its customers actually returned the rifles as part of a nationwide recall of the Model 700 bolt action rifles, it would cost Remington $22 million to conduct the recall.  Remington opted against a recall.

54.    In 1995, Remington documents revealed that further efforts to redesign the Walker Fire Control trigger assembly were underway.  Unfortunately, the redesign project was doomed before it began.  Remington's Fire Control Business Contract of January 27, 1995 provided (emphasis added):

- The goal is to provide a fire control that "feels" the same to our customers yet provides additional safeguards against inadvertent or negligent discharges.

- The purpose of the redesign of the fire control is to reduce the number of parts required, lower cost and to add design characteristics that enhance the safety attributes of our firearms.

 Under "Financial Analysis" the truth is further revealed:

- This is where the rubber meets the road.  Is the project worth doing?  What are the minimum forecasts to insure profitability and does our pricing structure support these expected profits.

55.    This sentiment was echoed by Robert Haskin, Remington's former general counsel and vice-president of marketing, who testified that "[i]t was my opinion that the new product was only worth doing if we could achieve certain goals, one of which was that **it costs the same or less**, another was that we could make certain improvements on the product, which you asked me to characterize, and I said my opinion could fairly characterized as **safety issues**."  So while

18

Remington on the one hand took the position that any redesign of the Walker Fire Control trigger assembly was focused on addressing safety issues, the reality is that when the rubber meets the road, safety would take a back seat to profit.

56. Remington possessed clear knowledge by the late 1990s that the Walker Fire Control trigger assembly was dangerous and defective. Yet a clear decision was made that there would not be a public warning and the defective Rifles would not be recalled. Instead, Remington decided to introduce a new rifle series to the consuming public – the Model 710. When designing the Model 710, Remington looked at what fire control system to employ in the new product. In 1997 the answer was straight forward – "Not the M700 fire control."

57. An internal February 1998 memo shows that Remington considered the costs to change their manufacturing process to produce a safer trigger assembly. It was determined that to change the trigger assembly it would require "fairly substantial investments in capital and technical resources" to increase their processing capabilities in Ilion, New York. In May 1998, the new trigger design was put on hold by Remington management "until economics and [the] project is approved." Repeating its historical practice of putting profits over safety, on August 25, 1998, Remington abandoned implementation of a new, safer trigger design because of an "estimated cost increase." Instead, to "eliminate development cost and time," Remington used the unsafe Walker Fire Control mechanism in the Model 710, completely reversing its decision made just eighteen months earlier to "Not [use] the M700 fire control."

58. During testing of the Model 710 rifle, internal Remington documents reveal that on more than one occasion during pilot testing the rifles fired upon bolt closure and fired when the safety was moved from the safe to the fire position. Despite these internal testing failures, Remington introduced the Model 710 rifle to the consuming public in 2000. Remington's

Case 4:13-cv-00086-ODS   Document 87-1   Filed 04/15/15   Page 20 of 45

knowledge of the potential dangers of the Model 710 rifle were so obvious that it issued a call order to its customer service department regarding how to handle customers who call complaining of unintended firings.

59. Following the preventable death of a 9-year-old boy, Gus Barber, Remington did eventually agree to a limited safety modification program. Young Gus died when his mother moved the safety into the off position in order to unload her rifle, which caused the rifle to discharge suddenly and unexpectedly without a trigger pull. Gus' death garnered nationwide attention after his family became committed to seeing to it that Remington take necessary steps to prevent future needless death or injury. After the Barber incident and only after the sustained media attention to this serious safety issue was brought to the forefront attention of the public, Remington ultimately agreed to a safety modification program for rifles produced prior to 1982 that contained a "bolt-lock" feature, which requires the safety to be placed in the off position in order to unload the gun. This modification program (as compared to a recall) addressed one issue with pre-1982 Rifles, the propensity of the rifle to fire when a consumer was forced to unload the rifle with the safety off. This modification failed to address the documented defects related to the Walker Fire Control trigger assembly however. The modification simply now allowed users to cycle the bolt with the safety on. This modification did not correct the underlying potential of a rifle firing without a trigger pull.

60. From 1992 to 2004, Defendants acknowledge receiving 3,273 customer complaints about Remington Model 700 rifles firing without a trigger pull. This amounts to an average of approximately five unintended firings per week for this twelve year period. On information and belief, the actual number of unintended firings for this time period is much higher because it is

unlikely that every consumer who experienced a misfire would report the problem to Remington if he was lucky enough to avoid injury or property damage.

61.     In response to complaints from consumers regarding unintended firings of the Model 700 Rifle without a trigger pull, consumers were and are asked to return their rifle to Defendants for repair and testing.  Defendants purportedly test the rifle, albeit using undisclosed testing procedures.  Following the testing, Defendants consistently claim that they were "unable to duplicate" the unintended discharge, or that they were or are "unable to duplicate" the customer's complaint.  On information and belief, Defendants statements are false and fraudulent and made to deceive and continue to deceive consumers about the defects associated with the Rifles.  Tellingly, Defendants admit internally that "a common source of accidents with firearms is accidental discharge" and that "a safety is provided to prevent accidental discharge."

