UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| IAN POLLARD, on behalf of himself and all others similarly situated | § § § | |
| Plaintiffs | § § | |
| v. | § § | Case No. 4:13-CV-00086-ODS |
| REMINGTON ARMS COMPANY, LLC, et al | § § | |
| Defendants | § § | |

**MEMORANDUM IN SUPPORT OF**
**OBJECTION TO THE PROPOSED NATIONWIDE SETTLEMENT**

Objector, RODNEY TOWNSEND, is a member of Settlement Class B(1) who, by and through undersigned counsel, files this Memorandum in Support of Objection to the Proposed Nationwide Settlement. The proposed settlement should be rejected because it is unfair, inadequate, and unreasonable. In particular, the proposed settlement: (1) provides no financial relief or for that matter relief of any sort to Settlement Class B(1) members; (2) the notice is inadequate because it fails to provide accurate information concerning the danger of the XMP firing without a trigger pull; (3) the method of providing notice to class members is deficient; and, (4) class counsel attorneys' fees are unreasonable and far out of balance as to the benefit rendered the class. Upon objective examination it is clear the proposed settlement should be rejected for the reasons set forth in this memorandum[1]

---

[1] In the absence of a large number of objectors, one cannot infer support from silence. A court should be reluctant to rely heavily on the lack of opposition by alleged class members. Such parties typically do not have the time, money or knowledge to safeguard their interests by appearing at hearings, presenting evidence etc. *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1137 (7th Cir. 1979) and *Figueroa v. Sharper Image Corp.*, 517 F. Supp 2d 1292, 1328 (S.D. Fla. 2007).

## STANDARD FOR APPROVAL OF CLASS ACTION SETTLEMENTS

Under the Federal Rules of Civil Procedure, the Court may only approve a class action settlement only if it is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(2). In the Eighth Circuit, the district court must consider all relevant factors including but not limited to: (1) the strength of the plaintiff's case; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and, (4) the amount of opposition to the settlement. *In re Uponor*, 716 F.3d at 1063 (8th Cir. 2013). None of the individual factors is considered controlling, with the court having discretion to weigh all factors in reaching its decision as to whether to approve a proposed settlement. The court acts in a fiduciary capacity in reviewing a proposed settlement with its job being to protect the class from an unfair and unreasonable settlement.

### The Terms Of The Proposed Settlement Are Unfair and Unreasonable As Proven By The Results To Date Of The Proposed Settlement

Preliminary approval of the settlement was entered on April 14, 2015. The official settlement website was up and running on May 6, 2015. Internet publication of the settlement began almost immediately with print ads for the settlement run shortly thereafter. Basically, save for continuing publication of the website, notice has been completed. To put it mildly, the response to the proposed settlement has been abysmal. Bottom line, very few class members seem to have any interest in trading a defective Remington trigger for another Remington trigger that has already been recalled on account of basically an identical defect, i.e the Model 700 rifle firing without a trigger pull. Only 2,327 claims were received between May 6, 2015, and August 14, 2015, a period of 100 days. Based on the representations of Class Counsel the value of the benefit afforded each class member ranges between $10.00 for a voucher and $69.00 for a replacement trigger assembly. Assuming an average

-2-

Case 4:13-cv-00086-ODS   Document 98-1   Filed 10/09/15   Page 2 of 19

value to class members of $60.00 per claim simple math tells us that $232,700 would be the total value of the settlement to all class members over the first 100 days of the settlement and this assumes every claim would be cashed, which is highly unlikely. If we project these numbers over the 18 month life of the period for which the class settlement apparatus will remain in place, the approximate number of claims and benefits will be somewhere in the range of 10,000 claims with a benefit to the class of maybe $1,000,000. No doubt the frequency of claims made will decline over time without continued advertising on a large scale so these figures are probably generous. Class Counsel is claiming a fee of $12,500,000 which appears as of this date to be somewhere in the range of 1000% of the benefit achieved for members of all settlement classes. His Honor simply cannot approve a class settlement with such a ridiculous result.

