**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| IAN POLLARD, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:13-cv-00086-ODS |
| REMINGTON ARMS COMPANY, LLC, et al. | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## PLAINTIFFS' AND DEFENDANTS' JOINT RESPONSE TO OBJECTIONS FILED BY RODNEY TOWNSEND, TERRY PENNINGTON, AND JACK BELK

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... III

EXHIBIT INDEX ............................................................................................... VI

INTRODUCTION .................................................................................................. 1

DISCUSSION ....................................................................................................... 2

I.     OBJECTORS PENNINGTON AND TOWNSEND ......................................... 2

     A.     Objections Regarding Notice Are Meritless ........................................ 2

     B.     Objections Regarding Settlement Relief are Meritless ......................... 6

     C.     Objections Regarding Claim Forms are Meritless ............................... 13

     D.     The Overwhelmingly Positive Response to the Settlement Supports Final Approval ............................................................................... 14

II.    OBJECTOR BELK ........................................................................... 16

     A.     Background .................................................................................. 16

           1.     The XMP trigger mechanism ............................................... 17

           2.     Belk's lack of qualifications. .................................................. 18

     B.     Belk's Objections about XMP Trigger Mechanisms Are Meritless ...... 18

           1.     Belk previously endorsed the X-Mark Pro. ........................... 18

           2.     Belk's opinions regarding premature wear of MIM parts are wrong and unsupported. ...................................................... 20

           3.     Belk's opinions based on his inspection of seven XMP trigger mechanisms are unreliable. ................................................... 22

           4.     Belk's book undermines his credibility. ................................. 24

     C.     Belk's Objections about the Settlement Provisions Are Likewise Meritless ....... 24

CONCLUSION ...................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................... 28

**Page(s)**

**CASES**

*Bachert v. Remington Arms Company, LLC*,
    No. 4:15-cv-03220 (S.D. Tex.) ..................................................................................7

*Charron v. Wiener*,
    731 F.3d 241 (2d Cir. 2013)........................................................................................10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)..............................................................................................21, 22

*DeBoer v. Mellon Morg. Co.*,
    64 F.3d 1171 (8th Cir. 1995) .....................................................................................16

*DeHoyos v. Allstate Corp.*,
    240 F.R.D. 269 (W.D. Tex. 2007) ..............................................................................2

*Eastwood v. S. Farm Bureau Cas. Ins. Co.*,
    No. 3:11-CV-03075, 2014 WL 4987421 (W.D. Ark. Oct. 7, 2014).........................3

*Edge v. Remington Arms Company, Inc., et al.*,
    No. 14-0201 ................................................................................................................6

*Farrell v. OpenTable, Inc.*,
    No. 11-1785, 2012 U.S. Dist. LEXIS 10564 (N.D. Cal. Jan. 30, 2012).................11

*Farrell v. OpenTable Inc.*,
    No. 11-1785-SI, 2012 WL 1379661 (N.D. Cal. Jan. 30, 2012).............................13

*Figuera v. Sharper Image Corp.*,
    517 F. Supp. 2d 1292 (S.D. FLa. 2007)...................................................................13

*First State Orthopaedics v. Concentra, Inc.*,
    534 F. Supp. 2d 500 (E.D. Pa. 2007) .........................................................................7

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)...................................................................................................26

*Hamilton v. SunTrust Mortg. Inc.*,
    No. 13-60749-CIV, 2014 WL 5419507 (S.D. Fla. Oct. 24, 2014) .........................13

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ...............................................................................8, 12

*In re "Agent Orange" Prod. Liability Litig.*,
    818 F.2d 145 (2d Cir. 1987)........................................................................................5

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
 789 F. Supp. 2d 935 (N.D. Ill. 2011) .................................................................11

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Litig.*,
 No. 08-cv-1967-MD-D-ODS, 2011 WL 1790603 (W.D. Mo. May 10, 2011) ...............10, 12

*In re Charter Commc'n, Inc., Sec. Litig.*,
 No. 4:02-cv-1186-CAS, 2005 WL 4045741 (E.D. Mo. June 30, 2005)................................10

*In re Ford Motor Co. Bronco II Prod. Liab. Litig.*,
 981 F.Supp. 969 (E.D. La. 1997) ..........................................................................13

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
 55 F.3d 768 (3rd Cir. 1995) ...................................................................................12

*In re Imprelis Herbicide Mktg. Sales Practices & Prod. Liab. Litig.*,
 296 F.R.D. 351 (E.D. Pa. 2013).............................................................................9

*In re M3 Power Razor System Mktg. & Sales Practice Litig.*,
 270 F.R.D. 45 (D. Mass. 2010).............................................................................13

*In re Sprint Corp. ERISA Litig.*,
 443 F. Supp. 2d 1249 (D. Kan. 2006) ....................................................................5

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liability Litig.*,
 716 F.3d 1057 (8th Cir. 2013) ..............................................................................15

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
 396 F.3d 922 (8th Cir. 2005)...................................................................10, 14, 15

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
 No: 4:03-MD-015-FJG, 2004 WL 3671053 (W.D. Mo. Apr. 20, 2004) ................................9

*Isby v. Bayh*,
 75 F.3d 1191 (7th Cir. 1996) ................................................................................15

*Kumho Tire Co., Ltd. v. Carmichael*,
 526 U.S. 137 (1999)..............................................................................................21

*Lane v. Page*,
 862 F. Supp. 2d 1182 (D.N.M. 2012) .....................................................................2

*Lee v. Ocwen Loan Servicing, LLC*,
 No. 14-CV-60649, 2015 WL 5449813 (S.D. Fla. Sept. 14, 2015) ...........................................7

*Marshall v. Nat'l Football League*,
 787 F.3d 502 (8th Cir. 2015) ........................................................................10, 15

*Petrovic v. Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999) ................................................................5, 9, 10, 16

*Pro v. Hertz. Equip. Rental Corp.*,
   No. 06-3830(DMC), 2013 WL 3167736 (D.N.J. June 20, 2013) ...........................13

*Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*,
   678 F.3d 640 (8th Cir. 2012) .........................................................................10, 14

*Reynolds v. Nat'l Football League*,
   584 F.2d 280 (8th Cir. 1978) ................................................................................15

*Seiden v. Nicholson*,
   72 F.R.D. 201 (N.D. Ill. 1976) ...............................................................................7

*Shames v. Hertz Corp.*,
   No. 07-cv-2174-MMA(WMC), 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) .......13

*Snell v. Allianz Life Ins. Co. of N. Am.*,
   No. Civ. 97-2784-RLE, 2000 WL 1336640 (D. Minn. Sept. 8, 2000) .........9, 13, 25

*Stoetzner v. U.S. Steel Corp.*,
   897 F.2d 115 (3rd Cir. 1990)................................................................................16

*Thompson v. Metropolitan Life Ins. Co.*,
   216 F.R.D. 55 (S.D.N.Y. 2003) ..............................................................................5

*Van Horn v. Trickey*,
   840 F.2d 604 (8th Cir. 1988) ................................................................................15

*Williams, et. al. v. Remington Arms Company, LLC*,
   No. 3:15-cv-00217-BAJ-SCR (M.D. La.) .........................................................7, 20

## OTHER AUTHORITIES

Rule 23 .............................................................................................................2, 25

## EXHIBIT INDEX

| Ex. # | Document |
|-------|----------|
| A | 11/17/2015 Supplemental Declaration of Charles Powell |
| B | 11/20/2015 Declaration of Kris Carson |
| C | 10/21/2015 Henry Jackson Belk Deposition Transcript |
| C-1 | Videotaped Belk Deposition (clips) |
| D | 11/14/2015 Joseph W. Newkirk Report on Validity of Belk Objection and Deposition |
| E | 11/18/2015 Supplemental Declaration of Derek L. Watkins |

