Richard D. Barber
3240 Heeb Road
Manhattan, MT. 59741
(406) 599-0524

December 10, 2015

Honorable Ortrie D. Smith
Charles Evans Whittaker Courthouse
400 East Ninth Street
Kansas City, Missouri, 64106
   Your Honor:

   My name is Richard Barber. I live in Manhattan, Montana. I have become generally recognized as a national authority of the subject matter involving Remington bolt action rifles, to include: history, defects and programs to mitigate "known or suspected product deficiencies" in Remington brand products since the conception of the Walker fire control design that are at the center of the Pollard case. My research also encompasses alternative design fire control development, recalls, proposed recalls and a host of other subjects associated to this vast issue before your court. My opinions and insights are derived from my extensive review of the company's own internal documents, which I suspect range in the millions of pages of content; including other exhaustive research of this subject matter I will not go into for the purpose of this letter.

   First off, I am writing this letter to you in an unofficial capacity as a courtesy to the court. I have come to believe grossly misleading and deceptive statements were made to you during the February 4, 2015 hearing. I have and continue to believe these false statements were possibly made with the intent to deceive the court, with the ultimate goal to minimize the financial impact to "old" Remington surrounding one of the products not covered by the retrofit of the X Mark Pro covered by the class settlement. The primary purpose of this letter is to educate the court and to ultimately correct the faulty record.

## INTRODUCTION

   I was at one time involved in the Pollard case as an expert. This relationship began at the onset of the litigation before the team was assembled for this project or before the Petition was drafted. I would later assist with drafting the Petition, writing historical details of this subject matter to include: ensuring technical accuracy of contentions made in the document as the draft was circulated to others associated to the project. My services further included providing documentation to support the Plaintiff's contentions in the final draft of the petition. I remained a consulting expert for Plaintiff's until shortly after the hearing before your court on February 4, 2015. Shortly thereafter I resigned, severing all communication with class counsel

1

with the exception of one attorney who was representing my interests in a defamation case against Remington. This litigation involved my participation in the 2010, CNBC Documentary— *Remington Under Fire*—which heavily relied upon my research and opinions. In this case I sought a judicial determination involving who told the truth and who ultimately lied to the public. This attorney was permitted to assist with the class due to my insistence that if they wanted my services as an expert, they had to bring in my attorney who has been with me for as long as I have been involved with this issue.

   I am no longer acting as a paid consultant in any Remington bolt action litigation, nor do I presently intend to do so again in the future. I am writing to the court solely as a concerned individual who knows more about this subject matter than most individuals; someone who owns several Remington bolt action rifles that are subject to the pending settlement. For the courts information, I am not being compelled by anyone to either support or oppose the settlement before this court. In effect, I am writing this letter solely on my own behalf, with my own views, observations and opinions, including providing information for the court's consideration. For the record, I generally support the Class Settlement for many reasons public safety will greatly benefit if done properly. I feel this can perhaps only be accomplished if the court has the necessary facts it needs to make well informed decisions to advance the case to the best interest of all class members, hence, the purpose of my letter to you.

   As you already know, my wife and I were planning to travel to the hearing on December 14th. This travel plan was at our own time and expense. We were primarily attending more as witnesses of the hearing to observe what might be said before this court, to see for ourselves how this monumental event may eventually play out in the end. I believe I am also the person in the best position to separate fact from fiction, surrounding any direct statements made before this court. We hold the belief all the comments made before this court might tend to be more candid and truthful with someone who knows the difference between the two at the final settlement hearing. We were also hoping to finally have closure of this chapter in our lives as we move forward; to ultimately see my past fifteen year effort through –one way or another— to an eventual and logical conclusion.

   I no longer have any future interest to work in the civil litigation field at this time. This comes from my personal experiences gained over the past ten years I have worked as a consultant to plaintiff's attorneys. From the host of cases where I have assisted plaintiffs, I have finally come to a very hard realization, which amounts to this simple but hard learned lesson:

*"As long as anyone might hold any vested financial interest in the outcome of my personal and professional research, the truth will more than likely never be entirely known and justice cannot ever be entirely served."*

2

I refuse to play any part in a mere "dog and pony show," for effect, or where only a marginal result to add to my personal body of knowledge may be continually hindered by back door deals brokered behind the scenes between plaintiff and defense attorneys any longer.

I feel I have been cheated, exploited, and deceived by plaintiff attorneys, generally. Not just in Pollard, but also in other personal injury and death cases. Most attorneys somehow get the impression because they employ my services as a consultant, this somehow gives them the supreme authority to direct and/or control my public advocacy. In Pollard, this came in the form of manipulation "for the greater good." The above comments also hold true to ultimately control my personal research archive which I have amassed involving this subject matter, primarily through my own effort and expense. Far too often my clients have tried to lay claim to my personal property, barring document production that was provided to me for my analysis by firms that added to my archive subject to "Protective Order." Attorneys have also generally tried to silence me and stop my public advocacy efforts to expose certain undeniable truths about this issue and the ever present danger posed to the public through my networking with the news media. I have finally drawn my line in the sand, in that, my moral ethics, my reputation for truthfulness, and the ultimate integrity of my work in this field will no longer be subject to compensation. I will no longer be controlled, manipulated, exploited or deceived. I have over the course of my involvement working with trial attorneys for the past ten years have seemed to diminish my faith in a system where relief from justice has a monetary price, where deals are brokered to bury the truth and release the guilty from responsibility for profit—albeit this is how the game is played.[1] This method of justice has only permitted more injury and death from the same dangerous Remington products annually. I no longer have the stomach to be ineffectual or to become part of the ultimate problem; preventing me from making any kind of meaningful difference—the reason I became involved in the first place.

I have long held the position Remington and their attorneys are entirely within their right to say what they want to the public, the courts, and the injured, but historically as it relates to my oversight, the tires hit the pavement by what the company's own internal documents say about what the company and its attorneys know, when they knew it and what they did or did not do with the body of knowledge documented within the pages of their own internal documents. I firmly hold, everyone has the undeniable right to defend themselves from criticism or controversy, such as in this case, but both parties on either side of the debate must be held accountable for what is contained within the claims and contentions made, in that, the defense claimed must be accurate and a truthful representation of the facts in pursuit of that right to defense, especially where public safety is of the utmost concern.

---

[1] I fully comprehend this is not a game but a serious endeavor where lives hang in the balance involving the decisions and actions of others.

As now, in this instance, this has not been my experience with Remington or their attorneys. History and my experience tells me, this is a company that simply cannot be trusted to always tell the truth, to live up to their bargains, obligations, responsibilities or to always play by the rules of civil procedure. The conduct warned about in this letter has also been exhibited in statements to the public and in claims (when caught red handed) in other courts where sanctions were imposed—All a gamble to protect Remington's bottom line. I contend Remington indeed lied to the public with the intent to deceive through a 2.2 million dollar (in legal fee) Remington response to the CNBC Documentary, *Remington Under Fire* and are doing so again in this case. This conduct should not ever be encouraged or rewarded when discovered. Long story short, the company can say what it likes to defend its once signature product—the Model 700—to the courts or the public, but at the end of the day, the company cannot refute their own internal documents or withstand what these documents have to say about what Remington actually knows about the safety and integrity of the Walker fire control systems contained in a host of products.

Finally, as outlined above, at the time of my resignation from Pollard, I again found myself in direct conflict with my handlers—"for the greater good"— I was told, to sit on the side line while some very offensive findings remained outside the comprehension of this court. I have now maybe been given another opportunity to rectify my previous reluctance to speak up in light of the cancellation of the final settlement hearing. Possibly speaking up now instead of later, as it was suggested, seems like the best way to prevent another deceptive act from ultimately degrading our system of justice, or permitting this court to make grossly misinformed decisions that could have adverse affect on public safety in the future.

