**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| IAN POLLARD, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:13-cv-00086-ODS |
| REMINGTON ARMS COMPANY, LLC, et al. | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## JOINT SUPPLEMENTAL BRIEF PURSUANT TO THE COURT'S ORDER OF DECEMBER 8, 2015

977730

# TABLE OF CONTENTS

I.   CLASS NOTICE ................................................................................................ 2

    A.   The Original Notice, Current Claims Rate, and Relevant Caselaw ........................ 2

    B.   The Plan Reinforces the Original Notice Plan. ........................................................ 6

II.  ADDITIONAL TOPICS RAISED IN DECEMBER 8 COURT ORDER ...................... 10

    A.   Class Members Do Not Waive Personal Injury Claims Under the
         Settlement. ............................................................................................................ 10

    B.   There Are Significant Obstacles To the Consumer Protection Claims of
         Settlement Class B. ................................................................................................ 11

         1.   Class Certification under the Texas UDTPA is Unlikely. ......................... 15

         2.   The Availability of Only Limited Damages Under the Florida
              DUTPA Favors Settlement. ................................................................... 21

         3.   Decisions Addressing the Missouri Merchandising Practices Act
              Present Hurdles to Overall Success, Class Certification and
              Damages. ............................................................................................... 23

III. CONCLUSION AND REQUEST FOR HEARING ................................................... 27

Case 4:13-cv-00086-ODS   Document 127   Filed 06/10/16   Page 2 of 39

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alford Cheverolet-Geo v. Jones;* 91 S.W.3d 396 (Tex.App. – Texarkana 2002, no pet.) ............16

*Alford Chevrolet-Geo v. Murphy*; No.06-02-00059-CV, 2002 WL 31398487 (Tex.App. – Texarkana, October 25, 2002, no pet.) .....................................................................................16

*America Online Inc. v. Williams*; 958 S.W.2d 268, 277 (Tex.App. – Houston [14th Dist] 1998, no pet.) .........................................................................................................................16

*American Tobacco Co. v. Grinnell*,
951 S.W.2d 420 (Tex. 1997) ...................................................................................................17

*Berry v. Volkswagen Group of Am.*,
397 S.W.3d 425 (Mo. 2013) ..............................................................................................26, 27

*Best Buy Co. v. Barrera*,
248 S.W.3d 160 (Tex. 2007) ...................................................................................................18

*Bossier Chrysler-Dodge II, Inc. v. Riley*,
221 S.W.3d 749 (Tex. App. Waco 2007) ...............................................................................26

*Bryant v. S.A.S.*,
416 S.W.3d 52 (Tex. App. Houston 1st Dist. 2013) ...............................................................14

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*,
169 So. 3d 164 (Fla. Dist. Ct. App. 2015) .............................................................................21

*Chen v. BMW of No. Am.*,
No. 12-09262, 2013 WL 3940815 (C.D. Cal. July 26, 2013) ................................................13

*Churchill Village, LLC v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004) ...................................................................................................3

*City First Mortgage Corp. v. Barton*,
988 So. 2d 82 (Fla. 4th DCA 2008) ..................................................................................21, 22

*Collins v. DaimlerChrysler Corp.*,
894 So. 2d 988 (Fla. 5th DCA 2004) ......................................................................................22

*Compaq Computer Corp. v. Lapray*,
135 S.W.3d 657 (Tex. 2004) ...................................................................................................17

*Daigle v. Ford Motor Co.*,
No. 09-3214, 2012 WL 3113854 (D. Minn. July 31, 2012) ...................................................13

Case 4:13-cv-00086-ODS   Document 127   Filed 06/10/16   Page 3 of 39

*DaimlerChrysler Corp. v. Inman*,
  252 S.W.3d 299 (Tex. 2008)..........................................................................14

*Daniel Chrysler Corp. v. Inman*; 252 S.W.3d 299 (Tex. 2008) ...........................16

*Date v. Sony Elec. Inc.*,
  No. 07-CV-15474, 2013 WL 3945981 (E.D. Mich. July 31, 2013) .........................3

*Davis v. Powertel, Inc.*,
  776 So. 2d 971 (Fla. Dist. Ct. App. 2000) ..........................................................22

*DeHoyos v. Allstate Corp.*,
  240 F.R.D. 269 (W.D. Tex. 2007) .........................................................................4

*Dorestin v. Hollywood Imports, Inc.*,
  45 So. 3d 819 (Fla. 4th DCA 2010) ......................................................................22

*Eastwood v. S. Farm Bureau Cas. Ins. Co.*,
  No. 3:11-cv-03075, 2014 WL 4987421 (W.D. Ark. Oct. 7, 2014).............................4

*Ford Motor Co. v. Ocanas*,
  138 S.W.3d 447 (Tex.App. – Corpus Christi 2004, no pet.) ...................................16

*Ford Motor Co. v. Sheldon*,
  22 S.W.3d 444 (Tex. 2000).................................................................................16

*Fraley v. Facebook, Inc.*,
  966 F. Supp. 2d 939 (N.D. Cal. 2013) ................................................................4, 5

*G. Milne PC v. Ryan*; _____ S.W.3d _____, 2015 WL 5999898, *15-*17 (Tex.App. –
  Texarkana 2015, no pet.) ...................................................................................16

*General Motors Corp. v. Garza*,
  179 S.W.3d 76 (Tex.App. – San Antonio 2005, no pet.)........................................19

*Grunin v. Int'l House of Pancakes*,
  513 F.2d 114 (8th Cir. 1975) ................................................................................3

*Henry Schein Inc. v. Stromboe*,
  102 S.W.3d 675 (Tex. 2002)......................................................................16, 17, 18

*Hope v. Nissan N. Am., Inc.*,
  353 S.W.3d 68 (8th Cir. 2011).............................................................................24

*In re Apple iPhone 4 Prods. Liab. Litig.*,
  No. 10-2188, 2012 WL 3283432 (N.D. Cal. Aug. 10, 2012) ................................4, 5

*In re Aqua Dots Prods. Liab. Litig.*,
  270 F.R.D. 377 (7th Cir. 2010).............................................................................13

977730                                   iv

*In re Bisphenol-A Polycarbonate Plastic Prods. Liab. Litig.*,
    2011 U.S. Dist. LEXIS 150015 (W.D. Mo. Dec. 22, 2011) .................................................25

*In re BPA Prods. Liab. Litig.*,
    MDL No. 1967, 2011 WL 6740338 (W.D. No. Dec. 22, 2011) .................................................15

*In re Charter Commc'n., Inc. Sec. Litig.*,
    No. 4:02-cv-1186, 2005 WL 4045741 (E.D. Mo. June 30, 2005) .................................................12

*In re ConAgra Peanut Butter Prods. Liab. Litig.*,
    251 F.R.D. 689 (N.D. Ga. 2008) .................................................13

*In re Imprelis Herbicide Mktg. Sales Practices & Prod. Liab. Litig.*,
    296 F.R.D. 351 (E.D. Pa. 2013) .................................................10

*In re McNeil Consumer HealthCare Mktg. & Sales Practices Litig.*,
    MDL No. 2190, 2011 WL 2802854 (E.D. Pa. July 15, 2011) .................................................13

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) .................................................3

*In re Packaged Ice Antitrust Litig.*,
    No. 08-MDL-01952, 2011 WL 6209188 (Dec. 13, 2011) .................................................3, 5, 6, 7, 8, 9

*In re Pet Foods Prods. Liab. Litig.*,
    629 F.3d 333 (3d Cir. 2011) .................................................14

*In re Phenylpropanolamine (PPA) Prods. Liab. Litg.*,
    214 F.R.D. 614 (W.D. Wash. 2003) .................................................13

*In re Serzone Prods Liab. Action*,
    231 F.R.D. 221 (S.D. W. Va. 2005) .................................................3

*In re TracFone Unlimited Serv. Plan Litig.*,
    No. C-13-3440 EMC, 2015 WL 4051882 (N.D. Cal. July 2, 2015) *reconsideration
    denied,* No. C-13-3440 EMC, 2015 WL 4735521 (N.D. Cal. Aug. 10, 2015) .................................................23

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) .................................................13

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
    No: 4:03-MD-015-FJG, 2004 WL 3671053 (W.D. Mo. Apr. 20, 2004) .................................................12

