# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| IAN POLLARD, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:13-cv-00086-ODS |
| REMINGTON ARMS COMPANY, LLC, et al. | ) ) | |
| Defendants. | ) ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**Proposed Notice Plan**

**Pursuant to Order Dated December 8, 2015**

**CONTENTS** PAGE

GLOSSARY…………………………………………………………………………...4

PART 1: INTRODUCTION ....................................................................................5

  SECTION 1: OVERVIEW ...................................................................................5

    Executive Summary ......................................................................................5

    Foundation—Existing Hunter-sportsman Consumer Models and Data...........5

    Media Overview ............................................................................................6

    Pre-program Data Modeling and Media Testing............................................7

    Proposed Next Steps—Social Networking and National Radio Advertising...................8

  SECTION 2: PRINCIPAL EXPERTS OF SIGNAL INTERACTIVE MEDIA..................8

    *Jim Messina*—Mass Media and Data Analytics................................................9

    *Matt Garretson*—Aggregate Legal Programs .................................................10

PART 2. ADDITIONAL SOCIAL NETWORKING MEDIA ...............................................11

  SECTION 1: MECHANICS OF SOCIAL NETWORKING MEDIA...............................11

    How a User Views *Facebook* .......................................................................11

    Click-through to Case Website.......................................................................14

  SECTION 2: THE SOCIAL NETWORKING MEDIA TEST PROGRAM .....................15

    Test Program Results....................................................................................15

    Round 1 Testing (March 29 – May 4)..........................................................15

    Social Media Ad #1 ......................................................................................16

    Social Media Ad #2 ......................................................................................16

    Social Media Ad #3 ......................................................................................17

    Social Media Ad #4 ......................................................................................17

    Round 2 Testing (April 22 – May 12)...........................................................18

    Social Media Ad #5 ......................................................................................19

    Social Media Ad #6 ......................................................................................19

    Round 3 Testing (May 2 – May 12) ..............................................................20

    Cumulative Test Results: Increase in Response Rate ....................................21

  SECTION 3: PROPOSED NEXT STEPS .......................................................21

    Expanding Social Media Advertising among Putative Class Members.........................21

PART 3: NATIONAL RADIO CAMPAIGN..........................................................................22

    SECTION 1: OVERVIEW...............................................................................................22

        Introduction ...........................................................................................................22

        Components of the National Radio Campaign.......................................................22

    SECTION 2: PROGRAMMING GUIDE ......................................................................23

        Networks and Stations...........................................................................................23

        Hannity Network ...................................................................................................24

        Information Today Network....................................................................................24

        Rush Limbaugh Weekday Network .......................................................................25

        John Boy & Billy...................................................................................................25

    SECTION 3: RADIO CAMPAIGN EXECUTION .........................................................25

        Professional Voice Actors and Media Placement .................................................25

        Radio Advertisement Script ..................................................................................25

        In-program Testing and Adjustments....................................................................27

        Metrics and Reporting ..........................................................................................27

PART 4: DIRECT MAIL, E-MAIL, AND RETAILER POSTER CAMPAIGNS ................27

    SECTION 1: DIRECT MAIL AND E-MAIL NOTICE ...................................................27

        Overview and Data Processing..............................................................................27

        Direct Mail Notice ................................................................................................28

    SECTION 2: RETAILER POSTER CAMPAIGN ..........................................................28

        Informational Posters at Retail Locations ...........................................................28

CONCLUSION…………………………………………………………………………29

APPENDIX 1: CURRICULUM VITAE OF JIM MESSINA .................................................30

APPENDIX 2: CURRICULUM VITAE OF MATTHEW L. GARRETSON .......................32

**GLOSSARY**

| | |
|---|---|
| "Case Website" | the public website for this Proposed Class Settlement[1] |
| "Court" | United States District Court, Western District of Missouri |
| "Mediator" | Judge Glenn Norton (Ret.) |
| "Notice Documents" | the long-form and short-form notice documents approved by the Court[2] |
| "Notice Provider" | Angeion Group, LLC |
| "Notice Provider Declaration" | document #9-29, Declaration of Steven Weisbrot on the implementation of notice activities[3] |
| "Proposed Class Settlement" | the proposed class action settlement of *Pollard v. Remington Arms Company, LLC, et al.*[4] |
| "12/8 Order" | document #112; order filed December 8, 2015, requiring the parties to provide a plan for additional notice[5] |
| "Proposed Court-ordered Notice Provider" | Jim Messina and Matt Garretson, on behalf of Signal Interactive Media, LLC |
| "Court-ordered Notice Plan" | this proposed plan for additional notice as requested by the Order |

---

[1] *Available at* http://remingtonfirearmsclassactionsettlement.com/.

[2] *Id.*

[3] Declaration of Steven Weisbrot on Implementation and Adequacy of Notice Plan, *Pollard v. Remington Arms Company, LLC, et al.*, Case No. 4:13-cv-00086-ODS (W.D. MO).

