Hon. Otrie D. Smith
Senior District Judge
United States District Court
Western District of Missouri
Courtroom 8C
400 E. 9th Street, Room 8552
Kansas City, MO 64106

MAILING ADDRESS:
154 EAST ATLANTIC BOULEVARD
OCEAN CITY, NJ 08226-4511
+1 (215) 486-2658

WRITER:
THILSEE@HILSEEGROUP.COM

Re: *Pollard v. Remington*, Case No. 13-00086-CV-W-ODS

Dear Judge Smith:

I am the class action notice expert who has advised the Federal Judicial Center in a *pro bono* capacity at various times over the past 14 years in developing its class action notice communications and claims process practice standards (Model Notices and FJC Checklist) now used throughout courts in the U.S.[1]

For the first time in my career, I am writing as ***amicus curiae***.  I am not an attorney.  I have not been hired by anyone, nor do I seek any appointment.  I have not been asked by anyone to write this letter, but given the importance of the case, and its potential effect on class action notice everywhere, I feel compelled to alert the Court to hidden defects that explain the original notice and claims process failure, and show why the new proposed "reminder" campaign will not cure them.

I respect that the Court may disregard this letter.  If the Court would prefer that I retain an attorney and seek leave to file this letter in the form of an *amicus curiae* brief, I will try my best to do so.  My only goal is to give the Court missing information pursuant to my independent analysis.

### Overview / Why I am Writing

This case, involving alleged trigger defects in some 7.5 million guns that Class Counsel believe could kill class members and their family members at any time, highlights the importance of the <u>best notice</u>

---

[1] In 2002, I collaborated with the FJC to write and design the <u>Model Plain Language Notices</u> at the request of the Advisory Committee on Civil Rules.  In 2010, I worked with the FJC to develop the <u>Judges' Notice and Claims Process Checklist and Plain Language Guide</u> ("FJC Checklist") and the notice and claims sections of the FJC publication <u>Managing Class Actions: A Pocket Guide for Judges</u>, with attribution at <u>www.fjc.gov</u> (click on the class action notices item.)  I have been recognized by dozens of courts and lawyers for my credibility during a 26-year career designing, giving, and analyzing the effectiveness of notice to Holocaust Survivors, impoverished lead-poisoned children, abused aboriginal children, and women sick from breast implants, among hundreds of class action cases.  I have authored law review articles on notice and due process.  I am trained in advertising and mass communications, and have continuously studied the latest notice issues.  My case experience, publications, speaking engagements and judicial recognition can be found at <u>www.hilseegroup.org</u>.  I analyze notice independently, but I no longer execute campaigns.  I have no vested interest in this matter.  I am often hired as an expert by plaintiffs, defendants, and as a court-appointed neutral notice expert, most recently for Judge Joan Gottschall, N.D. Illinois. I do not work for serial or professional "objectors."  I've never publicly spoken or written about guns or gun control.  I'm not politically active.  My opinions do not necessarily reflect the opinions of the Federal Judicial Center.

practicable requirements of Fed. R. Civ. P. 23.  It exemplifies the communications lessons that due process teaches the notice expert: "*The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.*"[2]

I must inform you, speaking as the expert who worked with the FJC to create the FJC Checklist, that the notice plan did not satisfy the FJC Checklist's guidance.   The Court is not to blame for the original notice that has prompted only 7,000 claims for a trigger replacement.  Instead, I found that the notice documentation provided to the Court included information that was incorrect and overstated. In addition, key facts were not disclosed.

The notice vendor's methodology was improper and its promises about anticipated effectiveness inflated.  In truth, about half the Class or less was even provided an opportunity to know their rights in my opinion, let alone act.  Notice amounted to a gesture relative to actual notice standards—in many respects appearing to address Remington's public relations concerns.  The parties seem to know the claims "registration" process was doomed.

The "reminder" campaign submission does not address why the original campaign failed; only half of rifle owners use Facebook at all, and these ads will reach far less than that.  The rest of the Class members, including those who never claimed or got notice originally, would not have a chance to act.  The implication that past political campaign successes can be repeated here, is belied by the fact that the 2012 Obama campaign spent $483 million on advertising, mostly on TV.

There have been large cases where people suffered or risked devastating injuries.  Cases where many people lost millions of dollars.  There have been defective products with men, women and children at risk.  Massive notice programs ensued in those matters, notice that "turned over rocks" to find class members and provide them—often 95% or more of them, 5 times each or more—opportunities to come forward.  The minimal notice activities in this case did not match the import of the case.

I believe a class action could—if the claims process and poor notice were not problems—represent the best way to fix the allegedly unsafe guns.  But at this point, it would be releasing the claims associated with 7.49 million unrepaired guns, and leave any families of victims later hurt or killed with only the sad option to pursue money for their dead or injured relative, not get his or her life or health back.

> The precedent for notice could be enormous.  If the truth about the original effort is not revealed, and the "reminder" notice proposal is approved, the most important class action notice campaigns can be fleeting internet banners with inflated promises.  This is part of an alarming trend that threatens class actions, and independent experts do not scrutinize settling parties' vendors' plans.  *See below*: How could this happen / why does nobody come forward?

Class Counsel were appointed to represent fathers and mothers of kids; kids like Gus Barber who was killed by a Remington rifle that fired without the trigger being pulled.[3]  Millions remain at risk of death

---

[2] *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950)

[3] Remington Under Fire: The Reckoning, CNBC, Dec. 8, 2015, http://video.cnbc.com/gallery/?video=3000463701, last visited July 24, 2016; Letter from Richard D. Barber to Hon. Otrie D. Smith, Dec. 10, 2015, Case 4:13-cv-00086-ODS, Document 113, Filed 12/21/15.

and injury according to their complaint. Remington has publicly released documents showing a long-standing awareness that triggers may fire without being touched, and its ability to mitigate this risk. Yet, the original notice and notice plan, and now the "reminder" notice proposal, show defects consistent with systemic notice industry problems that are empowering weak notice proposals. For all these reasons, I cannot be silent.

In this report I will: a) summarize why the original notice campaign failed; b) discuss those issues in detail; c) explain how it happened; d) explain why the new notice proposals will not cure the problems; and e) provide conclusions and suggestions.

### *Why did the Original Notices Fail?*

Significant problems were not reported to the Court:

1. **Inflated "reach" statistics**. The notice vendor stated the original notice plan reached 73% of the class, but those assertions were not correct.[4] In fact, audience data show that about half the class was reached, and the rest were reached with notices unlikely to be noticed, and which were not compelling. Regardless, the level of outreach was inadequate for a case where lack of notice may be disastrous. Under today's notice standards and FJC guidelines, the notice should be designed to reach close to 95% of the Class, with repetitive attention-getting exposures.

2. **Over-reliance on internet banners**. Small banners are not notices. Only those who clicked on them—which was certainly a small fraction—could have then seen a notice. The vendor would know how many people clicked a banner and then clicked and saw a notice, but those metrics, and many other critical and routine metrics, were not disclosed in court reports.

3. **Poor notice design**. Even the people who were "reached" were exposed to magazines ads that did not follow the attention-getting, large, action-oriented headlines that the FJC models prescribe, and which directly caused only 102 people to respond to them, likely because few noticed them or read them. The notices failed to *highlight* the trigger concern and repair offer.

4. **Failure to exploit individual notice** to all reasonably identifiable Class members despite mailed notice being known—including by the notice vendor—to be the most-responsive notice tactic by far. Many ways to send notice to individuals could have been considered. There are many databases of gun owners, and courts often order non-party assistance in other cases. The million-plus names and addresses that surfaced in the parties' June proposal but were not used originally—perhaps warranty registrants (but not explained)—reveal the original campaign to have failed best notice practices.

5. **Failure to Exploit Press Coverage** despite no press "gag" order issued or agreed to. Class Counsel soliciting, offering, and giving interviews asking Class members to come forward could have made a big difference. This is a newsworthy case—a luxury from a notice perspective—

---

[4] Declaration of Steven Weisbrot, Esq, on Adequacy Notice Plan (stet), ECF No. 80-11, Feb. 9, 2015; Declaration of Steven Weisbrot on Implementation and Adequacy of Notice Plan; ECF No. 92-9, Sept. 4, 2015; Declaration of Steven Weisbrot; Declaration of Steven Weisbrot, ECF No. 127-4, June 10, 2016.

and failing to capitalize surely caused a large number of Class members to be left unaware and without encouragement to act.

6. **Claims process unnecessary and designed to fail.**  Even if notice had reached the Class and been noticeable and compelling, the procedure used a process akin to "registration"—known to be reviled by gun owners—as well as a clumsy claim form.  The parties' post-notice argument that low claims were to be expected because of a registration-averse Class,[5] suggests the settlement was structured for poor response.

7. **Vendor statements and omissions.**  In multiple declarations, the settling parties' notice vendors have provided incorrect and/or misleading information, and omitted information that if revealed would have helped the Court understand the weakness of the notice plans and require the correct improvements.

8. *_Did not Satisfy FJC Checklist and "Norms" for Important Notice Programs._*  Despite the vendor's statements that notice satisfied Federal Judicial Center guidance, it did not.

### *Discussion of Problems*

#### INFLATED REACH STATISTICS / OVER-RELIANCE ON INTERNET BANNERS

Every mass communications program can be objectively assessed using decades-old advertising industry methods and readily available audience data to answer a basic objective question for courts:  *Out of the total universe of class members, what percentage will the notices reach and provide an opportunity to act on rights*?  That is the "reach" of a notice effort.  For due process communication—unlike a commercial product campaign and unlike a political campaign—broad and fair coverage of as many different class members as practicable is critical.  Every class member deserves the same opportunity to read about, understand, and act upon his or her rights.  It cannot be whisper down the lane.  Exposure to a blurb or a slogan is not exposure to a notice.

Conversely, In a commercial ad campaign, the marketer cares only about a good return on his advertising dollars.  He can "fish where the fish are," and only advertise to a narrow audience as long as he makes money and increases sales, relative to his advertising investment.  In a political campaign, the candidate builds awareness and positive image.  Tens of millions of dollars are spent to influence the 41.9% of eligible citizens who vote.[6]

---

[5] Joint Supplemental Brief Pursuant To The Court's Order Of December 8, 2015, ECF No. 127, June 10, 2016.

