# EXHIBIT B

| | |
|---|---|
| IAN POLLARD, on behalf of himself and all others similarly situated, ) ) ) Plaintiffs, ) ) v. ) ) REMINGTON ARMS COMPANY, LLC, et al. ) ) Defendants. ) ) | Case No. 4:13-cv-00086-ODS |

# DECLARATION OF MATTHEW L. GARRETSON

# REGARDING PRE-PROGRAM TESTING AND

# PROPOSED SOCIAL MEDIA AND RADIO AWARENESS PROGRAM

1. **Introduction.** At the request of the parties, I, Matthew L. Garretson, on behalf of and in collaboration with the experts of Signal Interactive Media LLC ("Signal"), submit the following response to the undated letter of Todd B. Hilsee, filed on July 29, 2016 (ECF Entry No. 135).

2. My credentials and experience are provided in our prior report (ECF Entry No. 127-1). In preparing this declaration, I have received consultation from Signal's team of specialized experts. This team has overseen over $1 billion in advertising placement. Our team retains highly specialized knowledge of digital media and data analytics, as well as expertise in the planning and administration of traditional media.

1

3. We are extremely pleased with the empirical results of pre-program testing in this matter. This data *factually* demonstrates increased awareness and response among potential class members. We appreciate the opportunity to offer a state-of-the-art approach to class notice to the bench, bar, and class members in this matter, involving widely accepted, vetted, leading-edge digital media and data analytic methodologies. We hesitate to burden the court with a response to the criticism of Mr. Hilsee's unsolicited letter; however—to the extent constructive to improve the current state of class action notice generally—we offer the following response.

4. **Background; Scope of Role and Response.** As a preliminary matter, to clarify the scope of our role and response in this matter, we have included a brief background and a summary of events.

5. On April 14, 2015, in its *Order Preliminarily Approving the Class Action Settlement Agreement*, this Court appointed the Angeion Group ("Angeion") as the settlement notice agent and claims administrator. Prior to making their recommendation to the Court, the parties evaluated four proposals from four competing class notice experts. Our company was not involved.

6. Upon selection and appointment as notice agent, Angeion defined and executed class notice ("Due Process Notice Program") as described fully by its expert, attorney Steven Weisbrot, in his declaration filed on September 4, 2015. Among other media vehicles, Angeion executed notice by direct mail, internet advertising, and publication in consumer magazines that targeted substantial circulation among potential class members (according to leading tools and databases customarily used in media planning, such as *GfK MRI*). Angeion administered the direct and publication notice program primarily between May and July of 2015. For complete details, please see Declaration of Steven Weisbrot on Implementation and Adequacy of Notice Plan,

2

*Pollard v. Remington Arms Company, LLC, et al.,* Case No. 4:13-cv-00086-ODS (W.D. MO), ECF. Entry No. 92-9.

7. As is customary, Angeion administered claims intake in tandem with the Due Process Notice Program. While claims intake is ongoing, a status hearing was held in September, 2015, to review the results of the notice and claims processes. Mr. Weisbrot detailed the number of claims submitted in his aforementioned declaration.

8. On December 8, 2016, the Court issued an Order deferring final approval and directing the parties to provide a supplemental briefing. The Court held, "**The parties are ordered to develop a notice plan, for the Court's review, that will be effective and result in a more significant response rate.**" See Order (1) Deferring Consideration of Joint Motion for Settlement Approval and Motion For Attorney Fees, (2) Cancelling Final Approval Hearing, and (3) Directing Parties to Provide Court-ordered Briefing, *Pollard v. Remington Arms Company, LLC, et al.,* Case No. 4:13-cv-00086-ODS (W.D. MO).

9. Subsequently, in December, 2015, plaintiffs' counsel initially approached Signal. Plaintiffs' counsel requested consultation regarding how to <u>increase awareness of the proposed settlement</u> among potential class members, as well as how to achieve <u>a more significant response rate</u>.

10. The scope of Signal's role was to build awareness of the settlement, and to increase response rates as requested by the Court. To further this objective, Signal leveraged highly specialized expertise and data-driven media approaches (for example, reaching a target audience through digital media).

11. In this context, based on proprietary data-driven approaches to consumer modelling and digital advertising, the experts of Signal began to define and implement several rounds of pre-program testing among an initial 150,000-person test group using

3

digital media—more specifically, the social network *Facebook*. Again, *Facebook* was selected as it is overwhelmingly the highest-read social network on the web, with 1.09 billion daily active users on average for March, 2016, and a staple ingredient in contemporary large-scale corporate advertising. For complete statistics, see https://newsroom.fb.com/company-info/.