62.     On occasion, Remington has concluded a customer's malfunction was the result of the condition of the rifle, due to rust, corrosion, poor maintenance, excess lubrication or some other "abuse" of the rifle.  Remington's literature and Owner's Manuals contain no such admonitions or warnings regarding the "abuse" of Model 700 rifles or the consequences that may result in dangerous malfunctions.  On the contrary, some Owner's Manuals issued by Remington specifically state, "The firearm will fire when the trigger is pulled."  There is no warning or instruction that any such "abuse" or any other condition of the rifle will result in a firing of the rifle in the absence of a trigger pull.

## THE CNBC DOCUMENTARY

63.     On October 20, 2010, after a ten-month investigation, CNBC aired a documentary entitled, "Remington Under Fire: A CNBC Investigation."  The "CNBC Original documentary examines allegations that the Remington Model 700 series hunting rifle is prone to firing without

pulling the trigger, and that its manufacturer, Remington, has been aware of this concern for almost 60 years. Dozens of deaths, scores of injuries, and more than five thousand customer complaints have been linked to the alleged problem. The story is told through former corporate insiders and the company's own internal documents."[2] During the documentary, the reporter speaks to several gun owners who suffered devastating consequences as a result of the 700-series rifle, including Richard Barber, a father who has devoted his life to finding answers about the tragic death of his nine-year-old son which resulted from a fire on safety release, "FSR," malfunction with a Remington Model 700 bolt action rifle containing the Walker Fire Control.

64.     As part of the investigation for the documentary, CNBC interviewed Mike Walker, the Remington engineer who designed the Walker Fire Control trigger for the 700 rifle. "Walker's internal company memos, obtained by CNBC, indicate that he repeatedly raised concerns, even after he retired from Remington, about the trigger system he designed." *See id.*

65.     "Other concerns were raised as well, including one from a Remington colleague who warned in a memo, 'this situation can be very dangerous.' Walker proposed a relatively inexpensive solution, though Remington has never recalled the rifle, and insists it has no defect." *See id.* In fact, on information and belief, Remington repeatedly considered a "call back" of the 700 rifle, but decided against it.

66.     As part of its investigation for the documentary, CNBC spoke with a former Remington employee whose job involved dealing with customer complaints related to the 700-series rifle.  This former employee informed CNBC that he was instructed not to acknowledge any problem with the rifle because, if he had, he would have lost his job.

---

[2] *See* Remington Under Fire: A CNBC Investigation, About the Show, http://www.cnbc.com/id/39554879/ (last visited Dec. 24, 2012).

67.     Remington responded to the numerous first-hand accounts of unintended firings from the Model 700 rifle by maintaining that the unintended firings are the result of poor maintenance and unsafe handling, often by inexperienced users.[3]   In fact, Remington gave a written statement to CNBC before the documentary aired. This statement, mentioned during the program, contained the following statements which Remington knew were false when they were made:

- The Model 700, including its trigger mechanism, has been free of <u>any</u> defect since it was first produced and, despite any careless reporting to the contrary, the gun's use by millions of Americans has proven it to be a safe, trusted and reliable rifle.

- Both Remington and experts hired by plaintiff's attorneys have conducted testing on guns returned from the field which were alleged to have fired without a trigger pull, and neither has ever been able to duplicate such an event on guns which had been properly maintained and which had not been altered after sale.[4]

68.     After CNBC aired the documentary, Defendants published several responses, including a website located at http://remington700.tv, an Official Statement for CNBC Program Regarding the Model 700, and a Point by Point Response to the CNBC documentary.

69.     These responses contained false and deceptive statements intended to deceive the public, including the claim that the Remington Model 700 rifle is a safe and reliable firearm that can only fire without a trigger pull where the rifle is improperly modified or maintained. Specifically, Remington's responses contained the following statements that Remington knew were false:

---

[3] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).
[4] Remington Arms, Official Statement for CNBC Program Regarding the Model 700, submitted September 7, 2010, http://www.remington700.tv/fileadmin/pdfs/OfficialStatement.pdf. (last visited Dec. 24, 2012).