In an effort to obtain approval of the settlement and walk away with $12,500,000 Class Counsel has projected a potential class size of 7,500,000 Model 700 owners with potential benefits available of $487,958,398.78. These may well be some pie in the sky numbers but they do not reflect real life results. Class Counsel was well aware of the abysmal results of the proposed settlement on September 4, 2015, when its latest fee application was filed but for some reason failed to bring to the court's attention the disastrous results achieved by its proposed settlement over its first 100 days of life. His Honor should rely not on the pie in the sky projections of Class Counsel but rather on real life results and summarily reject the settlement. While a theoretical calculation of potential value to the class has been made by Class Counsel it is more practical to examine the monetary amount that will actually be paid based on actual results to date rather than a hypothetical value that has no basis in fact. *Vought v. Bank of America, N. A.,* 901 F. Supp. 2d 1071 (C.D. Ill. 2012). Payment to class members with coupons or other non cash items such as the trade in offered in this case should always be considered a warning sign of an unfair settlement. *See, In re HP Inkjet Printer Litigation,* 716 F.

3d 1173, 1179 (9th Cir. 2013) and, *Synfuel Technologies, Inc., v. DHL Express (USA), Inc.,* 463 F.3d 646,654 (7th Cir. 2006).

### The Proposed Settlement Offers No Compensation To Class B(1) XMP Owners and Therefore Is Neither Fair Nor Reasonable

In proposed settlements such as the one in this case, forms of non-monetary relief should be carefully scrutinized. See Fed. R. Civ. P. 23(2)(C)(h), Advisory Committee Note ("Settlements involving non-monetary provisions for class members... deserve careful scrutiny to ensure that these provisions have actual value to the class"). Members of Settlement Class B receive nothing of value in the proposed settlement. Settlements that provide no relief to an entire subclass must be rejected. *See e.g., Mirfasihi v. Fleet Mortgage Corp.,* 356 F. 3d 781,785 (7th Cir. 2003) and *Crawford v. Equifax Payment Services,* 201 F.3d 877 (7th. Cir. 2003).

In April 2014 Remington initiated a voluntary recall of all Model 700 XMP rifles. That recall has since resulted in the retrofit of in excess of 200,000 rifles and according to Remington's official website remains in full force as of the date of this writing. See, www.bit.ly/1VdzwKl. The proposed class settlement offers nothing more to XMP owners than has already been voluntarily made available by Remington. Conversely, the proposed class settlement if approved would result in the termination of any cause of action that class members might have against Remington including warranties and consumer protection remedies enacted by various states. Inasmuch as the proposed settlement is totally without consideration to XMP class members, it must be summarily rejected.

The recall of Model 700 XMP rifles had nothing to do with Class Counsel. On December 30, 2013, a video was posted on YouTube demonstrating the XMP rifle would fire when the safety was moved from safe to fire. See, https://www.youtube.com/watch?v=Qa0cNr2_fSE. This became known as the Jimmy Dickens video and was in fact the third video received by Remington documenting the XMP would fire without pulling the trigger. Remington responded to the nationwide posting on

Youtube of XMP accidental firings in an extremely dangerous manner by instituting an internal investigation that quickly discovered the excess sealant problem. Shortly thereafter Remington instituted its voluntary recall. Nothing in the corporate records of Remington even remotely makes mention of any role of Class Counsel in bringing about the voluntary recall of all Model XMP rifles. The first customer video provided to Remington documenting an XMP live fire malfunction was received from Michael Brees by Remington in January 2010. What is known as the Charles Young video documenting an XMP malfunctioning with live ammunition was posted on November 26, 2013 at https://www.youtube.com/watch?v=cbTIkDQ93Tc. Basically, Remington simply and arrogantly ignored the Brees and Young video documentaries when received and continued to market the XMP without any meaningful investigation to find out exactly what was wrong with the XMP. Objector's counsel will provide a viewing to the court of all three video's at the time of the final approval hearing.