# INTRODUCTION

Plaintiffs[1] and Defendants Remington Arms Company, LLC ("Remington"), E. I. du Pont de Nemours and Company ("DuPont"), and Sporting Goods Properties, Inc. ("SGPI") submit this joint response to objections filed by Objectors Terry Pennington (Doc. 96), Rodney Townsend (Doc. 98), and Jack Belk (Doc. 73, 94).[2]

The Settlement Agreement in this case represents the culmination of nearly three years of effective advocacy and robust negotiations and offers real benefits for upwards of seven million firearms. The vast majority of those firearms are eligible to be retrofitted with a connectorless trigger mechanism (including a new X-Mark Pro trigger mechanism) at Remington's cost—relief entirely consistent with what Plaintiffs sought in their original complaint. (*See* Doc. 1 at ¶¶ 28, 159.) The Settlement will be administered on a claims-made rather than capped-fund basis, so any and all Settlement Class Members are entitled to the full scope of benefits.

Of the millions of firearms implicated in this Settlement, a mere three Settlement Class Members have objected. For the reasons set forth below, the objections of Terry Pennington, Rodney Townsend, and Jack Belk do not call into question the fairness, reasonableness, or adequacy of the Settlement. The Parties request that the Court reject each of their contentions and grant final approval following the final approval hearing.

---

[1] Dylan Anderson, Rodney Barbre, Wallace Brown, John Corsi, Chase Delperdang, Gordon Hardaway, Roger Keesy, William Massie, William Moodie, Gary Otis, Ian Pollard, James Waterman, and Mitchell Winterburn.

[2] Plaintiffs will respond in a separate brief regarding objections to Class Counsel's fee request and the Representative Plaintiff Awards.

<u>**DISCUSSION**</u>

**I.     OBJECTORS PENNINGTON AND TOWNSEND**

**A.     Objections Regarding Notice Are Meritless**

Objectors Pennington's and Townsend's arguments regarding the Notice do not render the Settlement unfair, unreasonable, or inadequate.[3]

First, the Objectors' unsupported speculation that the Notice is inadequate given the current participation rate (Townsend Objection, Doc. 98 at 12-13; Pennington Objection, Doc. 96 at 3) is refuted by expert evidence. The Court-appointed Class Action Settlement Administrator averred and will be available to testify at the approval hearing that the Notice Plan delivered a 73.7% reach, with Settlement Class Members seeing the Notice on average 2.96 times, and the Notice Plan thus satisfied Rule 23 as well as due process. (Declaration of Steven Weisbrot on Implementation and Adequacy of Notice Plan, Doc. 92-9, ¶¶ 6, 27, 30-31.) In addition to traditional publication notice and direct notice, the Notice Plan also utilized Internet banner ads and social media in order to supplement awareness of the Settlement. (*Id.* ¶¶ 13-17.) The banner ads were shown 38,844,449 times, and the Facebook Ad Campaign was shown 971,978 times. (*Id.* ¶¶ 16-17.) *See also DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 302 (W.D. Tex. 2007) (refusing to entertain objector's conjecture that the claims rate indicates that the notice was not well distributed and instead looking to the affidavit from the company that oversaw the notice program on the reach of the notice).[4] Moreover, the Objectors' emphasis on the current participation rate is misplaced, given that Settlement Class Members need not make a claim—and benefits will not be distributed—until after the Effective Date. *See Lane v. Page*, 862 F.

---

[3]  The Parties are working to schedule depositions for Objectors Pennington and Townsend, and reserve the right to seek leave to supplement this Response following any such depositions.

[4]  For the same reason, the Court should reject Objector Townsend's unsupported contention that "television ads of high quality" should have been part of the Notice Plan. (Townsend Objection, Doc. 98 at 13.)

Supp. 2d 1182, 1246 (D.N.M. 2012) (holding that the notice was the best practicable and noting that class members do not make claims for various unknown reasons); *Eastwood v. S. Farm Bureau Cas. Ins. Co.*, No. 3:11-CV-03075, 2014 WL 4987421, at *4 (W.D. Ark. Oct. 7, 2014) (reasoning that a low participation rate did not mean that the notice procedures were deficient).

Second, there is no basis for the objection that the Notice fails to describe the reason for the XMP recall and the risks associated with recalled firearms. (Townsend Objection, Doc. 98 at 10.) As the Class Action Settlement Administrator opined, "the notice itself ensures that the class members understand their rights and options under the settlement and can make an informed decision as to how they would like to proceed." (Declaration of Steven Weisbrot, Doc. 92-9, ¶ 30.) The Long Form Notice clearly identifies which firearms potentially contain defective XMPs, explains that those firearms are the subject of an ongoing voluntary Product Safety Recall, and directs Settlement Class Members to the recall website for additional information. Both the Settlement Website and the recall website contain prominent warnings containing the following information:

> WARNING:
>
> > IF YOU CURRENTLY OWN A MODEL 700 OR MODEL SEVEN RIFLE WITH AN X-MARK PRO TRIGGER MANUFACTURED FROM MAY 1, 2006, TO APRIL 9, 2014, YOUR FIREARM IS THE SUBJECT OF AN ONGOING VOLUNTARY SAFETY RECALL. <u>STOP USING YOUR FIREARM</u>.[5]
> >
> > Any unintended discharge has the potential to cause injury or death. Immediately cease use of your firearm and submit your electronic claim form.

It is accordingly factually incorrect for the Objectors to argue that the Notice is inadequate for failing to warn of the dangers associated with recalled Settlement firearms,

---

[5] http://remingtonfirearmsclassactionsettlement.com.

including the risk of personal injury or death, when this information is plainly in the Notice. (Townsend Objection, Doc. 98 at 10.)

Third, Objector Pennington is incorrect that paragraphs 101-102 of the Settlement Agreement expand the scope of the Release. (Pennington Objection, Doc. 96 at 1-2.) Those provisions are not intended to nor do they in fact release any Settlement Class Member's claims under the Settlement. Rather, they simply account for the possibility that Remington may be sent a firearm which the company believes is unsafe, cannot be repaired, and must be returned to the owner as Remington is obligated to do. (Doc. 86-1, ¶¶ 101-102.)[6] These provisions apply (if at all) to only a limited fraction of firearms and *have yet to be invoked in connection with any claim filed to date*. Procedural safeguards are in place to provide Settlement Class Members with the right to challenge a determination that their firearm is unsafe. Pursuant to the Settlement Agreement, a class member can utilize a dispute resolution process though a neutral gunsmith to challenge Remington's position that a firearm cannot be repaired. (*Id*.)

Nor is the Notice inadequate for any purported failure to properly publicize the Release. (Pennington Objection, Doc. 96 at 3.) The full language of the Release is set forth in three different places on the Settlement Website (in the Settlement Agreement, Amended Motion for Preliminary Approval, and Supplemental Motion for Preliminary Approval), and the Long Form Release summarizes the Release and directs Settlement Class Members to the relevant paragraphs in the Settlement Agreement that contain the Release.[7] In addition, Class Counsel have been available, have answered numerous inquiries and questions, and remain available to answer questions from class members regarding the scope of the Release.

---

[6] For example, a firearm may have been altered post-manufacture or have been so poorly maintained as to render it unsafe.

[7] Although the Release is adequately disclosed even without Appendix A to the Long Form Notice, the Parties took immediate steps to include that information on the Settlement Website and through the Class Action Settlement Administrator following this particular objection.