## MY FINDING

After my review of the February 4, 2015 hearing transcript, it came to my attention that certain statements offered by Remington counsel as to their belief of the ultimate safety of Model 600 rifle were not entirely truthful, not even close! The false and grossly misleading statements were offered to this court as an assurance to ease Your Honors expressed concerns about leaving members of the class at "risk" without a retrofit for the Model 600 rifles. The primary statement that caught my immediate attention as false was this, Mr. Sherk's—a matter of fact—assurance to the court:

*"Remington thinks there is nothing wrong with these guns and that they fire appropriately and that they're safe. And, you know, to the extent there would have been an issue, one would think [wouldn't you] presumably we would have learned about it by now given the age of these guns."* (February 4, 2015 Hearing Transcript) (Attachment: a – Pg. 19 - L. 13-19)

4

Mr. Sherk's offensive statements were made to the court during your direct questioning related to the Model 600 voucher proposal. Here are three (3) primary facts the court could not have obviously known at the time the statements were made to the court –but as you will soon learn for the first time, there are still many more examples to exemplify this fact:

1- The entire Model 600 series rifles, including the XP-100 bolt action pistol are already the subject of a safety "Recall" as of October 1978.[2] (Attachment: b)

2- During 1975, three (3) years before the "Recall," Remington internally conducted a series of safety audits on a sampling of Model 600 rifles. Initially, Remington identified failures as high as 80% of the rifles tested exhibited failures. These were new rifles still in the plant warehouse. (Attachment: c) Remington later gathered another sample of new rifles from wholesalers, whereby the company concluded (1975) the sample revealed a 55.9% failure rate involving 615 rifles tested; were susceptible to firing when the safety was released. (Attachment: d) Remington terms this condition "FSR." This was considered a "dangerous" condition.[3]

3- In a 1982 document, Remington management, including in-house counsel, Robert Sperling whom received the memo which acknowledged:

*"Those guns which are capable of being 'tricked' are dangerous and should be modified."*

Another interesting point made in the same 1982 memo goes on to indicate:

 *Four years after this recall [of the Model 600 rifles] was instituted, only 13% of the guns have been modified. Thus, there are still over 175,000 guns outstanding."* (Attachment: e)

If only these three (3) articles of evidence I have attached for your review were relied upon, Your Honor, this information clearly and convincingly contradicts the statements made before your court. This limited information should clearly demonstrate to the court what "Remington," through its attorneys, actually knew at the time the false statements were made about the Model 600 being a "safe" rifle. And yet so much more pertinent information exists—For example, what fire control was retrofitted to the Model 600s during the 1978 safety "Recall." (Attachment: f)

---

[2] I am not aware of any time limit on a safety "Recall" that, in fact, Remington implemented in 1978. When I called Remington's customer service representatives earlier this year to inquire for myself, I was initially told the Model 600 was "never" the subject of a fire control recall.
[3] A test which would come to be known as "the trick test" was developed by Remington engineers to determine the susceptibility of Remington bolt action rifles fitted the Walker fire control to fire when the safety was released.

## CONCLUSION

I am not an attorney nor will I advocate for any penalties levied against anyone involving what I have uncovered. This will ultimately fall to your authority. However, I believe I must now attempt to inform you about my observation to show Remington counsel, on February 4, 2015, absolutely knew certain statements made during direct questioning by the court, responding to the courts grave concerns involving the Model 600 voucher proposal were demonstrably false and misleading when these statements, along with others were made.

Even if Mr. Sherk did not know with any real degree of certainty the statements he made were misleading and false, there was at least one other defense attorney in the room that would have most certainly known the statements offered to the court were grossly inaccurate. As an attorney and an officer of the court, he would have instantly known the faulty statements ultimately had the effect to mislead the court and should have immediately recognized his obligation to correct the misleading inaccuracies in the record. I say this only because no-where in the February 4th transcript did I observe he, or anyone else for that matter, made any attempt to correct the faulty statements on the record. Had I attended the hearing, as planned, I would have immediately recognized the defective statements as false. Unfortunately I was not permitted or more accurately stated I was instructed not to attend the February hearing, even though I had every good intention to do so at the time. By design, it was probably all for the best (looking back), that I had not attended because I might not have been able to restrain myself at the time from speaking up. My attendance would have, no doubt, resulted in a person to person exchange with Remington's defense attorneys shortly thereafter, if not sometime during the hearing. I did voice my observation to my primary plaintiff contact and shortly thereafter in frustration and disbelief, after the exchange, I resigned.

## IN SUMMARY

From where I sit—on the outside looking in—an attorney who through oversight or lack of preparation, in fact, made some grossly misleading statements to the court surrounding your questions about the Model 600 voucher proposal. Of one thing I am certain, there was at least one attorney in the room at the time, who, without question, was in the best position to know the statements made before your court were grossly misleading in response to Your Honor's direct questions. This belief might prove out if the attorneys were questioned about these absurd statements, if Your Honor should see fit to inquire. I also will point out again, no-one ever attempted to correct the statements—not to this day. Your Honor, the question begs to be asked: Was this an oversight, a slip of the tongue or were the statements made with the actual intent to mislead the court? Of one thing we can all be certain, the faulty statements would have the lasting effect to deprive Your Honor from administrating well reasoned and informed

decisions to ultimately advance the settlement to the best interest of all class members. I contend the Model 600 is a "dangerous" and defective rifle and "should be modified"—not just because I say so, Your Honor, but because Remington's own internal documents do. And –as to what Remington and its attorneys actually knew at the time the defective statements were made before your court, the documents I have attached to this letter clearly speak for themselves.

I think this conduct is absolutely shameful. Far too often has similar conduct by Remington and their attorneys, who knows every detail about this subject matter, taken advantage of the public and the courts, who by comparison, know very little or nothing about this subject. This statement cannot hold more-true here, in light of the false statements made in your court, Your Honor. This conduct if not challenged and corrected has the lasting effect to degrade not only the publics' confidence in our system of justice, but the system itself, it certainly has mine. I however, I remain hopeful in this instance, Your Honor, by my coming forward now that possibly it's not too late to level the playing field and for the truth to prevail. All I can say at this point, Your Honor, is I sincerely hope this time this deceitful conduct will not go un-noticed and the information I bring to the forefront of the court's attention might in some way permit me and my research to make a meaningful difference.

## IN CLOSING

This may very well be my last act as a consultant in Remington bolt action rifle litigation. Your Honor, it is my sincere hope to develop your understanding involving the potentially toxic statements made in your court. I am not trying to litigate this matter; to the contrary, I am just merely attempting to correct technical and historical inaccuracies in the record to permit the court an opportunity to adequately adjudicate authority over this matter, an opportunity, Your Honor that might not otherwise exist if I continue to remain silent. I fully realize this undertaking may have consequences beyond my control, but in the end, it will ultimately fall to your authority how my insights will be used or how this information may benefit or harm the final outcome of the Pollard Class Settlement. I am uncertain of the outcome but at least I will know I did my part to ensure your decisions will be based on well reasoned documented facts instead of falsities and deceit as you advance this case forward. In the end—for me—no longer will I be forced to be plagued with the nagging regrets for not having the willingness or the courage to not take a stand long before now; at a time when I am desperately trying to close this chapter in my life for the best interest and wellbeing of my family.