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
    644 F.3d 604 (8th Cir. 2011) .................................................15

*Johnson v. Harley-Davidson Motor Co. Group, LLC*,
    285 F.R.D. 573 (E.D. Cal. 2012) .................................................15

977730

*Jovine v. Abbott Labs., Inc.*,
795 F. Supp. 2d 1331 (S.D. Fla. 2011) ................................................13

*LaGarde v. Support.com, Inc.*,
No. 12-609 JSC, 2013 WL 1283325 (N.D. Cal. Mar. 25, 2013) ...........................4, 5

*Lane v. Page*,
862 F. Supp. 2d 1182 (D.N.M. 2012) ................................................4, 5

*Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist.*,
921 F.2d 1371 (8th Cir. 1990) ................................................12

*Lochinvar Corp. v. Myers*,
930 S.W.2d 182 (Tex.App. – Dallas 1996, no writ) ................................................19

*Methodist Hospitals of Dallas v. Tall*; 972 S.W.2d 894, 899 (Tex.App. – Corpus Christi
1998, no pet.) ................................................16

*Nissan Motor Co. Ltd. v. Fry*; 27 S.W.3d 573, 587-92 (Tex.App. – Corpus Christi 2000,
no pet.) ................................................16

*O'Neil v. Simplicity, Inc.*,
574 F.3d 501 (8th Cir. 2009) ................................................14

*Owens v. GMC*,
533 F.3d 913 ................................................26

*Peel v. Credit Acceptance Corp.*,
408 S.W.3d 191 (Mo. Ct. App. 2013) ................................................26

*Peltier Enterprises Inc. v. Hilton*; 51 S.W.3d 616, 619, 625 (Tex.App. – Tyler 2000, no
pet.) ................................................16, 19

*Perez v. Asurion Corp.*,
501 F. Supp. 2d 1360 (S.D. Fla. 2007) ................................................4

*Perras v. H&R Block*,
789 F.3d 914 (8th Cir. Mo. 2015) ................................................24

*Poertner v. Gillette Co.*,
618 Fed. App'x 624 (11th Cir. 2015) ................................................4, 5

*Rollins, Inc. v. Butland*,
951 So. 2d 860 (Fla. Dist. Ct. App. 2006) ................................................21, 22

*Rollins, Inc. v. Heller*,
454 So.2d 580 (Fla. 3d DCA 1984) ................................................22, 23

*Saccoccio*, 297 F.R.D. 683, 696 (S.D. Fla. 2014) ................................................4

977730

vi

*Shiplet v. Copeland*,
  450 S.W.3d 433 (Mo. App. 2014) ...................................................................26

*Southwestern Bell Telephone Co. v. Marketing on Hold Inc.*,
  308 S.W.3d 909 (Tex. 2010)..........................................................................16

*Stonebridge Life Ins. Co. v. Pitts*,
  236 S.W.3d 201 (Tex. 2007)...........................................................................18

*Urling v. Helms Exterminators, Inc.*,
  468 So. 2d 451 (Fla. 1st DCA 1985) ...............................................................22

*W.S. Badcock Corp. v. Myers*,
  696 So. 2d 776 (Fla. 1st DCA 1996) ...............................................................22

*Wall v. Parkway Chevrolet Inc.*; 176 S.W.3d 98, 105, 107 (Tex. App. – Houston [1st
  Dist] 2004, no pet.) ........................................................................................16

*Walsh v. Al West Chrysler, Inc.*,
  211 S.W.3d 673 (Mo. App. 2007) ..............................................................24, 25

*Webb v. Carter's, Inc.*,
  272 F.R.D. 489 (C.D. Cal. 2011) .....................................................................13

*Winzler v. Toyota Motor Sales U.S.A.*,
  681 F.3d 1208 (10th Cir. 2012) .......................................................................13

## STATUTES

TEX. BUS. & COMM. CODE §2.315 ......................................................................19

TEX. BUS. & COMM. CODE §2.607 ......................................................................19

TEX. BUS. & COMM. CODE §17.45 ......................................................................18

Tex. Bus. & Comm. Code § 17.46.................................................................16, 17

TEX. BUS. & COMM CODE §17.48 .......................................................................16

TEX. BUS. & COMM. CODE §17.50 ...........................................................15, 16, 19

Fla. Stat. Ann. § 501.211 ...........................................................................21, 22

Fla. Stat. § 501.2105 .......................................................................................26

Missouri Merchanding Practices Act (MMPA)...........................14, 23, 24, 25, 26, 27

Mo. Rev. Stat. § 407.025 ............................................................................26, 24

977730

Mo. Rev. Stat. § 510.265 ...................................................................................................24

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 .......................................................................................................2, 3

# EXHIBIT INDEX

**EX.**  **DESCRIPTION**

**A.**  Proposed Notice Plan, Signal Interactive Media, LLC

**B.**  Declaration of Steven Weisbrot on Implementation and Adequacy of Notice Plan, Doc. 92-9, Sept. 4, 2015

**C.**  Bryan R. Johnson, *Concealed Weapons*, National Review (September 26, 1994)

**D.**  Declaration of Steven Weisbrot on Proposed Notice Plan, June 10, 2016

**E.**  Reminder to Remington Rifle Owners (proposed e-mail and postcard notification language)

**F.**  Third Amended Settlement Agreement

The parties jointly submit this supplemental brief in compliance with the Court's December 8, 2015 Order. First, in the Order, the Court stated that "[t]he parties are ordered to develop a notice plan, for the Court's review, that will be effective and result in a more significant response rate" (hereafter referred to as the "Plan"). The Plan centers on a state-of-the-art, pre-tested social media campaign developed by an internationally recognized expert in the design and administration of political and commercial advertising campaigns. *See generally* Ex. A (Proposed Notice Plan, Signal Interactive Media, LLC). The Plan was created from unique proprietary databases and analytics, includes two Facebook advertisements, and is likely to result in a more significant response rate based on empirical, preliminary testing results. *Id.* ¶¶ 2-12, 26-49. The Plan also includes a national radio campaign spanning the country's top syndicated networks and programs. Notice of the Settlement will be delivered during a 60-second advertisement that will run over a four-week period and is forecasted to generate more than 61 million targeted impressions. *Id.* ¶¶ 6, 50-58. Finally, approximately 1 million e-mails and 93,000 postcards will be sent to Remington consumers, and 11,000 informational posters will be displayed at retail locations. The details of the Plan are set forth in full in Part I.B below.

At the outset, however, the Parties have included some additional background that may provide context to both the original plan and the Plan, as well as the results they may achieve. This brief also responds to the Court's additional questions regarding paragraphs 101 and 102 of the Settlement Agreement and the propriety of the relief for members of Settlement Class B (the X-Mark Pro Class) in light of the strengths and weaknesses of their potential consumer-protection claims.

977730

# I.    CLASS NOTICE

## A.    The Original Notice, Current Claims Rate, and Relevant Caselaw

In this economic-loss case, the Settlement provides the vast majority of potential Settlement Class Members with a retrofit of their trigger mechanism at no cost to them. This is a real and substantial benefit, especially in light of Plaintiffs' allegations regarding the safety of the original trigger mechanisms. Moreover, there is no limit to the number of Settlement Class Members who may receive a retrofit, as the claims-made structure does not cap Defendants' obligations under the Settlement. The Settlement also provides benefits to a comparatively small subset of owners of older firearms whose economic-loss claims would likely be barred by the statute of limitations and other defenses. In short, the Settlement in this case is comprehensive and robust and goes well beyond the typical relief provided in a case alleging economic loss.

Beginning in the summer of 2015, notice of the Settlement was widely disseminated through a variety of direct, print, and online media, reaching approximately 74% of all Settlement Class Members almost three times.[1] The Class Action Settlement Administrator averred that the Notice Plan provided the best notice practicable under the circumstances and comported with due process and Fed. R. Civ. P. 23. This litigation has also received significant local and nationwide coverage in the press, including online and in television reports. Ex. B ¶¶ 6, 20, 28-32 (Declaration of Steven Weisbrot on Implementation and Adequacy of Notice Plan, Doc. 92-9, Sept. 4, 2015).