[4] *Pollard v. Remington Arms Company, LLC, et al.*, Case No. 4:13-cv-00086-ODS (W.D. MO) (hereinafter, "*Pollard v. Remington*").

[5] Order (1) Deferring Consideration of Joint Motion for Settlement Approval and Motion For Attorney Fees, (2) Cancelling Final Approval Hearing, and (3) Directing Parties to Provide Court-ordered Briefing, *Pollard v. Remington.*

# PART 1: INTRODUCTION

## SECTION 1: OVERVIEW

### Executive Summary

1.      In its 12/8 Order, the Court directed the parties to develop a notice plan, for the Court's review, that will result in a more significant response rate.  To this end, the parties engaged Signal Interactive Media LCC ("Signal") to design and test the proposed Court-ordered Notice Plan described herein.

2.      From March 29, 2016, to May 12, 2016, Signal conducted preliminary testing of this Court-ordered Notice Plan and collected empirical results.  These empirical results indicate that the Court-ordered Notice Plan is likely to result in a more significant response rate in this Proposed Class Settlement, as requested by the Court.  Informed by media testing and empirical results, our group has now prepared this Court-ordered Notice Plan for the Court's review.

### Foundation—Existing Hunter-sportsman Consumer Models and Data

3.      In his prior affidavit, the Notice Provider indicated, "Demographic and media usage data are not *readily available* for owners of these specific models."[6]  That is true with respect to the commercial databases customarily used in similar class settlements.[7]  However, our proposed Court-ordered Notice Plan extends above and beyond the commercial databases readily available and customarily used.  Our proposed additional notice effort leverages our unique proprietary dataset and specialized data modeling techniques.

4.      In summary, co-founder Jim Messina is an internationally recognized expert in the design and administration of political and commercial advertising campaigns.  The function of such mass media advertising is similar to that of notice: each is designed to

---

[6] Declaration of Steven Weisbrot on Implementation and Adequacy of Notice Plan, *Pollard v. Remington*, at paragraph 9.

[7] See *Id.*, at paragraph 13.

effectively reach and inform a specified audience. Messina and his team have supervised more than $1.1 billion in paid advertising. In the course of this work, Messina's team has developed consumer models and large-scale datasets to identify, reach, and engage various specific audiences. To reach a desired audience (including but not limited to hunter-sportsmen, for example), the complete database may be modeled and queried, and a desired subset of information returned.

5. Signal has substantial past experience modeling its dataset to administer mass media campaigns involving the hunter-sportsman demographic, among many other groups. Our proprietary hunter-sportsman consumer models and data incorporate a variety of information as inputs. The information includes, for example, hunting permits, membership in relevant organizations, and stated affinities on social media. The information has been refined through statistical modelling to identify individuals within the larger population who are likely to own qualifying firearms. The resulting data provides a unique resource for additional class notice in this Proposed Class Settlement.

**Media Overview**

6. This Court-ordered Notice Plan proposes the additional use of the following:

    a. a **social networking media campaign** utilizing our unique proprietary databases and analytics;

    b. a **national radio media campaign,** including advertisements across the country's top syndicated radio networks and programs aligned with the demographics of potential class members; and

    c. a **direct mail, e-mail, and retailer poster campaign**, encompassing approximately 1 million e-mails and 93,000 postcards sent to Remington customers, and 11,000 informational posters displayed at retail locations.

6

**Pre-program Data Modeling and Media Testing**

7.      Our team has tested the social networking media plan among a sample of 150,000 potential class members in order to collect preliminary empirical results.  Such *pre-program testing* is customary in commercial and political mass media advertising.  *Pre-program testing* is used to measure the effectiveness of various media and messaging, so that the parties may adjust and optimize *prior to* full-scale investment and implementation.

8.      *Pre-program testing* was administered in rounds, allowing for adjustment of the message and graphic design.  Testing encompassed several different advertisements via *Facebook*[8] served to 150,000 individuals who were identified as likely to be potential class members.

9.      The empirical results of *pre-program testing* were:

Impressions: 1,049,860

Reach: 309,958[9]

Frequency: 3.03

Clicks-to-Case-Website: 18,721[10]

10.      In sum, as described further on the following pages, the empirical results of *pre-program testing* of the additional social networking media campaign indicate that this component of the Court-ordered Notice Plan is likely to *result in a more significant response rate* than the response previously achieved, as requested by the Court.

---

[8] Facebook was selected as it is overwhelmingly the highest-read social network on the web, with 1.09 billion daily active users on average for March 2016.  For complete statistics, see https://newsroom.fb.com/company-info/.

[9] Of note, the reach statistic displayed here equals the reach of advertisements during *pre-program testing* (*Facebook* advertising alone), and therefore does not implicate or reflect a calculation of combined net reach across media. This statistic does not include the synergistic effect of a fully-implemented, cross-media notice plan and is therefore conservative.

[10] Upon clicking the notice advertisement in *Facebook*, potential class members are redirected to the Case Website, which contains links to short-form notice, long-form notice, and claims forms, among other information and materials.