[6]  U.S. Census Bureau, Current Population Survey, November 2014.
https://www.census.gov/content/dam/Census/library/publications/2015/demo/p20-577.pdf, last visited July 27, 2016.

For these reasons, reach has become the standard objective tool to measure class action notice effectiveness, and this has been so for decades.[7] The FJC, a great many courts, and qualified notice professionals have recognized this. All media, including digital media, is measurable.

1. The vendor opined that ads in certain magazines and internet banners appearing on websites reached 73% of the Class but these calculations cannot be replicated. My study shows:

   a. The magazine portion reached only 48-49% of rifle owners depending on the GfKMRI audience study utilized.[8] This is not in the vendor's reports.[9]

      i. The magazines did not reach high audiences. The gun-related magazines skew heavily male, and none reach more than 12% of class members. Magazines have dropped readers heavily, especially the larger ones, Parade and Athlon.

      ii. The magazine selections focus on men, while the 2015 Gfk MRI study shows women comprise as many as 30% of rifle owners.

      iii. Many large geographic areas of the country were reached to a substantially lesser extent than others. Parade is a supplement inserted in Sunday newspapers—and many large, well-read newspapers do not carry Parade. Major areas where the largest newspaper does not carry Parade include:

         - New York – New York Times
         - Houston – Houston Chronicle
         - Phoenix – Arizona Republic
         - Honolulu – Honolulu Star Advertiser
         - Detroit – Detroit Free Press, or Detroit News
         - Louisville – Louisville Courier Journal
         - Cincinnati – Cincinnati Enquirer
         - Des Moines – Des Moines Register
         - Nashville – Nashville Tennessean
         - Milwaukee – Milwaukee Journal Sentinel
         - Indianapolis – Indianapolis Star

---

[7] See Analysis of the FJC's 2010 Judges' Class Action Notice and Claims Process Checklist and Guide: A New Roadmap to Adequate Notice and Beyond, CLASS ACTION LITIGATION REPORT, 12 CLASS 165, 2/25/2011; See also Effective Class Action Notice Promotes Access to Justice: Insight from a New U.S. Federal Judicial Center Checklist, Todd B. Hilsee, SUPREME COURT LAW REVIEW 53 S.C.L.R.(2d) 275, (2011)

[8] GfK MRI is the leading media audience service. Every major national consumer print vehicle – approximately 225 magazine and national newspaper titles – subscribes to its audience surveys. All the major broadcast and cable networks, the largest radio stations and networks and the most established Internet players rely on the surveys. Digital measurement services focus on counting audiences. The survey excels in counting and understanding them. Over 450 U.S. advertising agencies – nine out of ten – subscribe to the Survey. Gfk MRI is the research gold standard for the print industry and a powerful resource for consumer and market insights.

[9] GfK MRI Spring 2015 (latest) and GfK MRI Spring 2013 Doublebase (cited by notice vendor).

Since Parade was the largest audience publication on the list of chosen publications by far, the reach within the above areas, and often within the entire state or surrounding in which these major newspapers are located, was greatly diminished.

b. Two different target audiences were blended ("rifle owners" for print media; men 35-64 with a household income of $75,000+ for internet banners). These target audiences cannot be mixed. The "rifle owner" audience in MRI includes 30% women. Only 23% of rifle owners are men 35-64 with a 75K+ HHI. The reach of one cannot be projected to the other and will inflate the reach improperly if done.

c. Mixing targets in different data sources is incorrect advertising media methodology and leads to inaccurate reach inflation. Instead, a common broader target that contains the class members and is available in both audience sources must be used.

d. The report citing 38 million "impressions" sounds impressive but does not bear upon the net reach of the effort. The key data should be disclosed, including what was ordered, what appeared, and on what websites. Nonetheless, comScore data shows the reach of the internet portion to have been at best only 16.5%-17.4% of the chosen target of men 35-64 audience with a household income of 75k+.[10]

e. The target was poorly chosen. Only 57.6% of rifle owners are males aged 35-64, and only 49.4% of rifle owners have a household income of $75,000 or more. The rest of the rifle owners fall outside this narrow demographic. As a result, it is necessary to calculate the reach of the internet banner ads against the wider adult population that contains class members. ComScore data shows that the internet banner ads reached only 12.3-12.4% of adults 18+.[11]

f. When the internet banner target of men 35-64 with household incomes of $75,000+ is further scrutinized, one finds that only 22% of rifle owners fall within this target. Many more are either older than 64 or younger than 35, and most are less wealthy. The narrow age and high income target inflates the reach, while discriminating against lower income class members, and especially senior citizen Class members.

g. The internet reach figures above are subject to further reductions to determine the true internet banner reach. While disclosing only one lump-sum gross "impressions" figure, one must realize that:

---

[10] Top advertisers, agencies and publishers rely on comScore as the standard currency for online measurement. comScore's Unified Digital Measurement methodology provide full insight into a site's total audience, offering global coverage, reporting on more than 250,000 entities worldwide with audience measurement in 44 countries and 6 regions. By measuring audience composition and performance within key user segments, comScore studies a variety of demographic, lifestyle, product ownership and behavioral characteristics, allowing advertisers to compare online with other media using traditional metrics such as reach, frequency and GRPs.

[11] comScore February 2015, and comScore June 2016.

Case 4:13-cv-00086-ODS   Document 134   Filed 07/29/16   Page 6 of 42

    i. "Frequency capping" must be accounted for.  This practice saves money by limiting the number of times a banner appears, but falsely inflates reach by not taking into account the fact that the same person can see the ad on several different devices and be incorrectly assumed to represent different people.

    ii. According to Google, *only 44% of banner "impressions" are actually viewable*.[12]

    iii. A great fraud is being revealed right now in the internet advertising business. Major advertising industry sources—*Ad Age, AdWeek, Bloomberg BusinessWeek,* the *Wall Street Journal* and many more—are now reporting that upwards of *80% of "impressions" are not viewed by humans* but instead are viewed by robots or are outright fake.[13]

    iv. Even if all non-human and duplicative viewers are factored out, the resulting impressions are supposedly "viewable."  However, that term is defined as follows: "***A display is considered viewable when 50% of the ad's pixels are in view on the screen for a minimum of one second***."[14]  That is a weak standard to rely on for due process communication in <u>any</u> class action that will bind people by their inaction and silence—especially one where inaction may kill.

    v. Then, if non-human viewers, duplicative exposure, and non-viewable impressions are factored out, the reality is that a tiny fraction of internet banner impressions are clicked on.  The latest "click thru" rates for internet display ads is an average of 0.04%.[15]  This is significant because the short and vague

---

[12] https://think.storage.googleapis.com/images/infographics/5-factors-of-viewability_infographics.pdf, last visited April 26, 2016

[13] **The Alleged $7.5 billion Fraud in Online Advertising**.  MOZ, June 22, 2015, https://moz.com/blog/online-advertising-fraud, last visited April 28, 2016; **Is Ad Fraud Even Worse Than You Thought? Bloomberg Businessweek Seems to Think So**.  Ad Age, September 25, 2015, http://adage.com/article/the-media-guy/ad-fraud-worse-thought/300545/, last visited April 28, 2016; **How Much of Your Audience is Fake?  Marketers thought the Web would allow perfectly targeted ads.  Hasn't worked out that way**.  Bloomberg Businessweek, September 25, 2015, http://www.bloomberg.com/features/2015-click-fraud/, last visited April 28, 2016; **What's Being Done to Rein in $7 Billion in Ad Fraud**.  AdWeek, Feb. 21, 2016, http://www.adweek.com/news/advertising-branding/whats-being-done-rein-7-billion-ad-fraud-169743, last visited April 28, 2016; **Inside Yahoo's troubled advertising business**.  CNBC, Jan. 7, 2016, http://www.cnbc.com/2016/01/07/yahoos-troubled-advertising-business.html, last visited April 28, 2016; **Ad Fraud, Pirated Content, Malvertising and Ad Blocking Are Costing $8.2 Billion a Year, IAB says**.  Ad Age, Dec. 1, 2015, http://adage.com/article/digital/iab-puts-8-2-billion-price-tag-ad-fraud-report/301545/, last visited April 28, 2016; **No More Ads**.  Wall Street Journal, February, 17, 2015, http://blogs.wsj.com/cmo/2015/02/17/cmo-today-apples-watch-is-coming-soon/, last visited April 28, 2016.

[14] Media Rating Council

[15] Average click thru rates for all styles of banner ads: "leaderboard" banners (728x90 pixels), "MPU" banners (300x250 pixels), and "Skyscraper" banners (160x600 pixels).  http://www.smartinsights.com/internet-

"headlines" that are possible to display in small internet banners are not themselves Rule 23-compliant notices. Only the notices actually seen by the precious few people who click the banners comply with Rule 23.

h. The reach of the internet banners cannot be added to the reach of the print media. That is because a percentage of those reached by the print notices also would be exposed to internet banners. Thus the internet banners have a marginal incremental effect on the reach provided by the magazines.

i. Overall, based on a review of comScore data for the impressions and webs services indicated, my opinion is that <u>the original notice campaign reached just over half the class</u> if one counts the fleeting internet banners as notice exposures. If one counts only those who clicked the banner and then opened one of the notices at the website, then I believe the true <u>overall reach was not much more than the 48-49%</u> reach provided by the magazines. The click rates are known and should be reported.