12. **Process and Empirical Results.** Our experts tested various messages, background images, and calls-to-action across three rounds, as we measured results, adjusted messaging and images, and re-tested to identify the most effective advertisements:

    Round 1 Testing—March 29-May 4, 2016

    Round 2 Testing—April 22-May 12, 2016

    Round 3 Testing— May 2-May 12, 2016

13. On June 10, 2016, in preparation for a status hearing, counsel annexed to their submission to the Court a description of the pre-program testing program and proposed next steps. The brief set forth empirical results of pre-program testing among an initial 150,000-person test group:

    Impressions: 1,049,860

    Reach: 309,958

    Frequency: 3.03

    Clicks-to-Case-Website: 18,721

14. While media-specific definitions are more relevant, in general across media, "reach" refers to the unduplicated audience exposed to the campaign, and "frequency" refers to how many times, on average, the target audience had the opportunity to see the message. Notably, for purposes of this declaration and in the specific context of pre-program testing of advertising via *Facebook* alone in this case, reach may be described as the number of individuals who logged in to *Facebook* and were exposed to the

4

advertisement while actively using *Facebook*. In this context, frequency may be described as the average number of times the advertisements were served to each person. "Clicks-to-Case Website" is defined as the number of times the case website was reached from advertisement. "Impressions" are the number of times the *Facebook* advertisement is displayed (a "post"), whether the advertisement is clicked or not. A person may see multiple impressions of the same post. For example, someone might see an advertisement in his or her "News Feed" once, and then a second time if a friend shares it.

15. Again, Signal is extremely pleased that our pre-program testing demonstrated empirically that if our social media campaign would be expanded to the full identifiable universe of hunter-sportsmen using social media, more hunter-sportsmen will be made aware of the settlement, their options and rights, and the opportunity to have their triggers replaced.

16. **Radio.** In addition to the digital media program, our report also proposed plan to reach class members and build awareness of the settlement (and related options and rights affected thereby) via radio. As testified by Signal in Court, the radio media plan proposes a 4-week national radio plan spanning top syndicated networks and programs, tailored to the target audience, and targeting peak morning and evening drive times. To design the plan, Signal collaborated with a professional media planning agent with substantial non-partisan experience in developing mass media campaigns directed at firearms owners. This media expert has been working on nonpartisan firearms-related campaigns with the *Department of Justice* and *Bureau of Alcohol, Tobacco, Firearms and Explosives* for approximately 10 years. This work includes the *Don't Lie for the Other Guy* anti-strawman purchasing program and *Project ChildSafe*. The firm has an exceptional understanding of the marketplace and

5

target audience. All forecasts provided were based on the methodologies and tools customarily relied upon in the radio advertising industry (*Nielsen Audio*).

17. **Status Hearing.** Signal was invited to present the additional media plan to the Court at the status hearing held on August 2, 2016. The goals were 1) to share the design and empirical results of pre-program testing among the test group; 2) to request the Court's approval to proceed to administer the social media campaign among the total universe of *Facebook* users in the United States who were identified pursuant to our hunter-sportsman audience model, overlaying individuals who self-identified as interested in topics relating to hunting and Remington Arms on social media (approximately 3.4 million potential class members); and 3) to share the design of the national radio plan and request approval to execute the plan. Of note, none of the complete plans proposed by Signal have actually been executed yet; only pre-program testing of social media among a small test group.

18. **Hilsee Letter.** On July 29, 2016, one full business day before the scheduled status hearing, Mr. Hilsee filed a 42-page letter with the Court. In his letter, he purported to find several "significant" problems that he charges were "not reported" to this Court with regard to the Due Process Notice Program administered by Angeion. Mr. Weisbrot has submitted a declaration in response to Mr. Hilsee's allegations and commentary. In summary, Mr. Weisbrot explains:

> *"However, Mr. Hilsee, whether by design or simply because he did not have all the proper information at his disposal, levels accusations that are objectively false, rife with misinformation, and derived from a foregone era of media consumption—the only era during which Mr. Hilsee ever actually professionally planned or implemented notice campaigns."*