- Recently CNBC produced an "expose" claiming that the trigger mechanism of the Model 700 rifle has a deadly design flaw. This claim is demonstrably false. [5]

- Both Remington and experts hired by plaintiff attorneys have conducted testing on guns returned from the field, which were alleged to have fired without a trigger pull, and neither has ever been able to duplicate such an event on guns which had been properly maintained and which had not been altered after sale. [6]

- Each of the tragic and emotional personal injury and death cases cited by CNBC involve a breach of one or more important gun safety rules:

- Failure to keep the rifle pointed in a safe direction

- Failure to properly maintain the rifle

- Altering the rifles trigger mechanism

- Failure to have the safety engaged when not actively engaged in firing the rifle. [7]

- The Barber rifle had been modified in multiple ways and poorly maintained (rusted action). Even so, in testing by experts for both Remington and the Barber family, the Barber rifle would fire only by pulling the trigger while the safety was in the fire position. [8]

- The truth about accidental discharges is clear. These things don't go off by themselves. [9]

- The Model 700, including its trigger mechanism, has been free of <u>any</u> defect since it was first produced and, despite any careless reporting to the contrary, the gun's use by millions of Americans has proven it to be a safe, trusted and reliable rifle. [10]

---

[5] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

[6] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012); *see also* Remington Arms, Official Statement for CNBC Program Regarding the Model 700, submitted September 7, 2010, http://www.remington700.tv/fileadmin/pdfs/OfficialStatement.pdf. (last visited Dec. 24, 2012).

[7] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

[8] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

[9] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

[10] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

- **No scientific test has ever supported the accidental discharge theory of plaintiffs' lawyers and their expert.** That's true, even with a gun at the center of the CNBC report. The reporter tells the compelling story of the Barber family, who lost their son in a hunting accident a decade ago.

- But the show never reveals the condition of the gun, which experts found was heavily rusted, with the trigger engagement screw, safety lever, and fire control mechanism all adjusted, or removed and reinstalled.

- The gun fired only when the safety was in the fire position and the trigger was pulled, exactly as it was designed to do.[11]

70.     In these responses, Defendants continued to fraudulently, deceptively and falsely state that Remington rifles containing the Walker Fire Control system can only fire without a trigger pull when they are improperly modified or improperly maintained.

71.     According to public records, there have been more than 140 lawsuits filed against Defendants involving serious injury or death as a result of a firing in the absence of a trigger pull of Remington bolt action rifles containing the Walker Fire Control.

**X-MARK PRO TRIGGER RECALL**

72.     Beginning in May 2006, Remington began replacing the Walker Fire Control trigger in Remington Model 700 rifles with an X-Mark Pro trigger (the "XMP Trigger"). The XMP Trigger was also used in all Model Seven rifles.

73.     From May 1, 2006 through April 9, 2014, certain rifles with the XMP Trigger contained a manufacturing defect that could lead to the unintended discharge of the firearm. Specifically, during the manufacturing process excess bonding agent was used in some of the XMP Triggers.

---

[11] Chen, Joie, "*Remington's In-Depth Response to CNBC Under Fire,*" http://www.remington700.tv/#, Tr. at [00:02:25;16]; [00;13:10;08]; and [00:03:18,27].

25

Case 4:13-cv-00086-ODS Document 87-1 Filed 04/15/15 Page 25 of 45

- **No scientific test has ever supported the accidental discharge theory of plaintiffs' lawyers and their expert.** That's true, even with a gun at the center of the CNBC report. The reporter tells the compelling story of the Barber family, who lost their son in a hunting accident a decade ago.

- But the show never reveals the condition of the gun, which experts found was heavily rusted, with the trigger engagement screw, safety lever, and fire control mechanism all adjusted, or removed and reinstalled.

- The gun fired only when the safety was in the fire position and the trigger was pulled, exactly as it was designed to do.[11]

70.     In these responses, Defendants continued to fraudulently, deceptively and falsely state that Remington rifles containing the Walker Fire Control system can only fire without a trigger pull when they are improperly modified or improperly maintained.

71.     According to public records, there have been more than 140 lawsuits filed against Defendants involving serious injury or death as a result of a firing in the absence of a trigger pull of Remington bolt action rifles containing the Walker Fire Control.

**X-MARK PRO TRIGGER RECALL**

72.     Beginning in May 2006, Remington began replacing the Walker Fire Control trigger in Remington Model 700 rifles with an X-Mark Pro trigger (the "XMP Trigger"). The XMP Trigger was also used in all Model Seven rifles.

73.     From May 1, 2006 through April 9, 2014, certain rifles with the XMP Trigger contained a manufacturing defect that could lead to the unintended discharge of the firearm. Specifically, during the manufacturing process excess bonding agent was used in some of the XMP Triggers.

---

[11] Chen, Joie, "*Remington's In-Depth Response to CNBC Under Fire,*" http://www.remington700.tv/#, Tr. at [00:02:25;16]; [00;13:10;08]; and [00:03:18,27].