In summary, Remington has not provided any consideration in exchange for the release of consumers' ability to seek future economic damages "based upon or related in any way to the trigger mechanisms in the rifle models subject to the Settlement Agreement."

### Settlement Class B Has A Strong Case On Its Merits Which Has Not Been Adequately Developed By Class Counsel At This Point In Time

Several factors weigh in favor of the Objector's argument that the proposed settlement is unfair, inadequate, and unreasonable. Most importantly, Settlement Class B has a strong case which simply has not been adequately developed[2]. Very little, if any, research and development has been

---

2  When considering whether a settlement is fair and reasonable, the Court must consider Plaintiffs' likelihood of success on the merits. "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to present value." *Rodriguez v. West Pub. Corp.*, 563 F.3d 948, 965-966 (9th Cir. 2009) citing Federal

devoted to the potential for success of Settlement Class B, the XMP Class, should that group of plaintiffs go forward against Remington. Objector would show that in fact Settlement Class B, a/k/a the XMP Class, has critical facts individual to the claims of its class members that are not common to members of Settlement Class A, a/k/a the Trigger Connector Class. The basis of liability for the Trigger Connector Class is a design defect, inclusion of the trigger connector as a part of the trigger assembly, whereas the basis of liability for the XMP Class is a manufacturing defect, use of excess sealant in the manufacturing process. The existence of the manufacturing defect has already been proven beyond any reasonable doubt such that the substantive portion of the liability case does not even offer room for debate. In addition, M700 XMP rifles with the known defect were manufactured between 2006 and 2014 whereas the M700 Trigger Connector rifles were manufactured between approximately 1950 and early 2006. Controlling statutes of limitation have for the most part not yet expired as to many claims of the XMP Class whereas almost every known statute of limitations has expired against the Trigger Connector Class. Critical factual and legal issues are simply not common to Settlement Class A and Settlement Class B with Settlement Class B having a much stronger factual and legal case than Settlement Class A which simply has not yet been adequately developed.

Set out below is an illustration of the value of the rights that are being surrendered or released by potential class members. This type of analysis would need to be expanded to cover the consumer laws of every state where the XMP has been marketed. It may very well be that in the future a separate sub class is necessary for each state to adequately enforce the consumer protection remedies enacted by each state.

---

Judicial Center, Manual for Complex Litigation § 21.62, at 316 (4th ed. 2004).

-6-

Case 4:13-cv-00086-ODS Document 98-1 Filed 10/09/15 Page 6 of 19

A prime example of rights being surrendered without adequate compensation involves named plaintiff Wallace Brown as well as all other Florida XMP owners as they have a very viable cause of action under Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 to 201.213. In particular, Section 501.204(1), declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." The express purpose if the Act is to "protect the consuming public...from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce", Section 501.202(2). "A consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.'" *City First Mortgage. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008) (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006), *rev. den.*, 962 So. 2d 335 (Fla. 2007)). A "deceptive act" occurs when there is a "representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt.*, 842 So. 2d 773, 777 (Fla. 2003); *see also Maguire v. S. Homes of Palm Beach*, 591 F. Supp. 2d 1263, 1271 (S.D. Fla. 2008). To state a FDUTPA claim, Plaintiffs need only allege that Remington's conduct was unfair and likely to deceive consumers and that they were injured by the conduct. *See Florida v. Tenet Healthcar Corp.,* 420 F. Supp. 2d 1288, 1309–1310 (S.D. Fla. 2005). The representation is evaluated from the perspective of a consumer acting reasonably under the circumstance. *See Rolins, Inc. v. Butland* , 952 So. 2d 860  (Fla. 2d  DCA 2006.)