Objector Pennington also makes sweeping conclusions regarding the Notice's explanation of the Settlement benefits for each subclass, but he does not point to any particular benefit that he thinks should be described in greater detail or what "critical information" is absent that would help Settlement Class Members decide whether to participate. (Pennington Objection, Doc. 96 at 2.) Rather, he makes broad assertions without any legal support that the Notice is deficient because it does not explain the basis for the valuation of non-monetary benefits that allegedly is important for class members to evaluate the fairness of the Settlement. (Pennington Objection, Doc. 96 at 2.)[8] In the same vein, he provides no support for his assertion

---

[8] Courts have not required that Notice include information for a class member to determine the aggregate value of the benefits to the class or how the benefits were going to be allocated to each class member. *See, e.g.*, *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) (notice of a class-action settlement comported with due process, even though it did not reveal how the total amount of monetary damages would be distributed among the individual class members, when the notice alerted the members to their status, informed them of the proposed settlement and their right to object to the settlement at a fairness hearing, and provided a telephone number for more information.); *In re "Agent Orange" Prod. Liability Litig.*, 818 F.2d 145, 170 (2d Cir. 1987) (there is no absolute requirement that a distribution plan be formulated prior to notification to the class of a proposed settlement.); *In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249 (D. Kan. 2006) (notice is adequate when it sets forth the formula for distributing the settlement fund among the class members; it is unnecessary for the settlement distribution formula to specify precisely the amount that each individual class member may expect to recover and it is not unusual for class members not to know amounts they will be receiving until after final approval.). Rather, courts have required that the notice provide the class member with sufficient information to make a determination about the value of the settlement benefits. The Notice in this case did just that—it provided the class members with a description of the non-monetary benefit available to them—replacement of the trigger mechanism with an XMP trigger mechanism. To require additional detail would be unnecessary and potentially overwhelming to the Settlement Class Member. Moreover, Class Counsel has been and will remain available to answer any questions that Settlement Class Members may have about the Settlement benefits and their value. Finally, in their fee application, which is a public document filed on the Court's Electronic Case Filing System, Class Counsel provided the support for the value of the non-monetary benefits—cost to retrofit or replace the triggers with the XMP trigger mechanism. Settlement Class Members were afforded the opportunity to review this document and the fact that Objector Pennington has done so and objected to Plaintiffs' fee request belies his argument that class members did not have access to this information. *See Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 67 (S.D.N.Y. 2003) ("The appearance and argument by counsel on behalf of these objectors at the fairness hearing belies their claim that the notice denied them the opportunity object to the fees.").

that an image of a shotgun rather than a rifle appearing on the Facebook Ad Campaign somehow renders the Notice insufficient. (Pennington Objection, Doc. 96 at 3.)[9]

Finally, it is disingenuous for Objector Pennington to assert that Settlement Class Members "have no definite timeframe in which to submit claims," (Pennington Objection, Doc. 96 at 2), when, in fact, they have been notified that they can submit claims now and that the end date cannot be determined until it is known whether any appeal will be filed. Furthermore, the Parties will update the Settlement Website with the end date for the Claims Period once the Effective Date can be determined. This is what is typically done. Courts routinely approve class action settlements that provide for the claims process to begin before final approval and end after a specified amount of time following the resolution of any appeals.[10]

### B. Objections Regarding Settlement Relief are Meritless

As an initial matter, Objector Townsend is an attorney and is litigating a pending personal injury case against Remington involving an alleged accidental discharge of a firearm containing a recalled X-Mark Pro trigger mechanism. (*Edge v. Remington Arms Company, Inc., et al.*, No. 14-0201, Houston County, Texas District Court, 3rd Judicial District). Townsend's co-counsel in *Edge* is his counsel here—Robert Chaffin. In addition to the *Edge* case, Mr.

---

[9] The Facebook Ad Campaign served only as a supplement to the two methods of notice (publication and internet banner ads) used to calculate the 73.7% reach and 2.96 average frequency figures that evidenced compliance with Rule 23 and due process. (Declaration of Steven Weisbrot, Doc. 92-9, ¶¶ 6, 27, 30-31).

[10] Nor is the Notice as a whole deficient because the Long Form Notice contains Class Counsel's names and mailing addresses rather than their phone numbers. (Pennington Objection, Doc. 96 at 2.) Settlement Class Members were, and continue to be, sufficiently apprised of Class Counsel's contact information in a variety of settlement pleadings filed with the Court and otherwise part of the Notice Plan. With respect to Class Counsel's phone numbers in particular, those are set forth in the Amended Joint Motion for Preliminary Approval (signature block) and the Supplemental Joint Motion for Preliminary Approval (signature block), which are posted on the Settlement Website. The Settlement Website also provides those numbers on the FAQs section and in the "contact us" tab. Mr. Lanier's phone number is listed in the press release, which is also posted on the Settlement Website. Additionally, the phone number for the Class Action Settlement Administrator is listed on the Long Form, Short Form, and Direct Notices, and Settlement Class Members can call the Administrator if they have questions on how to reach Class Counsel. Finally, each of four Class Counsel maintains easily accessible Internet websites prominently featuring toll-free contact telephone numbers.

Chaffin is counsel in two other personal injury cases pending against Remington involving a recalled X-Mark Pro—*Williams, et. al. v. Remington Arms Company, LLC*, No. 3:15-cv-00217-BAJ-SCR (M.D. La.) and *Bachert v. Remington Arms Company, LLC*, No. 4:15-cv-03220 (S.D. Tex.)—and has brought other litigation against Remington in the past. Other courts have recognized that objections filed under similar circumstances may be biased and not motivated by the best interest of the class. *Lee v. Ocwen Loan Servicing, LLC*, No. 14-CV-60649, 2015 WL 5449813, at *14 (S.D. Fla. Sept. 14, 2015) (noting that "courts consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class members first" and rejecting objection when objector and counsel had competing suits that made their objections suspect) (internal alteration and quotation omitted); *First State Orthopaedics v. Concentra, Inc.*, 534 F. Supp. 2d 500, 517 (E.D. Pa. 2007) (noting that some objectors had "mixed motives" as evidenced by their claims in other courts that could be cut off by the settlement); *Seiden v. Nicholson*, 72 F.R.D. 201, 206 (N.D. Ill. 1976) ("Objections to class action . . . settlements cannot be used to gain leverage in other disputes. Objectors cannot enter a proceeding purporting to protect a corporation or a class and instead use the proceeding for their own ulterior purposes that could harm the interests of the class and corporation by delay, expense, confusion, and the loss of a favorable settlement."); *see also* Federal Judicial Center, *Manual for Complex Litigation* § 21.643, at 326 (4th ed. 2008) ("Some objections, however, are made for improper purposes, and benefit only the objectors and their attorneys (e.g., by seeking additional compensation to withdraw even ill-founded objections). An objection, even of little merit, can be costly and significantly delay implementation of a class settlement."); *see generally* 5 William B. Rubenstein, Alba Conte, and Herbert B. Newberg,

*Newberg on Class Actions* § 15:37, Abusive Conduct by Counsel Objecting to Class Action Settlement (4th ed. 2002).

Regardless, the Court should reject Objectors Townsend's and Pennington's unfounded criticism that the relief to members of Settlement Class B-1 (the X Mark Pro Recall Class) is inadequate because they receive "no benefits" under the Settlement that they cannot obtain through the recall itself. (Pennington Objection, Doc. 96, at 3; Townsend Objection, Doc. 98, at 4.) First, members of Settlement Class B-1 are free to participate in the recall rather than the Settlement. This option is stated clearly in myriad Settlement filings, including the Settlement Agreement (Doc. 86-1, ¶ 54(a)), Long Form Notice (Doc. 86-3 at 6-7), and in the FAQ section of the Settlement Website.[11] *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) (noting that settlement class members could opt out of the settlement if they thought their personal claim was being sacrificed for the greater benefit of the class).