Now, finally with a clear conscience, I can finally move forward knowing I have planted certain undeniable facts in your care—Facts that were concealed from you before, and by doing so, only now can we all share in the peace of mind knowing the truth might finally have a chance to eventually prevail—where none existed before.

In the end—Hopefully as my last act as a consultant, and for my own piece of mind, only now might the system of justice stand a fighting chance to uphold the integrity of Your Honor's court and to hopefully advance the Pollard case to the benefit of all class members that has only manifest through the sacrifice, support and encouragement of my family, who finally give me the strength and courage, one last time, to permit me and my research in this field to attempt to make some kind of meaningful difference when it mattered to the public the most.

ON A PERSONAL NOTE

Your Honor, assuming you know who I am, If my son, Gus, had to die for any possible constructive purpose whatsoever, it should be so others might eventually know the truth and thereby not suffer his fate. The only way the public can ever take personal responsibility for their own safety and that of their friends and family, to break the cycle of injury and death associated to the Walker fire control, is ultimately for the public to know the truth first hand. You have inadvertently taken care of my primary hurdle by denying the Joint Motion for Protective Order in Pollard, (docket 66 – Filed 12/3-14) whereby, I seized upon the opportunity almost one year later to ensure my exhaustive research of this subject matter will forever become the rightful property of the public. (cnbc.com/The Reckoning) After all, my research to find the truth will remain Gus' only contribution to the world, to serve as a warning to others, and this effort will always remain as his living legacy and a memorial to my son's short life. (Attachment: g)

For the foregoing reasons, this information is being provided as a courtesy for the courts review and ultimate consideration in making well informed decisions affecting the health and safety of all similarly situated persons that own Remington brand products that employ the Walker fire control system. For your further consideration, in my routine fashion, Your Honor, my beliefs and opinions are fully supported by Remington's own internal documents as my accustomed method to support my beliefs and to avoid any argument as to the validity of my claims as nothing other than true and correct contentions of fact. For reasons involving public safety and to permit Your Honor to uphold the ultimate integrity of your court, if you should find cause, I respectfully offer the following information for the courts review:

Respectfully yours,

Richard D. Barber

8

# Attachment a

Excerpt-February 4, 2015 Hearing Transcript

```
 1              IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
 2                    WESTERN DIVISION

 3   IAN POLLARD, on behalf of himself  )
     and all others similarly situated, )
 4                                       )
                        Plaintiffs,      )Case No.
 5            vs.                        )13-CV-00086-ODS
                                         )
 6   REMINGTON ARMS COMPANY, LLC, et al.,)
                        Defendants.      )
 7
                TRANSCRIPT OF MOTIONS HEARING
 8         BEFORE THE HONORABLE ORTRIE D. SMITH
                    FEBRUARY 4, 2015
 9               KANSAS CITY, MISSOURI

10                     APPEARANCES

11   For the Plaintiffs:      MR. JON D. ROBINSON
                              Bolen Robinson & Ellis, LLP
12                            202 S. Franklin, 2nd Floor
                              Decatur, Illinois 62523
13
                              MR. RICHARD J. ARSENAULT
14                            Neblett Beard & Arsenault
                              PO Box 1190
15                            Alexandria, Louisiana 71315

16   For the Defendants:      MR. JOHN K. SHERK
                              MR. BRENT DWERLKOTTE
17                            Shook, Hardy & Bacon, LLP-KCMO
                              2555 Grand Boulevard
18                            Kansas City, Missouri 64108

19                            MR. DALE G. WILLS
                              Swanson, Martin & Bell, LLP
20                            330 North Wabash, Suite 3300
                              Chicago, Illinois 60611
21

22          Gayle M. Wambolt, RMR, CRR
            U.S. Court Reporter, Room 7552
23        Charles Evans Whittaker Courthouse
                 400 East Ninth Street
24      Kansas City, MO 64106 (816) 512-5641

25
                           1
```

1   They'll do it there.

2           Can we look at this next slide, slide two.  Yeah.

3           You'll see that those are comparatively not that

4   many guns, so I think we can do this at the factory.  The

5   company takes care of the shipping, the cost of that, supplies

6   the boxes, so I think it's relatively painless for class

7   members.

8           Jon, all apologies for injecting.

9           MR. ROBINSON:  No problem.  They know more about

10  those issues than we do, I think, at this point.

11          THE COURT:  Mr. Robinson, maybe the third category

12  is one more suitable to be addressed by you in any event.

13  These older firearms are not going to be repaired.  They get

14  either $10 or $12.50 in either the voucher or coupon.  It

15  looks like a voucher to me, but you may choose to address

16  that.

17          If the guns are defective, why are they still out

18  there?

19          MR. ROBINSON:  Your Honor, we believe that, first of

20  all, there are very few of those.  Most of those guns are at

21  least 30 -- the newer ones of the groups are 30 plus years

22  old.  The older ones average probably 50 or 60 years old.

23          If they've lasted this long, if they're still being

24  used and a risk, a safety risk, they are probably going to

25  continue to be okay.  They're probably going to continue to be

                                    16

1   safe.

2          They cannot be repaired practically just from what

3   we know.  They cannot be retrofitted, as like the other 700s

4   can be, and so when we look at -- the court -- we've called

5   them a voucher.  We believe that they are like cash.  They are

6   transferable.  Remington has a website with lots of products

7   on it that have a value of -- within the values of these

8   vouchers.

9          Remington will allow them to be combined with other

10  offers, with other vouchers, with other credits and premiums,

11  so they are like cash and, again, can be transferable.  We

12  believe it's a real value for these gun owners.

13         In addition, because they are so old, there are

14  problems, I think, timing wise in making claims.  Statutes of

15  limitations may come -- become a problem.

16         The other --

17         THE COURT:  The settlement agreement ignores the

18  statute of limitations?

19         MR. ROBINSON:  It does, it does.  That's true.

20         The settlement does not waive a right for personal

21  injury or property damage, though, so if there is an issue

22  with one of the 600s or the 715s or the early 770s --

23         THE COURT:  The problem with that approach,

24  Mr. Robinson, is somebody actually has to get hurt.  If the

25  guns are defective and they're still out there, there is the

                                17

1    possibility that somebody is going to be severely injured or

2    killed by one of those weapons.

3            Was there a discussion about a repurchase or a

4    buyback of those weapons?

5            MR. ROBINSON:  We discussed this honestly, Your

6    Honor, many times during the mediation and both before and

7    since.  The -- Mr. Sherk may have comments from their

8    perspective, but I believe that from the plaintiffs' point of

9    view that this is a reasonable resolution for those folks.

10   They are getting warnings as well as the Ten Commandments of

11   Gun Safety.

12           Mr. Sherk, do you --

13           MR. SHERK:  Maybe I can address the court's

14   questions from Remington's perspective.  Let me start with the

15   question you posed about five minutes ago, Your Honor, and

16   that's what's the difference between the original Pollard

17   complaint and the amended Pollard complaint, and I think the

18   court was probably referring to the fact that we brought in

19   additional models of firearms that were not originally

20   implicated in the Pollard complaint.

21           And I'll tell you what, that was arrived at in the

22   crucible of the mediation and negotiation largely at the

23   insistence of Remington because, Your Honor, we wanted to

24   bring in, if we were going to do this, we wanted to bring all

25   the models of firearms possible that had either the Walker

                                18

1    Fire Control or the trigger connector, the component that the

2    plaintiffs allege is the design defect.