On December 8, 2015, the court ordered the parties to develop the Plan.[2] Accordingly, the Parties have worked diligently to craft a thoughtful, targeted, and robust Plan. Additionally,

---

[1] As of June 10, 2016, 6,279 claims have been filed.

[2] Defendants respectfully maintain that the claims rate does not reflect on the adequacy of, or justify additional, class notice.

the Parties include an analysis of case law that discusses the link between notice and claims rates, as well as the generally modest rate seen in consumer product class action settlements.

Due process does not require perfect notice or actual notice but "the best notice that is practicable under the circumstances . . . ." Fed. R. Civ. P. 23(c)(2)(B); *see Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 120 (8th Cir. 1975); *see also Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (notice is satisfactory if it "generally describes the terms of the settlement in sufficient detail to alter those with adverse viewpoints to investigate and to come forward and be heard.").

Given this standard, when assessing the adequacy of notice, courts focus on the fact that the notice reached class members and not on claims rates. *See, e.g.*, *In re Serzone Prods Liab. Action*, 231 F.R.D. 221, 236 (S.D. W. Va. 2005) ("[T]he adequacy of notice is measured by whether notice reached Class Members and gave them an opportunity to participate, not by actual participation")  For example, in *Packaged Ice*, the district court held that notice was adequate even though only 1% of the class members receiving the notice filed claims.  The court noted that claims rates are "frequently less than 5%" and that the response rate "should not be given great significance" in light of the number of factors which affect such rates.  *In re Packaged Ice Antitrust Litig.*, No. 08-MDL-01952, 2011 WL 6209188, at *1, 14 (Dec. 13, 2011).

That sentiment has been echoed by courts nationwide. *See, e.g.*, *Date v. Sony Elec. Inc.*, No. 07-CV-15474, 2013 WL 3945981, at *10 (E.D. Mich. July 31, 2013); 3 Alba Conte & Herbert Newberg, Newberg on Class Actions § 8.45 (4th ed. 2002) ("Claims response levels will tend to vary with the circumstances, types of class notices employed, and size of individual claims involved in each case."); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 941, 944-45 (9th Cir. 2015) (approving 35 million-member settlement class when only 1.183

million—less than 4%—filed claims; "settlements have been approved where less than five percent of class members file claims"); *Poertner v. Gillette Co.*, 618 Fed. App'x 624, 625-26 (11th Cir. 2015) (approving 7.26 million-member settlement class when just 55,346—less than 1%—filed claims); *Saccoccio*, 297 F.R.D. 683, 696 (S.D. Fla. 2014) (noting that courts within its district have approved claims-made settlements where participation rate was very low); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1377-78 (S.D. Fla. 2007) (finding the notice was the best practicable and granting final approval despite 1.1% claims rate); *Eastwood v. S. Farm Bureau Cas. Ins. Co.,* No. 3:11-cv-03075, 2014 WL 4987421, at *4 (W.D. Ark. Oct. 7, 2014) (finding that even though class participation was low, there was nothing "facially deficient about the notice procedures"); *LaGarde v. Support.com, Inc.*, No. 12-609 JSC, 2013 WL 1283325, at *2, 6 (N.D. Cal. Mar. 25, 2013) (approving settlement with a 0.17% claims rate "since the settlement amount is commensurate with the strength of the class' claims and their likelihood of success absent the settlement"); *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 941 (N.D. Cal. 2013) (approving settlement with a 0.4% claims rate because "the settlement as a whole provides fair, reasonable, and adequate relief to the class, in light of all the circumstances, including the low probability that a substantially better result would be obtained through continued litigation"); *In re Apple iPhone 4 Prods. Liab. Litig.*, No. 10-2188, 2012 WL 3283432, at *2 (N.D. Cal. Aug. 10, 2012) (approving settlement with a 0.16%-0.28% claims rate); *Lane v. Page*, 862 F. Supp. 2d 1182, 1246 (D.N.M. 2012) (holding that the parties provided the best notice practicable and observing that class members who did not participate "either are deceased, do not exist, or are uninterested in participating, and exchanging their shares, for unknown reasons"); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 302 (W.D. Tex. 2007) (relying on affidavit of claims administrator overseeing notice program regarding adequacy of notice plan).

Putting aside the legal issue of whether participation rates should be considered in assessing class notice or the reasonableness of a settlement, myriad decisions nationwide demonstrate that consumer class action settlements typically generate modest claims rates. *See, e.g.*, *In re Apple iPhone 4 Prods. Liab. Litig.*, 2012 WL 3283432, at *2 (0.16%-0.28%); *LaGarde*, 2013 WL 1283325, at *2, 6 (0.17%); *Fraley*, 966 F. Supp. 2d at 941 (0.4%); *Poertner*, 618 Fed. App'x at 625-26 (0.76%); *In re Packaged Ice*, 2011 WL 6209188, at *1, 14 (1%).

Courts also recognize that there are a number of potential reasons that impact the claims rate in a particular case that have nothing to do with the notice or settlement benefits. *See, e.g.*, *Lane*, 862 F. Supp. 2d at 1246 (observing that class members who did not participate may be uninterested in participating "for unknown reasons," and recognizing that there are "many emotional factors at play"); *In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188, at *14 (noting that "many factors affect response rates").

In this case, for example, owners of firearms may be skeptical of any process that they perceive as analogous to firearms registration.[3]   Indeed, even when localities *require* firearm registration and impose civil or criminal penalties for noncompliance, a miniscule fraction of

---

[3]  This concern is largely rooted in New York City's 1967 law requiring the registration of rifles and shotguns.  At that time, New York "instituted city-wide registration of all rifles and shotguns assuring everyone the registration list would never be used for confiscation. In 1990, when the city decided to ban certain semi-automatic rifles, the police went to that very same registration list to find the names and addresses of everyone who owned such rifles. These owners received letters from the police informing them that they had three choices: remove the rifles from the city limits, render them inoperative, or turn them in to the police."  Bryan R. Johnson, *Concealed Weapons*, National Review (September 26, 1994), p. 56 (attached as Ex. C).  Since then, gun owners have been wary of attempts to regulate the sale or ownership of firearms, viewing them as precursors to registration and ultimate confiscation. *See, e.g.*, "Push for Broader Gun Checks Stalls," The Wall Street Journal (March 6, 2013), *available at* http://www.wsj.com/articles/SB10001424127887324034804578344783865399720 (statement from the NRA that "[o]ur big concern is one shared by millions of firearms owners — that enforcing checks of used firearm transfers between individuals will lead to the creation of a national registry of firearms, something that Congress has expressly prohibited."); "Protesters burn gun registration forms," PostStar.com (March 16, 2014), *available at* http://poststar.com/news/local/protesters-burn-gun-registration-forms/article_0f9d8442-ad59-11e3-a480-001a4bcf887a.html?print=true&cid=print (statement from grassroots coalition that "[w]e are opposed to registration because the evidence is clear that registration leads to confiscation").

5

owners choose to comply.[4]  Other issues that may be impacting participation rates in this case include rifle owners not wanting to part with a firearm they use for personal protection,[5] not wanting to part with a firearm during hunting season, or generally being suspicious of litigation and the government.  Many rifle owners are also quite particular about their firearm and the way it operates—some may not want a new trigger connector, despite the allegation that their trigger connector is not safe.  One or more of these issues have likely played a role in the participation rate in this case, but that does not change the fact that real, substantial benefits are being offered to those class members who want to participate.

### B.    The Plan Reinforces the Original Notice Plan.

In accordance with the Court's order, the Parties have developed an additional proposal that will remind Settlement Class Members of the Settlement.  *See* Ex. A (Proposed Notice Plan, Signal Interactive Media, LLC); Ex. D (June 10, 2016 Declaration of Steven Weisbrot).