**Proposed Next Steps—Social Networking and National Radio Advertising**

11.     Informed by the results of *pre-program testing*, the Proposed Court-ordered Notice Provider now requests approval of the Court to expand the use of social media advertising beyond the 150,000-person test group.

12.     Subject to approval of the Court, and in collaboration with the Mediator, Signal proposes to direct notice to the total universe of *Facebook* users in the United States who were identified pursuant to our hunter-sportsman audience model, overlaying individuals who expressed a self-identified interest in topics relating to hunting and Remington Arms on social media (**3.4 million potential class members**).  Upon approval, this proposed Court-ordered notice campaign would be administered for four consecutive weeks, from July 4, 2016, through July 31, 2016.

13.     Moreover, to further supplement the prior notice efforts and to increase response rates, we propose to administer a **4-week national radio campaign** across the country's top syndicated networks and programs aligned with the demographics of potential class members.  The radio advertising schedule would also span four consecutive weeks, from July 4, 2016, through July 31, 2016, expanding reach across the country during peak morning and evening drive times.  The proposed networks will span more than 2,000 individual radio stations across the country and are forecasted to generate more than 61 million targeted impressions.

14.     Empirical results from these efforts will be tracked and reported as directed by this Court.

**SECTION 2: PRINCIPAL EXPERTS OF SIGNAL INTERACTIVE MEDIA**

15.     Signal Interactive Media LCC is a class action notice firm established by co-founders Jim Messina and Matt Garretson. The principal goal of this joint venture is to

safeguard *Due Process* and provide a meaningful opportunity to be heard through advanced data analytics, contemporary digital media, and all of the art and science of today's political and commercial advertising.

### *Jim Messina*—Mass Media and Data Analytics

16.     Jim Messina is an internationally recognized expert of reaching target audiences through contemporary mass media. As the reach and readership of traditional print media (e.g., the print editions of newspapers and magazines) continue to decline, consumers increasingly rely on web-based media and social networking for information. This media is highly fragmented and evolves at a rapid pace. Specialized experts are needed to design advertising campaigns to compete for consumer's attention across digital media, as well as to determine the best mix of traditional and digital media. Messina offers this highly specialized expertise to supplement traditional class notice plans.

17.     As President Obama's 2012 campaign manager, Messina abandoned every step of a traditional presidential campaign and merged media, data analytics, and politics in an unprecedented way. Google's Executive Chairman Eric Schmidt called it "the best-run campaign ever." More recently, Jim Messina has served as campaign strategy adviser to Prime Minister David Cameron during the 2015 general election campaign, and has been engaged by the Prime Minister of Italy as campaign advisor. Beyond political campaigns, his group currently designs media plans for non-profits and corporations, from top film studios to international retailers.

18.     Messina and his team have supervised over $1.1 billion in paid advertising across the globe. Messina has experience in using a variety of contemporary paid, earned, and owned media (including traditional print media and, more notably, contemporary digital media such as social networking using *Facebook*).

19. In the political context, Messina is engaged to use data and data analytics to increase voter turnout. In the commercial context, Messina employs the same data-driven philosophies to increase customer base. In the context of class actions, Messina has adopted all of the art and science of political and consumer advertising to increase response rates.[11]

### *Matt Garretson*—**Aggregate Legal Programs**

20. Matt Garretson is the co-founder of Signal, as well as the founder of The Garretson Resolution Group, which provides party-neutral complex administration services in high-profile, large-scale aggregate legal proceedings. He received his BA from Yale University and his law degree at Kentucky's Salmon P. Chase College of Law. Garretson is a frequent speaker at Continuing Legal Education seminars regarding lawyers' professional responsibilities in class action and other mass tort matters.

21. Garretson is also the author of a legal textbook published by West Publishing entitled "Negotiating and Settling Tort Cases," in addition to several articles regarding professional responsibility in individual and mass tort settlements.

22. Garretson has substantial firsthand experience administering the resolution of hundreds of class action and mass tort matters. Garretson and his team have extensive institutional knowledge of communications, claims intake, and processing procedures in class actions.

23. For example, Garretson's team currently serves as the court-appointed Claims Administrator for the medical benefits settlement arising from the Deepwater Horizon oil spill in April, 2010. His team is responsible for administering the settlement,

---

[11] See also, *Be Heard: Class Notice and Political Advertising*, available at www.signalinteractive.com/resources (providing additional information regarding how our team has adopted Messina's data-driven mass media approach to advance class notice practice).

including systems and process development, class member intake, documentation and correspondence, claims processing, medical record review and validation, fund administration, and fraud detection.

24.     Garretson's team also serves as the court-appointed Allocation Neutral in the 9-11 World Trade Center Disaster Site Litigation.  In June 2010, U.S. federal Judge Alvin Hellerstein appointed Garretson and his team as the Allocation Neutral for the WTC Captive Settlement, responsible to evaluate claims and pay $712.5 million to more than 10,000 plaintiffs who had alleged injuries from the rescue, recovery, and debris-removal operations at the World Trade Center site after the events of September 11, 2001.