<span style="color:blue"><u>POOR NOTICE DESIGN</u></span>

2. Even for those Class members reached, the notices as designed were not "noticeable."

a. The publication notice had no headline that would call itself to the attention of readers. Advertisers and advertising agencies understand this is required. For example, one may view the ad as it appeared in <u>Athlon Sports & Life</u> at <span style="color:blue"><u>http://magazine.athlonsports.com/publication/?i=260788</u></span> and see the contrast from surrounding ads and articles. This gives great concern that it would have gone largely un-noticed and un-read. Compare this publication notice to the FJC model summary notices at <span style="color:blue"><u>www.fjc.gov</u></span>.

b. There is no advertising reason to design a headline to appear as small as the body text of the notice except to cause audiences not to notice it or engage with it.

c. The notice as written reduces safety concerns about the guns, which would have caused fewer people to seek replacement, less money being spent by Remington, and fewer potential deaths and injuries being prevented.

d. The words of the headline or any other part of the notice did not generate a compelling reason to read and act. The closest thing to a headline was a generic phrase "**LEGAL NOTICE OF CLASS ACTION SETTLEMENT**" at the top of the notice.

e. The only sentence that is Remington-specific is no more prominent than an ordinary sentence of text. It reads "If you own certain Remington firearms, you may be eligible

---

<span style="color:blue"><u>advertising/internet-advertising-analytics/display-advertising-clickthrough-rates/attachment/average-clickthrough-rates-for-different-ad-formats-2016/</u></span>, last visited 4/27/16.

for benefits from a class action settlement."  This will not alert a gun owner to the real reason they should read the notice.  In this instance, why not:

# A class action settlement will replace the trigger in 7.5 million Remington rifles. Read this notice to learn about your rights.

f.  As also suggested by the FJC model notices, a prominent "call out" box might have read:

## Act now to have your trigger replaced – the case alleged the triggers may fire without being pulled.

g.  I don't believe either example headline shown here, nor the combination of them pre-supposes that any judgment on the merits has been rendered.  They are simply noticeable, compel readership, and are response-oriented.

h.  The volume of guns involved signifies the importance of the notice, and specifying the trigger problem and solution make it relevant and compelling for the reader.

i.  One might even have expected to see Class Counsel propose, and seek court-approval if Remington did not agree, even more attention-getting and compelling language as a special subhead or callout box.  For example:

## Remington 700 and Seven bolt-action rifles could accidentally discharge and cause injuries or death.  STOP USING YOUR RIFLE.

### FAILURE TO EXPLOIT INDIVIDUAL NOTICE

3.  Individual notice by physical mail is widely known by notice administrators—including the notice vendor in this case—to be the most effective and responsive means of notice.  However:

a.  The original notice campaign consisted of postcard notices to 2,571 class members who had paid for a trigger replacement.  Thus these notices (to .034% of the class) would not have accrued towards reducing unintended trigger discharges among any of the triggers that were never repaired.

b.  The notice program apparently did not include warranty card names and addresses that Remington would have.  *See* sample Remington warranty card at **Exhibit 1**.

c. The settling parties now indicate they have contact information for at least 1,093,000 individuals, in Remington's own databases, though the exact source is unclear. These potential Class members should have received a notice in the mail to begin with; and a physical mailing should have been sent to all available physical addresses, with emails sent only to those for whom a physical address was not available.

d. If claim forms were included in the mailings instead of requiring recipients to actively go and then get a claim form, the response would have been significantly increased.

e. The declarant for the notice vendor co-authored a publication stating that physical mailings with postage-paid tear-off and return claim forms attached are more responsive than email and postcards:

> "The following are the most common types of e-mail and direct-mail notices and claim forms.  **They're listed in order of least to most likely to increase the number of claims filed** in a settlement:
>
> - E-mail notice
> - Single postcard summary notice
> - Full notice and claim form
> - Full notice and claim form with return envelope
> - Full notice and claim form with postage-paid return envelope
> - Double postcard notice with tear-away claim form
> - Double postcard notice and postage-prepaid tear-away claim form"
>
> Class Action Settlement Administration for Dummies, KCC Special Edition, (emphasis added), co-author Steven Weisbrot.

f. This responsiveness of physical mailings over other means is supported by:

     i. Data recently provided to the Federal Trade Commission by the nation's oldest claims administrator, showing that all forms of stand-alone mailed notice greatly outperform email notice and all other forms of publication notice including internet banner ads. Generally, the data indicates, that mailed notice generates between an 800% and 3000% response increase relative to digital ads and 375% to 800% relative to email. Based on public information,[16] the FTC is currently undertaking a review of factors that determine notice effectiveness and resulting claims rates. *See* **Exhibit 2.**

     ii. The Direct Marketing Association, the world's largest trade association, dedicated to advancing and protecting data-driven marketing, reveals in its 2015 Response Rate Report that response to direct mail advertising (3.7%) is 18500% better than internet display (0.02%) and 3700% better than email

---

[16] https://www.regulations.gov/#!documentDetail;D=FTC-2015-0055-0001, last visited April 27, 2016.

(0.1%).[17]  *See* **Exhibit 3.**  These figures pertain to commercial solicitations seeking a recipient to buy something.  Therefore, a mailing from a court offering free trigger replacements to ensure a safe gun should garner an even higher response rate.

g.  The settling parties referenced a *National Review* news article in their June 2016 filing.[18]  The article states that 98% of the gun-owning mailing recipients responded to a mailing by New York City:

> "*These owners received letters from the Police informing them they had three choices: remove the rifles from the city limits, render them inoperative, or turn them into the Police.  The compliance rate was fantastic—98% of the people on the list mailed in the forms.*"

The article discusses that the follow through—*i.e.*, those acting on the three choices—was less than promised by the respondents in their forms.  But the relevant point for the Court here is that <u>response to a mailing could be very high</u>.  The action the Court is requesting, "get a free repair of a potentially dangerous weapon," is not off-putting relative to NYC's "get rid of your gun."

h.  Despite the relative importance of getting convenient response-oriented mailings directly into the hands of these class members, the notice plan did not use names and addresses held by third-parties that may be able and even willing to help get notices to class members if a request, or Order, were issued by the Court.  For example:

i.  Through the dealers and retailers that Remington sells through asking them to send notice mailings to all known customers who own the Remington guns at issue, report their efforts, and be reimbursed for their costs.  All federally licensed dealers hold ATF form 4473's on purchasers, providing an address that, even if old, can be updated to current addresses through public sources as notice mailing best practices (cited in the FJC checklist) call for.

ii.  Through the Bureau of Alcohol, Tobacco, Firearms & Explosives directly, which has captured and created a repository of records from federal firearms licensees that have gone out of business:[19]

> "*Out-of-Business Records:  FFLs that discontinue business are required by law to send all firearms transaction records to the [ATF's National Tracing Center] NTC. Out-of-business records are integral in the firearms tracing process. The NTC receives an average of 1.2 million out-of-*

---

[17] 2015 Response Rate Benchmark Study, DMA and Demand Metric, March 2015.

[18] <u>National Review</u>, Sept. 26, 1994, Page 56, ECF No. 127-3, June 10, 2016.

[19] Bureau of Alcohol, Tobacco, Firearms and Explosives, <u>National Tracing Center Fact Sheet</u>. https://www.atf.gov/resource-center/fact-sheet/fact-sheet-national-tracing-center, last visited July 27, 2016.

> *business records per month. Since 1968, ATF has received several hundred million such records, and its Out-of-Business Records repository is the only one of its kind in the world.*"

    iii.   Through the NRA, which reportedly possesses databases of the names and addresses of millions of gun owners.[20]  Name, mailing address, and email address are required fields in NRA contact forms and membership forms.[21]

    iv.   The NRA privacy policy states that it allows third parties to use its lists:

> *"We compile lists for communications and marketing purposes. We will provide that information to NRA affinity partners who we believe provide goods and/or services that might be useful to NRA members."*[22]

It would be surprising if the NRA refused to view the Court as an appropriate "affinity" partner if requested, let alone if ordered; or that Remington would not be an affinity partner.  Remington could support this to ensure Class members received notice so that it could receive a closure from this settlement that would not be subject to collateral attack.

    v.   While the NRA probably does not have manufacturer and model numbers of guns associated with each member or mailing list entry such that a physical mailing would be over-inclusive, it would not be expensive to send email notices to their entire list, even if that list is over-inclusive.

    vi.   One of the earliest missions of the NRA involved rifle safety, so their refusal to comply with a Court request (or Order) to assist with a safety notification would be counter-intuitive.[23]

    i.   The notice vendor has previously advocated subpoenas seeking the assistance of third-parties in class action cases, citing other cases where other courts have done the same:

> *"Additionally, Plaintiff's counsel could propose a notice plan that includes serving subpoenas on retailers where the Pre-Cold Medicine is sold to consumers. These subpoenas would seek consumers' e-mail addresses from the retailers' loyalty card programs – for known purchasers of the Pre-Cold Medicine – to effectuate individual notice to class members. In fact, I understand that this precise mechanism for identifying class members was recently utilized by Chief Judge George H. King of the United States District Court for the Central District of*

---

[20] *See* Big Surprise, the NRA keeps a mailing list, http://blog.timesunion.com/guns/big-surprise-the-nra-keeps-a-mailing-list/2490/, last visited July 24, 2016.

[21] https://joinnra.nra.org/join/join.aspx, last visited July 25, 2016.

[22] https://membership.nrahq.org/privacy.asp, last visited July 25, 2016.

[23] https://home.nra.org/about-the-nra/, Last visited July 25, 2016.

> *California in Forcellati v. Hylands, Inc., C.D. Cal. Case No. CV 12-1983-GHK (MRWx), Dkt. No. 155, to provide direct mail or email notice to more than 800,000 purchasers of six homeopathic cold and flu remedies for children from records subpoenaed from retailers' loyalty card programs. Similarly, in Ebin v. Kangadis Food, Inc., S.D.N.Y. Case No. 13-CV-2311, Dkt. No. 96, Judge Jed Rakoff of the Southern District of New York used the same procedure to provide individual notice to nearly 200,000 olive oil purchasers."*
>
> Declaration of Steven A. Weisbrot in Support of Plaintiff's Motion for Class Certification, April 2, 2015, *Melgar v. Zicam*, E.D. Cal., Case No. 2:14-cv-00160-MCE-AC.

j.  It is certainly possible to accommodate mailing list confidentiality issues when seeking to use mailing lists held by others:

  i.  Lists held by third parties can be provided to "vendor A" without disclosing the nature of the case or the sources of the names.

  ii.  Notices can be printed, stuffed into blank envelopes, and sealed by "vendor B."

  iii.  Vendor B can send the sealed envelopes to vendor A who can apply the addresses and mail them by first class mail.

  iv.  Pharmaceutical drug cases where patient privacy is a concern have utilized approaches such as this when necessary, and an approach could be used to satisfy gun owner "registration aversion" and mailing list confidentiality concerns.[24]

k.  The notice vendor's website references many cases and orders where courts enlist third-parties to assist with the sending of mailings.[25] In virtually every securities fraud class action—the most common class action settlement there is—non-party nominees are ordered by courts to assist by either a) sending mailed notices to the beneficial holders if they wish to keep their data confidential, or b) providing the names and addresses to the administrator for the administrator to effectuate a mailing. These orders typically accommodate reimbursement of expenses to help the court fulfill its critical individual notice obligations. For example:

  i.  *Larson v. Insys*, D. Ariz., Case No. Case No. CV-14-01043-PHX-GMS

---

[24] *See* for example, *In re Serzone Products Liability Litigation*, 231 F.R.D. 221 (2005). This settlement provided substantial payments for a small subset of patients who had suffered injuries out of a large class of drug takers. Notice reached 80% of all purchasers through 370 million national impressions and used multiple sources of mailings to reach a far higher, though not precisely calculable, percentage of the injured patients, many of whom had come forward already, with the court employing careful privacy controls on the mailings, and resulting in a high percentage of the injured patients claiming payments.