6

19. In the course of sweeping negative criticism of most parties in this matter, as well as the class notice regime in general (which he claims he was instrumental in shaping), Mr. Hilsee provided some commentary regarding limited aspects of the pre-program testing work of Signal. While our efforts can be characterized as steps taken above and beyond the traditional Due Process Notice Plan for the purposes of increasing awareness of this settlement and encouraging trigger repairs, we welcome constructive feedback. We appreciate Mr. Hilsee's contributions over past decades to create guidelines that shape the practice of class notice as we know it today. That said, our group shares Mr. Hilsee's implication that the efficacy of class notice in the U.S. today can be greatly improved. We believe class notice practices today have fallen unaccountably far behind commercial media practices, are less effective to compete for attention, and may be ripe for substantial progress. This is precisely why we chose to bring our contemporary skills and experience to this practice area.

20. **Outdated Expertise**. One particular passage evinces that Mr. Hilsee lacks a current understanding and / or acceptance of digital mass media. Mr. Hilsee states:

> *"Every mass communications program can be objectively assessed using decades-old advertising industry methods and readily available audience data."*

That statement is peculiar: every mass communications program cannot logically be assessed using decades-old industry methods and data, because some types of mass media that are widely consumed today have not existed in their current form for decades.

7

21. One class action attorney explains:

> *"The advent of the Internet has fostered a revolution in class action notice. Notification through the Internet is virtually free, websites may be updated hourly, claim forms and questionnaires can be completed and returned online, and class members can visit the class action website as frequently they desire to stay current on events in the case."*
>
> Elizabeth J. Cabraser, *The Essentials of Democratic Mass Litigation*, 5 Colum. J.L. & Soc. Probs. 499, 507 (2012).

22. In summary, traditional media planning typically relies upon an assessment of demographic and psychographic factors *of a target audience* (for example, age and income distribution, geographic dispersion, product preference, media usage, etc.). By contrast, web-based media and data allow a much more granular approach to identify and reach *individuals* who have publically expressed an affinity for a particular activity or brand (e.g., hunting, Remington Arms). Thus, rather than assessing "every mass communications program…using decades-old advertising industry methods," Signal applies a state-of-the-art media-specific approach to reach potential class members—the same proven contemporary approach used by retailers globally to reach and inform customers.

23. We submitted our empirical findings and recommendations regarding pre-program testing of digital media prior to the deadline set by the Court, June 10, 2016. Mr. Hilsee chose to submit his letter only one full business day before the hearing, scheduled to be held on August, 2, 2016. That procedure was irregular, and lack of notice by the notice expert favored a dramatic entry in lieu of constructive collaboration and a meaningful opportunity for the parties to review and respond in

8

Court. That is, appreciating that Mr. Hilsee is not an attorney, Mr. Hilsee would seek to violate Due Process purportedly in order to safeguard Due Process.

24. **Objections in a Series of Cases.** Mr. Hilsee appears to have submitted objections in a series of unrelated class action settlements over the past year (regardless of whether the criticism is couched as an "amicus brief" or "declaration"). For example, Mr. Hilsee offered two similar objections over the last year, one filed in February, 2016, and one dated August 9, 2016 (of note, in the brief period since he submitted his letter in the immediate matter). Mr. Hilsee explains in nearly cut-and-paste language:

> *"I am being paid my standard hourly rates, which for analysis and testimony is $500 per hour. I no longer design or implement notice plans nor perform media management, and I do not seek to do so here."*
>
> Joseph, et al. v. Monster, Inc. and Best Buy Co., Inc., 2015-CH-13991 (Cir. Ct. Cook Co., Ill.), Declaration of Todd B. Hilsee on Proposed Settlement Notice Plan, p. 3-4, August 9, 2016.

> *"I am being paid my standard hourly rates, which for analysis and testimony is $500 per hour. I no longer design or implement notice plans nor perform media management, and do not seek to do so here should a notice plan be designed, submitted and approved."*
>
> Czuchaj, et al. v. Conair Corporation, 13-cv-1901 (S.D. Cal.), Declaration of Todd B. Hilsee on Plaintiffs' Motion for Approval of Notice of Class Certification and Proposed Notice Plan, p. 2, February 8, 2016, ECF No. 200-1.

9

25. **One-sided Commentary.** Mr. Hilsee's letter framed most, if not all, efforts to simply increase awareness and encourage a response to have triggers repaired in this matter in a negative light. His citations and supporting evidence appear to consistently omit complete information. His one-sided commentary evinces a bias against contemporary web-based media to reach and inform individuals, paradoxically citing web-based sources.