25

Case 4:13-cv-00086-ODS Document 87-1 Filed 04/15/15 Page 25 of 45

74.    On April 11, 2014, Remington issued a Product Safety and Recall Notice related to this issue, instructing consumers not to use any firearm with an XMP Trigger until after it has been inspected, cleaned, tested and (presumably) repaired.[12]

## CLASS ACTION ALLEGATIONS

75.    Plaintiffs, Moodie, Waterman, Barbre, Delperdang, Otis, and Keesy, bring this class action pursuant to Federal Rule of Civil Procedure 23, and case law thereunder on behalf of themselves and all others similarly situated, with the Classes defined as follows:

> Class A(1) – Plaintiffs Moodie and Waterman:
>
> All current owners of Remington Model 700, Seven, Sportsman 78, and 673firearms containing a Remington trigger mechanism that utilizes a trigger connector. Excluded from the class are: (a) persons who are neither citizens nor residents of the United States or its territories; (b) any Judge or Magistrate Judge presiding over the action and members of their families; (c) governmental purchasers; (d) Remington Arms Company, LLC, Sporting Goods Properties, Inc., E.I. du Pont Nemours and Company, and each of their subsidiaries and affiliates (the "Trigger Connector Class").
>
> Class A(2) – Plaintiff Delperdang
>
> All current owners of Remington Model 710, 715, and 770, firearms containing a Remington trigger mechanism that utilizes a trigger connector. Excluded from the class are: (a) persons who are neither citizens nor residents of the United States or its territories; (b) any Judge or Magistrate Judge presiding over the action and members of their families; (c) governmental purchasers; (d) Remington Arms Company, LLC, Sporting Goods Properties, Inc., E.I. du Pont Nemours and Company, and each of their subsidiaries and affiliates (the "Trigger Connector Class").
>
> Class A(3) – Plaintiffs Otis and Keesy

---

[12] The recall is posted online at http://xmprecall.remington.com/pdfs/xmprecall-notice.pdf. (last visited April 14, 2014).

All current owners of Remington Model 600, 660, and XP-100 firearms containing a Remington trigger mechanism that utilizes a trigger connector. Excluded from the class are: (a) persons who are neither citizens nor residents of the United States or its territories; (b) any Judge or Magistrate Judge presiding over the action and members of their families; (c) governmental purchasers; (d) Remington Arms Company, LLC, Sporting Goods Properties, Inc., E.I. du Pont Nemours and Company, and each of their subsidiaries and affiliates (the "Trigger Connector Class").

Class A(4) – Plaintiff Barbre

All current owners of Remington Model 721, 722, and 725 firearms containing a Remington trigger mechanism that utilizes a trigger connector. Excluded from the class are: (a) persons who are neither citizens nor residents of the United States or its territories; (b) any Judge or Magistrate Judge presiding over the action and members of their families; (c) governmental purchasers; (d) Remington Arms Company, LLC, Sporting Goods Properties, Inc., E.I. du Pont Nemours and Company, and each of their subsidiaries and affiliates (the "Trigger Connector Class").

76.     Plaintiffs, Brown, Winterburn, Hardaway, Pollard, Anderson, Corsi, and Massie

bring this class action pursuant to Federal Rule of Civil Procedure 23, and case law thereunder on

behalf of themselves and all others similarly situated, with the Classes defined as follows:

Class B(1) –  Plaintiffs Brown, Winterburn, and Hardaway

All current owners of Remington Model 700 and Model Seven rifles containing an X-Mark Pro trigger mechanism manufactured from May 1, 2006 to April 9, 2014 who have not participated in the voluntary X-Mark Pro product recall.  Excluded from the class are: (a) persons who are neither citizens nor residents of the United States or its territories; (b) any Judge or Magistrate Judge presiding over the action and members of their families; (c) governmental purchasers; (d) Remington Arms Company, LLC, Sporting Goods Properties, Inc., E.I. du Pont Nemours and Company, and each of their subsidiaries and affiliates (the "X-Mark Pro Class").

Class B(2) – Plaintiffs Pollard, Anderson, Corsi, and Massie

All current and former owners of Remington Model 700 and Model Seven rifles who replaced their rifle's original Walker trigger mechanism with an X-Mark Pro trigger mechanism manufactured from May 1, 2006 to April 9, 2014. Excluded from the class are: (a) persons who are neither citizens nor residents of the United States or its territories; (b) any Judge or Magistrate Judge presiding over the action and members of their families; (c) governmental purchasers; (d) Remington Arms Company, LLC, Sporting Goods Properties, Inc., E.I. du Pont Nemours and Company, and each of their subsidiaries and affiliates (the "X-Mark Pro Class").

77.　Plaintiffs reserve the right to modify or amend the Class definitions, as appropriate. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of these claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims, and because this case meets the requirements of Federal Rule of Civil Procedure 23.

78.　*Numerosity*:　The Trigger Connector Class is composed of thousands of persons geographically dispersed throughout the United States, the joinder of whom in one action is impractical.　The X-Mark Pro Class is composed of thousands of persons geographically dispersed throughout the United States, the joinder of whom in one action is impractical.　The subject Remington rifles have been among the most popular guns (in terms of sales volume) in the United States. Plaintiffs are informed and believe that there are at least thousands of purchasers who have experienced the Defect and have been damaged by Defendants' conduct, as alleged herein. Moreover, upon information and belief, the Class is ascertainable and identifiable from Defendants' records or identifying marks on the Product.