XMP Class Members have been aggrieved by Remington's unfair and deceptive practices in that they purchased and consumed Remington's defectively manufactured XMP at a time when Remington had actual knowledge of the defect contained in the product. The sale of the products at

issue in this cause was a "consumer transaction" within the scope of the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 to 201.213, *Florida Statutes*. Plaintiffs are "consumers" as defined by Section 501.203, *Florida Statutes*. Each of Remington's XMP Model 700 rifles is a "good", within the meaning of the Act. Remington engaged in trade or commerce within the meaning of the Act. Remington's unfair and deceptive practices are likely to mislead – and have misled – the consumer acting reasonably under the circumstances and, therefore, violate Section 500.04, Florida Statutes and 21 U.S.C. Section 343. Remington has violated the Act by engaging in unfair methods of competition, unconscionable acts and practices, and unfair and deceptive acts and practices in the conduct of its business which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers. Specifically, Remington has represented that the Model 700 is a safe, reliable firearm when in fact the XMP trigger mechanism was defectively manufactured resulting in accidental discharges without the trigger being pulled. The manufacturing defect found in the XMP has caused unintended discharges resulting in personal injuries and deaths.

As a direct and proximate result of Remington's deceptive, misleading and unfair practices in violation of FDUTPA, members of the proposed Class have suffered economic damages because the value and utility of their Model 700 XMP rifles have been diminished as a result of the defectively manufactured rifles. Pursuant to Section 501.211(1), *Florida Statutes*, Plaintiffs and the Class may seek a declaratory judgment and court order enjoining the above described wrongful acts and practices of Remington as well as for restitution and disgorgement. Additionally, pursuant to sections 501.211(2) and 501.2105, *Florida Statutes*, class members may make claims for damages, punitive damages, attorneys' fees and costs. In summary, all class members who are residents of Florida have a very viable economic claim against Remington that will be lost via a settlement that affords them no economic

relief.

Numerous other states such as Texas via the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.50 (a) (West 2011), and Missouri via the Missouri Merchandising Practice Act which is relied upon at present by class members also offer consumer remedies which are readily available to members of the XMP class. Remedies under Texas DTPA include cost of repairs, replacement costs and attorneys' fees. In summary, the substantive rights of the members of the XMP settlement class should offer a strong opportunity for members of the XMP class to be successful. Class Counsel has as of yet failed to adequately explore and develop options available to the XMP class members.

### Disparate Remedies Offered to Different Sub-Classes Render the Settlement Unfair

Settlement Class B (2) consists of all those who purchased an XMP trigger assembly as a replacement for a Walker trigger assembly. This group could accurately be referred to as the "XMP Replacement Sub Class" as compared to the members of Settlement Class B (1) which consists of all those who bought a new Model 700 fitted with the XMP trigger assembly and could accurately be referred to as the "XMP Original Equipment Sub Class." Each member of the Replacement Sub Class is entitled to receive a cash payment of $119 under the terms of the proposed settlement without any further obligation such as mandatory retrofit of the old XMP trigger. Conversely, each member of the Original Equipment Sub Class will only receive the option of a retrofit to the new XMP trigger. The only explanation for this disparate treatment appears to be the extremely small size of the Replacement Sub Class, approximately 2,500 members, such that Remington will incur only a very small cash outlay. In truth, there is no reason why each owner of a defective XMP trigger assembly should not have the same cash out option. This disparate treatment alone should be reason enough

for the court to reject the XMP settlement. As previously discussed in detail, payment to class members via non-cash benefits is often considered a warning sign of an unfair settlement.

### The Proposed Settlement Fails to Provide Adequate Notice

Class Counsel has produced a Notice provision that is severely inadequate insofar as it vastly understates the hazardous nature of the XMP by declaring that the rifle may fire without the trigger being pulled only "under certain limited conditions." In truth, the circumstances under which the rifle may fire without pulling the trigger are in fact very broad. Such an egregious misrepresentation fails to effectively warn class members of the scope of danger of the defective product in their possession and instead deters many class members from responding to the recall notice at all. The Remington Model 700 has been well documented to malfunction in various manners including: fire upon safety release; fire upon bolt closing; fire upon bolt opening; jar off; and, delayed firings when no one is even touching the rifle. The so called "limited conditions" that have been associated with the XMP firing without a pull of the trigger encompass the most frequent conditions under which the rifle is used or operated.