Additionally, the Settlement provides benefits over and above the relief available under the voluntary recall, including an educational DVD regarding safe firearms practices and additional oversight by the Court and Class Counsel.[12] The Notice also provides added means of informing owners of recalled firearms about the recall, Settlement, and availability of an XMP retrofit. These supplemental benefits weigh in favor of the Settlement's fairness and justify final approval. *See id.* (approving a class-action settlement following a recall and emphasizing the

---

[11] http://remingtonfirearmsclassactionsettlement.com/faqs.

[12] Class Counsel's oversight has already created substantial value and benefits for Settlement Class Members. Plaintiffs' expert, Charles Powell, has inspected the Remington manufacturing facility and operation to confirm that the manufacturing process that led to the Loctite issue and recall will not occur again. In this regard, he is of the opinion that Remington has the in-house capability to correctly manufacture and assemble the XMP trigger mechanism. The Remington changes to their assembly procedure and 100% microscopic inspection of all future XMP fire controls should ensure proper assembly. (Supplemental Powell Declaration, Ex. A, at ¶ 4.1.1.) But for the Settlement, this added oversight by Plaintiffs' expert who is not employed or affiliated with Remington would not have occurred.

additional benefits of monitoring by class counsel, the additional notice, and the fact that the court retained jurisdiction over implementation of the settlement).

And finally, while Objector Townsend contends that the existence of the recall somehow bolsters the strength of these Settlement Class Members' claims, (Townsend Objection, Doc. 98 at 5-8), he does not articulate what additional relief members of Settlement Class B-1 might reasonably be able to achieve through litigation and the Court should not have to guess for him. *See Snell v. Allianz Life Ins. Co. of N. Am.*, No. Civ. 97-2784-RLE, 2000 WL 1336640, at *19 (D. Minn. Sept. 8, 2000) ("While the [Objectors] understandably want more from the settlement, they offer no assurance that, under the circumstances presented, a greater recovery could be secured at Trial."). The facts remain that this case involves economic losses only, that Class Members release only economic-loss claims, and that a retrofit makes Class Members fully whole now without the delay and expense of pursuing individual or class litigation. *See In re Imprelis Herbicide Mktg. Sales Practices & Prod. Liab. Litig.*, 296 F.R.D. 351, 366 (E.D. Pa. 2013) (rejecting objections that the settlement did not provide compensation for damage to people or animals, when such injuries were specifically excluded from the settlement release); *see also In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No: 4:03-MD-015-FJG, 2004 WL 3671053, at *10 (W.D. Mo. Apr. 20, 2004) (balancing the strength of the plaintiffs' claims against the risk in pursing litigation, including the fact that any recovery from trial would occur for years); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999) (holding that the "speculative possibility" of punitive damages did not render the settlement agreement unfair).[13]

It is well-settled that settlements should not be judged against a "hypothetical or speculative measure of what might have been achieved by the negotiators" or what could be

---

[13] On this point, Objector Pennington incorrectly contends that Settlement Class Members are releasing wrongful-death claims. To the contrary, "[r]eleased claims do not include claims for personal injury." (Doc. 86-1, ¶ 88). The personal-injury exclusion extends to wrongful-death claims.

achieved by continued litigation.  *See Marshall v. Nat'l Football League*, 787 F.3d 502, 517 (8th Cir. 2015) (reaffirming that district courts need not consider "the range of reasonableness of the settlement fund in light of the best possible recovery" when determining whether a settlement agreement is fair, adequate, and reasonable, unlike other circuit courts of appeals) (citation omitted); *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 649 (8th Cir. 2012) ("Appellant falls far short of establishing the settlement agreement was unfair or inadequate simply because the retirees did not get as much as they believed they should."); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 933 (8th Cir. 2005) (affirming final approval of settlement and finding that the "uncertainty of relief," when weighed "against the immediate benefit provided in the settlement," supports the settlement's reasonableness).

Objector Pennington's criticisms regarding the adequacy of voucher benefits for members of Settlement Classes A-3 and A-4 (covering guns ranging in age from 33 to 67 years old) similarly ignore the balance the Settlement strikes and its role in assessing the Settlement's overall fairness.  (*See* Pennington Objection, Doc. 96 at 3-4.)  As this Court has recognized, "it is appropriate for interclass allocations to be based upon, among other things, the relative strengths and weaknesses of class members' individual claims and the timing of purchases and sales of the [product] at issue."  *In re Charter Commc'n, Inc., Sec. Litig.*, No. 4:02-cv-1186-CAS, 2005 WL 4045741, at *10 (E.D. Mo. June 30, 2005); *see also Charron v. Wiener*, 731 F.3d 241, 253 (2d Cir. 2013); *Petrovic*, 200 F.3d at 1150; *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Litig.*, No. 08-cv-1967-MD-D-ODS, 2011 WL 1790603, at *3 (W.D. Mo. May 10, 2011). Moreover, in a class action settlement, "it is permissible to award different relief to class members based upon objective differences in positions of the class members."  *Farrell v. OpenTable, Inc.*, No. 11-1785, 2012 U.S. Dist. LEXIS 10564, at *9 (N.D. Cal. Jan. 30, 2012);

*Alin*, 2012 U.S. Dist. LEXIS 188223, at *40 ("Tiered relief is common in class action settlements, and when fashioning relief this way, lines are inevitably drawn.") (quotation omitted); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 979 (N.D. Ill. 2011) (noting "there is no rule that settlements benefit all class members equally . . . as long as the settlement terms are rationally based on legitimate consideration") (internal citation omitted).

In this case, Settlement Class Members entitled to vouchers own firearms that were produced more than thirty years ago—some more than sixty years ago—and whose individual economic-loss claims would be subject to formidable statutes-of-limitations, statutes-of-repose, lack of reliance, lack of privity, and other defenses. Given that reality, as well as the fact that these firearms simply cannot be readily retrofitted with new Remington trigger mechanisms, vouchers provide appropriate relief to these Settlement Class Members.[14] The vouchers are in an amount sufficient to purchase myriad products, including safety and maintenance items, which ensures the vouchers' utility.[15] The vouchers are also transferable (theoretically making them convertible to cash), may be combined with other vouchers, and any unused portion of the voucher reverts to the owner; it is not relinquished if a purchase is less than the amount of the voucher code. *See In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Litig.*, 2011 WL

---

[14] Contrary to Objector Pennington's suggestion (Pennington Objection, Doc. 96 at 4) the voucher values were determined through compromise and an analysis of products available at Remington's online store. The vast majority of items on Remington's website are sold for under $10. The $10 baseline also represents about one-seventh of the value of the retrofit provided to other potential Settlement Class Members, which counsel compromised as being reasonable relative to the strength and circumstances of claims related to firearms that are 30 to nearly 70 years old. The two-tiered approach—providing owners of slightly newer firearms with a voucher for $12.50—also reflects the fact that owners of the oldest firearms have used those firearms for a longer period of time, and therefore have received more value from them.

[15] For example, a trigger block gun lock is offered for $6.95. *See* http://www.shopremingtoncountry.com/Storage-Safety-Gun-Care/b/3207135011?ie=UTF8&title=Storage+%26+SafetysearchNodeID=3207135011&searchPage=1&searchRank=salesrank&searchSize=12 (last visited November 23, 2015).