3           So we brought in the 710s, the 715s, and the 770s.

4    We also brought in these much, much older guns.  Your Honor,

5    these guns, many of these guns, as Mr. Robinson said, are 50,

6    70 years old.  Some of them are 30 and 40 years old.  As to

7    those guns, as Mr. Robinson said, they cannot be readily

8    retrofitted.

9           In fact, there has -- to do that, to drop in an

10   X-Mark Pro requires massive changes to the stock and barrel.

11   It ruins the integrity of the gun to the extent that they are

12   valuable because they're old.  It's expensive and time

13   consuming, and about the court's concern about the triggers,

14   you know, Your Honor, again, Remington thinks there is nothing

15   wrong with these guns and that they fire appropriately and

16   that they're safe.  And, you know, to the extent there would

17   have been an issue, one would think presumably we would have

18   learned about it by now given the age of these guns.

19           I want to think about the court's BPA decision here

20   too when we talk about the value of the relief because in that

21   decision, the court recognized that one thing you've got to

22   look at is what is the real value of these claims versus, you

23   know, what you could get if they were litigated individually

24   versus the settlement amount.  And here, Your Honor, I

25   respectfully put it to the court that these claims would not

19

# Attachment b

The Model 600 Safety Recall-October 1978

*Remington.* DUPONT REMINGTON ARMS COMPANY, INC. • PUBLIC RELATIONS • BRIDGEPORT, CONNECTICUT 06602

FOR RELEASE ___ IMMEDIATELY _____

BRIDGEPORT, Ct., October 25, 1978 -- On October 23, 1978, a product liability case against Remington Arms Company, Inc., and one of its dealers was settled for $6,800,000 by Remington's insurance carriers. The case involved an alleged accidental discharge of a Mohawk Model 600 rifle manufactured by Remington. Injuries to the plaintiff were extremely serious, leaving him partially paralyzed. The plaintiff alleged that at the time the gun fired the trigger was not pulled. Remington's investigation indicated that this was unlikely but possible due to the fact that under certain unusual circumstances the safety selector and trigger could be manipulated in such a way that subsequently moving the selector to the fire position could result in accidental discharge. Settlement costs are substantially covered by the Company's liability insurance.

A recall program has been initiated in connection with Mohawk Model 600 rifles and Remington Model 600 and 660 rifles and XP-100 pistols manufactured prior to February 1975.

### ###

RD-69  REV. 6-58

**REMINGTON ARMS COMPANY, INC.**
INTER-DEPARTMENTAL CORRESPONDENCE

*Remington*

RECEiVED
JAN 8 - 1979
R. A. PARTNOY

CC: E. F. Barrett
J. C. Williams
R. A. Partnoy

RBS

January 3, 1979

TO:     PHILIP H. BURDETT
        J. P. MC ANDREWS

RECEIVED
JAN 9 1979
R. B. SPERLING

FROM:   R. W. STEELE

Reserve for Model 600 Center Fire Rifle Recall Program

We propose to establish a reserve of $1,000,000 at December 31, 1978 in order to cover the estimated liability incurred for the Model 600 center fire rifle recall program (i. e., the program to recall the Mohawk Model 600, as well as the guns with similar trigger assemblies, Remington Models 600 and 660 and the XP-100, which were manufactured before February 1975).

The program, which was initiated in late October at the time of the Coates settlement, is expected to continue through the balance of 1979 and carry over to some extent into succeeding years. To date a substantial amount of effort has been expended on establishing a network of 173 domestic gunsmiths, as well as selected gunsmiths in Canada, to install replacement trigger assemblies on guns being re-called. Telephone lines with toll-free numbers have been rented for gun owners to obtain information concerning return procedures and participating gunsmiths. Advertising concerning the recall has been placed in January issues of shooting magazines and plans have been developed for direct notification of gun owners. Further expenditures for advertising and consumer notification will be made as circumstances warrant.

Due to the large number of gunsmiths involved in the program, it has not yet been possible to obtain an accurate reading on the number of guns returned to date. However, we estimate this number to be 8,000. The January advertising is expected to bring a substantial increase in gun returns and a substantial direct consumer notification effort to be made early in 1979 should further increase returns.

The total number of guns subject to recall is approximately 200,000. We, of course, seek the return of all of these guns; but realistically our plans are geared to a total return of 50,000 guns. The attached calculation of the reserve amount is based on a 50,000 gun return. This is expected to result in a total recall expenditure of $1,000,000, as proposed for the reserve.

Based on the above estimates of 50,000 guns and $1,000,000, the reserve would be liquidated in 1979 to firearms cost of goods sold at the rate of $20 per gun repaired.

R. W. Steele

RWS:mrp
Attach.

REM 0086572

LUN 0017906
Case 4:13-cv-00086-ODS   Document 113   Filed 12/21/15   Page 17 of 48

REMINGTON ARMS COMPANY, INC

## CALCULATION OF RESERVE FOR CENTER FIRE RIFLE RECALL PROGRAM

| Item | Amount |
|---|---|
| Number of guns - 50,000 | |
| Cost of trigger assemblies ($5 each) | $ 250,000 |
| Gunsmith cost ($8 average per gun) | 400,000 |
| Direct consumer notification | 200,000 |
| Recall advertising | 40,000 |
| Renting of telephone lines | |
| Atlanta | 20,000 |
| Connecticut | 15,000 |
| Ilion | 5,000 |
| Miscellaneous | 70,000 |
| Total | $1,000,000 |

WLF:mrp
1/3/79

REM 0086573

LUN 0017907

REMINGTON ARMS COMPANY, INC.
ILION, NEW YORK

cc: R.L. Hall   *J.H. Carter*

October 25, 1978

TO: ALL SUPERVISION - CODE B

BRIDGEPORT, CT., October 25, 1978 - Remington Arms Company, Inc., announced today that under certain unusual circumstances on some of its center fire bolt action firearms, the safety selector and trigger could be manipulated in such a way that subsequently moving the selector to the fire position could result in accidental discharge. Remington firearms involved are Model 600, 660 and Mohawk 600 Rifles and XP-100 Pistols manufactured prior to February 1975.

The difficulty can be corrected by installation of a new trigger assembly. In view of the potential safety hazard, the Company is recalling all of those guns produced prior to February 1975, for inspection and modification as required.

Efforts are being made to contact owners of these guns. Individuals who have Model 600, 660 and Mohawk 600 Rifles or XP-100 Pistols involved in the recall should write to Remington Arms Company, Inc., Bridgeport, Ct. 06602, or call the following toll-free number for information on procedures:

In all states except Georgia: 800-241-8444 - Ask for Operator 61

In Georgia:                800-282-1333 - Ask for Operator 61

Customers should give the operator the model and serial numbers of their gun when calling.

Serial numbers involved in the recall are as follows:

| | |
|---|---|
| Remington Model 600's | - From Serial #0001 to 131,552 |
| Remington Model 660's | - From Serial #0001 to 131,552 |
| Mohawk 600's | - From Serial #6,200,000 to 6,899,999 |
| Remington Model 660's | - From Serial #6,200,000 to 6,899,999 |
| Remington XP-100 | - From Serial #0001 to 11,000 |
| | - From Serial #7,500,000 to 7,507,983 |

R.A. Morris
Superintendent-Employee Relations

RAM:cp

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

SINZER V. REMINGTON

R2543624

FOR RELEASE _____ IMMEDIATELY _____

BRIDGEPORT, Ct., October 25, 1978 -- Remington Arms Company, Inc., announced today that under certain unusual circumstances on some of its center fire bolt action firearms, the safety selector and trigger could be manipulated in such a way that subsequently moving the selector to the fire position could result in accidental discharge. Remington firearms involved are Model 600, 660 and Mohawk 600 rifles and XP-100 pistols manufactured prior to February 1975.