The Plan was developed to complement the original notice plan.  The Plan consists of four components.  First, using its own proprietary hunter-sportsman consumer models and data developed in extensive past political and commercial advertising campaigns—including hunting permits, membership in relevant organizations, and stated affinities on social media—Signal Interactive Media, LLC developed and tested a Facebook advertising campaign that consumers could click and be redirected to the Settlement Website to file a claim.  *See* Ex. A ¶¶ 3-12, 26-49. Six initial advertisements, along with various text and calls to action, were pre-tested to more than 150,000 likely Settlement Class Members from March 29, 2016 to May 12, 2016.  *Id.* ¶¶ 2,

---

[4] *See* "New York Gun Owners Defy SAFE Act," *available at* www.americas1stfreedom.org/articles/2015/7/17/new-york-gun-owners-defy-safe-act/ (noting a 4% compliance rate under a New York registration law despite penalties of one to four years in prison); Bryan R. Johnson, *Concealed Weapons*, National Review (September 26, 1994), p. 56 (attached as Ex. C) (noting a compliance rate of less than 2% under a New Jersey registration law and 1% for a Denver registration law).

[5] In a 2013 Gallup poll, 60% of gun owners said they owned a gun for personal safety or protection.  *See* http://www.gallup.com/poll/1645/guns.aspx.

7-9, 33-44.  Clicking on any of the advertisements would take the user to the Settlement Website, where the Settlement Class Member can obtain additional information and submit a claim.  *Id.* ¶¶ 9 n.11, 37.  The two most effective advertisements and instructional language in terms of clicks on the advertisement are set forth below:





**POST COPY**: How well do you know your rifle? Take a moment to find out if your firearm qualifies for benefits from a class action settlement.

**HEADLINE**: Check your Remington serial number today.
**DESCRIPTION**: A proposed nationwide settlement has been preliminarily approved in a class action lawsuit involving certain Remington firearms and the replacement of certain trigger mechanisms.

*See id.* ¶¶ 37, 41-42. Informed by the results of this pre-testing, Signal Interactive Media proposes that the Facebook advertising should be expanded beyond the test group to the total universe of Facebook users identified pursuant to the hunter-sportsman consumer model, overlaying individuals who self-identify as having an interest in topics relating to hunting and Remington on social media—a campaign intended to reach 3.4 million potential class members. *Id.* ¶¶ 12, 47-49. Pre-testing provided clear empirical evidence that the use of such notice is likely to result in an increased response rate when overlaid upon prior notice activities. *Id.* ¶¶ 2, 47-48. The proposed Plan would be administered over four consecutive weeks, with a target range of July 4, 2016 through July 31, 2016. *Id.* ¶ 12.

Second, the Parties have developed a national radio media plan that includes the country's top syndicated networks and programs. *Id.* ¶¶ 6, 50-58. The proposed 60-second notice will run for four consecutive weeks, again with a target range of July 4 through July 31, designed to reach across the country during peak morning and evening drive times. *Id.* ¶ 50. The proposed networks will account for more than 2,000 individual radio stations across the country and will generate more than 61 million targeted impressions. *Id.* Specific components

of the plan include: (1) targeting key states/regions; (2) targeting key demographics; and (3) creating a terrestrial network composed of (a) hunting and fishing radio programs and (b) programs with strong sportsmen audiences. *Id.* ¶¶ 51-53. In addition, the plan includes custom digital streaming through iHeart radio, the largest national radio group (formerly Clear Channel) with the most widely used mobile app for streaming radio stations nationwide. *Id.* ¶ 54. When the notice runs online, it will include a companion banner for consumers to click for more information. *Id.* ¶ 55. After they click, they will be redirected to the Settlement Website. *Id.*

Third, Remington will send an e-mail notification of the Settlement to all potential Settlement class members for whom it has been able to locate an e-mail address—approximately one million individuals. Remington will also send approximately 93,000 postcards to potential Settlement class members for whom it has been able to locate a mailing address. Those address lists were compiled from multiple sources, including logs of potential customers who signed up for website and other company notifications, records of customers calling the company's customer service line, and lists of customers who have contacted the company for repair work. Both lists are admittedly over-inclusive and are not targeted to actual customers who own firearms affected by this Settlement—such a targeted list does not exist. Regardless, Remington will send notices to this overbroad group to maximize its chances of reaching as many Settlement Class Members as possible. *See* Ex. A (Proposed Notice Plan, Signal Interactive Media, LLC) ¶¶ 61-63; Ex. E (proposed e-mail and postcard notification language).

Finally, Remington will create informational posters for display at more than 11,000 retail locations. The posters will be disseminated in the same way recall notices are disseminated to ensure that the poster is received and displayed: a PDF of the poster will be emailed to Remington's twelve wholesale accounts and seven retail accounts, and those accounts will in

turn send the poster to more than 5,000 independent retailers and 6,000 retail stores for display. *See* Ex. A (Proposed Notice Plan, Signal Interactive Media, LLC) ¶ 64. This effort expands on the prior third-party campaign wherein posters were sent to those retailers where XMP trigger replacements were known to have been performed. The language on the posters will mirror the language in the direct e-mail and postcard notices. *See* Ex. E (proposed e-mail and postcard notification language).

## II. ADDITIONAL TOPICS RAISED IN DECEMBER 8 COURT ORDER

The Court also asked for supplemental briefing on two topics apart from class notice: (1) whether Settlement Class Members release personal injury or property damage claims under paragraphs 101 and 102 of the Settlement Agreement; and (2) the strengths and weaknesses of Settlement Class B members' claims under the consumer-protection laws of Missouri, Florida, and Texas. Order, Doc. 112, at 2.

### A. Class Members Do Not Waive Personal Injury Claims Under the Settlement.

This case involves economic losses only. Consequently members of the class are releasing only economic-loss claims, and a retrofit makes Class Members fully whole now without the delay and expense of pursuing individual or class litigation. *See In re Imprelis Herbicide Mktg. Sales Practices & Prod. Liab. Litig.*, 296 F.R.D. 351, 366 (E.D. Pa. 2013) (rejecting objections that the settlement did not provide compensation for damage to people or animals, when such injuries were specifically excluded from the settlement release).

The Settlement Agreement never released class members' personal injury and property damage claims. However, out of an abundance of caution, the parties removed paragraphs 101 and 102 to make clear what was already understood. *See* Second Amended Settlement Agreement, Dkt. No. 92 -1 at Paragraph 26 ("This release expressly exempts claims for personal injury and property damage); at Paragraph 89 ("Released claims do not include claims for

personal injury and personal property damage."). In his deposition, objector Pennington admitted that Paragraphs 101 and 102 contained no waiver of liability:

> Q. The settlement agreement
> Indicates that there is no waiver.
>
> A. The settlement agreement does
> indicate that there is no waiver.

Pennington Dep. Feb. 24, 2016 at 114:3-7.

Further, objector Pennington acknowledged that the basis of his objection was the alleged waiver of personal injury claims in Paragraphs 101 and 102, and if those paragraphs were removed, he would have no objection on those grounds:

> Q. Okay. And all I'm simply asking is if
> the paragraphs 101 and102 were removed, meaning they
> no longer need be explained, you don't have an
> objection anymore regarding the inadequacy of the
> notice and claims forms. Correct?
>
> A. I need to look at the claim form, but I
> don't have any objection to Sections 101 and 102 if
> You took them out. If they weren't there I couldn't
> object to them.

Pennington Dep. Feb. 24, 2016 at 119:8-16.

Objector Pennington admitted the express language of Paragraphs 101 and 102 did not waive personal injury claims, and that if they did waive, the removal of those paragraphs meant no basis for objection. Notwithstanding that Pennington's objection should be rejected altogether, it is now moot because the paragraphs have been removed. The amended Agreement is attached as Exhibit F.

### B. There Are Significant Obstacles To the Consumer Protection Claims of Settlement Class B.

The Court also asked the parties to address the relative strength of the consumer protection claims brought by Settlement Class B members—specifically Mr. Townsend's

objection that these claims are strong because the statute of limitations has not expired and higher damages may be available.

As an initial matter, the fact that a purported class member may be able to bring his or her own claim does not automatically lessen the strength of a proposed class settlement. Even if a purported class member could succeed in an individual action, it could take years to recover and the recovery may not exceed what Remington is already offering. *See In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No: 4:03-MD-015-FJG, 2004 WL 3671053, at *10 (W.D. Mo. Apr. 20, 2004) (balancing the strength of the plaintiffs' claims against the risk in pursing litigation, including the fact that any recovery from trial would occur for years). The facts remain that this case involves economic losses only and that a retrofit makes Settlement Class Members fully whole now without the delay and expense of pursuing individual or class litigation. Those facts weigh strongly in favor of approving the Settlement.