**Curricula Vitae**

25.     The *curricula vitae* of Jim Messina and Matt Garretson have been attached to this Court-ordered Notice Plan as *Appendix 1* and *Appendix 2*, respectively.


**PART 2.  ADDITIONAL SOCIAL NETWORKING MEDIA**

**SECTION 1: MECHANICS OF SOCIAL NETWORKING MEDIA**

26.     The following sections provide an overview of how a potential class member is exposed to class notice via *Facebook*, a web-based social networking service.

**How a User Views *Facebook***

27.     To use *Facebook*, a user first logs into his or her account on www.*Facebook*.com:




28.    The user will then be taken to his or her account homepage:



29.    The user will see his or her "newsfeed":



The main feature of the user's homepage is his or her "Newsfeed."

The "Newsfeed" is where a user will see content posted by Facebook friends in his or her network.

30.     An ad can be served in various locations across *Facebook*'s network – 1) in the desktop-computer newsfeed, 2) in the right hand column next to the newsfeed, and 3) in the *Facebook* app newsfeed on a user's cell phone (or other mobile device).



The Remington class notice ads were served across all three placements.

Here we see one of the ads in a user's desktop newsfeed.

A user is aware the post is an ad, as Facebook will identify the post as a "suggested post."

Below we demonstrate a Remington class notice ad in the right hand column of a user's homepage.





Above we see an ad as it would appear in a user's mobile phone newsfeed

**Click-through to Case Website**

31.



If a user clicks anywhere within the areas shown, he or she will immediately be taken to the Case Website (providing links to approved Notice Documents).

32.     The homepage of the Case Website provides additional information about the Proposed Class Settlement, as well as the option to submit a claim.  The Case Website also contains links to the approved long-form and short-form Notice and claim form documents.



14

**SECTION 2: THE SOCIAL NETWORKING MEDIA TEST PROGRAM**

**Test Program Results**

33.    *Pre-program testing* was administered in short iterations, allowing time for adjustment of the media and message.  In sum, testing for all rounds encompassed 150,000 individuals and provided the following cumulative results:

Total Impressions: 1,049,860

Total Reach: 309,958[12]

Frequency: 3.03

Clicks on Ad: 18,721

**Round 1 Testing (March 29 – May 4)**

34.    In the first round of testing, we implemented four initial test ads, including various text and a variety of calls to action such as "learn more," "get the facts," and "click to learn about the process."  We also tested the effect of two different background images.

35.    The test group and audience included 150,000 *Facebook* users who were identified pursuant to our hunter-sportsman audience model, layered over *Facebook* users who self-identified an interest in Remington firearms.

36.    Round 1 testing provided the following empirical results:

Total Impressions: 509,081

Total Reach: 222,619

Frequency: 2.3

Clicks on Ad: 11,095

---

[12] Of note, it is not unusual for reach to exceed the number of individuals in the test group.  If a *Facebook* user in our audience who has been served the ad opts to share the ad in his or her own newsfeed, it will then receive impressions from that user's network and the reach may increase.

**Social Media Ad #1**

37.     The following advertisement was the most effective in Round 1 testing.



Ad #1 Key Metrics
Impressions: 482,276
Reach: 213,812
Clicks: 10,810

38.     The following ads were also published via *Facebook* in Round 1 testing:

**Social Media Ad #2**



Ad #2 Key Metrics
Impressions: 10,662
Reach: 9,155
Clicks: 127

**Social Media Ad #3**



**Ad #3 Key Metrics**
Impressions: 7,410
Reach: 6,435
Clicks: 77

**Social Media Ad #4**



**Ad #4 Key Metrics**
Impressions: 8,135
Reach: 5,133
Clicks: 80

**Round 2 Testing (April 22 – May 12)**

39.    Based on the results of Round 1 testing, we adjusted advertisements for Round 2 testing. For example, we observed that simpler, more direct calls-to-action are most effective (e.g., "Learn More"). For the second round of testing, we also hypothesized that a stronger message involving safety and / or a question regarding how well rifle owners knew their firearm might better capture attention and increase clicks and response.

40.    In sum, we measured the following cumulative empirical results pursuant to Round 2 testing:

Total Impressions: 249,800

Total Reach: 78,091

Frequency: 1.6

Clicks on Ad: 2,807

41.    The following additional advertisements were published during Round 2 testing. The Round 2 test group encompassed 47,000 Facebook users who were identified pursuant to our hunter-sportsman audience model, layered over Facebook users who self-identified an interest in hunting and Remington firearms.

### Social Media Ad #5

**POST COPY**: How well do you know your rifle? Take a moment to find out if your firearm qualifies for benefits from a class action settlement.



<u>Ad #5 Key Metrics</u>

Impressions: 196,093

Reach: 72,782

Clicks: 2,312

**HEADLINE**: Check your Remington serial number today.
**DESCRIPTION**: A proposed nationwide settlement has been preliminarily approved in a class action lawsuit involving certain Remington firearms and the replacement of certain trigger mechanisms.