[25] *See* http://www.angeiongroup.com/cases.htm, last visited July 22, 2016.

ii. *Brown v. China Integrated Energy*, C.D. Cal., Western Div., Case No. CV 11-02559-BRO (PLAx)

iii. *Anderson v. Polymedix*, E.D. Pa., Case No. 2:12-cv-03721-MAM

iv. *In re Fuqi International Securities Litigation*, Case No. 10 Civ. 2515 (DAB)

l. The modest 102 notices that were mailed to those who saw magazine ads and posters,[26] is evidence that the magazine and poster notice effort was ineffective at producing response, not evidence that mailings increased overall effectiveness.

FAILURE TO EXPLOIT PRESS COVERAGE

4. Response suffered from bypassing the advantage of a newsworthy case to secure <u>compelling</u> news coverage.  Several key aspects are concerning in this regard:

a. The purpose of the press aspect of a settlement notice plan is to seek the most coverage and the most <u>effective</u> coverage.  Here, effective coverage could have come by highlighting the urgency to repair that Plaintiffs cited when they filed their complaint demanding a recall, and which they still sought in the complaint when they settled.  Indeed, the notice vendor hyped the press release component of the settlement as "*further alerting Settlement Class members of the Settlement Agreement*."[27]

b. From what I can see, the Court was not shown the joint press release for approval despite the settlement agreement indicating the parties would seek court-approval of notice documents.[28]  Despite the complaint seeking a recall, the press release mainly characterized the complaint as having sought "*economic losses for the alleged diminished value of the rifles, along with other equitable relief*."  The press release represented a cleansed version of the complaint, and blandly summarized the settlement, saying it "*would resolve two economic class-action lawsuits*."  This messaging marginalized the sense of import among reporters and class member readers.  The release also read, "*…to ensure continued satisfaction for its valuable customers, Remington has agreed to settle…*" This language, on top of other language highlighting Remington's arguments about safety ("*Remington believes that the trigger mechanisms are safe and has vigorously defended both lawsuits*"), would have reduced the perceived significance among news outlets.[29] The headline made no mention of the

---

[26] Declaration of Steven Weisbrot on Implementation and Adequacy of Notice Plan, ECF No. 92-9, Sept. 4, 2015, at para. 19

[27] *Id* at para. 20.

[28] Second Amended Settlement Agreement at paragraph 58. "*The text of the notices and the mechanisms for distributing the notices shall be subject to the approval of the Court.*"  ECF. No 86-1, Apr. 8, 2015.

[29] http://www.prnewswire.com/news-releases/preliminary-approval-granted-to-proposed-settlement-by-remington-arms-company-300105305.html, last visited July 24, 2016.

trigger replacement or the volume of guns, the specificity and importance of which would have grabbed editors' and reporters' attention.[30]

c. The settlement agreement does not require Class Counsel to remain silent in the press. There is no "gag" order that I am aware of.  And yet, the press release includes a sentence announcing an intent not to comment in connection with any news outlet actually running a story: "*The parties do not intend to comment further until the Court issues a final ruling*."  A plaintiffs' lawyer's name is listed in the press release as a "contact" but the only reason to include a contact is so that media can get a quote and understand the importance of a story.  When media actually call the designated contact—which is the rare luxury of a newsworthy case—the opportunity to engage the reporter must be capitalized on in order to pitch a bigger story and more prominence to help class members, and to ensure an accurate understanding of the rights and options that Class members have.

d. When CNBC aired a feature TV story in December—the proverbial "home run" of publicity for a settlement—the reporter says, "*The Plaintiffs declined to comment for this story*."[31]

e. It's one thing to navigate a settlement process where Remington—trusted by gun-owners—maintains the guns to be safe in juxtaposition to the settlement offer to replace triggers as a result of an alleged defect.  It's quite another thing for Class Counsel to not comment, when speaking up would serve Class members interests.

f. In this vacuum, it was left to Richard Barber, a gun owner, the former expert in the case, and father of Gus who was killed, to make a statement that was clear, neutral, compelling, non-judgmental, not conclusory, and that did not violate or disparage any term of the settlement.  None of the lawyers would have been prohibited from making such a statement to any member of the media they possibly could get to listen them:

> "*If you're on the fence, do your homework, and even if you're on the fence after reviewing the information that exists today, just out of caution, why not have your rifle retrofitted with a trigger to prevent any chance of you, your wife, your children, your friends from being maimed or killed*."[32]

The settlement needed many more such appearances and comments, without any "don't worry they are safe" messaging to undermine them, in order to make an impact on claims under the claims process the parties have in place.

---

[30] The headline read "Preliminary Approval Granted to Proposed Settlement by Remington Arms Company."

[31] http://video.cnbc.com/gallery/?video=3000463701, last visited July 24, 2016.

[32] http://video.cnbc.com/gallery/?video=3000463701, last visited July 24, 2016.

g. The "source" of the press release was listed as "Angeion Group" which may have diminished the perceived legitimacy of the release to that of a solicitation. For a court-approved press release, the "source" can be the Court. This legitimacy can be important in order to increase the number of appearances in news media and credibility among readers.

## CLAIMS PROCESS DESIGNED TO FAIL

5. The claims process was a hurdle that squelched claims. For example:

a. In assessing claims process issues, I first look at whether a claims process is necessary, and if so, how to ensure the process and claim form are as streamlined as possible. After ensuring that the reach of the notice campaign, and then the clarity and simplicity of the notice itself are not hurdles and limits on claims participation, the objective is to establish claims procedures that do not interfere with a 'natural' claims rate, so that the process itself does not become a variable that limits claims. The FJC Checklist calls for avoiding claims processes when they are not necessary.

b. The parties chose a process with a claim form seeking name, address and gun serial number—akin to a registration which many gun owners strongly disfavor. Also the process requires that one must mail his/her gun away. The parties apparently knew this process was unfavorable based on their filing last month arguing that the low claims rate should not have been a surprise, by citing Class members' aversion to a registration-like process.[33] So why did they agree to have one?

c. If Class members could simply take guns to their local dealer, such as to the dealer they purchased the gun from, or any Remington dealer, I believe the response would have been far greater. Such dealers could be trained and reimbursed for their expenses. They might also have relished the opportunity to interact with gun owners.

d. A report stating that 669 vendors sent customers' guns to Remington to have triggers repaired,[34] suggests that dealers could have been a legitimate conduit for customers to take in guns, get them fixed and return them, in order to avoid a central registry and obviate gun owners' concerns.

e. To maximize outreach and claims, as a case of this magnitude and importance should, the notice plan could have utilized outreach coordinators to reach out to dealers, set up claims procedures, and train them to assist the Court.

f. If the new batch of contact information the parties have proposed for their "reminder" campaign were gleaned from a Remington warranty card database, that begs the question: why can't those Class members simply be deemed claimants and sent a

---

[33] JOINT SUPPLEMENTAL BRIEF PURSUANT TO THE COURT'S ORDER OF DECEMBER 8, 2015, ECF No. 127, June 10, 2016, at page 5.

[34] Declaration of Steven Weisbrot on Implementation and Adequacy of Notice Plan, ECF No. 92-9, Sept. 4, 2015.

postage paid box and instructions, or a voucher, as appropriate?  High participation rates come from convenience and eliminating burdens that are not necessary.  If the new contacts are not from warranty registrants, where is the warranty registrant data?

g.   If a claim form was absolutely necessary, the forms used in the case were too confusing and lengthy.  There were 16 pages of forms that could have been two to three.

    i.  A separate form for each model number bound in one PDF created confusion, excess length and the appearance of complexity.  A more sophisticated organization of the information would have greatly increased claims.

    ii.  If there was just one spot to provide a serial number, the claims administrator could have determined which benefits apply to that gun.  Thus, every model of gun could have used the same form instead of many forms if the rest of the necessary information was reorganized and streamlined.

    iii.  The forms contained unnecessary redundancy. For example, in ECF No. 92-2, on page 8 of 17, the lengthy explanations of the implications of choosing either yes and no are identical and confusing.  Redundant information fatigues claimants and often reflects carelessness or willful intent to deter claims.

    iv.  The forms create confusion.  For example, in section 4, "benefit election," a reasonable reader who selected "yes" to the question whether an accidental discharge took place, could understand that repair/replacement applies to those who select "no," in as much as the "I want to receive pre-paid shipping tags…" language is only associated with the "no" box.

    v.  The <u>first</u> 4 pages of the 16-page claim form reflected the modest $12.50 and $10.00 voucher offers.  This page organization would have deflected attention from the later pages offering the more important trigger replacements.  Many readers would have dis-engaged before seeing the trigger repair offer pages.  This would accrue towards decreasing the Class member's interest in participating in the settlement.   In my experience, organizing these pages this way is a way of distracting readers and lessening response.

*Note:  The claim form or notice make no mention of the fact that the model 600 recall and repair is still ongoing at Remington's website.[35]  This is a lost opportunity to communicate that ongoing recall and make more guns safer. Also, it is worth noting that ANYONE who submits an invalid serial number at Remington's own recall pages is immediately offered a 20% discount on purchases.*

---

[35] https://www.remington.com/support/safety-center/safety-modification-program/remington-model-600-660, last visited July 28, 2016.

h. The "warning" about accidental discharges that is provided on claim form pages 7, 10, 13, and 14 alerting Class member to STOP using their weapons, should have been provided prominently in the notices themselves:

  i. If this warning had been prominent in the notices, claims would have been much higher, and Class members much safer, in my opinion.

  ii. Instead, being "buried" inside the claim form in the way it is, it appears as though the warning is more of a tool for future litigation purposes in the event a gun is not returned, and later discharges unintentionally.

  iii. The positioning of this warning in the claim form, associated with "yes, I have experienced an accidental discharge" communicates that potential danger exists only as to a gun that has already exhibited an accidental discharge. This serves to lessen concerns among others, and would have accrued to a lower claims rate not a higher one.