26. For example, Mr. Hilsee cites an irrelevant statistic: "*The latest 'click-through' rates for internet display ads is an average of 0.04%.*" Although he had available to him empirical results *for this actual case* (18,721 click-throughs among a reach of just over 300,000 persons), he chose to cite average statistics across web advertising as a whole (all unrelated markets, products, and services). These average statistics are irrelevant, because *Signal collected precise empirical data pursuant to pre-program testing in the actual immediate matter*:

    Impressions: 1,049,860

    Reach: 309,958

    Frequency: 3.03

    Clicks-to-Case-Website: 18,721

27. Mr. Hilsee's bias against digital advertising is further evinced where he delineates limitations of digital advertising, but neglects to note that many of those same limitations affect traditional advertising. For example, regarding internet banner advertisements, Mr. Hilsee dramatically opines on the limitations of the media:

10

> *"However, that term is defined as follows: 'A display is considered viewable when 50% of the ad's pixels are in view on the screen for a minimum of one second.' That is a weak standard to rely on for due process communication in any class action that will bind people by their inaction and silence— especially one where inaction may kill."*

28. However, Mr. Hilsee consistently omits similar, commonly known flaws inherent to the decades-old media alternatives he proposes. For example, with respect to direct individual notice by mail, Mr. Hilsee omits to note significant limitations highlighted in his recent past work:

   > *Once an address is accurate we should not simply assume that every notice— regardless of its design—will be opened and read. The 2003 USPS Household Diary Study shows that only 12.4% of respondents indicated that they usually read all such mail. Indeed other data on mail readership is disturbing. Studies show that 75% of all direct mail ends up in the trash unopened; and that four billion tons of junk mail is received every year of which 44% is unopened. Although the USPS Diary study does not study legal notices, it does show that even "official" mail is at risk of not being opened and read, as 51.8% of standard "Federal Government" mail is not even opened immediately. There is simply an enormous volume of unrequested mail that households are buried with, as 76.2 billion pieces of advertising are received by households each year.*
   >
   > See Todd B. Hilsee et al., *Hurricanes, Mobility, and Due Process: The "Desire-To-Inform" Requirement for Effective Class Action Notice is Highlighted by Katrina*, 80 Tul. L. Rev. 1771, 1794 (2006).

11

29. Nonetheless, Mr. Hilsee does not argue or imply that direct mail should be scrapped due to significant inherent limitations.  Similarly, with respect to traditional newsprint, only 41% of adults now claim to read a newspaper daily, down from 78% in 1970. On average, only about two-thirds of a newspaper's pages are opened.  See Helen Katz, THE MEDIA HANDBOOK, 80-84 (5th ed. 2014).  Again, Mr. Hilsee does not argue that we should forgo the use of newspapers, although only a fraction of class members read traditional newsprint and there is no precise and perfect measure of whether a reader actually views a particular page and ad.  In short, no media can meet Mr. Hilsee's alleged standards.

30. While Mr. Hilsee otherwise provided one-sided criticism, he vaguely supports Signal's use of pre-program testing in class notice practice.  Outside of class notice, pre-program testing is used in virtually all other mass media practices to maximize efficacy (to ensure reach is maximized for every dollar available).  Framing his assessment in the counter-negative—indicia of bias and a resistance to adopt widely-accepted best practices—Mr. Hilsee concedes that "Testing is not a bad idea."

31. **Robots.**  In order to attempt to devalue Internet advertising as a whole, Mr. Hilsee summarizes the "big story now," a conspiracy theory (in this case, citing the work of a blog from 2012):

> *"The big story now for Facebook advertisers is that robots are generating clicks not humans."*
>
> Eric Jackson, *Why Do Some Advertisers Believe That 90% Of Facebook Ad Clicks Are From Bots?*, Forbes (July 31, 2012), http://www.forbes.com/sites/ericjackson/2012/07/31/why-do-some-

12

advertisers-believe-that-90-of-facebook-ad-clicks-are-from-bots/#60695db237d9.

This does not warrant a response from Signal. Counsel for *Facebook* is in a much better position of interest to defend against Mr. Hilsee's sensational implication that the company is involved in unprecedented massive global fraud. Mr. Hilsee omitted to describe the measures by *Facebook* addressing authenticity, fraud prevention, and security. See for example, Huseyin Kerem Cevahir, *Breaking New Ground in the Fight Against Fake Likes*, Facebook Business News (April 17, 2015), https://www.facebook.com/business/news/fighting-fake-likes-update.