79.　*Commonality*:　The critical question of law and fact common to the Classes that will materially advance the litigation is whether the Products are defective, contrary to the expectations imparted by Defendants through their representations and omissions.

80. Furthermore, other questions of law and fact common to the Trigger Connector Class exist as to all members of that Class and predominate over any questions affecting only individual members of the Class include the following:

    a. Whether the design of the Remington 700 does not provide enough clearance between the sear and the trigger connector and thereby causes the Defect;

    b. Whether the design of the Remington 700 allows for excessive clearance between the sear and the trigger connector and thereby causes the Defect;

    c. Whether the manufacturing process of the Remington 700 can cause metal shavings or steel chips to become concentrated in one position and thereby causes the Defect;

    d. Whether the design of the Remington 700 allows the Defect to occur by unlocking the bolt;

    e. Whether the design of the Remington 700 allows the Defect to occur by pushing the safety to the "off" position;

    f. Whether the design of the Remington 700 rifle will fail to fire if the fire control is not consistently lubricated, especially in cold climates;

    g. Whether the Defect is caused solely by improper gun maintenance;

    h. Whether Defendants violated the Missouri Merchandising Practices Act by, among other things, engaging in unfair, unlawful, or fraudulent practices in connection with the failure to disclose the material and potentially life-threatening Defect in the Remington 700;

    i. Whether Defendants have been unjustly enriched as a result of the conduct complained of herein;

    j. Whether Plaintiffs and the Class are entitled to equitable relief, including but not limited restitution;

    k. Whether the design or manufacturing of the Remington 700 can cause the Defect, and thus the rifles are not suitable for their intended use;

    l. Whether Defendants knew or should have known that Remington 700s were defective;

    m. Whether Defendants had a duty to Plaintiffs and the Class to disclose the true nature of the Remington 700s;

n.  Whether Defendants falsely represented that their Remington 700 were of a certain standard, quality, and grade, when in fact, they were not;

o.  Whether Defendants concealed material information regarding the true characteristics and defective nature of their products;

p.  Whether Defendants' false representations and concealment of the defective nature of their Remington 700s was knowing, intentional, reckless, and/or malicious;

q.  Whether Plaintiffs and the Class are entitled to actual, statutory, punitive, exemplary, and/or other forms of damages, and/or other monetary relief and, if so, in what amount;

81.  Additional common questions of law and fact also exist as to all members of the Class related to the X-Mark Pro trigger and proposed recall, including the following:

a.  Whether the manufacturing process of Remington rifles with an X-Mark Pro trigger allows an excess bonding agent to be used thereby causing rifles with an X-Mark Pro trigger to unintentionally discharge;

b.  Whether there are other manufacturing or design defects causing rifles with an X-Mark Pro trigger to unintentionally discharge;

c.  Whether the X-Mark Pro trigger itself, after correction of the above manufacturing defects, is a safe trigger; and

d.  Whether the proposed Remington recall is sufficient to address the defects described above.

82.  *Typicality*:  Plaintiffs Moodie, Waterman, Barbre, Delperdang, Otis, and Keesy's, claims are typical of the claims of the members of the Trigger Connector Class, as all such claims arise out of Defendants' conduct in designing, manufacturing, marketing, advertising, warranting and selling the defective Remington Model 700, 7mm 08 bolt action rifles with a Walker Trigger Mechanism manufactured from 1948 to present, as well as other Remington models containing a trigger mechanism that utilizes a trigger connector. The universally defective nature of the Remington 700 and other Remington models containing a trigger mechanism that utilizes a

trigger connector renders each Class member's clams, legal theory, and injury common and typical.

83. *Typicality*: Plaintiffs Brown, Winterburn, Hardaway, Pollard, Anderson, Corsi, and Massie's claims are typical of the claims of the members of the X-Mark Pro Class, as all such claims arise out of Defendants' conduct in designing, manufacturing, marketing, advertising, warranting and selling the defective Remington Model 700 and Model Seven Rifles from May 1, 2006 to April 9, 2014. Each class member's claims are typical of those of Plaintiffs.

84. *Adequate Representation*: Plaintiffs will fairly and adequately protect the interests of the members of both Classes and have no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions, including but not limited to consumer class actions involving, *inter alia*, breach of warranties, product liability and product design defects.

85. *Predominance and Superiority*: This class action is appropriate for certification because questions of law and fact common to the members of both Classes predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Classes is impracticable. Should individual Class members be required to bring separate actions, this Court and/or courts throughout the United States would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

## ESTOPPEL FROM PLEADING AND TOLLING OF
## APPLICABLE STATUTES OF LIMITATIONS

86.     Defendants are estopped from relying on any statutes of limitation or repose by virtue of its acts of fraudulent concealment, which include Defendants' intentional concealment from Plaintiffs and the general public that their firearms were defective, while continually marketing the firearms as a durable and suitable product.