A proper notice should contain language that without limiting qualification warns of the extreme danger of the XMP firing without a trigger pull and potentially causing death or injury. Any high powered rifle that will fire without the trigger being pulled is a safety problem of the highest magnitude as a high probability of death and injury exists whenever this occurs. The notice to class members is horribly deficient in that it intentionally and falsely portrays the problem with the Remington XMP as occurring only "under certain limited conditions." In truth, the response of XMP owners in the form of rifles returned with the well documented complaint that the rifle will fire without the trigger being pulled under a wide variety of circumstances and conditions, is strong

-10-

Case 4:13-cv-00086-ODS   Document 98-1   Filed 10/09/15   Page 10 of 19

evidence refuting this claim. Further, Remington's own research conducted prior to and following the decision to institute a voluntary recall of the XMP proves that the claim that the problem exists only "under certain limited conditions" is in fact simply not true. Informing class members that the XMP will only malfunction "under certain limited conditions" is a false representation which will discourage and ultimately prevent many XMP owners from responding to the recall notice. The "under certain limited conditions" language was in fact adopted directly from the voluntary recall notice issued in 2014 by Remington. Instead of simply adopting the unilateral description of the problem offered by Remington, it was incumbent upon Class Counsel to adequately investigate the XMP problem and fashion the recall/warning language broadly and accurately.

Exactly what do Remington and Class Counsel mean when they state that the rifle will fire without a trigger pull only "under certain limited conditions"? The mere inclusion of this description is in and of itself highly confusing and in fact a less than subtle attempt by Remington to downplay the extent of the XMP problem thus reducing the number of XMP owners who will respond to the recall. Had Class Counsel thoroughly researched the history of the XMP problems they never would have agreed to this language. Objector's counsel is aware that Remington frequently takes the position that the XMP will malfunction only under certain weather conditions, temperatures at or below somewhere between 32°F and 45°F. Even if the XMP were susceptible to dangerous malfunctions only within cold weather conditions as suggested by Remington, a claim which is hotly disputed, how does this justify inclusion of the language "under certain limited conditions." Weather conditions under which the XMP will unquestionably malfunction are the exact conditions that prevail during large game hunting season in most of the U.S. when the rifle is most likely to be in high use. Thus, the "under certain limited conditions" is inclusive of the time frame when the XMP rifle is most likely

to be in use.

### The Method of Giving Notice to XMP Class Members is Deficient

The abysmal results obtained by the proposed class notice procedure is the best evidence of the insufficiency of the notice procedure. On May 6, 2015, following the institution of the notice advertising proposed by class counsel, the Claims Administrator began accepting claim forms from potential class members. According to Class Counsel the potential number of class members could exceed 7,500,000. As of August 14, 2015, only 2,327 claims have been filed with the Claims Administrator. Utilizing the benefit figures estimated by Class Counsel of approximately $60 per claim, the total value of all claims filed in the first three months of the class notice period would be in the range of $140,000. As they say, the proof is in the pudding. A detailed inquiry into the advertising budget allotted to the notice procedure as well as the effectiveness of the substance of the notice should be immediately undertaken. At this rate the total compensation paid to class members will be less than $1,000,000 while Class Counsel walks away with $12,500,000. A truly ridiculous result.