1790603, at *4 (noting the propriety of voucher benefits in a similar context).  Finally, the number of Settlement Class Members entitled to vouchers represents a sliver of the total number of Settlement Class Members, evidencing the overall fairness of the Settlement.[16]  *See Hanlon*, 150 F.3d at 1026 ("It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness.").

Nor does the fact that members of Settlement Class B-2 can receive reimbursement for their prior out-of-pocket costs associated with replacing their Walker Fire Control with an XMP render the Settlement unfair to members of Settlement Class B-1, who are not eligible for such reimbursement.  (Townsend Objection, Doc. 98 at 9-10.)  There is no "disparate treatment" in this regard because members of Settlement Class B-1, by definition, did not incur the same out-of-pocket expense.

Objector Townsend's related plea that Settlement Class Members should be given the option to choose a cash benefit instead of a retrofit is illogical given the allegations in the amended complaint regarding the potential safety risks associated with Settlement Firearms.[17] *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 811 (3rd Cir. 1995) (rejecting settlement agreement in which the settlement benefits did "not address the safety defect that formed the central basis of the amended complaint . . . ."); *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 981 F.Supp. 969 (E.D. La. 1997) (rejecting settlement agreement when participating in the settlement "will, at most, merely return the vehicles to their

---

[16]  These older firearms—even assuming all are still in existence—represent about 8% of the total number of Settlement Firearms and about 9.5% of firearms that comprise Settlement Class A.  (Declaration of Kris Carson, attached as Ex. B, at ¶¶ 3-8; Preliminary Approval Hearing, Doc. 84, at 10:23-11:5; Motion for Final Approval, Doc. 92, at 9-10 & n.10.)

[17]  This is especially true with respect to Settlement Class B, which involves firearms that Remington has affirmatively recalled and instructed owners to stop using.

pre-modified condition—a condition that the plaintiffs allege in their complaint is defective.").[18]

*See also Snell*, 2000 WL 1336640, at *19 ("We are obligated to consider a settlement in the context of contested litigation, whose result is uncertain—seldom, if ever, is a settlement the equivalent, as the Objectors seem to imply, of a 'wish list' tendered by the victorious litigant.").[19]

Finally, the Objectors are wrong that the value of the Settlement should be linked to the current participation rate. (*See* Townsend Objection, Doc. 98 at 2-3.) "A settlement's fairness is judged by the opportunity created for the class members, not by how many submit claims. What matters is the settlement's value to each class member—it is ultimately up to class members to participate or not." *Hamilton v. SunTrust Mortg. Inc.*, No. 13-60749-CIV, 2014 WL 5419507, at *7 (S.D. Fla. Oct. 24, 2014). Courts have routinely refused to give weight to the claims rate in determining the fairness and reasonableness of a settlement. *See, e.g., id.* at *5; *Shames v. Hertz Corp.*, No. 07-cv-2174-MMA(WMC), 2012 WL 5392159, *14 (S.D. Cal. Nov. 5, 2012).

## C. Objections Regarding Claim Forms are Meritless

Finally, Objector Pennington raises two objections regarding the Claim Forms, neither of which call into question the fairness, reasonableness, or adequacy of the Settlement.

---

[18] Most of the cases cited by Objector Townsend do not explain what types of benefits should be provided to class members, simply approving settlements that provide class members with several options. *See Farrell v. OpenTable Inc.*, No. 11-1785-SI, 2012 WL 1379661, at *1 (N.D. Cal. Jan. 30, 2012); *In re M3 Power Razor System Mktg. & Sales Practice Litig.*, 270 F.R.D. 45, 52 (D. Mass. 2010); *Pro v. Hertz. Equip. Rental Corp.*, No. 06-3830(DMC), 2013 WL 3167736, at *2 (D.N.J. June 20, 2013). And the *Figueroa* case is similarly inapposite, holding only that a pure coupon settlement failed to provide reasonable relief to class members. *Figuera v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1327 (S.D. FLa. 2007). It does not remotely suggest that a settlement is unfair when, as is the case here, the primary settlement relief consists of a retrofit that addresses the core safety claims in the plaintiffs' complaint.

[19] So too is Objector Pennington's desire that the retrofit program "be available indefinitely." (Pennington Objection, Doc. 96 at 4.) The Settlement is not unfair or inadequate simply because there is a limit to the time period in which Settlement Class Members can make claims. Counsel is aware of no class-action settlement that extended into perpetuity.

Objector Pennington's first argument—that the Claim Form is unreasonable and unfair because "Class Members should not be forced to acknowledge any warning regarding the defective products"—ignores the pragmatics of retrofitting Settlement Firearms. (Pennington Objection, Doc. 96 at 4-5.) The Claim Forms applicable to Settlement Firearms that may be retrofitted under the Settlement each contain a section that asks whether the firearm has ever fired without a trigger pull. If so, the Claim Form warns the Settlement Class Member to stop using the firearm due to the potential for it to cause injury or death. *See*, *e.g.*, Doc. 86-2 at 9. This question and associated warning are necessary both so that Remington may responsibly examine any firearm alleged to have fired without a trigger pull and so that Remington can ensure that consumers are adequately warned of the potential harm that could result.

Objector Pennington also argues that the Claim Form applicable to Settlement Class B-2 is unfair because it requires an affidavit before the Class Member can receive reimbursement for his prior retrofit. This objection is entirely without merit. As the Claim Form makes clear, there is no requirement that these Settlement Class Members submit affidavits from the individual who performed the XMP retrofit in order to receive a refund. A receipt is sufficient. *See* Doc. 86-2 at 23.

### D. The Overwhelmingly Positive Response to the Settlement Supports Final Approval

Class members' reaction to a proposed settlement—objecting to or opting out of—is a factor in determining whether the settlement is fair, adequate, and reasonable. *Prof. Firefighters Ass'n of Omaha*, 678 F.3d at 648; *In re Wireless Tel. Fed Cost Recovery Fees Litg.*, 396 F.3d at 932; *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988) (reaffirming that a district court must consider four factors including "the amount of opposition to the settlement"); *see also 2 McLaughlin on Class Actions* § 6:10 (10th ed.) ("Courts have generally assumed that silence

constitutes tacit consent to the agreement, so that the absence of objectors or receipt of a relatively small number of objectors and opt-outs supports the conclusion that the settlement is adequate.") (citation omitted). Objector Pennington asks the Court to ignore this well-established principle by arguing—without any legal support—that "[t]he absence of opt-outs or objections does not equal Class support or settlement fairness." (Pennington Objection, Doc. 96, at 7.) Courts infer that a settlement is fair, adequate, and reasonable when few class members object to it, however. *See, e.g., Marshall*, 787 F.3d at 513-514; *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liability Litig.*, 716 F.3d 1057, 1066 (8th Cir. 2013) (affirming final approval of settlement where 26 class members, out of a class of 30,000, objected); *In re Wireless Tel. Fed Cost Recovery Fees Litg.*, 396 F.3d at 933 (affirming final approval of settlement because, in part, only a "minuscule" number of class members, .00068% of the class, objected); *Reynolds v. Nat'l Football League*, 584 F.2d 280, 287 (8th Cir. 1978) (affirming final approval of settlement and finding that the "few" objectors, 16 out of 5,700 class members, "certainly does not indicate any substantial dissatisfaction with the settlement agreement"); *see also Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996) (affirming final approval of settlement where 13% of the class submitted written objections).