The difficulty can be corrected by installation of a new trigger assembly. In view of the potential safety hazard, the Company is recalling all of these guns produced prior to February 1975 for inspection and modification as required.

Efforts are being made to contact owners of these guns. Individuals who have Model 600, 660 and Mohawk 600 rifles or XP-100 pistols involved in the recall should write to Remington Arms Company, Inc., Bridgeport, CT 06602, or call the following toll free number for information on procedures:

In all states except Georgia:

800-241-0444 - Ask for Operator 61

In Georgia:

800-282-1333 - Ask for Operator 61

PLAINTIFF'S
EXHIBIT

Customers should give the operator the model and serial numbers of their gun when calling.

Serial numbers involved in the recall are as follows:

Remington Model 600s -From Serial #0001 to 131,552
Remington Model 660s -From Serial #0001 to 131,552
Mohawk 600s          -From Serial #6,200,000 to 6,899,999
Remington Model 660s -From Serial #6,200,000 to 6,899,999
Remington XP-100     -From Serial #0001 to 7,508,983

*A*

# IMPORTANT MESSAGE TO OWNERS OF REMINGTON MODEL 600 AND 660 RIFLES, MOHAWK 600 RIFLES, AND XP-100 PISTOLS.

Under certain unusual circumstances, the safety selector and trigger of these firearms could be manipulated in a way that could result in accidental discharge.

The installation of a new trigger assembly will remedy this situation. Remington is, therefore, recalling all Remington Model 600 and 660 rifles, and all Mohawk Model 600 rifles—except those with a serial number starting with an "A."

Also included in the recall are any XP-100 pistols with a serial number below 7507984, except those with the prefix "A" or "B" before the number.

### Owners of the above guns should contact one of the following gunsmiths:

In Anchorage
Howard's Gun Shop
528 Fifth Avenue
Anchorage, Alaska 99501
(907) 272-4570

In Anchorage
Bill's Gun Shop
8729 Lake Otis Parkway
Anchorage, Alaska 99507
(907) 349-1312

In Fairbanks
Dixon's
261 College Road
Fairbanks, Alaska 99701
(907) 456-8742

If the location of the nearest gunsmith is not convenient for personal delivery of your gun, you may send the gun collect to the gunsmith and have it returned prepaid. Guns covered by the recall should be inspected and modified before further usage. This work will be done at no charge by participating gunsmiths.

✓ via telephone call

Today, the Remington Arms Company, Inc., announced the recall of Models 600, 660, Mohawk 600, XP-100 bolt action guns, produced prior to February, 1975, because of a possible safety problem.

As a Remington Recommended Gunsmith, your shop has been listed with an 800 Enterprise message receiving center in Atlanta, Georgia. Upon receipt of a call from an owner of one of the guns involved, the message receiving center will direct him to the Remington Recommended Gunsmith located geographically nearest to him, for repair of the gun. We estimate you may receive up to 200 of these guns for repair.

To provide the simplest and most positive repair, you will be supplied with new trigger assemblies for replacement of the original. The repair will be done at no charge to the gun owner.

Our Arms Service section reports that the replacement of the trigger assembly can be made in 7-1/2 to 10 minutes. Based on this, we plan to allow you a $5.00 bench charge for this work. Where transportation or other special handling costs are involved, we will reimburse you.

While full details have not been developed, we did want to give you this advance notice, and we will contact you in the very near future, covering all details.

Meanwhile, should any guns be returned to you, please record the date, name, address, zip code, and serial number and caliber of the gun, and hold until you have our instructions.

# Attachment c

The Initial 1975 Model 600 Safety Audit

# REMINGTON ARMS COMPANY, INC.

### INTER-DEPARTMENTAL CORRESPONDENCE

Remington
DUPONT

PETERS
DUPONT

"CONFINE YOUR LETTER TO ONE SUBJECT ONLY"———————— February 7, 1975

TO: R. L. HALL

RE: MOHAWK 600 SAFETY MALFUNCTION

Subsequent to a series of complaints from the Dallas, Texas area, it was found that if the Mohawk 600 was manipulated in a certain sequence some guns could be made to fire when the safety was moved from "on" to "off". Such guns could be made to fire if the safe was positioned between "full safe on" and "full safe off", the trigger firmly squeezed and released followed by manipulation of the safe.

As a result of this determination, the warehouse and assembly was held until the condition could be corrected. It was further determined that this condition existed in original design guns as well as "Manufacturing Sample" guns.

Analysis of the problem showed that the present design of the cam portion of the Safety contacting the rear end of the Sear Safety Cam was not in contact long enough for the Safety Detent to always snap forward to the "off safe" position. Thus, a fixture was set up to slightly "swage" this cam portion of the Safety to provide longer contact with the Sear Safety Cams.

Of the 2446 Mohawk 600 guns in the warehouse, 1945 have been inspected to date. Results have shown 511 or 26% did not exhibit the malfunction and were returned to the warehouse in their present condition. 1434 more have been repaired by replacing the Safety with a swaged Safety or new fire control, and returned to the warehouse. Shipments have been resumed and it is expected that inspection and repair of the remaining 501 warehouse guns will be complete by Feb. 10, 1975.

For future production, we will continue to use swaged Safeties in Mohawk 600 guns, including a test incorporating the manipulation which would show the malfunction if present. Research and Development personnel are reviewing possible design modifications to assure freedom from the condition.

C. B. Workman
Supt. P.E. & C.

E. R. Carr
Supt. Process Engineering
Current Products

ERC:jc

PLAINTIFF'S
EXHIBIT
3327

AL 0030000

## FIREARMS

### MODEL 600 RIFLE

E.F. Barrett reported to the Subcommittee that Remington's examination of approximately 300 Model 600s, drawn from the stock of a Texas dealer, revealed that about 80% of the sample could be "tricked" (easing the safety to the midway position, then pulling the trigger) so as to cause the gun to fire when the safety is moved to the off position. Four guns were found to fire under the following sequence of events; the trigger is pulled with the safety on and then the safety is taken off (hereinafter referred to as the "full safe condition"). These four guns have been returned to Ilion for further examination. At Ilion, a recheck produced consistent repetition of the problem in only one of the four guns.

It was estimated that approximately 1,000 Model 600s were shipped from Ilion in January. The return from this quantity should provide an adequate sample to analyse the nature and magnitude of the problem, and to calculate the number of guns that may be out in the field in the "full safe condition".

#### COMMITTEE ACTION

An immediate request to all Remington wholesalers to whom the Model 600s were shipped in January 1975, to return said inventory to Ilion for a quality audit. Every gun Remington examines, and every gun which is returned to Ilion for any reason, will be modified by substituting a longer safety lever if it is found to be necessary to prevent the "tricking" of the gun or to correct the "full safe condition".

## AMMUNITION

### 22 L.R. RIFLE MATCH

E.F. Barrett next apprised the Subcommittee that we have received reports of several rimfire target guns being damaged, with no personal injuries involved, due to Remington rim fire Match ammunition loaded with excessive powder charges. Preliminary investigation indicates product loaded at Bridgeport sometime in July and August may be suspect.

REM 0002623

# Attachment d

The 1975 Model 600 Final Safety Audit Results

................ COMPANY, INC.
............ ...