Additionally, as with any analysis of the strengths and weaknesses of a claim, or of the defenses to that claim, the parties must factor in the inherent unpredictability and risk that accompanies a jury trial, including that even a successful result may not be enough to overcome the expenses and costs associated with obtaining the result. As such, settlement is the preferred method to handle all litigation. *See, e.g.*, *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist.,* 921 F.2d 1371, 1383 (8th Cir. 1990) ("The law strongly favors settlements. Courts should hospitably receive them. . . . As a practical matter, a remedy that everyone agrees to is a lot more likely to succeed than one to which the defendants must be dragged kicking and screaming."). And a settlement brokered between sophisticated parties with the aid of an experienced and qualified mediator is presumed to be fair, reasonable and in the best interests of all involved. *See In re Charter Commc'n., Inc. Sec. Litig.*, No. 4:02-cv-1186, 2005 WL 4045741, at * 4 (E.D. Mo.

June 30, 2005); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) (explaining that there is an "overriding public interest in settling class action litigation, and it should therefore be encouraged."); *see also* 4 Newberg § 11.41; Manual for Complex Litigation (Fourth) § 21.612 (2004).

Further, Settlement Class B Members' claims are weaker because of the ongoing product safety recall. Some courts, for example, have dismissed claims as moot or for lack of standing when a product recall is in place. *See, e.g.*, *Winzler v. Toyota Motor Sales U.S.A.*, 681 F.3d 1208, 1215 (10th Cir. 2012) (moot); *Chen v. BMW of No. Am.*, No. 12-09262, 2013 WL 3940815, at *4 (C.D. Cal. July 26, 2013) (same); *In re McNeil Consumer HealthCare Mktg. & Sales Practices Litig.*, MDL No. 2190, 2011 WL 2802854, at *13-14 (E.D. Pa. July 15, 2011) (no injury in fact). Other courts have denied class certification in light of a product recall, reasoning that a class action is not a superior method of resolution. *Webb v. Carter's, Inc.*, 272 F.R.D. 489, 504-05 (C.D. Cal. 2011); *In re ConAgra Peanut Butter Prods. Liab. Litig.*, 251 F.R.D. 689, 699-702 (N.D. Ga. 2008); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 214 F.R.D. 614, 622 (W.D. Wash. 2003); *In re Aqua Dots Prods. Liab. Litig.*, 270 F.R.D. 377, 381-385 (7th Cir. 2010); *Daigle v. Ford Motor Co.*, No. 09-3214, 2012 WL 3113854, at *6 (D. Minn. July 31, 2012). The existence of a product recall also undermines the plaintiff's allegations of economic loss. *See Jovine v. Abbott Labs., Inc.*, 795 F. Supp. 2d 1331, 1344 (S.D. Fla. 2011) (holding that plaintiff "cannot plausibly allege that he suffered damages [under the FDUTPA] insofar as the amount he paid for the product, for he alleges that Defendants issued a voluntary recall"). Members of Settlement Class B would have to overcome these arguments in pursuing any consumer-protection claim.

Even setting the recall to the side, members of Settlement Class B would face significant obstacles litigating either individual or class claims under the various consumer protection statutes. Contrary to Objector Townsend's position that "[t]he existence of the manufacturing defect has already been proven beyond any reasonable doubt such that the substantive portion of the liability case does not even offer room for debate," (Townsend Objection, Doc. #98, at 6), the law is clear that a claimant must prove that his or her particular firearm *in fact* contains an excess amount of bonding agent—the mere possibility that a manufacturing defect exists is not sufficient. *O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 503 (8th Cir. 2009) ("[I]it is not enough to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather the plaintiffs must allege that *their product* actually exhibited the alleged defect." (emphasis added); *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 306-07 (Tex. 2008).

Claimants would also have to prove culpable conduct on the part of Remington; the existence of such a product defect does not in and of itself establish Remington's liability or entitle these Settlement Class Members to recovery. As this Court held in its order on Defendants' motion to dismiss, a private right of action under the MMPA requires evidence that Remington knew of the excess bonding issue and either failed to disclose it or affirmatively misrepresented it. *See* Order, Doc. #40 at 5, 7; *see also In re Pet Foods Prods. Liab. Litig.*, 629 F.3d 333, 347-48 (3d Cir. 2011) (in a nationwide class settlement involving state consumer protection claims, rejecting the argument that recalls or reimbursement programs establish strict liability or otherwise automatically entitle consumers to recover against the defendant); *Bryant v. S.A.S.*, 416 S.W.3d 52, 58 (Tex. App. Houston 1st Dist. 2013) (under the DTPA, a defendant has no duty to disclose unknown facts).

Succeeding on a class-wide basis would be even more challenging for members of Settlement Class B. Courts—including in the Eighth Circuit—refuse to certify classes that include uninjured persons. *See, e.g.*, *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011); *In re BPA Prods. Liab. Litig.*, MDL No. 1967, 2011 WL 6740338, at *1 (W.D. No. Dec. 22, 2011). Individualized inquiries would be required to determine whether any particular class member suffered an injury—*i.e.*, that their specific Model 700 or Seven in fact contains an excess amount of bonding agent and that defect caused a reduction in the rifle's value. The amount of damages (if any) will also vary significantly among class members, and the precise amount of each class member's damages must be assessed on an individual basis. *See In re BPA Polycarbonate Plastic Prods. Liab. Litig.*, MDL No. 1967, 2011 WL 6740338, at *6 (W.D. Mo. Dec. 22, 2011) (denying class certification in part because the "value of the product was not universal, and those consumers who used a product obtained more value—and suffered less in damages—than a person who disposed of the product upon immediately learning about the [alleged defect]."); *Johnson v. Harley-Davidson Motor Co. Group, LLC*, 285 F.R.D. 573, 582 (E.D. Cal. 2012) (holding that economic harm and damages cannot be resolved on common proof because some class members will have used the product more than others).

In addition to the above general obstacles to certification that would apply to the Texas, Florida, and Missouri consumer protection statutes, Plaintiffs address specific obstacles in turn below.

### 1. Class Certification under the Texas UDTPA is Unlikely.

The Texas Deceptive Trade Practices Act, Tex. Bus. & Comm. Code §17.50(A) ("TDTPA"), is unlikely to provide Settlement Class B Members relief beyond that achieved in the present settlement because it is unlikely that the case could be certified as a class action. To put it lightly, Texas appellate courts have not been friendly to TDTPA class certifications.

Plaintiffs have located thirteen cases where class certification has been challenged on appeal. In eleven on those cases, the certification was reversed.[6] While a certification order was affirmed in two companion cases,[7] those matters predated Texas' Supreme Court case law which more fully addressed certification requirements for TDTPA cases.

Section 17.48 of the Texas Business & Commerce Code defines the various theories of recovery under the TDTPA. Under § 17.50, a consumer, defined as a person "who seeks or acquires by purchase or lease any goods or services," may bring an action against a defendant who uses or employs a false, misleading or deceptive trade practice that is listed in § 17.46 of the Business & Commerce Code and that was relied on by the consumer to the consumer's detriment. TEX. BUS. & COMM CODE § 17.50(a)(1)(A) and (B). Texas consumers may also sue under the TDTPA for a breach of an express or implied warranty, or for "any unconscionable action or course of action by any person." TEX. BUS. & COMM. CODE §17.50(a)(2) & (3).