### Social Media Ad #6

**POST COPY**: Safe shooting is a Remington tradition. Take a moment to find out if your firearm qualifies for benefits from a class action settlement.

<u>Ad #6 Key Metrics</u>

Impressions: 44,273

Reach: 15,671

Clicks: 495

**HEADLINE**: Check your Remington serial number today.
**DESCRIPTION**: A proposed nationwide settlement has been preliminarily approved in a class action lawsuit involving certain Remington firearms and the replacement of certain trigger mechanisms.

**Round 3 Testing (May 2 – May 12)**

42. The third and final test compared the most successful advertisements from Round 1 against the most successful advertisements from Round 2. Pursuant to this testing, Social Media Ad #1 and Social Media Ad #5 outperformed the others, based on the reach and number of impressions achieved per ad:



Ad #1 Key Metrics

Impressions: 70,357

Reach: 32,247

Clicks: 1,012



Ad #5 Key Metrics

Impressions: 79,493

Reach: 41,753

Clicks: 780

**Cumulative Test Results: Increase in Response Rate**

43.     18,721 total clicks on the ads demonstrate an increase in response.

44.     Between March 29, 2016, and May 12, 2016, 309,958 individuals were exposed to advertisements associated with the Proposed Class Settlement. The ads were clicked 18,721 times, which then redirected those users to the Case Website.  18,721 clicks on the ad among 309,958 individuals reached equates to a 6% response rate.  With respect to the initial test population of 150,000 individuals, 18,721 clicks equates to a 12% response rate.[13]

45.     Subject to Court approval, we predict that a similar response rate will be observed if we serve the approved advertisements to the entire universe of 3.4 million putative class members within our complete relevant dataset, as described below.

46.     Additionally, due to the combined effect of the radio and direct mail and e-mail components of the proposed plan, we predict the response rates will exceed those observed during social networking testing described herein.


**SECTION 3: PROPOSED NEXT STEPS**

**Expanding Social Media Advertising among Putative Class Members**

47.     *Pre-program Testing* provided clear empirical evidence that the use of digital media (more specifically, social networking advertising via *Facebook*) is likely to result in an increased response rate when overlaid upon over prior notice activities.

48.     In turn, if the Court approves this proposed plan, then the Signal will publish the social networking media advertisements which provided the strongest results during *pre-program testing* (Social Media Ad #1 and Social Media Ad #5).

---

[13] Again, it is not unusual for reach to exceed the number of individuals in the test group.  If a *Facebook* user in our audience who has been served the ad opts to share the ad in his or her own newsfeed, reach will increase beyond the test group.

49.     The Court-ordered Notice Provider proposes to expand the audience to include the entire universe of putative class members within our relevant dataset— *Facebook* users in the United States who were identified pursuant to our hunter-sportsman audience model, overlaying data for individuals who expressed a self-identified interest in topics relating to Remington Arms on social media (**3.4 million individual putative class members**).

## PART 3: NATIONAL RADIO CAMPAIGN

## SECTION 1: OVERVIEW

### Introduction

50.     As part of a larger effort to raise awareness of the proposed Remington Class Settlement and increase the response rate, the Court-ordered Notice Plan includes a national radio media plan spanning the country's top syndicated networks and programs. The proposed national radio campaign spans four consecutive weeks, July 4, 2016, through July 31, 2016 (the same period as the Court-ordered social media campaign).  The national radio campaign is designed to reach across the country during peak morning and evening drive times.  The proposed radio networks are comprised of more than 2,000 individual radio stations across the country.  Subject to testing, we forecast the national radio campaign will generate more than 61 million targeted impressions.

### Components of the National Radio Campaign

51.     The national radio campaign has been designed to target key states and regions.  For example, according to the market data provided by the defendant, Pennsylvania and Texas are the top two states in terms of the number of Remington rifle purchases.

52.     The radio program has also been designed to target key demographics (for example, men ages 25-64).

53.     To reach this audience, we propose to define a terrestrial network of hunting and fishing radio programs, as well as programs with strong hunter-sportsmen audiences.  The network will be defined based on research utilizing market data possessed by Remington Arms in addition to third-party data.  Our customized network will be composed of more than 100 affiliate stations that will run the 60-second notice advertisement (described on the following pages).

54.     In addition to this terrestrial network, notice will be digitally streamed online through *iHeartRadio*.  *iHeartRadio* is the largest national radio group (formerly *Clear Channel*).  *iHeartRadio* has the most widely used mobile app for streaming radio stations nationwide. Utilizing *iHeartRadio,* our team will design and implement a digital streaming plan directed to consumers who listen to the radio online or via mobile devices. We will direct ads to *iHeartRadio*'s news/talk, sports, country and rock stations online.

55.     The 60-second advertisement (described on the following pages) will run online and include a companion banner advertisement.  Upon clicking the advertisement on their mobile device, listeners will be redirected to the homepage of the Case Website, which contains links to the approved long-form and short-form Notice Documents.