STATEMENTS AND OMISSIONS

6. Important and available information should be provided to the Court.

  a. Statistics from the internet banner portion of the notice program that were presumed to reach the owners of nearly 2 million guns, including:[36]

    i. The target audience used for combining the reach of the magazines with reach of the internet banners.

    ii. Support for the calculations utilized to make the overall reach calculation.

    iii. The reach calculation ascribed to the internet banner campaign.

    iv. Where the internet banner impressions appeared by network, and by website URL.

    v. How many different human beings clicked the internet banners and then clicked to open a notice at the settlement website.

    vi. All of the Facebook metrics including clicks from Facebook to the website and ensuing clicks to notice pages.

---

[36] The magazines reached 48% of Class members (7.5 million guns x 48% = 3,600,000 guns) as shown by 2015 GfK MRI data. The vendor opined that the magazines and internet banners together reached 73.7% of Class members (owners of 5,527,500 guns). Therefore, the notice vendor believes that the owners of 1,927,000 guns were reached with notice through internet banners. However, the click data from banner to notice which the vendor would possess would likely refute this—click rates are routinely small fractions of a percent.

    b.   Information about the magazine portion of the notice program including:

        i.   Tearsheets showing whether and how the notices actually appeared in print.

        ii.   The reach calculation ascribed to the magazine campaign.

        iii.   Confirmation that the full circulation of each publication was purchased.

    c.   Other important and readily available information:

        i.   How many mailings were returned as undeliverable and the treatment of those mailings.

        ii.   Which websites, print, and broadcast media ran news stories and on what dates.

        iii.   All settlement website traffic statistics including unique visitors on a page by page basis, along with time spent and including the number of total and unique page views for the notices and claim forms.

7.   Notices and Plan aspects were apparently not court-approved or disclosed. The FJC Checklist advises that all notices seek court-approved prior to issuance.  The settlement agreement states that "notices would be submitted for court approval."  These key items were not in Court filings before the notices were issued as far as I can see:

    a.   The internet banner—what it would look like, or what it would say.  Did the banner meet the content requirements of Rule 23?

    b.   The original Facebook posting—what it would look like, or what it would say.  Did its content satisfy Rule 23?

    c.   The joint press release.

    d.   The magazine notice shown to the Court for approval was not the actual size it appeared in publications.  It was shown as an 8 ½ x 11 page, but was published as a fractional page, rendering it less noticeable.  *See* **Exhibit 4**, ECF No. 86-4, April 8, 2015, compared to the notice as it appeared in <u>Parade.</u>

    e.   The mailed notice format was not shown as it would appear on the front and back for the Court to test whether it was likely to be noticed and read.   We do not know how it was addressed and what the callouts were if any to ensure readership.  The FJC models show outside envelopes designed to overcome "junk mail" appearance and gain readership at <u>www.fjc.gov</u>.

8. The vendor stated that the appearances in the press release "*appeared on 225 websites and reached a potential audience of 21,972,000 persons.*"[37]  This is misleading because the total audiences of all of the pages of the websites overstates the number of people who viewed the page that contained the press release on each site.  This is like putting a needle in a haystack and stating that all of people who walked by the haystack "potentially" saw the needle.

### NOTICE FAILED FJC CHECKLIST AND NORMS FOR IMPORTANT NOTICE PROGRAMS

9. The vendor indicated that the original effort satisfied the FJC Notice Checklist,[38] but it did not.

10. The FJC Checklist has four (4) major points:

   a. **Reach** – The FJC wrote: "***Will notice effectively reach the class?***"  The FJC cited in the Checklist a study reporting that median reach of Court approved plans was 87%.  Most high-stakes notice efforts in the FJC study cases achieved upwards of 95%—truly and conservatively—or <u>higher</u>.  An inflated 73% plan that actually reached slightly more than 49%—leaving half the class unaware—for a case of this import, woefully fails the FJC guidance.  The FJC Checklist states:

      > *"The lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70–95%. A study of recent published decisions showed that the median reach calculation on approved notice plans was 87%."*

      As the notice expert who collaborated with the FJC on the Checklist and the study, in my opinion the FJC Checklist is not stating that the low end of 70% is a <u>high</u> reach.  Instead, the median of 87% is critically important.  And the most high-stakes cases in the FJC study reached close to 95% or more of Class members.

   b. **Design** – The FJC wrote: "***Will the notices come to the attention of the class?***"  The *Pollard* notices did not have an attention-getting headline which would have dramatically reduced the noticeability, readership, and thus response.

   c. **Content** – The FJC wrote: "***Are the notices informative and easy to understand?***"  The *Pollard* internet banners, revealed to be small,[39] could not have contained Rule 23 compliant content, meaning only those that click them and then click the notice would have seen a notice.  The internet banner design and content was not provided as far as I

---

[37] <u>Declaration of Steven Weisbrot on Implementation and Adequacy of Notice Plan</u>, ECF No. 92-9, Sept. 4, 2015.

[38] <u>www.fjc.gov</u>, click on the class action notices item.

[39] The notice vendor listed the pixel sizes: *"…standard IAB sizes (160x160, 300x250, 728x90)"* Note: a pixel is 1/75th of an inch on a typical computer screen.  <u>Declaration of Steven Weisbrot on Implementation and Adequacy of Notice Plan</u>, ECF No. 127-2, June 10, 2016.

can find in the public record, nor have the typical click-rate statistics. Additionally, the print notices did not focus on the trigger problem enough to compel action.

d. **Convenience** – The FJC wrote: "***Are all of the rights and options easy to act upon?*** The Claims process was akin to gun registration and unnecessarily complex; a <u>known</u> hurdle that would deter claims. The claim form was clumsy and confusing.

e. The FJC Checklist warns about over-reliance on internet banners. It specifically warned that claims would be very low as a result. The FJC Checklist states:

> *"Inflated audience data via Internet ads is common. It is very expensive to reach a significant percentage of a mass audience with Internet banner ads. Watch for suggestions that Internet ads and social network usage can replace all other methods. Reach, awareness, and claims will likely be very low when such a program is complete."*

f. There was no report on the budget spent to advertise, no documents from the actual websites showing where the impressions appeared or indeed whether they appeared; none of the data that determines actual effectiveness. The FJC warned against data that simply sounds impressive:

> *"Is any Internet advertising being measured properly? Audiences of Internet websites are measured by "impressions." Total, or "gross," impressions of the entire website do not reveal how many people will view the notice "ad" appearing periodically on a particular page."*

g. The FJC Checklist warns about overlooking meaningful individual mailed notice:

> "*Look closely at assertions that mailings are not feasible.*"

> *"If individual notice will not be used to reach everyone, be careful to obtain a first-hand detailed report explaining why not."*

There was no such report. Apparently there are now more names and addresses but lists held by others that could be tapped and should be investigated. Physical mailings yield the greatest response—by far.

h. The FJC Checklist explains how to design notices to garner attention and compel action. The original notices clearly fail to stand out or contain any meaningful call to action appropriate for this case. *See* www.fjc.gov (click the "class action notices" item, and then by way of example, click on "for homeowners").

i. The FJC Checklist calls for notices to have attention-getting headlines. The *Pollard* notices as published did not. The FJC Checklist states:

> *"It is important to capture attention with a prominent headline (like a newspaper article does). This signals who should read the notice and why it is important. The overall layout of the notice will dictate whether*

*busy class members will take time to read the notice and learn of their rights."*

j. The FJC Checklist guidance on "reach" was not satisfied:

> *"Consider the breakdown of known and unknown class members, the age of any mailing lists, and the parties' willingness to spend necessary funds to fully reach the class."*

> *"Is the notice plan conducive to reaching the demographics of the class?"*

> *"Are the reach calculations based on accepted methodology? An affiant's qualifications are important here. Reach calculation methodology is commonly practiced in advertising and media-planning disciplines. Claims administrators are often accountants by training and may lack personal knowledge or the training to conduct reach analyses."*

We have seen that the target audience was narrow and mixed improperly to inflate the overall reach. The methodology used was not accepted. The affiant is a lawyer. In truth, it will most likely take more money than expected to achieve adequate notice and do this job properly.

11. Information from experience in major notice cases may help the Court. For example, comparing the notice here to one other high profile class action:

a. In the *In re Holocaust Victims' Assets Litigation (Swiss Banks)*, notice needed to find Survivors of past atrocities. A team of notice professionals designed notices with large headlines and callouts. *Pollard's* notices to Class members at current risk of injury and death, according to the complaint, had no large headlines.

b. *Swiss Banks* notice reached more than 95% of its Class members 5 times each or more via mailings, publications, television, radio, internet, press outreach, and organizational outreach *Pollard* left about half the Class uninformed after magazine and internet banner ads.

c. *Swiss Banks* notice used millions of individual notices to reach hundreds of thousands of survivors and heirs. As many lists as could be obtained from sources were captured and scrubbed. *Pollard* sent notice to 2,400 people who already had trigger repairs, not to warranty databases, and not to lists of millions of gun owners that third parties hold.

d. *Swiss Banks* notice used multiple press conferences and Class Counsel fielded as many press calls as possible to achieve accurate and neutral but highly read and viewed compelling news stories. *Pollard* notice included a press release that was not focused on the trigger problem and repair and the lawyers did not comment for reporters.

e. *Swiss Banks* notice used teams of outreach coordinators to explain and provide notices for third party organizations to send and hand out to their members who may be class members. Those stakeholder groups encouraged participation and facilitated claims

filing.  *Pollard* did not leverage dealers except to send posters that together with magazine ads received 102 responses.

f.   The *Swiss Banks* court received four highly detailed reports together with my analysis of the overall effectiveness of notice, notice that generated 270,000 forms before final approval which was prior to another notice program and years away from claims deadlines, among a class of some 600,000 elderly Survivors alive at that time.

g.   I recommend to the Court, by way of example, AMENDED REPORT OF NOTICE ADMINISTRATOR TODD B. HILSEE ON ANALYSIS OF OVERALL EFFECTIVENESS OF NOTICE PLAN, *In re Holocaust Victims Assets Litigation*, ECF No. 355, Cv-96-04849, E.D.N.Y.