32. **iHeartRadio.** In addition to the AM/FM radio media plan, Signal proposes to digitally stream notice advertisements through *iHeartRadio*. *iHeartRadio* is the most widely used mobile app for streaming radio stations nationwide. Mr. Hilsee's one-sided assessment again describes only limitations of this media:

> "The I-Heart internet streaming radio [sic] *will not reach high percentages of Class members: Only 6.3% of rifle owners use internet radio based on GfK MRI data.*"

Of note, *iHeartRadio* is an add-on to a much broader national radio plan. As such, in context, the assertion that "6.3% of rifle owners use internet radio" actually supports the use of the additional media to further increase awareness of the opportunity to have triggers replaced.

33. **Evaluating Constructive Recommendations in Good Faith.** To the extent Mr. Hilsee offers constructive, actionable recommendations, Signal has carefully evaluated each in good faith.

13

34. **Television Advertising.** The parties first evaluated television advertising prior to the involvement of Signal and determined it is prohibitively expensive and impracticable in this matter. Nonetheless, Signal evaluated Mr. Hilsee's suggestion to consider a television advertising campaign.

35. Mr. Hilsee writes, "The fact is that 92.3% of rifle owners view television, the highest coverage of rifle owners of any media type. Social media, Facebook and internet radio audiences provide the least coverage of rifle owners." Mr. Hilsee omitted any reference therein to the national AM/FM radio campaign, although it is clearly a key component of the media plan proposed.

36. According to *The Nielsen Company*, television reaches roughly 86% of the U.S. population 18 and over each week. By comparison, *Nielsen* reports that radio reaches roughly 93% of U.S. population 18 and over each week:



14

See *Comparative Metrics Q4 2015*, The Nielsen Company, http://www.nielsen.com/content/dam/corporate/us/en/reports-downloads/2016-reports/comparable-metrics-report-q4-2015.pdf.

37. In addition to the various media executed by Angeion, Signal has proposed additional media efforts spanning radio, PC, smartphone, and tablet devices in the chart on the preceding page, in order to build awareness and increase response.

38. Further, while Mr. Hilsee argues that "92.3% of rifle owners view television," the simplified term "television" is used generally to encompass media that is actually highly fragmented. Today, "television" encompasses at least:

    - live network television (ABC, CBS, NBC, among others);
    - cable television (for example, Comcast), satellite television;
    - DVR-based video on demand (by which viewers skip roughly 60% of commercials) (see Helen Katz, THE MEDIA HANDBOOK, 66 (5th ed. 2014)); and
    - streaming video-on-demand (for example, Netflix, Hulu Plus, and Amazon Prime).

39. To say that "92.3% of rifle owners view television" may oversimplify and mislead as to reach, expense, and practicability of advertising across all fragmented media vehicles referred to colloquially as "television."

40. Ultimately, upon further evaluation and in collaboration with professional media buying agents, we concur with the parties' previous evaluation that television advertising is not suitable in this matter, particularly in light of the national radio campaign, among other media.

15

41. **Conclusion.** The experts of Signal appreciate this opportunity to leverage highly specialized expertise and proprietary data-driven media approaches (particularly regarding reaching the target audience through contemporary digital media and data analytics). Signal is pleased that our pre-program testing of social media demonstrates empirically that if our social media campaign is expanded to the full identifiable universe of hunter-sportsman using social media (approximately 3.4 million potential class members), we will increase awareness of the settlement, including the opportunity to have triggers replaced.

42. In sum, to build awareness, we have proposed the additional use of several synergistic media campaigns including:

    a. a **social networking media campaign** leveraging customized data and analytics;

    b. a **national radio media campaign,** including advertisements across the country's top syndicated radio networks and programs aligned with the demographics of potential class members; and

    c. a **direct mail, e-mail, and retailer poster campaign**, to be administered by the defendant.

43. Signal Interactive Media is honored to support the mediator and Court in this matter. Based on our consumer models and datasets, our experts and team are prepared to begin administering *Facebook* advertising immediately, as well as national radio advertising within three weeks, upon approval by the Court.

\s\ Matthew L. Garretson
Co-founder
Signal Interactive Media LLC
August 19, 2016