87.     Given Defendants' failure to disclose this known but non-public information about the defective nature of the Product – information over which it had exclusive control – and because Plaintiffs and Class Members therefore could not reasonably have known that the firearms were defective, Defendants are estopped from relying on any statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

## COUNT I
## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
## Mo. Ann. Stat. § 407.010 *et seq.*

88.     Plaintiffs individually and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

89.     This cause of action is brought on behalf of a nationwide class of consumers pursuant to the Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.010 *et seq.* (the "MMPA").

90.     The MMPA provides, in part, as follows:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the State of Missouri, is declared to be an unlawful practice. . . . Any act, use or employment declared unlawful by this subsection

violates this subsection whether committed before, during or after the sale, advertisement or solicitation. Mo. Ann. Stat. § 407.020.

91.     Defendants violated the MMPA by engaging in the unfair and deceptive actions and/or omissions as described herein by engaging in unfair or deceptive acts or practices that occurred in trade or commerce, had an impact on public interest, and caused injury to property.

92.     Plaintiffs and members of the Class purchased Defendants' Product primarily for personal, family, or household purposes.

93.     Defendants' misrepresentations and unfair and deceptive acts and/or omissions as set forth in this Complaint are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiffs and members of the Class regarding Defendants' products.

94.     In violation of the MMPA, Defendants employed fraud, deception, false promise, misrepresentation and the knowing concealment, suppression, or omission of material facts in their sale and advertisement of the Product in the State of Missouri and all other states in the nation.

95.     Defendants engaged in the concealment, suppression, or omission in violation of the MMPA when, in selling and advertising the Product, they (1) represented that the Product was free of defects and would not fire without a trigger pull when, at best, it lacked credible evidence to support those claims, and, at worse, knew the Product was, in fact, defective in that it has the propensity to fire without a trigger pull, was not suitable to be used for its intended purpose, and otherwise was not as warranted and represented by Defendants; (2) failed to disclose to, or concealed from, consumers material facts about the defective nature of the Product; and (3) failed to disclose its own knowledge of the defective nature of the Product when Defendants knew that there were defects in the firearms which would result in damage and harm.

96.     Defendants engaged in the concealment, suppression, or omission of the aforementioned material facts with the intent that others, such as Plaintiffs, Class Members, and/or the general public would rely upon the concealment, suppression, or omission of such material facts and purchase Defendants' Product with said design defect.

97.     The concealment, suppression, or omission of the aforementioned material facts had the capacity to, was reasonably foreseeable that it would, and did so deceive a substantial portion of the public including the members of the class into believing the Product was free of defects.

98.     Plaintiffs and Class Members would not have purchased the Product had they known or become informed of the material defects.

99.     Defendants' concealment, suppression, or omission of material facts as alleged herein constitutes unfair, deceptive and fraudulent business practices within the meaning of the MMPA.

100.    Defendants have acted unfairly and deceptively by misrepresenting the quality, safety and reliability of the Product.

101.    Defendants either knew, or should have known, that the Product was defectively designed and/or manufactured and would fire without a trigger pull, which would result in damage to property and injury.

102.    Upon information and belief, Defendants knew that, at the time the Product left Defendants' control the Product contain the defect described herein resulting in a misfire.  At the time of sale, the Product contained design and construction defects.  The defects reduced the effectiveness and performance of the Product and rendered it unable to perform the ordinary purposes for which it was used as well as cause the resulting damage described herein.

103.    As a direct and proximate cause of the violation of the MMPA, described above, Plaintiffs and members of the Class have been injured and suffered ascertainable loss of money and damages in that they have purchased firearms with the defective trigger based on nondisclosure of material facts alleged above. Had Plaintiffs and Class Members known the defective nature of the trigger, they would not have purchased the Product.

104.    Defendants used unfair methods of competition and unfair or deceptive acts or practices in conducting their businesses. This unlawful conduct is continuing, with no indication that Defendants will cease.

105.    Defendants' actions in connection with the manufacturing and distributing of the Product as set forth herein evidences a lack of good faith, honesty in fact and observance of fair dealing so as to constitute unconscionable commercial practices, in violation of the MMPA, Mo. Ann. Stat. § 407.010 *et seq*.

106.    Defendants acted willfully, knowingly, intentionally, unconscionably and with reckless indifference when it committed these acts of consumer fraud.

107.    Said acts and practices on the part of Defendants were and are illegal and unlawful pursuant to Mo. Ann. Stat. § 407.020.

108.    As a direct and proximate result of Defendants' violations of Mo. Ann. Stat. § 407.020 *et seq*., Plaintiffs have suffered damages. Plaintiffs are entitled to actual damages, including but not limited to the difference in value between the Product as it was originally delivered and as it should have been delivered, equitable and declaratory relief, punitive damages, treble damages, costs and reasonable attorney's fees.

109.    Furthermore, Defendants' unlawful conduct set forth in this Complaint was and is wanton, willful and outrageous, and manifests a reckless disregard for the consequences of

Defendant's actions and for the rights of Plaintiffs and members of the Class and warrants an award of punitive damages to deter Defendants, and others in similar circumstances, from committing such actions in the future.