Remington instituted a voluntary recall of all Model 700 XMP rifles in April of 2014. Remington's official website contains details of the recall program as well as detailed instructions on how to receive a retrofit. www.bit.ly/1VdzwKl. The method of providing notice of the class settlement to XMP owners fails to distinguish how it would be any different or more efficient than the program in effect by Remington for over 18 months. Remington's notice of recall as well as methodology employed in the recall has not been successful with less than 20% of XMP owners responding to the recall notice. Given the extreme degree of risk involved with continued use of a defectively manufactured Model 700 XMP, it must be assumed that the context as well as delivery

method of the recall has not been well thought out. Class Counsel has failed to explain how its methodology of notice will be any different and/or more effective than that already in use by Remington.

### Class Members Should Have the Option of Cash Reimbursement

Remington's product defect problems have not been confined to its Model 700 series of rifles. For many years Remington produced 12 gauge shotguns with barrels that routinely would explode. His Honor should take time to look at *Garza v. Sporting Goods Properties, Inc.,* 1996 WL 56247 (W.D. Texas). In *Garza,* commonly referred to as the "exploding barrel class" a potential class of 8,500,000 Remington customers who had purchased potential exploding barrel shotguns was certified and settled with a $31,500,000 cash payment to class members. No coupons or new barrels were passed out, simply cash to all who qualified for a payment. At least one of the law firms representing the exploding barrel class is also involved with the Model 700 class. *Garza* offers a far superior settlement model than what has been adopted in the Model 700 proposed settlement. It is also noteworthy that the *Garza* settlement notice was published in over 20 wide or national circulation magazines whereas the Model 700 list of publications has totaled only six. In reality to reach the widest range audience television ads of high quality should be utilized.

Objector would prefer to be reimbursed or at the least receive a cash settlement for his purchase of the XMP rather than having the trigger mechanism replaced with yet another Remington device. In light of Remington's negligent and hazardous business practices, significant numbers of XMP class members would rather not do business with Remington at all. Many XMP class members simply no longer trust Remington. Excerpts from communications to Remington from XMP class members, call them silent objectors, are in possession of Objector's Counsel but subject to protective

-13-

Case 4:13-cv-00086-ODS   Document 98-1   Filed 10/09/15   Page 13 of 19

orders which Objector's Counsel will attempt to gain relief from prior to the hearing of December 14, 2015. However, the proposed settlement does not give class members that option and is therefore unfair, inadequate, and unreasonable. *See e.g., Figueroa*, 517 F. Supp. 2d at 1327 (discussing unfairness of settlement that would require class members to continue to do business with the settling defendant) ; see also *Farrell v. Open Table, Inc.* No. C 11-1785 SI, 2012 WL 1379661 (N.D. Cal. Jan. 30, 2012) (where the settlement provided that class members could either redeem the expired gift certificates at issue or make a refund request for the purchase price); *In re M3 Power Razor System Marketing and Sales Practice,* 270 F.R.D. 45, 52 (D. Mass. 2010) (providing class members who wish to participate in the settlement the option of choosing a refund or a rebate); *Pro v. Hertz Equip. Rental Corp.*, No. 06-3830 (DMC), 2013 WL 3167736, *2 (D. N.J. June 20, 2013) (where the settlement agreement provided class members with the option of either obtaining a cash refund or credits on future equipment rentals).

Common sense makes it easy to understand why class members would rather be reimbursed than have their guns refitted or replaced by a company that has produced two defective triggers during the course of this litigation. Members of Settlement Class B have already had their original defective Remington model replaced or refitted with a second defective Remington device after the well documented track record of both the Walker or Trigger Connector device and the XMP device. Class members should not be forced to engage in further transactions with an entity that has already proven an unreliable and untrustworthy manufacturer of explosive devices; nor should they be required to trust that the replacement trigger made by the very same company that issued a defective version will now be free from all dangerously defective conditions. Such settlement provisions are draconian and unreasonable.