Here, Class Members' response has been overwhelmingly positive. Only three Settlement Class Members have voiced an objection to the Settlement, and two other Settlement Class Members have requested exclusion from the Settlement altogether. This clearly weighs in favor of final approval of the Settlement. *See, e.g., Marshall*, 787 F.3d at 513 (noting and citing cases where the Court approved previous class action settlements where almost half the class objected, and where all the named plaintiffs opposed it); *Petrovic*, 200 F.3d at 1152 (approving settlement where objectors represented fewer than 4 percent of the class); *DeBoer v. Mellon*

*Morg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995) (determining that "[t]he fact that only a handful of class members objected to the settlement similarly weighs in its favor"); *see also Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-119 (3rd Cir. 1990) (holding that objections by only approximately ten percent of the class "strongly favors settlement"). The lack of objections supports the Court's finding that the Settlement is fair, reasonable, and adequate.

## II.   OBJECTOR BELK

### A.   Background

Objector Jack Belk filed an initial statement noting his opposition to the parties' Joint Motion for Conditional Certification of Settlement Classes on February 3, 2015. (Doc. 73.) That same day, Remington filed a response. (Doc. 76.) In September 2015, Belk submitted additional materials (Belk Objection, Doc. 94), and a "supplemental" report (Belk Supplement, Doc. 97).

Belk offers three bases for his Objection to the settlement: (1) that X-Mark Pro trigger mechanisms are not suitable replacements for Model 700 and Model Seven rifles with Walker trigger mechanisms because Remington's use of the metal injection molding ("MIM") process to make the XMP triggers causes the triggers to wear prematurely; (2) the process for Settlement Class Members to have rifles retrofitted with XMP trigger mechanisms is overly burdensome; and (3) educational materials should be provided to Settlement Class Members to warn of alleged inadequacies in Remington rifles.

The Parties deposed Belk on October 21, 2015. (*See* "Belk Depo." attached as Ex. C.)[20] The legal inadequacy of Belk's Objection is demonstrated by the litany of concessions made by Belk at his deposition, including:

---

[20]   For the Court's convenience, the Parties will hand-deliver to the Court as Ex. C-1 a disc of video clips taken from Mr. Belk's deposition.

- Belk is not a metallurgist, engineer, or chemist. Most of his work in his career has been devoted to working as a salesman in fields unrelated to firearms design and manufacture. (Belk Depo. at 61, 68-70, 116.)

- Belk has previously endorsed and recommended XMP Trigger mechanisms to customers and the public as a replacement for Walker trigger mechanisms. (*Id.* at 164-173.)

- Belk has never completed reliable scientific testing to validate his premature wear hypothesis. (*Id.* at 24-26, 108-110.)

- Belk does not understand Remington's MIM process or the differences between the MIM process and the powdered metal process. Nor is Belk familiar with the thread locker used in the XMP production process. (*Id.* at 95-99, 324-325.)

- Belk relies on his own book, "UNSAFE BY DESIGN: FORENSIC GUNSMITHING AND FIREARMS INVESTIGATION," which severely undercuts his credibility because of the numerous inaccuracies, falsehoods and exaggerations made by Belk throughout his book. (Belk Declaration, Doc. 94-4 at 6; Belk Depo. at 193-200, 262-273, 285-289, 290-303, 352-356.)

- Belk is unfamiliar with and does not otherwise understand the notice requirements for class action settlements. (Belk Depo. at 188.)

All of Belk's contentions are without merit and should be rejected by this Court.

### 1. The XMP trigger mechanism.

In 2006, Remington began incorporating XMP trigger mechanisms into newly manufactured Model 700 and Model Seven rifles. From 2006 to 2014, the XMP trigger was used in approximately 1.2 million such rifles. On April 11, 2014, and after consultation and coordination with Plaintiffs' Counsel, Remington undertook a voluntary recall of Model 700 and Model Seven rifles with XMP trigger mechanisms because it determined that some XMP trigger mechanisms could have excess bonding agent (Loctite 660) from the assembly process and could, under certain circumstances, accidentally discharge.[21] This potential condition has been eliminated in XMP trigger mechanisms produced shortly after the April 2014 recall that will be

---

[21] http://xmprecall.remington.com/pdfs/xmprecall-notice.pdf.

used in the retrofit program under the terms of the Settlement. (Supplemental Declaration of Charles Powell, Ex. A, at ¶ 4.1.1.)

### 2. Belk's lack of qualifications.

Belk is not qualified to offer reliable opinions on the suitability of the XMP trigger mechanisms, the MIM process used by Remington to make XMP triggers, the retrofit process implemented under the terms of the settlement, or the adequacy of the Notice (Joseph W. Newkirk, Ph.D., Report on Validity of Belk Objection and Deposition, Ex. D, at 2.) Belk obtained a high school equivalency diploma and attended a gunsmith trade school. (Doc. 73, Resume.) Belk is neither an engineer nor a metallurgist, and he has taken no college courses in metallurgy, engineering or chemistry. (Belk Depo. at 61:2-9; 116:3-6.) He holds no professional licenses. (*Id*. at 61:10-11.) Most of Belk's work career has been devoted to working as a traveling salesman in fields unrelated to firearms design and manufacture. (*Id*. at 68:1-70:3; *see also* Doc. 73, Resume.)

Belk has never worked for a firearms manufacturer, much less consulted or provided assistance to such an entity in design or manufacture of a fire control mechanism or a firearm safety mechanism. (Belk Depo. at 56:13-22.) Belk is not a member of the Association of Firearm and Toolmark Examiners. (*Id*. at 61:12-15.)

### B. Belk's Objections about XMP Trigger Mechanisms Are Meritless

### 1. Belk previously endorsed the X-Mark Pro.

While Belk now claims that the XMP is not a suitable retrofit for Model 700 and Model Seven rifles with Walker trigger mechanisms, his newly found claim is entirely inconsistent with his prior repeated endorsements of the XMP. In October of 2010, Belk appeared on a CNBC program entitled "Remington Under Fire" in which he criticized the design of the "Walker" fire control. Contemporaneous with that program, Belk took to the Internet and promoted the CNBC

program.  As part of his promotional activities for CNBC, Belk heartily endorsed the safety and reliability of the XMP fire control:

- "The MIM parts are plenty good enough and I prefer them to Ruger's investment castings.  Remington has always had a great finish on the active sear surface.  DON'T touch it!  It'll take a hundred pulls for it to become the best it'll be, but it'll be it's best for 50,000 more."

- "The X-Mark Pro is a good trigger."

- "My recommendation is to contact Remington for an X-Mark Pro trigger. . . . It's a good trigger."

- "CNBC is running a special this month.  I post the following as a service to the gunsmith community."  [In the article by Mr. Belk that followed, Mr. Belk stated,] "I have closely examined several X-Mark Pro triggers and their prototypes.  It is as good as any trigger on the market and better than many."

- "I recommend contacting Remington for the new X-Mark Pro for both guns.  I don't know availability, price, or process, but I do know it's a good trigger."

- "If the front of the trigger is slick, no grooves, it is an X-Mark Pro, and a very good trigger."

- "I suggest contacting Remington to get the new X-Mark Pro trigger installed."[22]

In his deposition in this case, Belk confirmed that he publicly endorsed the XMP trigger mechanisms as a safe and suitable alternative to the Walker trigger mechanisms both before and after the 2010 CNBC program.  (Belk Depo. at 166:12-174:8.)  In 2010, Belk wrote that the XMP was as good as any, and better than many, triggers on the market.  (*Id.* at 165:18-166:6.) Belk admitted in his deposition that he has held, and continues to hold, the opinion that the XMP is well-designed, well-made, and well-mounted.  (*Id.* at 92:25-93:4.)[23]

---

[22]  *See* Belk's 2010 and 2011 Online Postings, Doc. 76-3; *see also* Belk Depo. at 168-171.