"CONFINE YOUR LETTER TO ONE SUBJECT ONLY"————————

C. B. WORKMAN

## M/600 SAFETY FUNCTION AUDIT - FINAL REPORT

During the past year the design of the M/600 Fire Control was revised because of the possibility of tricking the gun, and firing it when the Safety was released. An audit was made, in Ilion, from April 14, 1975 to June 19, 1975, to determine the reliability of the Safety on M/600's currently in the field. This audit consisted of inspecting 615 total guns returned from the field. This sample represents guns that were shipped from 1970 through 1975, and to dealers scattered throughout the United States.

Results:

1. 0.3% of the returned guns (2) failed the worst test, as defined in Appendix I.

2. 55.6% of the returned guns (342) failed the trick test, as defined in Appendix I.

3. A total of 90 guns were received with the box marked OK. This represents guns shipped after revised inspection procedures, to check for proper Sear lift, were instituted. Of these, all passed both tests. See Appendix III.

J. W. Bower, Supervisor
Process Eng. - Current Products

Bower
8/26/75

## M/600 - SAFETY FUNCTION TEST - FINAL SUMMARY

Period - Start of Test 4/14/75 to 6/19/75

Total guns received . . . . . . . . . . . . . . . . . . . . . . . . . . . . 615

Guns received with box marked OK (Previously tested) . . . . . . . . . 90

Of 90 guns received with box marked OK - All guns passed both the worst test and trick test.

Of the remaining 525 guns:

      2 failed the worst test
    342 failed the trick test

Of the 342 guns which failed the trick test:

    335 repaired by installing swaged Safeties
      7 guns replaced by Custom Repair

Of the 2 guns which failed the worst test:

    2 repaired by installing swaged Safeties.

To GEORGE MARTIN

FROM GENE BULLIS

SAFETY MALFUNCTIONS
GALLERY 4

DATE 5-2-75

MALFUNCTIONS

| MODEL | FSR | | | JO | | | FD | | | FOS | | | SWW | | | TOTALS MALFUNC BY MODE |
|-------|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| | 75 | 74 | 73 | 75 | 74 | 73 | 75 | 74 | 73 | 75 | 74 | 73 | 75 | 74 | 73 | |
| 40 | | | | | | | 4 | | | | | | | | | 4 |
| XP 100 | | | | | | | 3 | | | | | | | | | 3 |
| 540 | | | | | | | | | | | | | | | | |
| 541 | | | | | | | | 2 | 1 | | | | | | | 3 |
| 580 | | | | | | | | | | | | | | 1 | | 1 |
| 581 | | | | | | | 3 | 2 | 1 | | | | | | | 6 |
| 582 | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| 600 | 1 | | | | | | 10 | 74 | 55 | | | | | | | 1140 |
| | | | | | | | | | | | | | | | | |
| 700 | 9 | | | | | | 7 | 19 | 10 | 1 | | | | | 1 | 47 |
| | | | | | | | | | | | | | | | | |
| 788 | 4 | | | | | | 3 | 9 | 3 | 2 | 9 | 4 | 14 | 95 | 53 | 196 |
| YEARLY MALF. TOTALS | 14 | | | | | | 30 | 106 | 70 | 3 | 9 | 4 | 14 | 97 | 53 | 410 |

MALFUNCTION MEANINGS

FSR – FIRES WHEN SAFE IS RELEASED – SELF EXPL.

JO – JARS OFF (HAMMER FAILS TO STAY ENGAGED WITH SEAR AND FALLS DOWN WHEN GUN IS JARRED.)

FD – FOLLOWS DOWN (COCKING PIECE FAILS TO PROPERLY ENGAGE WITH SEAR AND FOLLOWS THE COCKING CAM SURFACE OF THE BOLT TO THE FIRED POSITION)

FOS – FIRES ON SAFE (GUN FIRES WITH SAFE IN "ON" POSITION WHEN TRIGGER IS PULLED).

SWW – SAFETY WON'T WORK – SELF EXPL.

THAT SAFETY

010000150

* – 1975 DATA FROM DEC. 26, 1974 TO APRIL 230. 1975 ONLY.



J.H. Chisnall
E.G. Larson
F.D. Cole
D.C. Brooks

*[handwritten notes in top left margin]* 2/27/79 C. Kloch Prepare & Apv for 3/13 & ... Have Stekl's Hne Approval Opers wo. 51075 DC.

Mrs. Susan McGinnis
Star Route, Box A-8 I.H.
Cuba, Missouri 65453

Dear Mrs. McGinnis:

Examination has been completed on your Model 660, .243 Win. caliber rifle, serial number 108687, which allegedly fired when the safety was pushed to the off position.

Our experts thoroughly examined the rifle and trigger assembly and found that the safety selector and trigger could be manipulated in such a way that subsequently moving the selector to the fire position did result in accidental discharge.

In view of our findings, we will have our Accounting section issue a check in the amount of $73.90 for damages that occurred from the incident. This will be sent under separate cover and should be received within three (3) weeks.

Our Arms Service section will install a replacement trigger on your rifle, at no charge, and the rifle will be returned to you in the very near future. Once the rifle is again in your hands, we are sure you will find it satisfactory in every respect.

Thank you for bringing this matter to our attention, and for having afforded us the opportunity to be of service.

Sincerely,

J.A. Stekl, Supervisor
Firearms Product Service

JAS:tpp

PLAINTIFF'S EXHIBIT
3133

*[handwritten]* 1 of 5

AL 0024694

| RETAIL OR WHOLESALER | TOTAL RETURNED | NO. FAILED TRICK TEST | NO. FAILED WORST TEST |
|---|---|---|---|
| 1. Carter's Country Houston, Texas | 220 | 169 | 1 |
| 2. Sporting Goods, Inc. Houston, Texas | 118 | 1 | 0 |
| 3. Sports South, Inc. Lake Charles, La. | 70 | 39 | 1 |
| 4. Nationwide Sports Distributors Southampton, Pa. | 62 | 39 | 0 |
| 5. Jensen-Byrd, Co. Spokane, Washington | 24 | 19 | 0 |
| 6. Leslie Edelman of N.Y. Farmingdale, N.Y. | 14 | 6 | 0 |
| 7. John's Sporting Goods Canton, Ohio | 8 | 8 | 0 |
| 8. Grand National Sports Supply Buffalo, N.Y. | 3 | 3 | 0 |
| 9. Edelman's of N.J. Sauken, N.J. | 3 | 3 | 0 |
| 10. Leslie Edelman, Inc. Southampton, Pa. | 7 | 3 | 0 |
| 11. Outdoor Sports Hdqts, Inc. Dayton, Ohio | 5 | 0 | 0 |
| 12. Max L. ...ler Sporting Gds. Boothwyn, Pa. | 1 | 0 | 0 |
| 13. Edelman's Inc. Wayne, N.J. | 5 | 3 | 0 |
| 14. Grand Nat'l Shooters Supply Tonawanda, N.Y. | 1 | 1 | 0 |
| 15. All Sports Supply, Inc. Portland, Oregon | 3 | 1 | 0 |