---

[6] *Southwestern Bell Telephone Co. v. Marketing on Hold Inc.*, 308 S.W.3d 909, 927 (Tex. 2010)(decertifying class because class representative was not adequate); *Daniel Chrysler Corp. v. Inman*; 252 S.W.3d 299 (Tex. 2008)(decertifying class because named plaintiffs lacked standing); *Henry Schein Inc. v. Stromboe*, 102 S.W.3d 675, 700-01 (Tex. 2002)(decertifying class because proof of reliance precludes finding of predominance); *Ford Motor Co. v. Sheldon*, 22 S.W.3d 444, 453-55 (Tex. 2000)(decertifying class because of improper class definition); *Peter G. Milne PC v. Ryan;* ____ S.W.3d ____, 2015 WL 5999898, *15-*17 (Tex.App. – Texarkana 2015, no pet.)(decertifying class because plaintiffs failed to establish predominance); *Wall v. Parkway Chevrolet Inc.*; 176 S.W.3d 98, 105, 107 (Tex. App. – Houston [1st Dist] 2004, no pet.)(decertifying class because plaintiffs failed to establish commonality or predominance); *Ford Motor Co. v. Ocanas*, 138 S.W.3d 447, 452-53 (Tex.App. – Corpus Christi 2004, no pet.)(decertifying class because proof of individual reliance precludes predominance finding); *Peltier Enterprises Inc. v. Hilton*; 51 S.W.3d 616, 619, 625 (Tex.App. – Tyler 2000, no pet.)(decertifying class because individual issues predominate); *Nissan Motor Co. Ltd. v. Fry*; 27 S.W.3d 573, 587-92 (Tex.App. – Corpus Christi 2000, no pet.)(remanding for reconsideration of class certification in light of concerns regarding commonality, predominance and the lack of a trial plan); *Methodist Hospitals of Dallas v. Tall*; 972 S.W.2d 894, 899 (Tex.App. – Corpus Christi 1998, no pet.)(decertifying class for failure to satisfy numerosity requirement); *America Online Inc. v. Williams*; 958 S.W.2d 268, 277 (Tex.App. – Houston [14th Dist] 1998, no pet.)(decertifying class with was certified during DTPA abatement period).

[7] *Alford Cheverolet-Geo v. Jones;* 91 S.W.3d 396 (Tex.App. – Texarkana 2002, no pet.)(affirming certification in a TDTPA case); *Alford Chevrolet-Geo v. Murphy*; No.06-02-00059-CV, 2002 WL 31398487 (Tex.App. – Texarkana, October 25, 2002, no pet.).

However, under the TDTPA reliance is an element for a consumer bringing a claim for a violation of §17.46 or for breach of an express warranty.[8]

In *Henry Schein Inc. v. Stromboe*, 102 S.W.3d 675 (2002), the Texas supreme court reversed an order certifying a class under the Texas Deceptive Trade Practices Act alleging TDTPA violations based on breach of an express warranty. In concluding that certification was not proper, the court emphasized that the trial court must use a "rigorous analysis" in determining whether the reliance element precludes a predominance finding and that trial courts must specifically explain how they were going to deal with the issue on a class basis. The court stated:

> The plaintiffs contend that they have established "class wide reliance" on misrepresentations made by Schein, but this is not supported by the record. It is true, as the plaintiffs say, that there is evidence that Schein *wanted* purchasers to rely on its advertisements and other representations about its software products, as most marketers of any product would, but there is no evidence that purchasers did rely on Schein's statements so uniformly that common issues of reliance predominate over individual issues. To the contrary, there is, for example, significant evidence that purchasers relied on recommendations from colleagues and others rather than any statements made directly or indirectly by Schein. The trial court did not explain in its certification order how the plaintiffs can avoid individual proof of reliance or why the necessity for such proof would not defeat the predominance requirement for certification. Such an explanation would be an important part of the trial plan required by *[Southwestern Refining Co. v.] Bernal*, [22 S.W.3d 425 (Tex. 2000)]. The court of appeals premised affirmance of the order on the mistaken belief that reliance was not an element of the plaintiff's principal causes of action.

*Stromboe*, 102 S.W.3d at 694.

---

[8] *Compaq Computer Corp. v. Lapray,* 135 S.W.3d 657, 676-77 (Tex. 2004); *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 436 (Tex. 1997) (both cases holding that reliance was an element in a breach of express warranty claim).

The *Stromboe* court also emphasized other difficulties with certification under the TDTPA, including the fact that finding that a defendant acted knowingly, which would entitle the plaintiff to additional damages, would require evidence of "individual circumstances." *Stromboe*, 102 S.W.3d at 695. Further, the court made clear that it did not see how additional damages could be determined on a class wide basis without taking into consideration individual determinations regarding liability and individual damages. *Id.* Under *Stromboe*, Settlement Class B Members would face significant obstacles in getting similar TDTPA claims certified. *See also, Best Buy Co. v. Barrera*, 248 S.W.3d 160, 163 (Tex. 2007); *Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 206 (Tex. 2007)(both cases reversing class certification for causes of action where inquiry into the plaintiff's individual state of mind and circumstances is required).

"Reliance" is not an element in a cause of action alleging an "unconscionable action or course of action" under §17.50(a)(3), but Texas courts have also declined to certify those cases. The TDTPA defines "unconscionable action or course of action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Comm. Code §17.45(5). The very language of this definition casts doubt on the prospects of class certification. It requires an examination into each individual class members' "lack of knowledge, ability, experience or capacity" in order to determine whether the defendant's act took advantage of the consumer to a grossly unfair degree. Further, this statute requires an analysis of the detriment experienced by each individual class member/consumer. For these reasons, although reliance is not a specific element of the claim, Texas courts of appeals have reversed orders certifying TDTPA claims based on an unconscionable course of action. *Peter G. Milne PC*, 2015 WL at *15 ("While Hicks' actions were actionable and violated the 2001 injunction, determining whether they were

detrimental to any given class members requires an examination of that class member's specific situation."), *see also, id.* at \*16-17; *Peltier Enterprises Inc.*, 51 S.W.3d at 616 (denying certification because "there would need to be some showing of each customer's 'knowledge, ability, experience or capacity'").

Finally, Class B Settlement Members could conceivably bring a TDTPA class claim for breach of the implied warranty of merchantability. *See* TEX. BUS. & COMM. CODE §17.50(a)(2). But no Texas appellate court has affirmed certification of this claim. Indeed, in *General Motors Corp. v. Garza*, 179 S.W.3d 76 (Tex.App. – San Antonio 2005, no pet.), the court of appeals reversed the trial court's certification of an implied warranty of merchantability claim. The court held that even when a product is shown to be unmerchantable, a plaintiff still is required to establish that the defect caused him to suffer injury. The court noted that various members of the class had had different experiences with the alleged defect in the vehicle at issue in that case, and on that basis reversed the lower court's certification. *Garza,* 179 S.W.3d at 81-82, 83-84. In addition to these predominance concerns, implied warranty of merchantability claims require the plaintiff to give the defendant notice of breach within a reasonable time after he discovers or should have discovered the breach and an opportunity to cure. *See*, TEX. BUS. & COMM. CODE §2.607(c)(1); *Lochinvar Corp. v. Myers*, 930 S.W.2d 182, 189 (Tex.App. – Dallas 1996, no writ). Determining when a class member discovered or should have discovered the defect complained of and whether he gave notice within a reasonable time will involve individualized issues which, again, will likely be found to be predominate over common issues under Texas class action jurisprudence. Therefore, it is unlikely that Settlement Class B Members in Texas would be able to pursue such claims on a class basis. [9]

---

[9] Individual issues would also predominate in any claim based on an implied warranty for fitness for a particular purpose. TEX. BUS. & COMM. CODE §2.315. Under that statute, buyers must establish that the seller had "reason to

The deposition of objector Rodney Townsend, a Texas-licensed attorney, illustrates many of the hurdles under Texas consumer law. For instance, as to the statute of limitations, objector Townsend acknowledged many breach of warranty claims, including his own, would be facially barred under the statute of limitations:

> Q. And are you familiar with the statute of
> limitations for breach of warranty claims in Texas?
> A. I think I am.
> Q. And what is that period? From the time of
> purchase, what is the statute of limitations?
> A. I want to say four years?
> The Witness: Am I right?
> Q. Any warranties that were
> provided with this rifle by Remington when you purchased
> it in 2007 would have expired, by law, by 2011, correct?
> A. Yes.

Townsend Dep. Feb. 18, 2016 at 20:23 – 21:8.

Similarly, objector Townsend conceded that reliance was an element under the TDTPA:

> Q. Okay. You are aware that in order to succeed
> in that action (TDTPA), you need to prove reliance?
> A. Yeah.
> Q. So an individual
> would have to prove that
> he relied on an advertisement  or representation of
> Remington that was misleading?
> A. Uh-huh.

Townsend Dep. Feb. 18, 2016 at 118:18-25.

Thus, the availability of damages through Texas consumer and warranty law is, by objector Townsend's own admissions, not so clear cut or so readily available.