**SECTION 2: PROGRAMMING GUIDE**

**Networks and Stations**

Based on our assessment, we propose to include the following networks and stations within the custom-designed radio network. Of note, the Hannity Network and the Rush Network extend beyond the Sean Hannity and Rush Limbaugh programs alone, and the networks do not encompass only talk-radio.  Both networks include a wide sampling of

local and national programs and personalities (with audiences aligned with the class demographic). Currently proposed networks include:

**Activation Network**

- The Activation Network is comprised of 141 affiliate news/talk stations across the U.S.

- This network covers 95% of U.S. markets

- The network reaches 7.8 million listeners each week

- They reach 2.8 million adults 25 – 54 weekly

- Their largest audience demographic is Males 35 – 64

- 74% Male / 26% Female audience based on adults 25 – 54

**Hannity Network**

- The Hannity Network is made up of 87% of Sean Hannity affiliates in the U.S.

- The network is comprised of 414 affiliates across the country

- The network covers 98% of U.S. markets

- The network reaches 4.3 million listeners each week

- They reach 1.4 million adults 25 – 54 weekly

- Their largest audience demographic is Males 35 – 64

- 76% Male / 24% Female audience based on adults 25 – 54

**Information Today Network**

- The Information Today Network is comprised of 51 affiliate stations across the U.S.

- This network covers 63% of U.S. markets

- The network reaches 2.8 million listeners each week

- They reach 1.3 million adults 25 – 54 weekly

- 73% Male / 27% Female audience based on adults 25 – 54

**Rush Limbaugh Weekday Network**

- The Rush Limbaugh Weekday Network is comprised of 396 affiliate stations across the U.S.

- This network covers 99% of U.S. markets

- The network reaches 6.9 million listeners each week

- They reach 2.3 million adults 25 – 54 weekly

- 77% Male / 23% Female audience based on adults 25 – 54

- Their largest audience demographic is Males 35 – 64

**John Boy & Billy**

- *John Boy & Billy "THE BIG SHOW"* is a 4-hour program delivered via satellite, Monday through Saturday from 6am to 10am Eastern. (Also available 6-10am Central). The show is carried on 56 affiliate stations nationwide.


**SECTION 3: RADIO CAMPAIGN EXECUTION**

### Professional Voice Actors and Media Placement

56. Of note, our team will engage a professional voice actor, have the radio advertisement professionally produced, and place the advertisements using a well-established media placement company.

### Radio Advertisement Script

57. Our team evaluated both 60-second and 30-second radio advertisement placements. According to studies, "the general and proven recall of advertising messages from 60-second commercials is significantly greater than from 30-second commercials."[14]

---

[14] David Allan, *Comparative Effectiveness of 30- versus 60-Second Radio Commercials on Recall and Rate*, 14 J. OF RADIO STUD., issue 2, 2007, at 165.

Moreover, in the context of class notice, it is important to clearly articulate a summary of the case, describe rights and options, and describe how listeners may get more information and participate.  By executing a 60-second spot, we accomplish this without rushing, providing greater detail to the listener, and reiterating our call to action to improve recall.  In sum, we determined that 60-second advertisements will more effectively provide notice than 30-second advertisements.

58.    The proposed script of the radio advertisement follows:

"*Reminder to Remington Rifle Owners*

Owners of certain Remington rifles should take notice of a proposed nationwide class action settlement.  The plaintiffs in this case claim that the trigger mechanisms of certain bolt action rifles, such as the Remington Model 700 and certain other models, are defectively designed and can result in firing without a trigger pull.  Remington denies all of these allegations, but—to serve its valued customers— may replace these triggers *for no charge* with a brand new X-Mark Pro trigger or other trigger mechanism. Safety has always been a priority for Remington.

To learn more about this class action settlement, visit the website at "Remington Firearms Class Action Settlement Dot Com," or call 1-800-876-5940.  That's 1-800-876-5940.  1-800-876-5940.

### In-program Testing and Adjustments

59.     Our team will administer the national radio campaign in two rounds, providing the capability to measure results and adjust if necessary to improve response rates.

### Metrics and Reporting

60.     At the conclusion of the national radio campaign, we will provide a detailed radio traffic report for each spot, on each station, in each market.   This will detail both reach and gross impressions.


## PART 4: DIRECT MAIL, E-MAIL, AND RETAILER POSTER CAMPAIGNS
## SECTION 1: DIRECT MAIL AND E-MAIL NOTICE

### Overview and Data Processing

61.     An additional direct mail and e-mail campaign will be administered to increase response rates.  The defendant has indicated that data containing the physical addresses and e-mail addresses of a subset customers is available via multiple sources, such as lists of potential customers who registered for notifications, call center records, and product repair and maintenance records.  The defendant has indicated that such lists are over-inclusive, containing data associated with customers who may own Remington products other than qualifying class firearms. Regardless, the defendant will send notices to all individuals for whom physical address or email data is available, in order to maximize reach to as many potential class members as possible.

### E-Mail Notice

62.     The defendant will send an e-mail notification to all potential class members (approximately one million customers) for whom it possesses an e-mail address.