### *How Could This Happen? Why Does Nobody Come Forward?*

Notice vendors today purchase advertising for about the same prices.  When settling parties solicit "bids," as they now do, they ask <u>not only</u> for a price to execute an independently determined effective level of notice; instead, they ask vendors to propose a notice plan they will sign an affidavit in support of, <u>and</u> what will it cost.  The process thus becomes a "reverse auction" that awards notice contracts to vendors willing to provide the <u>least notice</u> but still swear it to be the "best practicable."

To compete, low bidders are providing erroneous calculations that overpromise effectiveness, thus appearing to achieve more, for less.  The experienced notice professionals who still stand for effective notice campaigns have been silenced by threats—implicit or explicit—by leading law firms, not to oppose the low bidders or their methods, even after being informed that the calculations are wrong.  The inflated conclusions are presented to courts nonetheless.  The threat is one of being "blackballed" in the industry, *i.e.,* firms will not award them contracts and they will tell other firms not to award them contracts if they appear in opposition at all, let alone for an objector.  Good law firms have fallen prey to falsely-effective inexpensive notice promises, and they must fear that criticism will compromise the assurances they have proffered, or will proffer, to other courts in other cases.

But why would this happen?  There is a lack of incentive for truly good notice among class action settling parties, a lack of adversarial notice practice, and often a mutual aversion or nonchalance towards effective notice.  For example: defense counsel bargain for low response to save its client money (claims-made); Class Counsel worry defendant will not settle; Class Counsel doesn't want objections to fees; both seek to avoid reduced *pro rata* payouts from too many claims that might suggest an insufficient settlement (fixed fund); Class Counsel fees are not usually tied to actual claims rates; defendant fears bad publicity; Class Counsel fears high cost when certified without settlement and must pay notice cost; both do not want opt outs, *etc.*  None of these interests help class members, or Courts who want to fairly allocate benefits to as many of the class members as it can, before binding them all by their silence, or worse, by their unawareness.

New vendors seeking market share have sold the idea that electronic, or "digital" means like internet banner ads can result in notice that "reaches" (exposes, *i.e.*, provides an opportunity to come to the attention of) class members for <u>far less money than other methods like physical mailings</u>.  The problems

with the last sentence are a) the "for far less money" part is false,[40] and b) data shows individual direct physical mailings to be far more responsive as discussed in this report.  Because they provide affiants who are not trained in advertising media calculations, and because no firm will subject them to a *Daubert v. Kumho* expert challenge, and because they have no history of testimony based on accurate high reach calculations to live up to, the vendors promise inflated levels of anticipated success that they purport to result from modest, inexpensive, and fleeting internet banner ad-reliant programs.  As such, the percentages of classes that such plans purport to reach is often grossly overstated, with often more than half of a class being bound without ever having seen a notice, and as a result, very small percentages of classes recovering benefits:

1.  In 2014, a Florida court was concerned about low response and the vendor stated that a 0.023% claims rate was typcial for their cases with little or no individual notice.[41]

2.  <u>Forbes</u> Magazine gleefully reported on that case, which involved refunds on Duracell batteries, "*The probability of getting a straight flush in a 7-card poker hand is slightly higher at 0.0279%.*"[42]

3.  Unless courts seek answers like this Court did in December, and correct the problems, notice proposals will lead to continued degradation.  Last month, a California appellate decision denied approval to a settlement where out of 500,000 members, 895 claims were filed, less than two-tenths of 1 percent (0.179%) for a refund of an obesity product.  Among other notice mistakes, the decision reveals that 237,000 physical mailing addresses of Class members were known.  Instead, an email was sent and the Class ignored it or it went to SPAM filters.[43]  Apparently in that case one could have simply sent checks to all 237,000, or, as the Court of appeals observed, investigated a subpoena process for additional mailing addresses.

These practices have created the danger that opt-out class actions will be de-legitimized.  To help minimal notice campaigns to be approved, some new vendors have been denigrating "reach" and "frequency," despite deeply established advertising industry measurement methodology critical for an objective assessment of the effectiveness of a mass communications program.  *<u>Out of the total universe of class members, what percentage will be exposed to a notice?</u>*  That is basic advertising science,

---

[40] <u>The Rising Cost of Consumer Attention: Why You Should Care, and What You Can Do about It</u>, Thales S. Teixeira, HARVARD BUSINESS REVIEW, working paper 14-055, Jan. 17, 2014. "*The cost of gaining attention has increased dramatically (seven- to nine-fold) in the last two decades*."

[41] <u>Declaration of Deborah McComb re Settlement Claims</u>, *Poertner v. Gillette*, M.D. Fla., Case No. 12-00803, ECF No. 156, April 22, 2014.  Note:  This marked one of the first times that a claims administrator publicly acknowledged the trove of class action response data they keep private and do not disclose in low-bid proposals.

[42] <u>Forbes Magazine</u>, ODDS OF A PAYOFF IN CONSUMER CLASS ACTION? LESS THAN A STRAIGHT FLUSH, May 8, 2014. <u>http://www.forbes.com/sites/danielfisher/2014/05/08/odds-of-a-payoff-in-consumer-class-action-less-than-a-straight-flush/#1d27ea45144f</u>, last visited July 29, 2016.

[43] *Duran v. Obesity Research Institute*, D067917, COURT OF APPEAL, FOURTH APPELLATE DISTRICT, DIVISION ONE, STATE OF CALIFORNIA, June 23, 2016, on appeal from San Diego County Superior Court.  Note: Remington defense counsel Shook, Hardy and Bacon are listed as representing defendant Wal-Mart in that case.

entirely answerable in every case, that courts deserve to know. Walking away from this because it now costs more than parties want to spend, will destroy not only the breadth and fairness of exposure that due process notice requires, but will continue to decimate response and participation in class actions, which this case has unfortunately become the latest poster child for.

Now, those who know better dare not speak up. That is why I speak up as someone who does not bid and does not compete to execute notice. Someone who lawyers and courts have trusted to be honest and straight forward. The low-ball notice plans and plummeting response rates are causing ridicule to courts and the class action device, studies calling class actions ineffectual, empowering legislation to eviscerate class actions, and now class action notice rule proposals that would weaken the one bulwark requirement—individual notice by mail—that generates the greatest response.

Most response data is privately held in claims administrators' case vaults—administrators who have been appointed by Courts, but compelled to keep information private by settlement appointments. Counsel often do not make the information public unless compelled by a Court. One might look at all this cynically if a class loses out on a refund on batteries, but here we have a case where lives may be at risk, and so this is evidence of the harm these notice practices will cause.

When notice truly is effective, and reach is not inflated, and a claims process is not a hindrance, it can be said that response does not dictate notice adequacy, but when notice and claims process weakness and defects are present, low response *is* an indicator of notice inadequacy, and the latter is the case here.

### *Will the New Media Proposal Cure the Problems?*

The campaign presumes that the first notice was sufficient to let Class members exercise their other due process rights. Given the reach and notice defects that were not reported to the Court as revealed above, that cannot be so. The notices would need to be revised to communicate all rights class members have before final approval.

The campaign targets a smaller group of younger, social-media using individuals who may or may not be Class members without an apparent concern for overall reach or the broadest possible coverage. That is suitable for a political campaign where only 41% of citizens vote, but not the requirements of notice.

Also, the proposal suggests that what worked for Pres. Obama will work here. But, the Obama media budget was $483 million dollars, including a massive television campaign as shown below.

The notices are "feel good" messages that would give Class members get a comfort level that Remington cares about their safety, rather than delivering notice in the most compelling way that will cause them to take advantage of the trigger replacement, owing to the danger that the Class Counsel believe they currently face under their operative complaint.

The public testing of notices in public was done without Court-approval it would seem, and none of the messages tested included any direct and compelling messages focused on the potential for guns firing without triggers being pulled.

The proposal does not cure the prior problems. The supporting papers are not transparent:

1. The program will fail to reach a high percentage of Class members.

   a. Only 52.8% of rifle owners even use Facebook.[44]  This means that even if enough advertising was purchased to dominate Facebook, *i.e.,* with banners everywhere on Facebook, the program would at best reach about half the Class.  No budget is provided, but the great likelihood is that a very low reach will be achieved.

   b. There is no budget for the intended use of Facebook.  The metrics provided are fuzzy, and information provided does not confirm whether the impressions are unique, viewable, and that the reach is a proper net reach, and whether those in the test who clicked were humans or if they then opened a notice.

   c. The suggestion that notice will be directed to "*the total universe of Facebook users in the United States who were identified pursuant to our hunter-sportsman audience model, overlaying individuals who expressed a self-identified interest in topics relating to hunting and Remington Arms on social media*" calling these 3.4 million people "*putative class members*" is conclusory, speculative, and is an improper media targeting method. One cannot know whether within this group of Facebook users are any significant percentage of Class members, or whether they own Remington rifles.

   d. The radio notice plan is deficient:

      i. The stations on which spots would appear are not identified.

      ii. The ratings and rankings of the stations to be used are not identified.

      iii. The specific markets where the spots will appear are not identified.  The new vendor discusses a focus on "key states" without any study of rifle ownership to verify a scientific basis for such a focus.

      iv. The specific mix of dayparts in which the spots would appear are not identified.

      v. The new vendor mentions only "impressions," when major market radio station advertising is purchased by rating points.[45]  The anticipated reach should be accurately calculated before approval to proceed and reported to the Court.

      vi. There is no information provided on the reach of this entire effort.  This is important because radio is a tool to build frequency <u>not reach</u>.

   e. The I-Heart internet streaming radio will not reach high percentages of Class members: **Only 6.3% of rifle owners use internet radio based on GfK MRI data.**

---

[44] 2014 Gfk MRI.