## COUNT II- FRAUDULENT CONCEALMENT

110.    Plaintiffs individually and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

111.    At all times mentioned herein, Defendants, through their experience, were in a position of superiority to Plaintiffs and the class members and as such had the duty and obligation to disclose to Plaintiffs the true facts and their knowledge concerning the Product; that is that said product was defective, had the propensity to fire without a trigger pull, and otherwise were not as warranted and represented by Defendants. Defendants made the affirmative representations as set forth in this Complaint to Plaintiffs, the Class, and the general public prior to (and after) the date Plaintiffs purchased the Product, while at the same time concealing the material defects described herein. All of these facts were material to consumers' (such as Plaintiffs') purchase decisions.

112.    The material facts concealed or not disclosed by Defendant to Plaintiffs and the Class are material facts in that a reasonable person would have considered those facts to be important in deciding whether or not to purchase Defendants' Product.

113.    At all times mentioned herein, Defendants intentionally, willfully, and maliciously concealed or suppressed the facts set forth above from Plaintiffs and with the intent to defraud as herein alleged.

114.    At all times mentioned herein, Plaintiffs and members of the Class reasonably relied on Defendants to disclose those material facts set forth above. If Defendants had disclosed

36

the above facts to Plaintiffs and the Class and had they been aware of said facts, they would have either negotiated a lower price to reflect the risk or simply avoided the risk all together by purchasing a different rifle.

115. Defendants continued to conceal the defective nature of their Product even after members of the Class began to report problems. Indeed, Defendants continue to cover up and conceal the true nature of the problem.

116. As a result of the previous and continued concealment or suppression of the facts set forth above, Plaintiffs and the Class members sustained damages in an amount to be determined at trial.

## COUNT III- UNJUST ENRICHMENT

117. Plaintiffs individually and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

118. Substantial benefits have been conferred on Defendants by Plaintiffs and the Class and Defendants have appreciated these benefits.

119. Defendants' acceptance and retention of these benefits under the circumstances make it inequitable for Defendants to retain the benefits without payment of the value to the Plaintiffs and the Class.

120. Defendants by the deliberate and fraudulent conduct complained of herein, have been unjustly enriched in a manner that warrants restitution.

121. As a proximate consequence of Defendants' improper conduct, the Plaintiffs and the Class members were injured. Defendants have been unjustly enriched, and in equity, should not be allowed to obtain this benefit.

## COUNT IV – DECLARATORY RELIEF

122.    Plaintiffs individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

123.    Defendants acted or refused to act on grounds that apply generally to the Trigger Connector Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole within the meaning of Fed. R. Civ. P. 23.

124.    Plaintiffs seek a declaration that:

a)    All Remington Models with the patented Walker Fire Control have defects which cause them to fire without a trigger pull;

b)    All Remington Models that contain trigger mechanisms that utilize a trigger connector have defects which cause them to fire without a trigger pull;

c)    All Remington Models with the patented Walker Fire Control have a defect in workmanship and material that causes failures;

d)    All Remington Models that contain trigger mechanisms that utilize a trigger connector have a defect in workmanship and material that causes failures;

e)    Defendants knew of the defects in their Remington Models with the patented Walker Fire Control;

f)    Defendants knew of the defects in their Remington Models that contain trigger mechanisms that utilize a trigger connector;

g)    Defendants shall issue a recall of all Remington Models with the patented Walker Fire Control; and

h)    Defendants shall issue a recall of all Remington Models that contain trigger mechanisms that utilize a trigger connector.

## COUNT V
## DECLARATORY RELIEF

125.    Plaintiffs individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

126.    Defendants acted or refused to act on grounds that apply generally to the X-Mark Pro Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole within the meaning of Fed. R. Civ. P. 23.

127.    Plaintiffs seeks a declaration that:

   a)    All Remington Model 700 rifles and Remington Model Seven rifles with the X-Mark Pro trigger have defects which cause them to fire without a trigger pull;

   b)    All Remington Model 700 rifles and Remington Model Seven rifles with the X-Mark Pro trigger have defects in workmanship and material that causes failures;

   c)    Defendants knew of these defects;

   d)    Defendants recall of Remington Model 700 rifles and Remington Model Seven rifles manufactured from May 1, 2006 to April 9, 2014, shall be supervised by this Court; and

   e)    Notice of the recall shall be accomplished pursuant to Fed. R. Civ. P. 23(c)(2)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Ian Pollard, William G. Moodie, James W. Waterman, Wallace Brown, Rodney Barbre, Mitchell Winterburn, Gordon Hardaway, Chase Delperdang, Gary Otis, Roger Keesy, Dylan Anderson, John Corsi, and William Massie, on behalf of themselves and all others similarly situated, pray for a judgment against Defendants as follows:

A.  Enter an Order certifying the proposed national Trigger Connector Class and X-Mark Pro Class (and subclasses, if applicable), designating Plaintiffs as the named Class Representatives of the Classes, and designating the undersigned as Class Counsel;