-14-

Furthermore, allowing Remington to reap the financial benefits of its negligent and harmful business practices fails to properly account for defendant's financial condition as required by the eighth circuit's standard for determining whether the class settlements is fair, just and reasonable. In this case, it would be manifestly unjust to allow a viably solvent defendant that has distributed "the best selling American rifle of all time" to keep it's ill-gotten gains. Remington is in good financial standing and is therefore capable of adequately reimbursing class members who would prefer a refund for their purchase of a defective gun. Shielding Remington from disgorging its illicit profits renders the class settlement unfair and unjust. At the very least, class members should have the option of being recompensed for purchasing a dangerously defective product that has already resulted in the death of two and the serious injury of many more.

## Class Counsel Attorneys' fees are Unreasonable As Proven And Should Not Be Approved.

As previously demonstrated, the proposed settlement is unfair and unjust because the attorneys' fees as submitted are unreasonable from both the standpoint of value generated for the class as a whole and the failure to distinguish which portion of the fees are associated with Settlement Class A work versus Settlement Class B work. Given that Class Counsel has provided no benefit to the XMP class members and little benefit to all classes, the application for attorneys' fees should be denied on that ground alone as it is well settled that Class Counsel should not be compensated for work that does not benefit the class. *Parsons v. Volkswagen of America, Inc.,* 341 P.2d 662 (9th Cir. 2014).

It is the duty of Class Counsel to thoroughly investigate all claims of the class and to conduct a detailed review of all available evidence in support of such claims. In this case the heart of the claim of the XMP portion of the class is that the XMP trigger assembly has been negligently manufactured

resulting in the flaws that allow the rifle to fire without the trigger being pulled. Based upon recommendations of Class Counsel as found in the documents on file with the court and at the *remingtonfirearmsclassactionsettlement.com* website it appears Class Counsel has failed to undertake a thorough review of Remington Product Service complaint records which document the wide range of weather and operating conditions under which the XMP has been documented to fire without the trigger being pulled. Further, Class Counsel appears to have failed to obtain and review the research and testing records of the XMP compiled by Remington up to and since the date of recall. Had Class Counsel obtained and reviewed the aforementioned documents, it is extremely unlikely they would have agreed to the proposed terms of the settlement.

Class Counsel owes a high duty to both the class and the court and should be careful to accurately report the facts. In more than one filing it has been represented to the court and class that "the Parties are unaware of any personal injury caused by or as a consequent of an X-Mark Pro assembled with excess bonding agent." However, as of this writing at least five personal injury or wrongful death actions are pending against Remington with all but one filed prior to the date of preliminary approval. *See, Carletta McNeil, et al v. Remington Arms Company, supra* (death of a 16 year old girl and near death of another 16 year old girl in North Carolina); *Williams v. Remington* (U.S. Dist Ct. Middle District of La.) (severe leg injury to young woman); *Bachert v. Remington* (Pending Transfer from U.S. Dist. Ct. Illinois), (severe leg injury); *Turner v. Remington* (U.S. Dist. Ct. Ga.) (leg and penis injury); and, *Edge v. Remington, supra*.(Foot injury in Houston County, Texas). At least one other hunter has reported an arm wound as well as several complaints of hearing damage due to unexpected firings. Much like its older trigger connector sibling, the XMP appears destined to leave a trail of misery in its wake.

## Adequacy Of Counsel For Objector

Objector's lead counsel, Robert A. Chaffin, has been involved in Remington Model 700 product liability litigation for almost 30 years including acting as lead counsel in the first consumer class action filed against Remington involving the Model 700. *See Remington Arms Co. v. Luna* 966 S.W.2d 641 (Tex. Civ. App. San Antonio 1998) and *Remington Arms Co. v. Canales,* 837 S.W.2d 624 (Tex.1992). Further, access to many if not most of the key documents involved in Remington Model 700 litigation was obtained only after mandamus was successfully sought and obtained from the Texas Supreme Court ordering Remington to produce critical files which Remington had resisted production of for years revealing the history of attempts by Remington to correct and improve defects in the design of what is known as the "Walker" fire control. *Chapa v. Garcia,* 848 S.W.2d 667 (Tex. 1993). Most of these documents remained subject to a confidentiality and protective orders but entered the public domain when introduced into evidence in the 1994 trial of *Collins v. Remington et al,* (No. 91-10856-CV, 293 Jud. Dist. Ct., Maverick County, Tex.), which resulted in a verdict in excess of $17,000,000, the largest verdict ever involving a defective Remington Model 700. The *Collins* verdict was followed by the publication of Berger, *Remington Faces a Misfiring Squad,* BusinessWeek, p. 90 ( May 23, 1994). More recently, Objector's lead counsel was interviewed for the 2010 CNBC special *Remington Under Fire, A CNBC Investigation*, (2010) a documentary on the decades long troubles of the Remington Model 700 found at htttp://www.cnbc.com/id/39554936. In summary, Objector's lead counsel has vast experience with Remington Model 700 accidents and lawsuits.[3]