[23]   Belk's involvement with CNBC continues to this day.  Belk and CNBC reporter, Scott Cohn, have maintained regular contact since the airing of "Remington Under Fire" in October 2010.  Cohn

Belk's prior testimony regarding the reliability and safety of the XMP aligns with his public endorsement of the trigger mechanism:

- **Q**:  And in your opinion, the X-Mark Pro was reasonably safe in design, is it not?
  **A**:  It is.
  **Q**:  And likewise, it is your opinion that the X-Mark Pro trigger mechanism is not defective in design; true?
  **A**:  That is correct.[24]

- "The X-Mark Pro represents a technologically and economically feasible alternative design that should have prevented [the plaintiff's] injuries in this case."[25]

Indeed, Belk testified as recently as 2011 that the XMP trigger mechanism was a safe, non-defective alternative to the Walker trigger mechanism.  (Belk Depo. at 173:4-174:8.)  Belk's current Objection to the XMP cannot be reconciled with his myriad previous endorsements, many of which were given under oath in other federal court proceedings.[26]

### 2.    Belk's opinions regarding premature wear of MIM parts are wrong and unsupported.

Belk claims in his Objection that Remington's MIM process is (a) the same as the "powdered metal" process, and (b) a cause of premature wear in XMP triggers.  (Belk Depo. at 94:21-95:8.)  But Belk himself admitted during his deposition that he does not know the difference between the MIM and powdered-metal processes.  (Belk Depo. at 96:24-97:2.)  Nor is Belk familiar with Remington's current MIM process:  "I don't know what process [Remington is] using in their MIM process.  I don't know what that process is."  (Belk Depo. at 99:9-12;

---

interviewed Belk prior to the February 2015 preliminary settlement approval hearing, which they both attended.  (Belk Depo. at 136-140; *see also id*. at 182-183.)

[24]  *See* Belk's Deposition from *Williams v. Remington*, Doc. 76-4; *see also* Belk Depo. at 167-69.

[25]  *See* Belk's Expert Report from *Bledsoe v. Remington*, Doc. 76-5; *see also* Belk Depo. at 171:25-173:3.

[26]  Belk is also connected to Objector Townsend's attorney, Robert Chaffin.  Belk has been hired to work as a firearms expert on behalf of Chaffin's personal injury clients in lawsuits alleging accidental discharges of Remington rifles on at least two other occasions.  (Belk Depo. at 153:15-156:8.)

99:21-24; 325:9-325:15.) Belk does not even know what type of steel is used in Remington XMP triggers. (*Id.* at 324:24-325:15.)

In addition, Belk has completed no reliable scientific testing to validate his hypothesis that the MIM fabricated trigger of the XMP trigger mechanism is susceptible to early or premature wear resulting in an unsafe condition. (Belk Depo. at 24:14-26:3; *see also id.* at 108:21-110:21.) Belk admitted he does not have the capability to measure wear patterns but relied on his subjective determination that a trigger showed wear. (*Id.* at 21:11-17.) Even then, he conceded that the trigger was not defective or unreasonably dangerous. (*Id.* at 21:18-21.) To the contrary, Belk agreed that based on his limited testing, he could only offer "speculation" as to whether "use" of the XMP in normal field conditions would ever lead to a dangerous condition. (*Id.* at 26:1-3.) Belk's limited testing never resulted in any malfunctions, accidental discharges, or even dangerous engagements of the internal components. (*Id.* at 110:6-21.) These speculations are woefully inadequate under *Daubert*.[27]

And contrary to Belk's unsupported assertions, two metallurgists have "evaluated and compared the MIM process with the powdered metal process" and submitted declarations in support of this Settlement, explaining that (a) Remington's MIM process and the powdered metal process are different, and (b) Remington's MIM process for fabricating components of the XMP trigger mechanism produces safe and reliable parts that are not susceptible to premature wear. (*See* Supplemental Powell Declaration, Ex. A, at ¶¶ 4.2.4-4.2.5; Amended Report of Charles Powell, Doc. 75 at § 6.9; Joseph W. Newkirk, Ph.D., Report on Validity of Belk Objection and

---

[27] Both *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) emphasize the significance of reliable testing and the necessity of the trial court's scrutiny of that testing. *Daubert*, 509 U.S. at 593 ("a key question to be answered . . . will be whether [a theory] can be (and has been) tested."); *Kumho*, 526 U.S. at 149-50. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert*, 509 U.S. at 593 (internal citations omitted).

Deposition, Ex. D, at 1, 6; Preliminary Report on MIM Process Suitability for Remington X-Mark Pro, Doc. 92-12.)  Belk has not even reviewed those reports.  (*See* Belk Depo. at 95:9-96:6.)  And Belk appropriately concedes that he would "defer to a metallurgist who has experience with" the MIM process, (*id*. at 96:7-11), which is precisely what Class Counsel has provided the Court in considering final approval of the Settlement.

Belk's opinion that the XMP trigger mechanism is not a suitable replacement is not based on a reliable foundation and should be rejected.  Moreover, even setting aside the absence of any valid scientific methodology employed by Belk to reach his conclusions, Belk has no reliable anecdotal evidence to support his MIM criticism.  Belk is unaware of any instances of an accidental discharge (*i.e.*, without a trigger pull) of an XMP trigger mechanism that was actually attributable to any premature wear (or deficiency in the Remington MIM process).  (Belk Depo. at 119:20-124:13.)  Belk's MIM criticism is a baseless stretch, at best.

3.      **Belk's opinions based on his inspection of seven XMP trigger mechanisms are unreliable.**

At his deposition, Belk produced seven total XMP trigger mechanisms that were identified and marked as Exhibits 1 through 7.  (Belk Depo. at 14-51; *see also* Watkins' Supplemental Declaration, attached as Ex. E, at ¶ 3.)  Specifically, Belk produced one XMP trigger mechanism that he purportedly received from attorney Jon Robinson, and six XMP trigger mechanisms he acquired from Terry Miller's Gun Repair in Twin Falls, Idaho.  (*See* Belk Supplement, Doc. 97; *see* Belk Depo. at 18-24; *see also id*. at 147-151.)  Belk's conclusion—that is, that all post-recall XMP triggers are susceptible to early or premature wear from regular use—is apparently drawn from his review of the seven XMP trigger mechanisms.  At deposition, however, Belk admitted that he had virtually no relevant knowledge of the history, usage or circumstances surrounding the fire controls—that is, who owned them, whether they were

manufactured under the pre- or post-recall process, whether they had experienced an accidental discharge, or whether they had been adjusted after leaving Remington's control. (Belk Depo. at 18-51.) Additionally, Belk never actually functioned any of the six "Miller" XMP trigger mechanisms in a rifle in the same condition those trigger mechanisms were in when received from Mr. Miller; Belk functioned the triggers only after making modifications and/or manipulating them in some way. (Belk Depo. at 49:18-50:4.) With respect to the XMP trigger mechanism Belk purportedly received from attorney Robinson, Belk altered it and then functioned it in a Model 600 rifle, not a Model 700 rifle. (*Id*. at 22:17-26:3; 109:11-113:3.) Regardless, he could only speculate that that trigger would ever "become dangerous[.]" (*Id*. at 25:14-25:3.)