APPENDIX A (continued)

| DEALER OR WHOLESALER | SOLD/SHIPPED | NO. ALLEG STOLEN TSR | NO. NOT ALLEG SOLD TSR |
|---|---|---|---|
| 16. Howes Lumber, Bellingham, Washington | 7 | 7 | 0 |
| 17. Manchesters, Longview, Washington | 2 | 1 | 0 |
| 18. Swanson's Esquian, Washington | 5 | 5 | 0 |
| 19. Jerry's Gun & Supply Oregon, Mo. | 3 | 0 | 0 |
| 20. Del Mar Distributing Co. Corpus Christie, Texas | 6 | 3 | 0 |
| 21. La Verns Firearms Service Portage, Wisc. | 1 | 0 | 0 |
| 22. Marlo's Custom Tackle | 4 | 3 | 0 |
| 23. Mounteiners Rod & Gun Club | 1 | 1 | 0 |
| 24. Vernon S. Drake | 1 | 1 | 0 |
| 25. Ackley & Son Westfried, Pa. | 1 | 1 | 0 |
| 26. V. F. Grace, Inc. Anchorage, Alaska | 4 | 3 | 0 |
| 27. Hughes Gun Repair | 5 | 3 | 0 |
| 28. Katz's Gun Shop | 3 | 2 | 0 |
| 29. The Gun Room, Inc. | 6 | 4 | 0 |
| 30. Welborn Enterprises | 1 | 1 | 0 |
| 31. Bob's Merchandise, Inc. | 7 | 6 | 0 |
| 32. Disco Sporting Goods Coos Bay, Oregon | 1 | 1 | 0 |

| DEALER OR WHOLESALER | TOTAL RETURNED | NO. PASSED TRICK TEST | NO. FAILED TRICK TEST |
|---|---|---|---|
| 33. Boston W. Company | 1 | 1 | 0 |
| 34. Frontier Sporting Gds. | 6 | 1 | 0 |
| 35. Valley Sports & Hdwe. Snohomisk, Wash. | 3 | 0 | 0 |
| 36. Stewarts Sport Shot Coos Bay, Oregon | 2 | 1 | 0 |
| 37. Village Trading Post | 2 | 2 | 0 |
| Total | 615 | 342 | 2 |

Bower
—5/9/75—
5-19-75

## M/600 - SAFETY FUNCTION TEST - PRELIMINARY SUMMARY

Period - Start of Test 4/14/75 to 5/9/75

Total guns received . . . . . . . . . . . . . . . . . . . . . . 359 344

Guns received with box marked OK (previously tested) . . . . . . · 88

Of 88 guns received with box marked OK - All guns passed both the worst test and trick test.

Of the remaining 256 guns: *271*

       1 failed the worst test
      139 failed the trick test *151*

Of the 139 guns which failed the trick test: *151*

      133 repaired by installing swaged Safeties *145*
      · 6 guns replaced by Custom Repair

Of the 1 gun which failed the worst test:

      1 repaired by installing swaged Safety

010000148

Bower
6/2/75

## M/600 - SAFETY FUNCTION TEST - PRELIMINARY SUMMARY

Period - Start of Test 4/14/75 to 5/30/75

Total guns received . . . . . . . . . . . . . . . . . . . . . . . . . . . . 585

Guns received with box marked OK (Previously tested) . . . . . . . . . 88

Of 88 guns received with box marked OK - All guns passed both the worst
test and trick test.

Of the remaining 497 guns:

    2 failed the worst test
  322 failed the trick test

Of the 322 guns which failed the trick test:

  316 repaired by installing swaged Safeties
    6 guns replaced by Custom Repair

Of the 2 guns which failed the worst test:

    2 repaired by installing swaged Safeties



RECEIVED

JUN 03 1975

G. W. MARTIN

010000152

Attachment e

Readopting The Model 600 Safety Recall-1982

RD-69 REV. 6-58

# REMINGTON ARMS COMPANY, INC.
### INTER-DEPARTMENTAL CORRESPONDENCE

*Remington*

cc: K. D. Green
P. H. Holmberg

Approved Copies: R. E. Fieltiz
C. A. Riley
K. D. Green
J. H. Chisnall
J. A. Stekl
R. L. St. John
P. H. Holmberg
W. H. Forson, Jr.
C. B. Workman
R. L. Sassone - For inclusion
in manual.

RECEIVED

SEP 15 1982

R. B. SPERLING

Bridgeport, Connecticut
September 13, 1982

R. B. SPERLING

## RECALL INFORMATION IN FIELD SERVICE MANUAL

The Field Service Manual, which gives assembly, disassembly,
and diagnostic information about our firearms, is being up-
dated at this time. This manual is made available to our
Recommended Gunsmiths and other gunsmiths who request it.

Previous editions of the manual have not had any reference
to product recalls. For the following reasons, we propose
to include Model 600 and XP-100 (attached) recall notes in
the Field Service Manual:

o   Those guns which are capable of being "tricked"
are dangerous and should be modified.

o   Four years after this recall was instituted, only
13% of the guns have been modified. Thus, there
are still over 175,000 guns outstanding.

o   Because the recall was started several years ago,
some dealers and gunsmiths have discarded the
descriptions of the guns subject to recall. These
inserts will provide them with a ready reference.

o   Recall was nationwide in scope as opposed to
localized via a distribution pattern.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
KINZER V. REMINGTON

R2543194

o  Many of our Recommended Gunsmiths were and are parti-
   cipating in the recall by making the repairs.

If you have no objection, we will have the XP-100 and Model 600
notices put in the Field Service Manual.

F. T. Millener

FTM:fms
att.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
KINZER V. REMINGTON

R2543195

# Attachment f

The Model 700 Fire Control Retrofitted to The Model 600

# REMINGTON ARMS COMPANY, INC.
### INTER-DEPARTMENTAL CORRESPONDENCE

Remington        PETERS

"CONFINE YOUR LETTER TO ONE SUBJECT ONLY"

Ilion, New York
January 14,     1976

TO:        J. P. LINDE

FROM:      F. E. MARTIN

SUBJECT:   Monthly Progress Report

## M-788 & M-580 SAFETY

New safety levers are in production and have shown adequate lift in all conditions. The double click problem as reported by production has been eliminated by the use of a new safety retaining pin designed by P. Nasypany. Alterations to the housing are also being made and evaluated.

## NEW BOLT PLUG

I am unable to report on the status of this change at this time.

## M-600 FIRE CONTROL

The evaluation of a proposed change on this model's fire control from the stamped folded type to one of the M-700 type is being evaluated by production. This change would give us a common fire control housing for M-600 M-700. All drawings are completed.

## TRIGGER GUARD

An investment cast aluminum trigger guard has been completed and is ready for evaluation.

## M/700 FIRE CONTROL

All testing is completed and changes will be dictated by results of present M-600 production testing.

PLAINTIFF'S
EXHIBIT
3091

AL 0023428

1 of 2

NEW MECHANICAL TRAP - contd.

OPERATIONS COMMITTEE
ILION DIVISION

APRIL 21, 1977

SPECIAL REPORTS

MOHAWK 600 AND MODEL 700 FIRE CONTROL REVIEW

MOHAWK 600 RIFLE

R & D reported that drawings have been transmitted to the plant
to alter the Mohawk 600 Fire Control.  The Fire Control Housing
presently used on the M/700 has been modified so that it will fit
the Mohawk 600.  This change will yield a common Fire Control
Housing for the Mohawk 600 and M/700 rifle.  It will reduce cost,
as the factory cost of the M/700 Fire Control Housing is less than
the factory cost of the Mohawk 600 Fire Control Housing  This change
should also improve the detent action of the Mohawk 600 Fire Control.
The side plate on the M/700 Housing is heat treated.  This is the
surface the hardened steel detent ball is spring loaded against to
obtain the two Safety positions.

MOHAWK 600 AND MODEL 700 RIFLES FOR EXPORT TO AUSTRALIA

R & D reported that one thousand Mohawk 600 rifles were shipped to
Australia and stopped by the customs officials as being unacceptable
for importation.  This action was taken because the customs
officials claimed the trigger adjusting screws should have a
mechanical locking means.