---

know any particular purpose for which the goods are required," and to further establish that the buyer was "relying on the seller's skill or judgment to select or furnish suitable goods."  These issues – the seller's notice of each particular buyer's purpose, and the buyer's reliance on the seller's skill – are individualized issues and not susceptible to classwide adjudication under the Texas DTPA.

## 2. The Availability of Only Limited Damages Under the Florida DUTPA Favors Settlement.

Certification of claims brought under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")[10] as class actions is not common. *See, e.g., Rollins, Inc. v. Butland*, 951 So. 2d 860, 875 (Fla. Dist. Ct. App. 2006) (noting that "our sister district courts have approved the certification of other FDUTPA claims as class actions in several cases.").[11] Certification has been granted for FDUTPA claims that involve "allegations of a single defect in a standard consumer product. . . [because] [i]n these cases, each of the consumers was treated alike, and individual issues about liability for alleged violations of FDUTPA did not arise." *Id.* Of course, the likelihood of getting a class certified is just one factor that practitioners must consider. As important is what relief you can obtain for the class if certified. Here, that relief has been achieved under the terms of the settlement, making further litigation under the FDUTPA an essential waste of judicial resources.

The FDUTPA provides both equitable and legal relief for violations of the statute. Specifically the statute allows for (1) injunctions or declaratory relief to cease and desist deceptive/unfair conduct, and (2) economic relief for "actual damages." Fla. Stat. Ann. § 501.211(1)-(2); *see Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 166-67 (Fla. Dist. Ct. App. 2015). Because a voluntary recall of the XMP was undertaken by Remington after consultation and coordination with Plaintiffs' Counsel, no further

---

[10] Objector Townsend admitted that his practice was mostly limited to Texas and expressed no opinions on Florida law. Townsend Dep. Feb. 18, 2016 at 51:14 – 52:2.

[11] "A consumer claim for damages under [the] FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *City First Mortgage Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008) (quoting *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006)). "[I]n order for the consumer to be entitled to any relief under FDUTPA, the consumer must not only plead and prove that the conduct complained of was unfair and deceptive but the consumer must also plead and prove that he or she was aggrieved by the unfair and deceptive act." *Macias*, 694 So. 2d at 90.

equitable remedies are available for Settlement Class B Members. This leaves the prospects of recovering monetary damages under the FDUTPA doubtful.

Pursuant to the FDUTPA, a party may recover "actual damages," reasonable attorneys' fees and court costs – not consequential, special or incidental damages. Fla. Stat. Ann. §§ 501.211 (2), 501.2105; *see Barton*, 988 So. 2d at 86; *Dorestin v. Hollywood Imports, Inc.*, 45 So. 3d 819, 827 (Fla. 4th DCA 2010) ("Florida courts have held that 'actual damages' under FDUTPA do not include 'consequential,' 'special,' or 'incidental' damages."). "Actual damages" are narrowly defined as "'the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.'" *Collins v. DaimlerChrysler Corp.*, 894 So. 2d 988, 990-91 (Fla. 5th DCA 2004) (quoting *Rollins, Inc. v. Heller,* 454 So.2d 580, 585 (Fla. 3d DCA 1984)). Diminished value qualifies as actual damage under the FDUTPA. *Id.* ("[W]e observe that Florida courts have allowed diminished value to serve as 'actual damages' recoverable in a FDUTPA claim since at least *Rollins* in 1984 without any corrective action by the Legislature."). But the "FDUTPA does not provide for the recovery of nominal damages, speculative losses, or compensation for subjective feelings of disappointment." *Id.* (quoting *Rollins, Inc. v. Butland,* 951 So.2d 860, 873 (Fla. 2d DCA 2006)).

Finally, and contrary to the assertions made by Objector Townsend, punitive damages are **not recoverable** under the FDUTPA.[12] The FDUTPA "specifically provides for the recovery of

---

[12] A FDUTPA claim differs from a fraud claim under Florida law. *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000) (citing *W.S. Badcock Corp. v. Myers,* 696 So. 2d 776 (Fla. 1st DCA 1996) and *Urling v. Helms Exterminators, Inc.*, 468 So. 2d 451 (Fla. 1st DCA 1985)) ("The plaintiff need not prove the elements of fraud to sustain an action under the [FDUTPA]" because "the question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances."). Consequently, in order for Settlement Class B Members to recover punitive damages, a claim for fraud, including actual reliance on the allegedly deceptive statements made by Remington, must be specifically pleaded and proven. This sort of claim would raise individual issues of liability and not be susceptible of class treatment. *See, e.g., Rollins* 454 So. 2d at 584-86.

actual damages, but makes no provision for punitive damages. A claim for punitive damages is outside the scope of chapter 501 and the FDUTPA. Accordingly, any award of punitive damages based upon a violation of FDUTPA would be improper absent some independent basis such as fraud." *Rollins, Inc. v. Heller*, 454 So. 2d 580, 584-86 (Fla. Dist. Ct. App. 1984) (citations omitted); *In re TracFone Unlimited Serv. Plan Litig.*, No. C-13-3440 EMC, 2015 WL 4051882, at *7 (N.D. Cal. July 2, 2015) *reconsideration denied,* No. C-13-3440 EMC, 2015 WL 4735521 (N.D. Cal. Aug. 10, 2015) (finding settlement objector's "argument that class members could obtain punitive damages [under Florida law] if they pursued this case through trial . . . off-base" because punitive damages are not available under FDUTPA pursuant to the holding in *Rollins, Inc. v. Heller,* 454 So. 2d 580 (Fla. 3d DCA 1984)).

As the settlement is structured, Settlement Class B Members will either: (a) receive a reimbursement for the amount a class member paid on his/her own to replace a trigger or (b) receive a brand new trigger mechanism that will eliminate the alleged defect. And the replacement program includes additional oversight by the Court and Class Counsel. When reviewing the actual law and facts of the case, Objector Townsend's argument is unsupported, ignores the hardships associated with pursuing an individual case, the hurdles to class certification, and that a settlement is a compromise of competing concerns and issues.

### 3. Decisions Addressing the Missouri Merchandising Practices Act Present Hurdles to Overall Success, Class Certification and Damages.

Similar to many other consumer protection statutes, the Missouri Merchandising Practices Act, § 407.020, *et seq.,* R.S.Mo. (the "MMPA")[13] allows a successful litigant to recover actual damages and, if deemed appropriate by the court, punitive damages, attorneys' fees and

---

[13] Again, Objector Townsend admitted his practice was mostly limited to Texas. Townsend Dep. Feb. 18, 2016 at 51:14 – 52:2.

equitable relief.  § 407.025(1) R.S.Mo; *Walsh v. Al West Chrysler, Inc.*, 211 S.W.3d 673, 676 (Mo. App. 2007) (noting that to recover punitive damages a plaintiff must "offer proof that Defendant's conduct was outrageous due to Defendant's evil motive or reckless indifference to the rights of others.").  Further, the MMPA specifically allows an aggrieved consumer to bring a class action.  *Id.* at (2); *see also Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68, 81-82 (8th Cir. 2011) ("The fact that class actions are specifically provided for by statute does not necessarily mean all MMPA class actions should be certified; nor does public policy suggest otherwise.").  For a class action to be certified, the Court must make specific findings in accordance with the statute, including a finding that questions of law common to the class members predominate over any individual questions of law.  *See, e.g., Perras v. H&R Block*, 789 F.3d 914 (8th Cir. Mo. 2015) (holding that denial of plaintiffs class certification motion was appropriate where individualized issues predominate the proceedings).

As discussed above, injunctive relief is not available here because Remington after consultation and coordination with Plaintiffs' Counsel has already voluntarily recalled the rifles owned by Settlement Class B Members.  Defendants have also agreed to pay Plaintiffs' attorneys' fees, expenses and court costs. And, similar to research under the Texas and Florida statutes, there is no reported case where punitive damages were awarded in a class action case under the MMPA.[14]  This leaves two basic questions: <u>first</u>, what is the likelihood that a claim brought by Settlement Class B Members under the MMPA would be successful; and <u>two</u>, what "actual damages" might Settlement Class B Members receive under the MMPA, if any, beyond (a) full reimbursement for money paid to replace an original XMP trigger and/or (b) the receipt of a new, improved XMP trigger that eliminates the locktite problem.