**Direct Mail Notice**

63.     The defendant will also send approximately 93,000 postcards to potential class members for whom it possesses a mailing address.


## SECTION 2: RETAILER POSTER CAMPAIGN

**Informational Posters at Retail Locations**

64.     Using the same channels and methodologies used by the defendant to inform customers of product recalls, the defendant will produce and disseminate informational posters to be displayed at more than 11,000 retail locations.  The text of the informational posters will mirror the text of the email notice.  The posters will be sent by email to the defendant's wholesalers and retailers.  In turn, these parties will send the posters to more than 5,000 independent retailers and 6,000 stores to display to potential class members.

**CONCLUSION**

65. In sum, this Court-ordered Notice Plan encompasses the additional use of several synergistic media campaigns in order to increase response rates, as requested by the Court. This additional media includes:

> d. a **social networking media campaign** utilizing our unique proprietary databases and analytics;
>
> e. a **national radio media campaign,** including advertisements across the country's top syndicated radio networks and programs aligned with the demographics of potential class members; and
>
> f. a **direct mail, e-mail, and retailer poster campaign**, encompassing approximately 1 million e-mails and 93,000 postcards sent to Remington customers, as well as 11,000 informational posters displayed at retail locations.

66. Signal Interactive Media is honored to support the Mediator and Court in this matter. Based on our consumer models and datasets, our experts and team are prepared to begin administering this proposed Court-ordered Notice Plan immediately upon approval by the Court.

<br>

| | |
|---|---|
| /s/ Jim Messina | /s/ Matthew L. Garretson |
| Co-founder | Co-founder |
| Signal Interactive Media LLC | Signal Interactive Media LCC |
| June 8, 2016 | June 8, 2016 |

**APPENDIX 1: CURRICULUM VITAE OF JIM MESSINA**

Co-Founder – Signal Interactive Media

Founder/CEO – The Messina Group

<u>The Messina Group</u>

Since 2013: Chief Executive Officer -- Provides strategic consulting to political campaigns, advocacy organizations and businesses. Serves as senior advisor to Prime Minister David Cameron for the 2015 elections. The Messina Group is a full-service consulting firm that works with organizations in the private, public, and social sectors to achieve their strategic goals. The group assists clients in addressing critical issues and generating custom solutions to their challenges.

<u>Prime Minister David Cameron and The Conservative Party (UK)</u>

Since 2013: Senior Advisor.

<u>Britain Stronger in Europe</u>

Since 2015: Senior Strategic Advisor.

<u>Organizing for Action (OFA)</u>

Since 2013: Chairman – OFA supports and advances President Barack Obama's agenda and legacy.


<u>Engagements</u>

•       Obama for America
2011-2012: Campaign Manager -- Served as the campaign manager for President Obama's successful 2012 re-election campaign.

2008: National Chief of Staff-- Responsible for day-to-day budget, political and field operations during the general election.

•       The White House
2009-2011: Deputy Chief of Staff for Operations -- Served as Deputy Chief of Staff to President Obama. Integral to the passage of the Affordable Care Act and the President's economic stimulus bills.

2008-2009: Director of Personnel -- Served as the Director of Personnel for the Obama-Biden Presidential Transition Team, and helped the President select his Cabinet.

•       U.S. Senate
2005-2008: Chief of Staff, Senator Max Baucus

2002-2004: Chief of Staff, Senator Byron Dorgan

2001-2002: Campaign Manager, Senator Max Baucus

1995-1999: Legislative Assistant, Senator Max Baucus

•       U.S. Congress
1999-2001: Chief of Staff, Congresswoman Carolyn McCarthy

Activities:

Member, Board of Directors, Lanzatech New Zealand Ltd., [since 2013]

Member, Board of Directors, Google Advanced Technology and Projects Group [Since 2013]

Member, Board of Directors, Vectra Networks, [since 2014]

Member, Advisory Board, OPower, Inc., [since 2014]

Member, Board of Directors, Hyperloop Technologies, Inc., [since 2014]

Member, Board of Directors, U.S. Soccer Foundation, [since 2015]

Member, Advisory Board, Beepi, [Since 2016]

Member, Advisory Board, Montana Land Reliance [Since 2016]

Education:

BA, Political Science and Journalism, University of Montana, 1993

**APPENDIX 2: CURRICULUM VITAE OF MATTHEW L. GARRETSON**

Matt Garretson is a U.S. lawyer, the co-founder of Signal Interactive Media, and the founder of The Garretson Resolution Group, which provides party-neutral complex administration services in high-profile, large-scale aggregate legal proceedings. For a complete list of class action and mass tort case experience, please see Garretson's website at www.GarretsonGroup.com.