[45] A rating point represents one percent of a target population.

     f.    The proposed script for the radio starts with "Reminder to Remington Rifle Owners." This distracts listeners from the urgency of the problem. Then, repetitive references to Remington's safety insistence undermines the goal of increasing claims. Highlighting an urgency to act and repair would not compromise Remington's denial of liability. Those arguments should not undercut response by being a center piece of public notices.

     g.    The proposed internet banner designs give too much emphasis on "image" for Remington:

          i.    None of the social media ads tested headline the problem and solution. They each dedicate the most prominent visual element to outdoor or generic gun/hunting imagery, and the headlines are non-specific—the type a reader would expect from a general safety public service announcement.

          ii.    Both social media ads ("*Learn more. Remington Owners Know: Safety First*" and "*How well do you know your rifle?*") are slogans that suggest that owners being responsible can obviate safety concerns. These designs will help any Remington PR concerns, but will dampen response.

          iii.    Even if a fleeting banner campaign is appropriate, how was "**Your Remington rifle may fire without pulling the trigger. Get it repaired now**" not one of the options tested?

          iv.    Testing is not a bad idea. However, the Court should have been afforded the opportunity to approve <u>which</u> messages would be tested publicly so as to avoid potentially confusing Class members pursuant to later approved notices.

2.    The metrics about the results of the Facebook test do not inform the reach or the anticipated responsiveness among Class members:

     a.    The "reach" figure quoted is misleading. Reach is a net percentage of a target audience but the number listed is not Class members. It is admitted to be greater than the total universe of a 150,000 test "group," by it being shared outside the target group.

     b.    The clicks merely show that out of the 1 million+ impressions only 18,000 clicked, and we are not told how many of those clicks were <u>different individuals</u>, not accidental clicks and not robots, *and,* how many humans <u>then</u> clicked to open and read an actual notice.

     c.    The big story now for Facebook advertisers is that robots are generating clicks not humans.[46]

---

[46] *See Forbes Magazine*, <u>Why Do Some Advertisers Believe That 90% Of Facebook Ad Clicks Are From Bots</u>?, July 31, 2012. <u>http://www.forbes.com/sites/ericjackson/2012/07/31/why-do-some-advertisers-believe-that-90-of-</u>

3. The proposed electronic campaign simply cannot do for the Court what the new vendor apparently effectively did for Pres. Obama. The proposal does not reveal the budget for the advertising to be purchased in *Pollard* in order to compare with the fact that President Obama spent $422 million on media in 2008 according to Federal Election Commission data[47]:

> ### ***OBAMA 2008 Media Spending:***
> Unspecified media buys $352,314,593[48]
> Web ads $21,087,908
> Print ads $20,619,814
> Miscellaneous media $17,006,627
> Media production $10,845,556
> Media consulting $294,907
> Broadcast ads $16,910

    a. In 2012 the Obama campaign spent even more, $483 million, on media.[49]

    b. If the plan was to spend $483 million (in today's dollars) on a pervasive television, print and internet advertising campaign as Pres. Obama did, I would revise my thinking. However, surely the budget will be a small fraction of that amount, thus resulting in the proverbial needle in the internet haystack as compared to Mr. Obama's media dominance.

4. The postcard mailing is defective in that it highlights a legal basis in the class action to characterize it in the headline as an "economic loss lawsuit" which muddies the message and weakens the headline. In my experience, this type of language reduces the attention paid and reduces response. This is inappropriate for notices that must be response-oriented using the main reason for the Class to care and respond. A better headline is: **Your Remington rifle may fire without the trigger being pulled. Read about a free repair available from a class action settlement.**

---

facebook-ad-clicks-are-from-bots/#a18d8cf37d9c, last visited July 28, 2016; *See also*, Did we get duped by Facebook click fraud?, *Diginomica*, August 24, 2014.

[47] https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&cad=rja&uact=8&ved=0ahUKEwiq3Zzd tlXOAhVENz4KHSpVBmkQFggjMAE&url=http%3A%2F%2Fwww.opensecrets.org%2Fpres08%2Fexpend.php%3Fcid %3Dn00009638%26cycle%3D2008&usg=AFQjCNGWCV996VRk3zbh5BU2ICKjm44aAw, last visited July 21, 2016.

[48] The New York Times reported that in 2008, $2.6 billion was spent by both candidates and their interest groups on advertising, with $2 billion going to local broadcast television. http://thecaucus.blogs.nytimes.com/2008/12/02/about-26-billion-spent-on-political-ads-in-2008/?_r=0, last visited July 28, 2016.

[49] https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&cad=rja&uact=8&ved=0ahUKEwiq3Zzd tlXOAhVENz4KHSpVBmkQFggcMAA&url=https%3A%2F%2Fwww.opensecrets.org%2Fpres12%2Fexpend.php%3Fid %3DN00009638&usg=AFQjCNHbvoDx5TDohGp-FvNM_2WKYGdgIA, last visited July 21, 2016.

5. Not sending a claim form along with the mailing will directly lead to lower response. Convenience builds claims rates.

6. The suggested individual mailing plan a) fails to indicate the source of the newly located 1,093,000 contacts held by Remington b) fails to indicate why they weren't available before, c) fails to indicate whether physical addresses are available for contacts they are choosing to send emails to (because physical mailings with claim forms will garner greater response), and d) fails to investigate mailings that could be pursued to millions of names and addresses of gun owners who's contact records are available in public records or records held by third parties.

7. The fact is that 92.3% of rifle owners view television,[50] the highest coverage of rifle owners of any media type.  Social media, Facebook and internet radio audiences provide the least coverage of rifle owners.[51]  Television has the power to demonstrate the trigger problem, and rifle owners and hunters are above average TV consumers.  The audience is broader and more mainstream and less high-income than the current notice proposal presumes.

8. The notice plan makes no reference to any changes in the claims process that certainly played a large part in the depressed response.

*Conclusion*

The original campaign was held out to be effective, but key information could have guided the Court towards a notice effort suited for this case.  The new proposal is unsuited for class action notice, may get response among a narrow audience, but it will reach as few Class members as the first campaign did. I'm afraid the Court and Class will get stung.

I do not know what the budgets for these notice programs were or are.  If the parties are prepared to spend millions of dollars to properly maximize individual mailed notice, utilize broad-reaching national media like television, and heavier and more attention-getting print media including newspapers to reach the traditional older segments of the real target audience,[52] and also a) revamp or do away with the claims process to avoid known registration aversions, and b) ensure direct, compelling, problem-oriented messaging, then response can and should be dramatically improved.  This would help Class members avoid the dangers that Class Counsel have alleged, and which too many fathers and mothers have suffered through already.

To avoid the real notice industry problems that I have identified, which have propelled a race to the bottom in class notice effectiveness and as a result the ever-lower claims rates such as here, I would suggest the Court solicit sealed notice proposals directly from notice professionals trained in mass media for class actions and deeply experienced in the most important cases.  The parameters should

---

[50] 2013 GfK MRI

[51] Only 61.4% of rifle owners use any social media network, while only 47.9% use Facebook, and 6.3% use internet radio, according to 2013 GfK MRI data.

[52] The notice budget in *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, was more than $20 million.

Case 4:13-cv-00086-ODS   Document 134   Filed 07/29/16   Page 29 of 42

include that notice reach 95% of Class members, exploit individual notice including research and investigation into non-party cooperation if feasible, and utilize media that are most used by the broadest Class demographic including television.  I would choose the best proposal not the cheapest.

I would also suggest a simpler claims process that avoids registration-like submissions and somehow allows local dealers to be involved.

Sincerely,

Todd B. Hilsee
Principal

# EXHIBIT 1

## Limited Two-Year Firearm Warranty

**Who and what is covered by this warranty and for how long?** Remington warrants to you, the original purchaser of a new firearm that, for two years from the date of purchase in the United States or Canada, your Remington firearm will be free from defects in material and workmanship.

**What will Remington do if you discover a defect?** If you make a claim within the warranty period following the instructions given in this warranty, we will, at our option, repair the defect(s), or replace the firearm at no cost to you. If we send you a new firearm, we will keep the defective one.

**What must you do to make a claim under this warranty?** First, when you purchase your firearm, you must complete and mail the warranty registration card to us (keep your sales receipt for proof of purchase date). Then, if you discover a defect, you must notify us or an authorized Remington warranty repair center before the end of the two-year period. You may either call or write Remington at:

**Remington Arms Company, Inc.**
**Consumer Service Department**
**Post Office Box 700**
**Madison, NC 27025**
**1-800-243-9700**

*PLEASE DO NOT RETURN FIREARMS TO THE ABOVE ADDRESS.* If we decide that it is necessary for you to return the firearm to the factory or an authorized warranty repair center, the owner must prepay freight. We will not accept COD shipments.

**What is not covered by this warranty?**
We will not cover damage of your firearm caused by:
    Failure to provide proper care and maintenance
    Accidents, abuse, or misuse
    Barrel obstruction
    Hand loaded, reloaded or improper ammunition
    Unauthorized adjustments, repairs or modifications
    Normal wear and tear

**What is excluded from this warranty?** Remington excludes and will not pay incidental or consequential damages under this warranty. By this we mean any loss, expense or damages other than to repair the defects in the firearm or replace the firearm. No implied warranties extend beyond the term of this written warranty. *PLEASE NOTE:* Some jurisdictions do not allow exclusion of incidental or consequential damages, or limitation on how long an implied warranty lasts, so the above exclusion and limitations may not apply to you. This warranty gives you specific legal rights and you may also have other rights.

PLEASE DETACH THIS PANEL BEFORE MAILING.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

2684470933



### Tell Us About Yourself

**First Name**    **I.**    **Last Name**

**Address (street number)**    **(Street name)**    **Apartment Number**

**City**    **State**    **Zip Code**    **Phone Number**

**Email Address (Example: yourname@yourhost.com)**

**Date of Birth:** ___ / ___ / ___
    Month   Day   Year

**Your Gender:** ☐ Male ☐ Female

**What is your passion? Select all that apply.**
☐ Big Game ☐ Small Game ☐ Waterfowl ☐ Upland ☐ Turkey ☐ Predator/Varmint ☐ Range & Recreation ☐ Tactical

**How likely are you to recommend Remington firearms to friends or family?**
☐ 0 ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 ☐ 6 ☐ 7 ☐ 8 ☐ 9 ☐ 10
Not At All Likely (0)     Extremely Likely (10)

☐ Yes! I want to receive offers or communications that may interest me from other companies via e-mail, I understand this e-mail address may be shared with and/or combined with information from other sources

☐ Yes! I want to receive offers or communications from Remington via e-mail

### Tell Us About Your Purchase

**Serial Number**

**Date of Purchase** ___ / ___ / ___
    Month   Day   Year

**Purchase Price** $ ___ , ___ . 0 0

**Product Name/ Model**
_____

**How many other Remington Firearms do you own?** ☐ None ☐ 1-2 ☐ 3-4 ☐ More

Thank You! We appreciate your providing us with the information requested. The information allows us to help us provide our customers to offer you product information and other communications that may interest you. If you prefer not to be contacted about these special offers(direct mail), please check here: ☐
**PLEASE FOLD AND SEAL WITH TAPE BEFORE MAILING. DO NOT STAPLE**

# EXHIBIT 2

# Participation Rates and Types of Notice

*Everything Else Being Equal…*



**Key Takeaways**

*Participation Rates are Generalizations*

<u>Known Class Members</u>: Direct Notice With a Claim Form is more expensive than the alternatives, but generally has higher class member participation.