B.  Declare that Defendants are financially responsible for notifying all Class members of the problems with the firearms at issue herein;

C.  Enter an Order enjoining Defendants from further deceptive advertising, marketing, distribution, and sales practices with respect to the Remington Models with the patented Walker Fire Control, as well as other Remington models containing a trigger mechanism that utilizes a trigger connector, and requiring Defendants to repair and/or replace Plaintiffs' and Class members' Remington Models with the patented Walker Fire Control, as well as other Remington models containing a trigger mechanism that utilizes a trigger connector, with a suitable alternative rifle of Plaintiffs' and Class members' choosing;

D.  Enter an award in favor of Plaintiffs and the Classes that includes compensatory, exemplary or punitive damages, and statutory damages, including interest thereon, in an amount to be proven at trial;

E.  Declare that Defendants must disgorge, for the benefit of the Classes, all or part of the ill-gotten profits it received from the sale of the Remington Models with the patented Walker Fire Control, as well as other Remington models containing a trigger mechanism that utilizes a trigger connector, or order Defendants to make full restitution to Plaintiffs and the members of the Classes;

F.  Declare that the recall undertaken by Defendants related to the X-Mark Pro Class shall be conducted under the supervision of this Court with Notice to Class Members in compliance with Fed. R. Civ. P. 23(c)(2);

G.  Enter an award of attorneys' fees and costs, as allowed by law;

H.  Enter an award of pre-judgment and post-judgment interest, as provided by law;

I.  Grant Plaintiffs and the Classes leave to amend this First Amended Class Action Complaint to conform to the evidence produced at trial; and

J.  Grant such other or further relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs, Ian Pollard, William G. Moodie, James W. Waterman, Wallace Brown,

Rodney Barbre, Mitchell Winterburn, Gordon Hardaway, Chase Delperdang, Gary Otis, Roger

Keesy, Dylan Anderson, John Corsi, and William Massie, hereby demand a trial by jury on all claims so triable.

Dated: April 8, 2015                    By: ____/s/Eric D. Holland_____
                                        Eric D. Holland
                                        R. Seth Crompton
                                        **Holland Law Firm**
                                        300 North Tucker Boulevard, Suite 801
                                        St. Louis, MO 63101
                                        Tel.: 314.241.8111
                                        Fax: 314.241.5554
                                        Email:  eholland@allfela.com
                                                  scrompton@allfela.com

                                        Richard Arsenault
                                        **Neblett, Beard & Arsenault**
                                        2220 Bonaventure Court
                                        Alexandria, LA 71301
                                        Tel.: 800.256.1050
                                        Email:  rarsenault@nbalawfirm.com

                                        Charles E. Schaffer
                                        **Levin, Fishbein, Sedran & Berman**
                                        510 Walnut Street, Suite 500
                                        Philadelphia, Pennsylvania 19106
                                        Tel.: 215.592.1500
                                        Email: cschaffer@lfsblaw.com

                                        W. Mark Lanier
                                        **LANIER LAW FIRM**
                                        6810 FM 1960 West
                                        Houston, TX 77069
                                        Tel: 713-659-5200
                                        Email: wml@lanierlawfirm.com

                                        Jordan L. Chaikin
                                        Florida Bar Number 0878421
                                        **Parker Waichman LLP**
                                        3301 Bonita Beach Road, Suite 101
                                        Bonita Springs, Florida 34134
                                        Tel.: 239.390.1000
                                        Email: jchaikin@yourlawyer.com

John R. Climaco
John A. Peca
**Climaco, Wilcox, Peca, Tarantino**
  **& Garofoli Co., LPA**
55 Public, Suite 1950
Cleveland, OH 44113
Tel.:  216.522.0265
Email:  jrclim@climacolaw.com
       japeca@climacolaw.com

Timothy W. Monsees
**Monsees & Mayer, P.C.**
4717 Grand Avenue, Suite 820
Kansas City, Missouri 64112
Tel.: 816.361.5550
Email: tmonsees@mmmpalaw.com

Richard Ramler
**Ramler Law Office, P.C.**
202 West Madison Avenue
Belgrade, Montana 59714
Tel.:  406.388.0150
Email: richardramler@aol.com

Jon D. Robinson
Christopher M. Ellis
**Bolen Robinson & Ellis, LLP**
202 South Franklin, 2nd Floor
Decatur, Illinois 62523
Tel.:  217.429.4296
Email: jrobinson@brelaw.com
      cellis@brelaw.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 8, 2015, I caused a copy of the foregoing document to be

served upon all counsel of record via ECF Notice of Electronic Filing.

s/Eric D. Holland
Eric D. Holland
**Holland Law Firm**
300 North Tucker Boulevard, Suite 801
St. Louis, MO 63101
Tel.: 314.241.8111
Fax: 314.241.5554
Email: eholland@allfela.com