---

[3] A lawyer for an objector who raises pertinent questions about the terms or effects, intended or unintended, of a proposed settlement renders an important service. *Great Neck Capital Appreciation v. Partnership, L.P.,* 212 F.R.D. 200 (E.D. Wis. 2002)

Case 4:13-cv-00086-ODS   Document 98-1   Filed 10/09/15   Page 17 of 19

In support of Remington's attempt to gain approval of the pending class action, the representation is made that there are no known cases of the XMP causing personal injury or death. This is simply not true and in the name of public safety should not be allowed to continue. Since the middle of 2014 Objector's lead counsel has been engaged in death as well as injury cases involving the X-Mark Pro or "XMP" version of the Remington M700 firing without the trigger being pulled. *See e.g., Carletta McNeil et al v. Remington Arms Company,* (No. 13 CVS 21261, (Sup. Ct. Div.), Mecklenburg Cty. N.C.), and *William Edge v. Remington Arms Company,* (Houston County, Texas). In contrast, none of Class Counsel are currently engaged in any XMP litigation other than the subject class action. Objector's lead counsel has spent many weeks and months researching the XMP via review of customer data obtained from Remington, interviews with XMP owners, consultation with experts and extensive review of testing data provided by Remington. Most of this material is subject to existing confidentiality orders which cannot be filed of public record at this time but which will be made available subject to court order and/or at the final hearing for class approval.

## CONCLUSION

For the reasons set forth above, Objector respectfully requests that this Court deny the proposed class settlement in full as it is unfair, inadequate and unreasonable. The Court cannot modify the settlement but must accept or reject in total. This one calls for a swift and decisive rejection. *Ahearn v. Fiberboard Corning,* 162 F.R.D. 505 (E.D. Tex. 1995).

Objector hereby gives notice that he intends to appear through his undersigned counsel at the final approval hearing in this matter. Objector reserves the right to call witnesses and to make use of all documents entered on the docket by any party or Objector. Objector further reserves the right to

cross-examine any witnesses who testify at the hearing in support of final approval or to supplement this Objection if the parties introduce new arguments for settlement approval or evaluation after the objection deadline. Objector joins the objections of any other objectors to the extent those objections are not inconsistent with this Objection.

DATE: October 5, 2015

Respectfully submitted,

*/s/ Robert A. Chaffin*

Robert A. Chaffin
Texas Bar No. 04057500
robert@chaffinlawfirm.com
Paul R. Miller (Of Counsel)
Texas Bar No. 14153500
pmiller@neosoft.com
4265 San Felipe Ste 1020
Houston TX 77027
713-528-1000
Fax 713-952-5972
Angela Arango-Chaffin (of Counsel)
Florida Bar # 87919
angela@chaffinlawfirm.com
90 Alton Rd Ste 2704
Miami Beach, FL 33139
713-818-2515
Fax 713-952-5972

OF COUNSEL:
THE CHAFFIN LAW FIRM

ATTORNEYS FOR OBJECTOR

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served upon all counsel of record pursuant to the Federal Rules of Civil Procedure on October 5, 2015.

*/s/ Robert A. Chaffin*

Robert A. Chaffin