Significantly, Belk maintains that ***only*** two of the trigger mechanisms that he produced at his deposition are "worthy" of the Court's attention—the so-called "F" trigger and the trigger he purportedly received from attorney Jon Robinson. (*Id*. at 50:5-51:9.) Belk's conclusions drawn from those two trigger mechanisms are unsupported by any facts and wrong. The "F" trigger is a pre-recall XMP trigger mechanism that has been heavily altered after leaving Remington's factory. (Watkins' Supplemental Declaration, Ex. E, at ¶ 8; *see also* Powell's Supplemental Declaration, Ex. A, at 4.2.2.) Likewise, the XMP trigger Belk purportedly received from Mr. Robinson had been heavily altered after leaving Remington's factory. (Watkins Supplemental Declaration, Ex. E, at ¶ 6.) Despite these alterations, neither trigger mechanism showed excessive wear, let alone wear that was unsafe in any way. (*Id*. at ¶¶ 6, 8.) Indeed, qualified expert testimony in this case demonstrates that none of the fire controls produced by Belk at his deposition "support his claim that an unaltered, unmodified and properly maintained X-Mark Pro

fire control manufactured under Remington's post-recall processes is in anyway unsafe, dangerous or susceptible to early or premature wear." (*Id.* at ¶ 11.)

### 4.    Belk's book undermines his credibility.

Belk released a book, "UNSAFE BY DESIGN: FORENSIC GUNSMITHING AND FIREARMS INVESTIGATION," in December 2014, contemporaneously with his objection in this case. (*See* Doc. 94-4 at 6.)  Belk's book is filled with stories that are riddled with inaccuracies, hyperbole, exaggeration, and, according to Belk, "mistaken authorship," all of which further undermine the credibility of his objections.  For example, Belk conceded in his deposition that his book (a) incorrectly stated he had been certified as a firearms expert and mechanical engineer by a federal judge in the *Emerson* matter, (b) misrepresented the facts surrounding the *Hull* case, and (c) inaccurately suggested he had helped secure the post-conviction release of a man convicted of shooting his wife.  (Belk Depo. at 193-200; 262-273; 290-303.)  Belk includes in his book the belief that the XMP trigger design is defective due to a corner that is less than 90 degrees, but in his deposition he admits that he bases his opinion on just one example that he knows of a broken corner.  (*Id.* at 207:22-208:22.)  But Belk had no documentation of his exam of the trigger which purportedly had a broken corner.  (*Id.* at 122:5-7.)  And Belk conceded that he had completed no testing to support his "90 degrees" opinion.  (*Id.* at 107:20-25.)  Belk's objections in this case represent yet another example of the myriad inaccuracies, misstatements, and unfounded assertions he continues to disseminate to the public.

### C.    Belk's Objections about the Settlement Provisions Are Likewise Meritless

First, Belk incorrectly suggests that Settlement Class Members must ship their rifles out of state to participate in the retrofit.  (Belk Objection, Doc. 94, at 2.)  The Settlement provides for 26 geographically dispersed Remington Authorized Repair Centers ("RARC") to retrofit rifles with new XMPs, many of which will necessarily be in the home state of a Settlement Class

Member. Settlement Class Members may ship their firearm to an RARC, but they also are entitled to take their firearm to the closest RARC, should they wish to avoid putting their firearm in the mail. Instead, Belk puts forth an undeveloped, untested, and barely researched suggestion for repair rather than replacement. (Belk Depo. at 114:16; Doc. 94-4 at 6.)

Belk further complains that participation in the Settlement amounts to "de facto registration." (Doc. 94 at 2.) But Remington could not repair any firearm without the customer providing a valid serial number. Moreover, Belk's complaint that class members have to provide personal information when participating in the retrofit process is undercut by his admission that federal law requires disclosure of such information when firearms are purchased from a federally licensed dealer. (*Id.* at 213:5-214:2.)

Finally, Belk's criticism that the Settlement should have an educational notice component regarding the alleged dangerous condition of Settlement Firearms ignores the expert testimony that the Notice satisfied Rule 23 and due process, as well as the fact that Defendants do not concede the existence of a product defect. *See Snell*, 2000 WL 1336640, at *19 ("We are obligated to consider a settlement in the context of contested litigation, whose result is uncertain—seldom, if ever, is a settlement the equivalent, as the Objectors seem to imply, of a 'wish list' tendered by the victorious litigant."). Belk readily admits that he has not completed any scientific analysis that validates his claim that the Settlement Firearms are defective and unreasonably dangerous. (Belk Depo at 274-278.) *Cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). For all of these reasons, Belk's educational notice criticism should be rejected.

## CONCLUSION

For the foregoing reasons, the Parties respectfully request that the Court enter final approval of the Settlement following the December 14, 2015 final approval hearing.

Respectfully submitted,

NEBLETT, BEARD & ARSENAULT

_____ s/ Richard Arsenault _____
Richard Arsenault
2220 Bonaventure Court
Alexandria, LA 71301
Phone:  800-256-1050
Fax:  318-561-2592
rarsenault@nbalawfirm.com

W. Mark Lanier
LANIER LAW FIRM
6810 FM 1960 West
Houston, TX 77069
wml@lanierlawfirm.com

Charles E. Schaffer
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone:  215-592-1500
Fax:  215-592-4663
cschaffer@lfsblaw.com

Eric D. Holland
R. Seth Crompton
HOLLAND LAW FIRM, LLC
300 North Tucker Boulevard, Suite 801
St. Louis, MO 63101
Tel:  314-241-8111
Fax:  314-241-5554
eholland@allfela.com
scrompton@allfela.com

**Class Counsel**

Jon D. Robinson
Christopher Ellis
BOLEN ROBINSON & ELLIS, LLP
202 South Franklin, 2nd Floor
Decatur, IL 62523
Phone:  217-429-4296
Fax:  217-329-0034
jrobinson@brelaw.com
cellis@brelaw.com

SHOOK, HARDY & BACON LLP

_____ s/ John K. Sherk _____
John K. Sherk, MO Bar #35963
Amy M. Crouch, MO Bar #48654
Molly S. Carella, MO Bar #56902
Brent Dwerlkotte, MO Bar #62864
2555 Grand Blvd.
Kansas City, MO 64108
Phone:  816-474-6550
Fax:  816-421-5547
jsherk@shb.com

Dale G. Wills
Andrew A. Lothson
SWANSON, MARTIN & BELL, LLP
330 North Wabash Avenue, Suite 3300
Chicago, Illinois  60611
Phone:  312-321-9100
Fax:  312-321-0990
dwills@smbtrials.com

**Attorneys for Defendants Remington Arms Company, LLC, E.I. du Pont de Nemours & Company, and Sporting Goods Properties, Inc.**

John R. Climaco
John A. Peca
Climaco, Wilcox, Peca, Tarantino &
Garofoli Co., LPA
55 Public, Suite 1950
Cleveland, OH 44113
jrclim@climacolaw.com
japeca@climacolaw.com

Richard Ramler
Ramler Law Office, PC
202 W. Madison Avenue
Belgrade, MT 59714
richardramler@aol.com

Timothy W. Monsees
Monsees & Mayer, PC
4717 Grand Avenue, Suite 820
Kansas City, MO 64112
tmonsees@mmmpalaw.com

Jordan L. Chaikin
Parker Waichman LLP
27300 Riverview Center Boulevard, Suite 103
Bonita Springs, FL 34134
jchaikin@yourlawyer.com

**Attorneys for Plaintiffs**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 23rd day of November 2015 I filed the foregoing document with the clerk of the court using the court's CM/ECF system, which will serve electronic notice on all parties of interest.

/s John K. Sherk

**Attorney for Defendants Remington Arms Company, LLC, E.I. du Pont de Nemours & Company, and Sporting Goods Properties, Inc.**