It has been our experience with the Mohawk 600, M/721, M/722 and
M/700 rifles that the trigger adjusting screws stay in adjustment.
The screws on the Mohawk 600, M/722, 721 were staked and sealed

REM 0028287

REM 0027599

April 25, 1977

## NOTES FOR OPERATIONS COMMITTEE

### MOHAWK 600, MODEL 700 FIRE CONTROL REVIEW

Mohawk 600 Rifles

Drawings have been transmitted to the plant to alter the Mohawk 600 Fire Control. The Fire Control Housing presently used on the M/700 has been modified so that it will fit the Mohawk 600. This change will yield a common Fire Control Housing for the Mohawk 600 and M/700 rifles. It will reduce cost, as the factory cost of the M/700 Fire Control Housing is less than the factory cost of the Mohawk 600 Fire Control Housing. This change should also improve the detent action of the Mohawk 600 Fire Control. The side plate on the M/700 Housing is heat treated. This is the surface the hardened steel detent ball is spring loaded against to obtain the two Safety positions.

The Safety functions by camming the Sear away from the Trigger; thus the Trigger is disconnected from the firing mechanism. The cam on the Safety Lever was altered to increase the disconnecting clearance. The Sear also had to be altered slightly to allow for the increased clearance. It was felt that the clearance should be increased somewhat to allow for manufacturing tolerances and lower costs by eliminating guns which would be rejected for insufficient clearance. The Safety mechanism operation is checked by the assembler, gallery personnel, and final inspector.

1 of 3

PLAINTIFF'S
EXHIBIT
3108

AL 0023597



OPERATIONS COMMITTEE
ILION DIVISION

SEPTEMBER 20, 1977

RESEARCH & DEVELOPMENT PRESENTATION

An active design program is being pursued to improve the function
and reliability of our Bolt Action Fire Controls.

Mohawk 600

The detent safety action on the Mohawk 600 rifle has been improved
by modifying the Model 700 Trigger Housing to fit both rifles.  Trial
and pilot operations are being run.

Model 700

The Model 700 Fire Control Assembly is also being redesigned to make
it more competitive with improved features.  The proposed Fire Control
Assembly will be adjustable for pounds pull within safe limits with-
out disassembling the rifle.  The rifle will be able to be unloaded
with the safety in the "on safe" position.  The Trigger pull char-
acteristics will be improved especially on varmint and target models.
Design prototypes are scheduled to be ready June, 1978.

M/788, M/580's, 541-S and 540-XR

These Fire Controls are being redesigned to improve their func-
tional performance.  On the present design the force required in
the "on safe" position varies with the tolerances of the component
parts.  The force to position the safety from the "on safe" to
"off safe" is on the low side.

A new design is being worked on which will give us a safety with
uniform "on safe" forces and increased "off safe" forces.  The
design will also improve the attachment of the assembly to the
rifle.  This Fire Control Assembly would be adaptable to all
the above listed rifles.  Design prototypes are to be ready in
December.  Drawings will be transmitted in the first quarter of
1978.

Traps

REM 0028206

REM 0027597

# Attachment g

Remington Release of All Protective Orders
("I am finally free")



SHOOK
HARDY & BACON

October 2, 2015

John K. Sherk III

2555 Grand Blvd.
Kansas City
Missouri 64108-2613
t 816.474.6550
d 816.559.2355
f 816.421.5547
jsherk@shb.com

<u>Via Electronic Mail</u>

Charles E. Schaffer, Esq.
LEVIN, FISHBEIN, SEDRAN AND BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106

Re:     Remington document disclosures

Dear Charlie:

As we have indicated to you several times over the last few weeks, the Defendants will not claim and are not claiming that any documents previously produced by the Defendants in any prior bolt-action rifle lawsuits are still subject to any of the protective orders which were entered in any of those cases. As a result, Plaintiffs are free to make those documents available to potential class members and the public. As for any documents and tangible things listed in the Plaintiffs' initial disclosures in *Pollard* which were not previously produced by the Defendants in any prior bolt-action rifle lawsuits, it is entirely up to the Plaintiffs and their attorneys as to whether those are made available by you to the potential class members and the public. We also have no objection to you sharing this letter with Arthur Bryant or any other person or entities.

To be clear, the Defendants are not producing or agreeing to produce any documents in furtherance of this agreement, nor are they establishing a repository for documents. Instead, the Defendants are confirming that they will not object to potential class members' or the public's review and/or disclosure of the Defendants' previously produced documents, although Defendants may choose to respond or comment about the documents' content or meaning following any disclosure.

Sincerely,

John K. Sherk, III

972506

# LEVIN, FISHBEIN, SEDRAN & BERMAN

*Counsellors at Law and Proctors in Admiralty*

ARNOLD LEVIN
MICHAEL D. FISHBEIN
HOWARD J. SEDRAN
LAURENCE S. BERMAN
FRED S. LONGER *
DANIEL C. LEVIN
CHARLES E. SCHAFFER
AUSTIN B. COHEN +
MICHAEL M. WEINKOWITZ * +
MATTHEW C. GAUGHAN * +
KEITH J. VERRIER *
BRIAN F. FOX
LUKE T. PEPPER

510 WALNUT STREET
SUITE 500
PHILADELPHIA, PA 19106-3697
www.lfsblaw.com

TELEPHONE (215) 592-1500
FACSIMILE (215) 592-4663

OF COUNSEL:
SANDRA L. DUGGAN

* also admitted in New Jersey
+ also admitted in New York

Charles E. Schaffer
cschaffer@lfsblaw.com

October 2, 2015

***Via First Class Mail and Email: abryant@publicjustice.net***
Arthur Bryant, Chairman
Public Justice
555 12th Street, Suite 1230
Oakland, CA 94607

### *Re: Document Disclosure*

Dear Arthur:

I am enclosing a copy of a letter from Remington's counsel wherein Remington clearly states that any and all documents previously produced by defendants in any prior bolt-action rifle suits are no longer protected by any protective orders which were entered in any of those cases. Plaintiffs' counsel are free to make those documents available to potential class members and the public. With respect to any non-Remington documents and tangible things listed in the *Pollard* initial disclosures which were not previously produced by the defendants in any prior bolt-action rifle suits, Remington has indicated that it is entirely up to plaintiffs and their attorneys as to whether those are made available to the potential class members and the public. I have confirmed with Remington's counsel, John Sherk and Dale Wills, that Remington does not have any reason to contest or object to plaintiffs' counsel disclosing these documents to potential class members and the public. Therefore, I am confirming that plaintiffs' counsel will produce to Public Justice, potential class members and the public, any documents in their possession, custody or control from prior bolt-action rifle lawsuits. In addition, plaintiffs' counsel will produce to Public Justice, potential class members and the public, any and all documents and tangible things listed in plaintiffs' initial disclosures in the Pollard action.

Based on the agreement with Remington, it is plaintiffs' counsel's position that the scope of the Court's Order denying the Motion for the Joint Protective Order has been clarified - all documents previously produced by defendants in any prior bolt-action rifle lawsuits are no longer protected by any confidentiality orders and can be disclosed to the public and potential class members. As stated above, plaintiffs' counsel will produce any of those documents in their possession, custody or control, as well as those documents and tangible items listed in the *Pollard* Rule 26 disclosures. As such, I believe this should resolve the issue for your client Center for Investigative Reporting, alleviating the need for Public Justice to object to the proposed Settlement or move to intervene and seek public access to the documents, tangible things and exhibits in *Pollard v. Remington*.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

CHARLES E. SCHAFFER

CES/ddg/enc.
cc:     Richard Arsenault
        Eric D. Holland
        W. Mark Lanier