---

[14] Punitive damages in Missouri are further limited by statute to the lesser of $500,000 or five times the net amount of the judgment.  § 510.265 R.S.Mo.

Objector Townsend uses the FDUTPA to demonstrate that Settlement Class B Members have "a strong case" under the consumer protection laws of "every state where the XMP has been marketed." (Townsend Objection, Doc. 98 at 5). Townsend goes on to point to the following practice that harmed consumers under the FDUTPA: "Specifically, Remington has **represented** that the Model 700 is a safe, reliable firearm when in fact the XMP trigger mechanism was defectively manufactured resulting in accidental discharges without the trigger being pulled." *Id.* at 8 (emphasis added). As it relates to any claim brought under the MMPA related to the XMP trigger, this Court has already dismissed a similar count involving the Walker Fire Conrol to the extent it relied on Remington's alleged fraudulent misrepresentations. (Dkt.. 40 at 6). Accordingly, to the extent that Objector Townsend believes that his case under the MMPA is strong because Remington misrepresented the safety of the XMP to the public at large, this Court is likely to hold otherwise.[15]

A further hurdle to a claim under the MMPA related to the XMP relates to what "actual damages" are recoverable under the MMPA. The most common measure of damages for claims brought under the MMPA is the "lost benefit of the bargain." *Walsh,* 211 S.W.3d at 675. The benefit-of-the-bargain rule can provide relief to a claimant who proves that he suffered an economic loss because the product that he purchased was worth less than the product as represented. *See id.* But there is "[n]o authority, in Missouri, or otherwise, for [the proposition that a consumer suffers *ipso facto* economic loss at the time of purchase of a non-conforming product]." *In re Bisphenol-A Polycarbonate Plastic Prods. Liab. Litig.*, 2011 U.S. Dist. LEXIS 150015, *7 (W.D. Mo. Dec. 22, 2011) (denying class certification for class members that had not

---

[15] The Court's Order made clear that a claim for fraudulent misrepresentation under the MMPA must specify exactly what misrepresentations were made to the proposed class and further that the plaintiff (and presumably every class member) in fact "saw, heard or was otherwise aware of any of this [sic] alleged misrepresentations." Such proof is simply not plausible in a class action setting. (Order, Doc. 40 at 6).

suffered an injury in fact); *see also Owens v. GMC*, 533 F.3d 913, 922 (8th Cir. 2008 (noting that where "the alleged unfair practice is the failure to disclose a product defect, there must be a showing that the [subject] vehicle in fact suffered that defect, or evidence from which the defect reasonably could be inferred, in order to demonstrate an ascertainable loss *as a result of* [defendant's] failure to disclose the defect."). And the benefit-of-the-bargain rule has been rejected as inadequate "where the only cognizable injury is the diminished use of a product," in lieu of a damage model that takes into account the consumer's post-purchase use of that product. 2011 U.S. Dist. LEXIS at *19-20; *see also Shiplet v. Copeland*, 450 S.W.3d 433, 442 (Mo. App. 2014) (noting that "where the purchaser willingly used the property for a considerable period of time aware of, and notwisthanding, its defect, calculation of the benefit of the bargain by 'crediting' the price paid for the property by a reasonable value for its use is not err.").

Finally, with respect to punitive damage, under the MMPA, as with the Texas DTPA, Plaintiffs would be required to show willful, intentional, or outrageous conduct above and beyond a violation of the statute. *See Peel v. Credit Acceptance Corp.*, 408 S.W.3d 191, 210 (Mo. Ct. App. 2013) (intentional wanton, willful, and outrageous act without justification or reckless disregard for the plaintiff's rights and interest); *Bossier Chrysler-Dodge II, Inc. v. Riley*, 221 S.W.3d 749, 758 (Tex. App. Waco 2007) (knowing or intentional conduct). Similarly, attorneys' fees are not automatic and are within the discretion of the court. Mo. Rev. Stat. § 407.025.2; Fla. Stat. § 501.2105(1). "One consideration in determining the amount of attorneys' fees is the result achieved." *Berry v. Volkswagen Group of Am.*, 397 S.W.3d 425, 431 (Mo. 2013). Given that any particular plaintiff's economic harm would be minimal, as well as the fact that litigation is unnecessary in light of the XMP recall, these plaintiffs would likely be unable to

show that "the nature and importance of the subject matter" and the "result obtained" justify fees. *See id.* (listing factors relevant to an attorney fee award under the MMPA).

Applying the above to any MMPA claim advanced by Settlement Class B Members causes concern about whether the case can successfully be litigated as a class action. The initial question is whether or not such a claim would survive a motion to dismiss. Thereafter, assuming certification is granted, even a certified class must take into account the considerable risks related to what damages can be successfully recovered. For these reasons, continued litigation of an MMPA claim carries risk and uncertainty.

## III.    CONCLUSION AND REQUEST FOR HEARING

The Parties have worked diligently to develop an additional proposal that would continue to remind Settlement Class Members about the Settlement. The Parties respectfully request that the Court schedule a hearing to address the parameters of the  plan, approve it thereafter, and order it to be implemented so that final settlement approval can be achieved.

Respectfully submitted,

NEBLETT, BEARD & ARSENAULT

_____ s/ Richard Arsenault _____
Richard Arsenault
2220 Bonaventure Court
Alexandria, LA 71301
Phone: 800-256-1050
Fax: 318-561-2592
rarsenault@nbalawfirm.com

W. Mark Lanier
LANIER LAW FIRM
6810 FM 1960 West
Houston, TX 77069
wml@lanierlawfirm.com

Charles E. Schaffer
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: 215-592-1500
Fax: 215-592-4663
cschaffer@lfsblaw.com

Eric D. Holland
R. Seth Crompton
HOLLAND LAW FIRM, LLC
300 North Tucker Boulevard, Suite 801
St. Louis, MO 63101
Tel: 314-241-8111
Fax: 314-241-5554
eholland@allfela.com
scrompton@allfela.com

**Class Counsel**

Jon D. Robinson
Christopher Ellis
BOLEN ROBINSON & ELLIS, LLP
202 South Franklin, 2nd Floor
Decatur, IL 62523
Phone: 217-429-4296
Fax: 217-329-0034
jrobinson@brelaw.com
cellis@brelaw.com

SHOOK, HARDY & BACON LLP

_____ s/ John K. Sherk _____
John K. Sherk, MO Bar #35963
Amy M. Crouch, MO Bar #48654
Molly S. Carella, MO Bar #56902
Brent Dwerlkotte, MO Bar #62864
2555 Grand Blvd.
Kansas City, MO 64108
Phone: 816-474-6550
Fax: 816-421-5547
jsherk@shb.com

Dale G. Wills
Andrew A. Lothson
SWANSON, MARTIN & BELL, LLP
330 North Wabash Avenue, Suite 3300
Chicago, Illinois 60611
Phone: 312-321-9100
Fax: 312-321-0990
dwills@smbtrials.com

**Attorneys for Defendants Remington Arms Company, LLC, E.I. du Pont de Nemours & Company, and Sporting Goods Properties, Inc.**

John R. Climaco
John A. Peca
CLIMACO, WILCOX, PECA, TARANTINO &
GAROFOLI CO., LPA
55 Public, Suite 1950
Cleveland, OH 44113
jrclim@climacolaw.com
japeca@climacolaw.com

Richard Ramler
RAMLER LAW OFFICE, PC
202 W. Madison Avenue
Belgrade, MT 59714
richardramler@aol.com

Timothy W. Monsees
MONSEES & MAYER, PC
4717 Grand Avenue, Suite 820
Kansas City, MO 64112
tmonsees@mmmpalaw.com

Jordan L. Chaikin
PARKER WAICHMAN LLP
27300 Riverview Center Boulevard, Suite 103
Bonita Springs, FL 34134
jchaikin@yourlawyer.com

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of June, 2016, I filed the foregoing document with the clerk of the court using the court's CM/ECF system, which will serve electronic notice on all parties of interest.

/s John K. Sherk

**Attorney for Defendants Remington Arms Company, LLC, E.I. du Pont de Nemours & Company, and Sporting Goods Properties, Inc.**