Relevant Publications:

- *Negotiating and Settling Tort Cases*, ATLA / West Publishing (2007).
- *Counseling Clients about the "Form" of Settlement*, 13 A.B.A. Prof'l Law. 4 (2002).
- *Don't Get Trapped By A Settlement Release*, Trial Magazine, September 2003.
- *Structured Settlement Factoring Transactions: New Laws Protect Clients Who Sell Their Structured Settlement Benefits*, Ohio Trial, Volume 13, Issue 2 (2004).
- *A Practical Approach to Proactive Client-Counseling and Avoiding Conflicts of Interest in Aggregate Settlements*, The Loyola University Journal of Public Interest Law, Volume 6 (2004).
- *Deferring Attorney Fees: Is There Now a Critical Mass of Enabling Legislation?* Ohio Trial, Volume 14, Issue 2 (2005).
- *Making Sense of Medicare Set-Asides*, Trial Magazine, May 2006.
- *What Does the Ahlborn Decision Really Mean?* Ohio Trial (Fall 2006).
- *Medicare's Reimbursement Claim - The Only Constant is Change,* Ohio Trial (Spring 2007).
- *One More Thing to Worry About in Your Settlements: The Medicare, Medicaid and SCHIP Extension Act of 2007,* Philadelphia Trial Lawyers Association Verdict, Vol. 2007-2008 Issue 6.
- *Act II -- Reporting Obligations for Settling Insurers where Medicare is a Secondary Payer: The Medicare, Medicaid and SCHIP Extension Act of 2007,* May 18, 2009.

Legal Ethics / Professional Responsibility Speaking Engagements

- AAJ Annual Meeting ('03, '06, '08, '15)
- AAJ (Hormone Therapy '04)
- AAJ (Mid Winter '05, '06, '13)
- AAJ (Weekend With The Stars '06)
- AAJ (Nursing Home Litigation Seminar '08)
- AAJ Ski Medical Seminar ('08) • AAJ Winter Convention ('08)
- AAJ Teleseminar ('12)
- Catholic Health Initiatives ('08)
- Colorado Trial Lawyers Association Winter Conv. ('09, '12)
- Connecticut Trial Lawyers Association ('09)
- Consumer Attorneys of California ('01, '03, '04, '06, '09)
- Consumer Attorneys of Sonoma County ('01)
- DRI Annual Meeting ('07)
- DRI Webcast ('13)
- Finkelstein & Partners (New York '02, '03)
- Florida Justice Association ('09)
- Georgia Trial Lawyers Association ('08, '09)
- Hamilton Country Trial Lawyers Association ('05)
- HarrisMartin ('13, '15, '16)
- Hormone Replacement Therapy Seminar ('07)
- Indiana Trial Lawyers Association ('09)
- Jeff Anderson & Associates/Clergy Abuse ('03)
- Kansas Trial Lawyers Association ('03, '04, '07)

- Kentucky Academy of Trial Lawyers ('06)
- Kentucky Justice Association ('08)
- Louisiana Admiralty Symposium ('06, '07, '13, '14, '15)
- Louisiana Bar Mass Tort Symposium ('02, '04, '13)
- Louisiana Trial Lawyers Association Annual ('07)
- Mass Torts Made Perfect ('03, '04, '06, '08, '13)
- Mealey's Lexis/Nexis Art of Negotiation ('07)
- Mealey's Lexis/Nexis Contingency Fees ('07)
- Mealey's Lexis/Nexis Ethics ('07)
- Mealey's Lexis/Nexis Client Expenses ('06)
- Mealey's Lexis/Nexis MMSEA ('08)
- Mealey's Medicare & ERISA Liens: New Developments ('09)
- Mississippi Trial Lawyers Association ('02)
- Michigan Negligence Law Section ('09)
- Michigan Association for Justice ('08)
- Minnesota Trial Lawyers Association ('09)
- Montana Trial Lawyers Association ('08)
- New York Academy of Trial Lawyers ('07)
- Norfolk and Portsmouth Bar Association ('03)
- NABIS – Medical Issues in Brain Injury ('05, '06, '07)
- Ohio Academy of Trial Lawyers Annual ('03, '04, '05, '06, '07)
- Ohio Academy of Trial Lawyers Subrogation Seminar ('06)
- Ohio Academy of Trial Lawyers Worker's Compensation ('07)
- Ohio Association for Justice ('08, '09)
- Ohio Association for Justice Insurance/Negligence Seminar ('09)
- Ohio State Bar Association Annual Convention ('06)
- Ohio Trial Advocacy Seminar ('04, '06)
- Oklahoma Trial Lawyers Association ('07)
- Perrin Conferences ('12, '13)
- Philadelphia Assn. for Justice (12/08)
- Plaintiff Asbestos Litigation Seminar ('07)
- Professionally Speaking Seminar ('07)
- Richardson, Patrick, Westbrook & Brickman Annual ('04, ''06, '12, '13, '14, '16)
- San Antonio Trial Lawyers Association ('07)
- SeminarWeb ('12)
- Society of Settlement Planners ('07)
- TBI Symposium - Brain Injury Association of Ohio ('04, '06)
- TPL-COB National Conference ('07)
- Utah Bar Association Annual Seminar ('05)
- Utah Trial Lawyers Brain Injury ('02, '03, '04, '05, '06, '07)
- Utah Trial Lawyers Association Annual Convention ('07)
- Utah Association for Justice ('09)