Presented to Federal Trade Commission, March 2016

Prepared by Analytics LLC

# EXHIBIT 3

# DMA RESP⟩NSE RATE REPORT

## 2015



## DATA TO BENCHMARK
### All of Your Marketing Campaigns





## About DMA

The Direct Marketing Association (www.thedma.org) is the world's largest trade association dedicated to advancing and protecting responsible data-driven marketing. Founded in 1917, DMA represents thousands of companies and nonprofit organizations that use and support data-driven marketing practices and techniques. DMA provides the Voice to shape policy and public opinion, the Connections to grow members' businesses and the Tools to ensure full compliance with ethical and best practices as well as professional development.

ISBN information: 978-0-9833791-7-1

© 2015 Demand Metric Research Corporation. All Rights Reserved. | 5

## Figure 3: Response by Selected Media



2015 Response Rate Benchmark Study, DMA & Demand Metric, March 2015

*Note: Response rate for telephone was graphed using the midpoint of the range.*

*\*CTR x Conversion rate*

© 2015 Demand Metric Research Corporation. All Rights Reserved.





## Chapter 3: Email

### Chapter Highlights

- **Open rates ranged from a low of 7-8% * for emails sent to prospect lists to drive traffic. Ironically, emails sent to house lists to drive traffic enjoyed the highest open rate at 23-24%.**

- **Click rates were lowest for lead generation emails sent to prospect lists (3-4%)** and highest for B-to-B emails sent to house lists (17-18%).

- **Conversion rates were lowest for B-to-C, B-to-B and lead gen emails sent to prospect lists (1-1.9%)** and highest for email campaigns to drive traffic sent to house lists (4-4.9%).

- **For 36% of respondents, the primary purpose of emails sent to house lists was to make a direct sale.** For emails sent to prospect lists, 62% say the main purpose was lead generation.

- **Email usage for marketing campaigns equals or exceeds 80% for most industries.** Email usage is lower for Consumer Packaged Goods (63%), Education (70%), Financial Services/Insurance (75%), Healthcare/Pharmaceuticals (79%) and Travel/Hospitality (53%).

© 2015 Demand Metric Research Corporation. All Rights Reserved. | 27

# EXHIBIT 4

# LEGAL NOTICE OF SETTLEMENT

**If you own certain Remington firearms, you may be eligible for benefits from a class action settlement.**

A proposed nationwide Settlement has been preliminarily approved in a class action lawsuit involving certain Remington firearms. The class action lawsuit claims that trigger mechanisms with a component part known as a trigger connector are defectively designed and can result in accidental discharges without the trigger being pulled. The lawsuit further claims that from May 1, 2006 to April 9, 2014, the X-Mark Pro® trigger mechanism assembly process created the potential for the application of an excess amount of bonding agent, which could cause Model 700 or Seven bolt-action rifles containing such trigger mechanisms to discharge without a trigger pull under certain limited conditions. The lawsuit contends that the value and utility of these firearms have been diminished as a result of these alleged defects. Defendants deny any wrongdoing.

## Who's included?

The Settlement provides benefits to:

(1) Current owners of Remington Model 700, Seven, Sportsman 78, 673, 710, 715, 770, 600, 660, XP-100, 721, 722, and 725 firearms containing a Remington trigger mechanism that utilizes a trigger connector;

(2) Current owners of Remington Model 700 and Model Seven rifles containing an X-Mark Pro trigger mechanism manufactured from May 1, 2006 to April 9, 2014 who did not participate in the voluntary X-Mark Pro product recall prior to April 14, 2015; and

(3) Current and former owners of Remington Model 700 and Model Seven rifles who replaced their rifle's original Walker trigger mechanism with an X-Mark Pro trigger mechanism.

## What does the Settlement provide?

Settlement Class Members may be entitled to: (1) have their trigger mechanism retrofitted with a new X-Mark Pro or other connectorless trigger mechanism at no cost to the class members; (2) receive a voucher code for Remington products redeemable at Remington's online store; and/or (3) be refunded the money they spent to replace their Model 700 or Seven's original Walker trigger mechanism with an X-Mark Pro trigger mechanism.

## How can I obtain benefits?

Submit a Claim Form. Claim Forms can be found at www.remingtonfirearmsclassaction settlement.com or by calling 1-800-876-5940.

## What are my legal rights?

Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue the Defendants yourself, you must exclude yourself from the Settlement Class by **October 5, 2015.** If you stay in the Settlement Class, you may object to the Settlement by **October 5, 2015.**

The Court will hold a hearing on **December 14, 2015,** to consider whether to approve the Settlement and a request for attorneys' fees of up to $12.5 million, plus a payment of $2,500 for each named Plaintiff. You or your own lawyer may appear at the hearing at your own expense.

**For more information or a Claim Form:**
**1-800-876-5940 or www.remingtonfirearmsclassactionsettlement.com**

; sparkle
be as *pétillant*,
vhich later made its
: Caribbean) takes
headiness usually
ider. Right now it's
pular cocktails as
d Dark 'n' Stormy.
r ale, this so-called
c and is typically
ale, it's not ginger
bonated water) is a
te awakener; with a
d perhaps a pour of
ituted for root beer
refreshing beverage
1 authentic ginger
in liquor stores
easy to make at
ness and spice can
ir taste.

### z Tea

matcha, a pow-
se green tea that
tury Japan (by way
s deep, slightly
lso

:harts
dants.
find it
ed in hot
:ed tea, and
smoothies;
3 a matcha
1esn't stop
incorpo-
:ktails
sing

te

1nd
1g
:ton's
1
man

1g twist
beer classic.

## *Mimi's Ginger Beer*

- ¼ lb fresh ginger, peeled and cut into small pieces
- 1 quart boiling water
- ½ cup floral honey
- 5-8 whole cloves
- 1 (1-inch) cinnamon stick
- ½ cup freshly squeezed lime or lemon juice

Grated zest of 1/2 lime or lemon
Ice, citrus fruit juice and/or dark rum
(optional), for serving

1. Put ginger in a food processor, adding just enough cold water to puree it. Scrape pureed ginger into a large, heatproof glass or ceramic bowl or pitcher and add boiling water, honey, cloves, cinnamon stick, zest and juice. Cover loosely with a kitchen towel and keep mixture in a warm place for about 4 hours, skimming off the foam as it accumulates on the surface.

2. Stir in 1 quart cold water and taste for sweetness, adding more honey or lemon or lime juice as needed. Strain ginger beer and pour it into ceramic or glass bottles. Cap tightly and store in the refrigerator. Serve ginger beer as soon as it is chilled, or wait 2-3 days for it to ferment and start to fizz slightly. Dilute with ice, more cold water, citrus juice—or, for an extra jolt, dark rum. Chill, covered, for up to 1 week. Makes about 2 quarts.

*There's ginger beer in my float!*

MAY 17, 2015 | **13**

---

## LEGAL NOTICE OF SETTLEMENT

If you own certain Remington firearms, you may be eligible for benefits from a class action settlement.

A proposed nationwide Settlement has been preliminarily approved in a class action lawsuit involving certain Remington firearms. The class action lawsuit claims that trigger mechanisms with a component part known as a trigger connector are defectively designed and can result in accidental discharges without the trigger being pulled. The lawsuit further claims that from May 1, 2006 to April 9, 2014, the X-Mark Pro® trigger mechanism assembly process created the potential for the application of an excess amount of bonding agent, which could cause Model 700 or Seven bolt-action rifles containing such trigger mechanisms to discharge without a trigger pull under certain limited conditions. The lawsuit contends that the value and utility of these firearms have been diminished as a result of these alleged defects. Defendants deny any wrongdoing.

### Who's included?

The Settlement provides benefits to:

(1) Current owners of Remington Model 700, Seven, Sportsman 78, 673, 710, 715, 770, 600, 660, XP-100, 721, 722, and 725 firearms containing a Remington trigger mechanism that utilizes a trigger connector;

(2) Current owners of Remington Model 700 and Model Seven rifles containing an X-Mark Pro trigger mechanism manufactured from May 1, 2006 to April 9, 2014 who did not participate in the voluntary X-Mark Pro product recall prior to April 14, 2015; and

(3) Current and former owners of Remington Model 700 and Model Seven rifles who replaced their rifle's original Walker trigger mechanism with an X-Mark Pro trigger mechanism.

### What does the Settlement provide?

Settlement Class Members may be entitled to: (1) have their trigger mechanism retrofitted with a new X-Mark Pro or other connectorless trigger mechanism at no cost to the class members; (2) receive a voucher code for Remington products redeemable at Remington's online store; and/or (3) be refunded the money they spent to replace their Model 700 or Seven's original Walker trigger mechanism with an X-Mark Pro trigger mechanism.

### How can I obtain benefits?

Submit a Claim Form. Claim Forms can be found at www.remingtonfirearmsclass actionsettlement.com or by calling 1-800-876-5940.

### What are my legal rights?

Even if you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue the Defendants yourself, you must exclude yourself from the Settlement Class by October 5, 2015. If you stay in the Settlement Class, you may object to the Settlement by October 5, 2015.

The Court will hold a hearing on December 14, 2015, to consider whether to approve the Settlement and a request for attorneys' fees of up to $12.5 million, plus a payment of $2,500 for each named Plaintiff. You or your own lawyer may appear at the hearing at your own expense.

For more information or a Claim Form:
1-800-876-5940 or
www.remingtonfirearmsclassactionsettlement.com

---