IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| IAN POLLARD, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 4:13-CV-00086-ODS |
| REMINGTON ARMS COMPANY, LLC, et al. | ) ) | |
| Defendants. | ) ) | |

ORDER AND OPINION (1) GRANTING PARTIES' JOINT MOTION FOR FINAL
SETTLEMENT APPROVAL, (2) CERTIFYING CLASSES FOR SETTLEMENT
PURPOSES, (3) APPROVING PLAINTIFFS' SUPPLEMENTAL FEE APPLICATION,
AND (4) DISMISSING MATTER WITH PREJUDICE

        Pending are the parties' Second Joint Motion for Final Settlement Approval (Doc. #179) and Plaintiffs' Supplemental Fee Application (Doc. #181). For the following reasons, the parties' Joint Motion for Final Settlement Approval is granted, and Plaintiffs' Supplemental Fee Application is approved.


## I.    BACKGROUND

        This matter began in January 2013 with the filing of a putative class action against Remington Arms Company, LLC, Sporting Goods Properties, Inc., and E.I. Du Pont Nemours and Company. Doc. #1.[1] The Complaint alleges certain rifles manufactured by Defendants since 1948 would fire unexpectedly without a trigger pull, and made claims of unfair and deceptive trade practices under Missouri statutes,

_____

[1] Similar putative class action suits were filed in Florida, Washington, and Montana. Doc. #84, at 5. *Chapman v. Remington Arms Co.*, Case No. 12-CV-24561 (S.D. Fla. Dec. 31, 2012); *Moodie v. Remington Arms Co.*, Case No. 13-CV-172 (W.D. Wash. Jan. 29, 2013); *Huleatt v. Remington Arms Co.*, Case No. 13-CV-113 (D. Mont. June 4, 2013). According to the parties, *Chapman* and *Huleatt* were voluntarily dismissed in 2013. Doc. #180, at 13. *Moodie* remains pending. *Id.* A fifth putative action was filed in the Western District of Missouri but was dismissed pursuant to Rule 41 of the Federal Rules of Civil Procedure. *Hembree v. Remington Arms Co.*, Case No. 13-CV-05161 (W.D. Mo. Dec. 17, 2013) (Doc. #4).

breach of express warranty, breach of implied warranty of merchantability, fraudulent concealment, and unjust enrichment in connection with the Walker Fire Control designed, manufactured, marketed, advertised, and sold by Defendants. *Id.*

Defendants moved to dismiss the Complaint. Doc. #40. The Court dismissed Counts II (strict liability), III (negligence), IV (violation of the Magnuson-Moss Warranty Act), V (breach of express warranty), and VI (breach of implied warranty of merchantability). The Court also found that to the extent Count I (violation of the Missouri Merchandising Practices Act) relied upon fraudulent misrepresentations or fraudulent concealment, it must be dismissed. Doc. #40, at 5-8.

The Complaint was later amended to include additional Plaintiffs and seek relief in connection with "all Model 700, 721, 722, 725, Seven, Sportsman 78, 600, 660, 673, XP-100, 710, 715 and 720 firearms manufactured by Defendants that contain trigger mechanisms utilizing a trigger connector, including the patented Walker Fire Control, and all Model 700 and Seven bolt-action rifles containing X-Mark Pro trigger mechanisms that are subject to an April 2014 voluntary recall by Defendants." Doc. #90, ¶ 1. Among other things, Plaintiffs asked that the Court require Defendants to repair or replace their firearms. *Id.*, Prayer for Relief. According to the parties, approximately 7,500,000 of these firearms have been sold in the United States. Doc. #180, at 17.

After engaging in extensive settlement negotiations, the parties finalized the material terms of a nationwide settlement in July 2014, and informed the Court they were in the process of executing a comprehensive settlement agreement for all class claims. Doc. #61; Doc. #220, at 18. In December 2014, the parties filed their settlement agreement and sought conditional certification of settlement classes, preliminary approval of class action settlement, approval of their proposed notice plan, appointment of class action settlement administrator, and appointment of class counsel. Docs. #67-68, 79-80. The proposed settlement provides benefits in the form of retrofitted triggers, vouchers, and/or reimbursements for replacing the firearm's original trigger mechanism to owners residing in the United States of certain Remington rifles manufactured from 1948 to the present. Doc. #68-1, at 15. In exchange, class members would release claims associated with the firearms, but retain the right to bring

claims for personal injury or property damage. Doc. #68-1, at 13, 27. The parties' proposed notice plan included (1) a joint press release; (2) direct notice; (3) short form notice; (4) long form notice; (5) notice through the settlement website; and (6) notice through social media and the internet. Doc. #80, at 17-18, 38-39; Doc. #80-1, at 20-24; Doc. #80-3; Doc. #80-4; Doc. #80-5.

In February 2015, the Court held a hearing on the parties' joint motion. Doc. #84. The Court granted the parties' joint motion and preliminarily approved the settlement, conditionally certified the settlement classes, approved the notice plan, appointed the class action settlement administrator, and appointed class counsel. Doc. #88. The Court directed all requests for exclusion from the settlement and objections to the settlement be received by October 5, 2015. *Id.* at 6-8. The Court scheduled a final approval hearing for December 14, 2015. *Id.* at 7.

In May 2015, the parties executed the Court-approved notice plan. Postcard notices were sent to approximately 2,500 individuals who paid Remington for trigger replacements. Doc. #92-9, at 6; Doc. #180-10, at 3. A notice about the settlement was published in several magazines with a combined circulation of more than 36 million. Doc. #92-9, at 5-6.[2] Poster-sized notices were mailed to nearly 700 vendors known to have mailed in Remington firearms on behalf of customers seeking trigger replacements. *Id.* at 7. The joint press release appeared on at least 225 websites, and reached a potential audience of more than twenty-one million people. *Id.* at 8. Internet banners, purportedly garnering more than 970,000 impressions,[3] were utilized, and some Facebook advertising was implemented. *Id.* at 6-7. As a result, 2,327 claims were submitted. *Id.* at 9.

In September 2015, the parties filed their joint motion for final settlement approval, accompanied by, among other things, the Second Amended Settlement Agreement,[4] claims forms, and declarations. Doc. #91. Plaintiffs also filed their

---

[2] These publications reached 57% of rifle owners. Doc. #139-1, at 8.

[3] "Impressions" are the number of times a post or advertisement is displayed, regardless of whether a person clicks on the post or advertisement. Doc. #139-2, at 6; Doc. #142, at 30-31.

[4] The benefits outlined in the initial settlement agreement remained unchanged in the amended settlement agreement. Doc. #68-1; Doc. #92-1.

application for attorneys' fees. Doc. #93. Objections to the settlement were timely filed by Terry Pennington, Jack Belk, and Rodney Townsend. Docs. #96-98.

On December 8, 2015, the Court issued an order cancelling the final approval hearing, deferring consideration of the parties' joint motion for settlement approval and Plaintiffs' application for attorneys' fees, and directing the parties to provide supplemental briefing. Doc. #112. The Court's principal concern was "the low number of claim forms that have been completed," noting the claims rate was "quite low" given several million firearms were potentially involved in the class action settlement. *Id.* at 1. The Court ordered the parties to develop a notice plan that "will be effective and result in a more significant response rate." *Id.* The Court also directed the parties to address additional concerns, including, most significantly, the settlement agreement potentially waiving personal injury claims. *Id.* at 2. The parties were directed to file their supplemental briefing by January 15, 2016. *Id.* The Court later granted the parties three extensions of time. Docs. #115, 124, 126.[5]

On June 10, 2016, the parties filed their supplemental brief in response to the Court's December 8, 2015 Order. Doc. #127. The supplemental briefing was accompanied by, among other things, the parties' amended notice plan and the Third Amended Settlement Agreement.[6] Docs. #127-1 – 127-6.[7] The Court scheduled a hearing on August 2, 2016, which the Court deemed a second preliminary approval hearing. Doc. #128. Prior to the hearing on August 2, 2016, Objectors Townsend and Pennington filed withdrawals of their objections. Docs. #131, 132.[8] Additionally, Todd Hilsee, who represented himself as a "class action notice expert," submitted a letter expressing concerns with the proposed settlement, particularly the proposed supplemental notice plan. Doc. #134.

---

[5] After the Court issued its December 8, 2015 Order, the parties engaged a mediator to assist them in developing a supplemental notice plan. Doc. #142, at 5-15.
[6] The benefits inured to class members did not change in the amended settlement agreement. Doc. #58-1; Doc. #92-1; Doc. #127-1.
[7] A complete copy of the Third Amended Settlement Agreement was filed on August 1, 2016. Doc. #135.
[8] The parties jointly moved to approve the withdrawal of these objections. Doc. #137. The Court granted the parties' motion on August 23, 2016. Doc. #141.

The hearing was held on August 2, 2016.  Docs. #136, 142.  As of the date of the hearing, more than 6,500 claims were submitted.  Doc. #142, at 40-41.  During the hearing, the parties presented their proposed supplemental notice plan and addressed the other concerns set forth in the Court's December 8, 2015 Order.  Doc. #142.  During the hearing, the Court also asked the parties to review the suggestions contained in Hilsee's letter and consider potential modifications to the proposed supplemental notice plan.  Doc. #142, at 51-54.  After the hearing, the parties filed the Fourth Amended Settlement Agreement.  Doc. #138; *see also* Doc. #180-1.  The paragraphs that drew concerns from the Court about potential waiver of personal injury were removed.  *Id.*

On August 23, 2016, the Court preliminarily approved the settlement again.  Doc. #140.  The Court also approved the parties' supplemental notice plan, which consisted of a targeted social media campaign, targeted national radio campaign, email and mail notification, and poster notification.  *Id.* at 2-3.  The Court accepted the parties' new claim forms, which removed language from the initial claim forms indicating the claimant read and acknowledged warnings.  *Id.* at 3.  The Court directed the parties to place the claims forms in a particular order, and instructed the parties to resend direct mail to the settlement class members who previously received direct mail.  *Id.* at 3-4.  The Court set November 18, 2016, as the deadline to submit all exclusions from and objections to the class action settlement, and scheduled a final approval hearing for February 14, 2017.  *Id.* at 4.

Eleven class members timely opted out of the settlement classes.  Doc. #210, at 6.  The Court received timely objections to the settlement from Jack Belk, Richard Barber, Lewis Frost, and Richard Denney.  Docs. #150, 157, 161.  The Court also received communications from Roger Stringer, David Wight, Paul Vigano, and Kelly Edwards, as well as additional communications from Barber expressing concerns about the settlement.  Doc. #147-49, 154, 160, 163-65, 167-71, 182, 192, 199, 214.[9]

In September and October 2016, the parties executed the Court-approved supplemental notice plan, which is discussed in detail *infra*.  As of January 13, 2017,

---

[9] The names of some objectors are intentionally omitted in the discussion that follows. Those omissions are intentional because their arguments are duplicative of those who are mentioned.

19,425 claims were received. Doc. #180, at 27; Doc. #180-13, at 4. Of the 19,425 claims, 2,666 firearms purportedly experienced an accidental discharge. Doc. #180-13, at 4. Of the 2,666 claims with alleged accidental discharge, 788 individuals claimed personal injury or property damage. *Id*.

On January 17, 2017, a motion for leave to file the brief of *Amici Curiae* Attorneys General ("*amici curiae*") in opposition to the proposed class action settlement was filed. Doc. #176. The motion was submitted by the Attorney General for the Commonwealth of Massachusetts, and on behalf of the Attorneys General of the District of Columbia and the States of Hawaii, Maine, Maryland, New York, Oregon, Pennsylvania, Rhode Island, and Washington. *Id*. After expediting briefing on the motion for leave, the Court granted the motion, and the *amici* brief was filed. Docs. #177, 190-191, 193, 194, 196. The parties were permitted to file responses to the *amici* brief, and *amici curiae* filed a reply. Docs. #201, 203, 208.

Also on January 17, 2017, the parties filed their Second Joint Motion for Final Settlement Approval, and Plaintiffs submitted their Supplemental Fee Application. Docs. #179, 181. The final approval hearing was held on February 14, 2017. Docs. #215, 220. During the hearing, the parties presented arguments in favor of approving the settlement agreement. Doc. #220, at 7-52, 93-114. At the time of the hearing, 22,000 claims had been submitted. *Id*. at 23. Objectors Denney and Frost, through their attorneys, and Objector Belk, appearing on behalf of himself, argued against approval of the settlement. *Id*. at 53-59, 66-92. On behalf of *amici curiae*, Gary Klein from the Massachusetts Attorney General's Office presented arguments against approval of the settlement. *Id*. at 59-66. The Court must now decide whether to approve the settlement.

## II.  DISCUSSION

In Section A, the Court will address class certification, including the requirements of Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure. In Section B, the Court will determine whether the proposed settlement should be approved. Therein, the Court will address objections raised to the settlement, followed by its analysis of whether the settlement is fair, adequate, and reasonable. Finally, in Sections C and D,

6

the Court will consider Plaintiffs' request for service awards to class representatives and Plaintiffs' Application for Fees and Costs.

## A. <u>Class Certification</u>

To grant final certification of this litigation as a class action, the Court must find the putative class action meets the four requirements found in Rule 23(a) of the Federal Rules of Civil Procedure and fits within one of the categories of Rule 23(b) of the Federal Rules of Civil Procedure. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997).

### (1) Rule 23(a) Requirements

Rule 23(a) of the Federal Rules of Civil Procedure sets forth four prerequisites all class actions must satisfy:

(1)  the class is so numerous that joinder of all members is impracticable;
(2)  there are questions of law or fact common to the class;
(3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4)  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also Amchem*, 521 U.S. at 613.

### a. Numerosity

To satisfy the numerosity requirement, Plaintiffs must show the class of plaintiffs is so large that joinder of all members would be impracticable. Fed. R. Civ. P. 23(a)(1). The parties represent to the Court, and no one has disputed, that approximately 7,500,000 of the firearms at issue have been sold in the United States. Doc. #180, at 17. Although number of class members is uncertain – because a class member could own more than one firearm or a firearm could have been destroyed or owned by someone outside the United States – it is apparent there are millions of potential class members. Accordingly, the Court concludes this requirement has been satisfied.

### b. Commonality

Commonality is satisfied when a "legal question linking the class members is substantially related to the resolution of the litigation." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995). "Commonality is not required on every question raised in a class action." *Id.*; *see also Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982) (noting factual variations do not necessarily deny class treatment when the claims have a common thread).

This lawsuit contains questions of law that link the class members and are substantially related to the resolution of this matter. Each class member shares a claim that his/her firearm, which was manufactured by Defendants, is defective, and his/her firearm's value and utility is decreased due to the alleged defectiveness of the firearms. The class members seek economic damages and equitable relief for buying a firearm that is allegedly worth less than its purchase price due to the alleged defect with the trigger mechanism. The class members will not need to present evidence that varies from member to member; the same evidence will suffice for each individual to make a prima facie showing. Thus, the Court finds this requirement has been satisfied.

### c. Typicality

The typicality requirement is "fairly easily met so long as the other class members have claims similar to the named plaintiff." *DeBoer*, 64 F.3d at 1174. The named plaintiffs' claims are typical to the class members' claims because they all maintain Defendants manufactured defective firearms, and as a result, they are entitled to an economic recovery. The Court finds this requirement has been satisfied.

### d. Adequacy of Representation

Rule 23(a)(4) requires "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement focuses on "whether (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Paxton*, 688 F.2d at 562-63 (citation omitted). This adequacy inquiry also serves to uncover any conflicts of interest between

the named parties and the classes they seek to represent. *Amchem*, 521 U.S. at 625 (citation omitted).

The class representatives stand in the same factual and legal shoes of the absent settlement class members. They assert the same claims and suffered the same injury as the absent settlement class members. *Id.* at 625-26 (stating a class representative must "possess the same interest and suffer the same injury" as the absent class members) (citation omitted). There are no apparent conflicts of interests between the class representatives and settlement class members or among individual settlement class members. There is no indication any of the class representatives were antagonistic to the other members of the classes or did not vigorously pursue the claims. Therefore, the Court finds the class representatives adequately represent the settlement subclasses. The Court approves and appoints class representatives as set forth in Appendix A.

Additionally, the Court finds class counsel to be experienced, competent, and qualified to prosecute this matter. The Court also finds class counsel has fairly and adequately represented and protected the interests of the settlement class members.[10] The Court appoints Richard Arsenault, Charles Schaffer, Eric Holland, and W. Mark Lanier as class counsel for the settlement classes. The Court concludes the requirements of Rule 23(a)(4) have been met.

### (2) Rule 23(b) Requirement

In addition to satisfying the Rule 23(a) prerequisites, Plaintiffs must demonstrate their claims qualify under one of the three subparts of Rule 23(b) of the Federal Rules of Civil Procedure. The parties contend they have met the requirements of Rule 23(b)(3).

---

[10] The only objection to class counsel was filed by Objector Barber. Barber contends class counsel did not adequately represent the best interests of the class by, among other things, joining with Defendants in seeking a protective order, and in so doing, hiding documents from the public. Doc. #157, at 3-4. The parties' joint motion for protective order referenced by Barber was denied by the Court in December 2014. Doc. #66. The Court finds class counsel's joinder in the motion does not call into question class counsel's experience, competence, or qualification to prosecute this matter, and overrules Barber's objection. Barber's other objections are addressed *infra*, section II(B)(1).

9

Doc. #180, at 51. This subpart is satisfied if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

### a. Predominance of Common Issues of Law and Fact

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623; *see also Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005).[11] "[T]he court must look only so far as to determine whether, given the factual setting of the case, if the plaintiffs['] general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Blades*, 400 F.3d. at 566.

In this matter, common questions predominate over any issues individuals within the settlement classes may have. First, class members' claims relate to the design, manufacture, marketing, and sale of allegedly defective firearms. Second, class members seek the same relief – economic damages and equitable relief for buying a firearm that is alleged to be worth less than its purchase price due to the alleged defect with the trigger mechanism. Third, the question of whether the firearms are indeed defective and the evidence to establish said defect would be the same for each class member. If each class member were to bring an individual claim, each class member would have to demonstrate the same defect to prove liability. The nature and scope of the common questions in this matter satisfy the predominance requirements. The Court finds that common issues of fact and law predominate here.

### b. Superiority of Class Action

A class action settlement is the superior method for resolving the disputes in this matter in a fair and effective manner. First, the settlement provides concrete, substantial remedies to individuals, many of whom, due to applicable statutes of

---

[11] *Amici curiae* raised objections to the settlement because variations in state law may defeat prominence. The Court addresses that objection, along with the other objections, in section II(B)(1).

limitations, may not otherwise be entitled to any relief.  Second, the settlement of the class members' claims avoids duplicative litigation, saving Plaintiffs and Defendants from expending resources to adjudicate common legal and factual issues.  Because individuals were permitted to opt-out of this settlement, those individuals who timely filed exclusions and desire to prosecute their claims on their own may do so.  Accordingly, the Court concludes the requirements of Rule 23(b)(3) have been satisfied.

Pursuant to the Court's finding that the settlement classes satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure, the settlement classes are approved and finally certified for settlement purposes.  The settlement classes are defined in Appendix A.  The Court finds the following class members submitted valid requests for exclusion from the settlement:  Vincent Agnelli Jr., Leon Baily, Mike Blair, Carol Bonham, Leonard Bonham, David Harris Jr., John Hoober, Ronson Ibarra, Brad Sisneros, Timothy Tomlinson, and David Wight.  Doc. #210, at 6.  These individuals' rights are not affected by the settlement, and they shall not receive any benefits from the settlement.

## B.  Approval of Settlement

To approve this class action settlement, the Court must find the settlement is fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e)(2); *see In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013).  Before turning to this particular analysis, the Court will address objections to the settlement.

### (1) Objections to Settlement[12]

Objections to the settlement concern the following issues:  (a) adequacy of notice; (b) fairness to class members; (c) adequacy of relief; (d) claims process and claims period; (e) release; and (f) differences among state laws.[13]

---

[12] Although not timely filed as an objection, the Court considers the *amici* brief when addressing objections to the settlement.  Doc. #196.

[13] The Court addresses the most significant objections to the settlement.  In filings and during the hearing, objectors made statements that may be construed as objections.  To the extent those statements are not addressed herein, the Court finds those statements are inconsequential to the Court's analysis and are overruled.

### a. Adequacy of Notice

Most objections to the settlement question the adequacy of notice to class members. *See* Docs. #150, 161, 196. Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure requires class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). "Notice of a settlement proposal need only be as directed by the district court…and reasonable enough to satisfy due process." *DeBoer*, 64 F.3d at 1176 (citations omitted). The notice must also "clearly and concisely state in plain, easily understood language" the following: (i) nature of the action; (ii) definition of the class certified; (iii) the class claims; (iv) a class member may enter an appearance through an attorney if so desired; (v) the court will exclude from the class those members who request exclusion; (vi) time and manner for requesting exclusion; and (vii) binding effect of a class judgment on members. Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii).

### 1. Supplemental Notice Plan

After the parties' initial notice plan resulted in an appalling claims rate, the Court required the parties to propose a supplemental notice plan. Doc. #112. Over the course of six months, the parties negotiated, tested, and ultimately proposed their supplemental notice plan. Doc. #127. The Court approved the proposed supplemental notice plan (Doc. #140), and it was administered in September and October 2016.[14] The supplemental notice plan utilized four avenues to reach class members.

First, the parties ran a targeted social media campaign, which consisted of advertisements on Facebook. The targeted social media campaign, when fully executed, ran for four weeks, reached more than four million individuals, and the advertisements were clicked more than 375,000 times. Doc. #180, at 33.

---

[14] Prior to seeking approval of their supplemental notice plan, the parties, through a third-party, pretested the social media campaign and adjusted the campaign – including the language used in the campaign – over the course of six weeks. Doc. #139-2, at 4-5; Doc. #142, at 32-38; Doc. #180, at 32; Doc. #220, at 11-13, 104-105. Six advertisements, with different messages, were pre-tested to more than 150,000 likely settlement class members. Doc. #180, at 32; Doc. #220, at 104-106.

Second, the parties implemented a national radio campaign. Sixty second advertisements ran over the course of four weeks during peak morning and evening drive times, and targeted key states/regions, key demographics of potential class members, hunting and fishing programs, and programs with a strong sportsmen audience. Doc. #180, at 33. Additionally, the advertisements were streamed on iHeartRadio, a digital streaming service. *Id.* More than 29,000 radio spots ran on more than 3,500 radio stations, covering 98% of the United States market and generating more than 55,000,000 gross impressions. *Id.*; Doc. #178, at 5.

Third, Remington compiled physical mailing addresses and email addresses from various sources, including customers who signed up for email notifications on the company's website, individuals who signed up for email notifications at trade shows, warranty registrations for all firearms, individuals who had firearms repaired by Remington, and individuals who contacted Remington's customer service number. Doc. #180, at 34; Doc. #180-10, at 3-4. The compilation was over-inclusive in that it included, for example, physical and email addresses for individuals who registered warranties for other firearms or had repairs performed on other firearms. Doc. #142, at 21-22; Doc. #180, at 34; Doc. #180-10, at 3-4. Ultimately, notices about the proposed settlement were sent to more than one million email addresses, and postcards were mailed to more than 93,000 physical addresses. If an email bounced back, a postcard was mailed to the individual if a physical address could be located. Doc. #180, at 34; Doc. #180-10, at 5. If a postcard was returned, a new postcard was mailed if a new mailing address could be located. Doc. #180, at 34; Doc. #180-10, at 5.

Finally, Remington disseminated an informational poster in PDF format. Doc. #180, at 34. The poster was emailed to Remington's twelve wholesale accounts and seven retail accounts, and those accounts were instructed to send the posters to 5,000 independent retailers and 6,000 retail stores for display. *Id.* at 34-36.

As a result of this four-pronged supplemental notice campaign, the claims rate increased to 19,425 claims (as of January 13, 2017) and 22,000 (as of February 13, 2017). Doc. #180, at 35; Doc. #220, at 23. The settlement website has been visited more than 500,000 times. Doc. #220, at 23.

The notices both in the initial notice plan and the supplemental notice plan clearly and concisely stated in easily understood language what the nature of this action was, what the claims were, the definitions of the classes conditionally certified, and the binding effect of a judgment.  The notices set forth the deadlines for exclusions and objections, and the manner in which those exclusions and objections must be submitted.  No objections to these particular requirements were lodged.  Accordingly, the Court finds that Rules 23(c)(2)(B)(i) through (vi) have been satisfied.[15]

## 2.  Best Notice Practicable

The more complicated question, which is raised by Objectors, is whether, under Rule 23(c)(2)(B), the notice provided was best notice "practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  The objections to the notice can be broken down into the following categories:  (a) identification of class members; (b) method of notice; (c) reach of and response to notice; and (d) content of notice.

### (a) Identification of Class Members

Objectors Frost and Denney, who adopted the opinions contained in the letter previously submitted by Hilsee, argue the parties did not use reasonable efforts to identify class members who are easily identifiable.  Doc. #150, at 16, 20-21, 26-27.  However, Remington, unlike other manufacturers, does not sell to the public or directly to individuals.  Doc. #220, at 34.  Remington does not possess a customer list with contact information.  Remington's communications with firearm owners are limited to those individuals who submit warranty cards, those who have a firearm repaired by Remington or an authorized Remington repair facility, those who sign up to receive email notifications from Remington, and those who have communicated with Remington's customer service line.  Doc. #180, at 34; Doc. #180-10, at 3-4.  Other than firearms indicated on warranty cards or on repair documents, Remington does not know

---

[15] Notice of the settlement was also provided to government officials as required by 28 U.S.C. § 1715 ("CAFA notice").  Doc. #180, at 31; Doc. #180-1, at 74-75.  No government official objected that this notice was not compliant.  The Court concludes the parties complied with the CAFA notice requirements.

14

what firearm is owned by the individual.  Consequently, Remington does not possess a compilation of names and contact information for owners of Remington firearms.[16] Much of the information Remington has is warranty registration (some decades old), which could be outdated given that individuals move and change email addresses. Remington obtains email addresses from individuals who contact it through its website, at trade shows, for repairs, or through its customer service department.  Remington routinely communicates with these individuals via email.  Doc. #220, at 35.

Objectors argue the parties should have obtained the National Rifle Association's ("NRA") mailing list or should have partnered with the NRA to send notice of the settlement to NRA members.  Doc. #150, at 27.  The parties attempted to obtain the NRA's mailing list or membership list, but the NRA would not provide the addresses to Remington because Remington is not an NRA Affinity Partner.  Doc. #220, at 103. Additionally, it is doubtful a membership or mailing list from the NRA would identify what firearms the recipients possessed.  Thus, obtaining such a list would not allow the parties to identify potential class members.[17]

Objectors Frost and Denney, as well as *amici curiae*, also maintain the parties should have obtained state hunting license records.  Doc. #150, at 27; Doc. #196, at 25; Doc. #220, at 72-73.  But Objectors do not set forth if these records are attainable, the mechanisms the parties must utilize to obtain the records, the costs associated with obtaining these records, and whether the parties would be required to file suit in every state to attain these records.  Objectors' argument also calls into question whether an individual could prevent the dissemination of his or her license information.  And even if the parties could obtain these records, in all likelihood, the records would not identify the firearm utilized by the licensee, which is the key to identifying class members.  The Court finds, under the circumstances of this case, it would be unreasonable to require the parties to obtain state hunting license registries to identify class members.

---

[16] The sole exception being information Remington has related to 2,571 individuals who paid Remington to retrofit their Model 700 or Seven with an XMP and are entitled to a refund.  Doc. #178-1, at 3.  These individuals received direct notice under the initial notice plan.  *Id.*

[17] Notice of the settlement was published in *American Rifleman*, an NRA publication with a circulation of more than two million, on June 15, 2015.  Doc. #92-9, at 5-6.

Objectors Frost and Denney – and to a lesser extent, *amici curiae* – contend the parties should have obtained Form 4473s, a Department of Justice form executed by the buyer and seller of a firearm and maintained by the seller. Doc. #150, at 26-27; Doc. #196, at 25. Again, Objectors do not indicate if these records are attainable, the mechanisms the parties must utilize to obtain the records, and the costs associated with obtaining these records. Objectors also do not address whether the sellers or the individuals who purchased the firearms could prevent a private company from obtaining these records, and if so, whether Remington would have to file suit against each retailer (up to 11,000) to obtain these records. The parties state these forms are not subject to subpoena or discovery but fail to provide legal authority for that proposition. Doc. #139-1, at 16-17. Assuming these forms could be obtained, the Court finds it would be unreasonable to require the parties to obtain these forms from private retailers to identify class members under the circumstances of this case.

The Court finds the parties have made reasonable efforts to identify potential class members. Class members consist of <u>owners</u> of the firearms, who are not necessarily the individuals who purchased the firearms. Firearms are gifted, handed down among family members, and purchased through avenues other than retailers. It would be impractical, if not impossible, to determine the identities of owners of firearms that were not purchased at a retailer. There is no national firearms registry.

In an effort to reach potential class members, Remington has communicated directly with more than one million individuals who have, in the ways described above, made contact with Remington. And the parties have communicated indirectly with millions of potential class members via publication, social media, internet, and posters. Other courts have found it unreasonable for the parties to obtain third-party records that do not specifically identify class members to compile a list of potential class members' names and contact information. *See*, *e.g.*, *Carter v. Forjas Taurus, S.A.*, Case No. 13-CV-24583, 2016 WL 3982489, at *5-6 (S.D. Fla. July 22, 2016)[18]; *In re Domestic Air*

---

[18] In *Carter*, which involved allegedly defective firearms that unintentionally discharged when dropped or when the safety was on, the district court found the best notice practicable was implemented through social media, publication, banner ads, and news releases because owners of the firearms could not be determined with reasonable efforts. *Carter*, 2016 WL 3982489, at *5-7. The district court concluded the parties

16

*Transp. Antitrust Litig.* 141 F.R.D. 534, 539-47 (N.D. Ga. 1992). The Court finds the parties engaged in reasonable efforts to identify potential class members, and so doing, met the requirements of Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure.

### (b) Method of Notice

In addition to objecting to reasonableness of the parties' efforts to identify class members, Objectors argue the notice was not the best notice practicable because the parties failed to utilize direct notice via United States mail to the fullest extent and relied too heavily on other methods of notice. Doc. #150, at 16; Doc. #220, at 90, 92.

The United States Supreme Court has stated notice must "apprise the interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950); *see also Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 120 (8th Cir. 1975) (citation omitted). Notice shall be given "in such manner as the court directs." *Grunin*, 513 F.2d at 121. "[T]he mechanics of the notice process are left to the discretion of the court subject only to the broad 'reasonableness' standards imposed by due process." *Id.* (citing 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1797 (3d ed. 1972)). When the names and addresses of class members are not readily available from existing records, individual notice is required only where identification is possible through reasonable efforts. Fed. R. Civ. P. 23(c)(2)(B); *see also In re Domestic Air Transp.*, 141 F.R.D. at 539-47.

Here, direct mail was sent to more than 93,000 individuals, and more than one million potential class members were notified via email. Several courts have approved the use of email to directly notify potential class members of a class action settlement. *See Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 289 (6th Cir. 2016); *Tennille v. W. Union Co.*, 785 F.3d 422, 440 (10th Cir. 2015); *Khoday v. Symantec Corp.*, Case No. 11-CV-180, 2016 WL 1637039, at *4-5 (D. Minn. Apr. 5, 2016) (report and recommendation of magistrate judge), *adopted by*, 2016 WL 1626836 (D. Minn.

---

were not required to utilize product enrollment forms, NRA membership promotions, or repair-customers' email addresses to identify class members because the time and effort put forth by the parties would be "grossly out of proportion to the negligible few Class Members located." *Id.* at *6.

Apr. 22, 2016); *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 331 (C.D. Cal. 2016); *Noll v. eBay, Inc.*, 309 F.R.D. 593, 604-05 (N.D. Cal. 2015); *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 585-86 (N.D. Cal. 2015).  Given that Remington routinely communicates with individuals via email and has an active email list, the Court finds email notification and United States mail when an email address was not available was reasonable.

Further, when class members' names and addresses cannot be determined with reasonable efforts, courts have found publication of the settlement notice is adequate and appropriate.  *See Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 677 (7th Cir. 2013); *Juris v. Inamed Corp.*, 685 F.3d 1294, 1321 (11th Cir. 2012) (citations omitted); *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 168 (2d Cir. 1987).  Because most of the class members could not be determined with reasonable efforts, the Court approved the parties' plan to publish the class action settlement notice in several targeted magazines with a combined circulation of thirty-six million.  Doc. #92-9, at 5-6.  Notice by publication was an additional reasonable component of the notice plan.

Objectors Frost and Denney also maintain the parties improperly depended on banner advertisements to notify potential class members.  Doc. #150, at 29-30.  Nearly eighty-five percent of rifle owners have access to the internet at home, and the vast majority of those individuals (84.2%) have used the internet in the last thirty days.  Doc. #139-1, at 11.  Given this statistic, notice via the internet in the form of banner advertisements (combined with all the other methods of notifying potential class members) was another reasonable component of the notice plan.

Although the objectors do not raise concerns about the use of social media for providing notice in this matter, the Court would be remiss if it did not address this form of notification.  One of the lynchpins of the supplemental notice utilized by the parties was their targeted social media campaign.  Through this method of notice, the notice reached more than four million individuals, and the advertisements were clicked more than 375,000 times.  Doc. #180, at 33.  Given the popularity of social media in the United States, the use of targeted social media to notify class members was yet another

reasonable component of the notice plan, especially when combined with all other forms and methods of notice utilized in this matter.

Finally, the use of approximately 11,000 posters at retailers was also appropriate. To the extent potential class members use their firearm(s), they will need to purchase ammunition, which is sold at the retailers to which the posters were sent. This additional form of notice was reasonable.

In sum, the components of the notice plan were each reasonable methods of communicating with potential class members. The various components combined represent the best notice practicable as required by Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure.

### (c) Reach of and Response to Notice
#### <u>Reach of Notice</u>

Objectors Frost and Denney opine, through Hilsee, the supplemental notice plan reached, at best, 49% of class members, and they argue the reach is not sufficient for the Court to approve the settlement. Doc. #150, at 29. The parties claim the notice reached 73.7% of the class members, noting Facebook advertisements, press releases, direct mail campaign, and the settlement website are not capable of precise reach calculations. Doc. #92-9, at 4; Doc. #180-4, at 4, 9. It is unclear how one can ascertain the reach of the notice when it is unknown how many of the firearms are still in circulation. Doc. #220, at 17. Most of these firearms were manufactured decades ago, and some were manufactured 70 years ago. The precise number of class members is unknown. Assuming all firearms are still in circulation, all owners of the firearms at issue are in the United States, and no one owns more than one firearm at issue, there are more than seven million class members. But, this scenario is improbable.

Nonetheless, Rule 23(c)(2)(B), which requires the best notice practicable under the circumstances, does not discuss the reach of the notice or any reach requirement that must be met. Here, through the initial and supplemental notice plans, millions of individuals were informed about the proposed settlement. More than one million individuals received emails from Remington, nearly 100,000 individuals received a notice via United States mail, more than thirty-six million magazines published the

19

notice, more than 225 websites displayed the press release, nearly one million internet banners were displayed, posters were sent to approximately 11,000 stores to be displayed, nearly thirty thousand radio spots reached fifty-five million individuals, and the targeted social media campaign on Facebook reached[19] four million individuals and resulted in 375,000 individuals clicking on the advertisements. Doc. #92, at 6-9; Doc. #180, at 33-36. The notice plans were far-reaching and utilized several types of mediums to communicate with potential class members.

When comparing the notice effectuated in this matter to the notice disseminated in *Carter*, the reach of this matter's notice plans was more significant. In *Carter*, the court-approved notice plan included publication in magazines, a press release, internet advertising, settlement website, and a toll-free number. *Carter*, 2016 WL 3982489, at *5-6. All of these components and more were included in the supplemental notice plan executed in this matter. The district court approved the settlement in *Carter*. *Id*. at *9-13.[20] Notably, although utilized in this matter, *Carter* did not use direct notice by mail and email, radio advertisements, or a targeted Facebook campaign to notify class members.

In another class action settlement involving allegedly defective firearms, *Garza v. Sporting Goods Properties, Inc.*,[21] the court-approved notice plan consisted of publication in magazines, direct mail to more than 250,000 individuals, and posters displayed in approximately 1,300 gun clubs. Case No. 93-CA-108, 1996 WL 56247 (W.D. Tex. Feb. 6, 1996); Doc. #220, at 30-33. All of these methods were used by the parties in this matter. The district court approved the settlement in *Garza*. *Id*. at *11-26. Although radio, banner advertisements, and a targeted social media campaign were used in this matter to notify potential class members of the proposed settlement, those avenues were not utilized in *Garza*. Doc. #220, at 30-33.

---

[19] "Reach" is defined by the number of individuals who have seen a post or advertisement. Doc. #142, at 30.
[20] *Carter* was appealed to the Eleventh Circuit Court of Appeals and remains pending. *See Scheffler v. Forjas Taurus, S.A.*, Case No. 16-15277.
[21] The three defendants in this matter are also defendants in *Garza*.

Given the methods and avenues of notice utilized in this matter, combined with the potential class members reached by the various forms of notice, the Court finds, in the circumstances of this case, the notice provided was the best practicable notice.

**<u>Response to Notice</u>**

Objectors, including Frost, Denney, and *amici curiae*, also raise concerns with the claims rate. The Court was dissatisfied with the claims rate after the initial notice plan was executed. As the guardian of class members' due process rights, the Court was uncertain whether the low claims rate suggested a deficiency in the initial notice plan. The Court denied the parties' initial motion for final approval and directed the parties to propose and implement a supplemental notice plan. As a result of the supplemental notice plan, the claims rate increased significantly. Although the Court is pleased the claims rate increased after the supplemental notice plan was executed, the Court remains disappointed by the claims rate.

Be that as it may, the Court is required to consider the legal requirements for notice and determine whether those requirements have been met. Here, more than 22,000 claims were filed as of February 14, 2017. Assuming all 7,500,000 firearms are still in circulation, which is highly improbable, the claims rate is 0.29%. Although individuals have been permitted to submit claims for approximately twenty months, the claims period will not begin to run until this Order becomes final. Then, the claims period will run for eighteen months. Thus, the claims rate will increase over the next eighteen months.

While not required by Rule 23, the Court is concerned as to why more claims have not been submitted. There are several possible explanations offered by the mediator, parties, and objectors: the class members did not receive notice of the proposed settlement, the class members are satisfied with their firearms and do not want the firearms to be retrofitted, the class members have not experienced issues with their triggers as alleged by Plaintiffs and see no reason to submit a claim,[22] the class

---

[22] By way of example, one of the mediators involved in this matter informed the Court that he owned one of the firearms at issue, and because he is satisfied with his firearm and never experienced any issues with the firearm, he will not submit a claim or send the rifle to Remington. Doc. #220, at 10-11.

members do not want to send their firearms off for an unknown period of time, the class is unique and does not trust the government or attorneys, and the class members do not want to submit claims because they believe the claims process is equivalent to a firearms registry.

Objector Belk stated the following: "It is unfair to expect millions of customers that are generally pleased with their purchase to accept the word of lawyers so inept and gun-ignorant…in an effort to collect details about firearms ownership for which they have no need or right." Doc. #161, at 7-8. He further stated "[s]hooters, as a group, generally distrust politicians, reporters, and lawyers. Those three groups of people are usually the ones that are trying to somehow take away from that group of people something that they very dearly hold true and trust that they're endowed by the Second Amendment." Doc. #220, at 55. Objectors Frost and Denney agree with Objector Belk, stating "gun owners are unique people…. You have to make it simple for gun owners. Gun owners don't trust the government. Gun owners don't trust lawyers." *Id.*, at 81.

The Court has carefully scrutinized the method of notice, the content of the notice, and the reach of the notice. The parties' supplemental notice plan was far-reaching and utilized different mediums to reach potential class members. To the extent class members do not want to participate, the Court cannot force them to do so. And the Court has no means for inquiry as to why they are not participating in the settlement. Because the notice was the best practicable notice in these circumstances, the Court must presume class members have chosen not to participate for reasons only they may understand.

The Court turns to whether the response rate of less than 1% should result in the Court denying approval of the settlement. Courts around the country have approved settlements where the claims rate was less than one percent. *See*, *e.g.*, *Poertner v. Gillette Co.*, 618 F. App'x 624, 625-26 (11th Cir. 2015) (approving a settlement involving more than seven million class members where the claims rate was roughly 0.75%); *LaGarde v. Support.com, Inc.*, Case No. 13-609, 2013 WL 1283325, at *2-10 (N.D. Cal. Mar. 26, 2013) (approving class action settlement with a claims rate 0.17% and noting 92% of the class members received notice via email); *In re Apple iPhone 4 Prods. Liab. Litig.*, Case No. 10-2188, 2012 WL 3283432, at *1-3 (N.D. Cal. Aug. 10, 2012)

(approving a class action settlement with claims rate between 0.16% and 0.28%); *Trombley v. Bank of Am. Corp.*, Case No. 08-CV-456, 2012 WL 1599041, at *2 (D. R.I. May 4, 2012) (approving a class action settlement that garnered 0.9% claims rate); *In re Packaged Ice Antitrust Litig.*, Case No. 08-MDL-1952, 2011 WL 6209188, at *14 (E.D. Mich. Dec. 13, 2011) (approving a class action settlement with a claims rate of less than 1%).  Additionally, many other courts have approved class action settlements when the claims rate was in the single digits.  *See, e.g., In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944-45 (9th Cir. 2015) (approving thirty-five million member settlement where less than four percent of class members filed claims); *Touhey v. United States*, Case No. 08-1418, 2011 WL 3179036, at *7-8 (C.D. Cal. July 25, 2011) (approving a class action settlement with a response rate of two percent); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1377-78 (S.D. Fla. 2007) (approving settlement where 1.1% of class members filed claims before the Court issued its decision).  And courts often approve class action settlements before claims are received or before the final claims deadline, as is the case here.  *See, e.g., Carter*, 2016 WL 3982489, at *5-6; *Lee v. Ocwen Loan Serving, LLC*, Case No. 14-60649, 2015 WL 5449813, at *23 (S.D. Fla. Sept. 14, 2015) (citations omitted); *Casey v. Citibank, N.A.*, Case No. 12-CV-820, 2014 WL 4120599, at *2 (N.D.N.Y. Aug. 21, 2014);  *Perez*, 501 F. Supp. 2d at 1383.

While the Court remains disappointed with the claims rate, the claims rate does not dictate whether the notice provided was the best notice practicable under the circumstances.  The claims rate does not govern whether the settlement is fair, reasonable, or adequate.  The Court finds the methods and mechanisms for disseminating notice in this matter satisfy Rule 23 of the Federal Rules of Civil Procedure.

### (d) Content of Notice

Objectors Frost and Denney argue the notice to class members was misleading because Remington denies the firearms are defective.  Doc. #150, at 31-32.  Similarly, *amici curiae* contend Remington should admit there is a defect with the firearms and

must warn class members that the firearms are defective. Doc. #196, at 14, 16-18.[23] Remington maintains the firearms are not defective, and Remington's experts have been unable to duplicate an accidental firing without a trigger pull on a rifle in proper working conditions. Doc. #180, at 13; Doc. #201, at 4; Doc. #203, at 11. Absent a recall, class action notices do not necessarily include admission of defect or liability. The notices here state Plaintiffs' position – that the firearms are defective, and Defendants' position – that the firearms are not defective. There is no requirement, certainly in the context of a compromised settlement of a class action, that a defendant admit liability in the notice to class members. Fed. R. Civ. P. 23(c)(2)(B); *Carter*, 2016 WL 3982489, at *12 (finding an admission of wrongdoing by the defendant is not required for settlement approval). The Court overrules this objection.

Objectors Frost and Denney also contend the notices should have included bigger and/or bolder print. Doc. #150, at 19. The Court reviewed the notices sent to potential class members, and finds that the content of the notices, including the font size used, were appropriate and proper. The Court overrules this objection.

For the foregoing reasons, the Court finds notice and the distribution of the notice to class members constituted the best practicable notice under the circumstances. The Court also finds the notice fully satisfied the requirements of Rule 23 and due process. Accordingly, objections to the notice are overruled.

### b. Fairness to Class Members

Objector Belk objects to the settlement because customers who are pleased with their purchases should not be expected to accept the word of attorneys about gun mechanisms, owners of Walker triggers should not have to accept another Remington trigger when there are better triggers available, and the settlement leaves out owners of the most dangerous Walker triggers. Doc. #161. With regard to the firearm owners who are satisfied with their firearm triggers or do not want a Remington trigger, those

---

[23] The Court declines to apply the notice requirements imposed by the Consumer Product Safety Commission ("CPSC"), as suggested by *amici curiae*. Doc. #196, at 20-25. Those requirements are not applicable here because manufacturers and sellers are firearms are exempted from regulations promulgated by the CPSC. 15 U.S.C. § 2052(a)(5)(E) (2017).

individuals do not have to file claims, and they had the opportunity to be excluded from the settlement. The Court overrules Belk's objection that the settlement is unfair to class members.

### c. Adequacy of Relief

Objectors Frost, Denney, and Belk maintain the settlement relief is inadequate because they should not have to send their firearms away for repair, and they should be permitted to take their firearms to local gunsmiths for the retrofit. Doc. #161, at 8; Doc. #220, at 83-84. The firearms are shipped to Remington or an authorized repair centers at no cost to the firearm owner. Doc. #178, at 14-15. Remington works directly with its authorized repair centers to ensure the retrofits are performed correctly. Doc. #174, at 7; Doc. #178, at 15. Because Remington bears responsibility if a retrofit is handled improperly, Remington should not be forced to have untrained gunsmiths perform retrofits for the class settlement. The Court overrules this objection.

Objectors Frost and Denney argue the settlement relief is inadequate because the class members should be permitted to seek reimbursement for triggers replaced with aftermarket triggers. Doc. #140, at 45. The X-Mark Pro trigger mechanism has been inspected by Plaintiffs' expert witness, and he opined the X-Mark Pro trigger mechanism is a safe alternative to the Walker trigger mechanism and can be retrofitted with many Remington firearms without affecting the firearm's performance or safety. Doc. #174, at 8. An aftermarket trigger may not be appropriate or safe for a Remington firearm, and it would be unrealistic (and likely costly) for the parties to have to test and approve all potential aftermarket triggers. Doc. #178, at 15. The settlement reached by the parties provides a safe option approved by Plaintiffs' expert. The Court overrules this objection.

Objectors maintain all class members should be permitted to get their firearms fixed, and they argue the settlement relief is inadequate in this regard. According to Remington, more than 600,000 firearms, which were manufactured thirty-five to seventy years ago, cannot be easily retrofitted. Doc. #166, at 13; Doc. #174, at 9-10; Doc. #220, at 85. The X-Mark Pro trigger does not fit on these older firearms. Doc. #174, at 10. Instead, these individuals will receive vouchers from Remington. *See Garza*, 1996 WL 56247, at *20 (overruling objections to class action settlement that the barrels of the

firearms at issue should be replaced, finding the replacement of all barrels was not feasible or necessary).  Moreover, given that these firearm owners' claims are time-barred and, in all likelihood, would have no cognizable claim against Defendants, relief in the form of a voucher is adequate in these circumstances.  The Court overrules this objection.

Objectors Frost and Denny argue the settlement is inadequate because it excludes government entities.  Doc. #150, at 41.  They also contend the settlement prejudices non-class members, such as police departments, but only offer speculation as to what prejudice non-class members may suffer.  *Id.*, at 52-53.  Because certain groups of individuals or entities have been excluded from this settlement does not render the settlement inadequate for those individuals who are included.  Any excluded individuals or groups do not waive or release any rights against Defendants and may maintain a separate action against Defendants.  The Court overrules this objection.

### d.  Claims Process and Claims Period

Objectors Frost and Denney contend the claims form are too clumsy, complex, and complicated.   Doc. #150, at 30-32, 34-35.  They also maintain the claims process suppresses participation because the claims period is short and confusing.  *Id.* at 32-35.

Class members may submit a claim through the settlement website, or a hard-copy claim form through U.S. Mail or email.  Doc. #180, at 26-27.  Claim forms are available on the settlement website or by calling the settlement telephone number.  *Id.* Doc. #138, at 22; Doc. #180-13, at 3.  Claims forms have been available for submission since May 15, 2015.  Doc. #180, at 26; Doc. #180-13, at 3.  Defendants' Counsel demonstrated the process of submitting a claim online at the final approval hearing. Doc. #220, at 37-38.  Filing a claim seemed relatively simply for anyone minimally proficient in the use of computers.

Objectors Denney and Frost maintain the claims forms contain language not included in the settlement agreement.  Doc. #150, at 35.  Specifically, Denney and Frost argue there is nothing in the settlement agreement about firearms not being fixed until the settlement is approved, and there is nothing in the settlement agreement about firearms being shipped to Remington.  *Id.* at 35-36.  Objectors are mistaken on both

counts.  First, the settlement agreement states "settlement benefits will not be administered until after the Effective Date."  Doc. #138, at 21.  Second, the settlement agreement indicates the firearms can be taken or shipped to a Remington Authorized Repair Center.  Doc. #138, at 19-20.  These objections are overruled.

The Court has carefully reviewed and considered the Objectors' arguments and the parties' arguments.  The Court finds the claims process is not complex or complicated.  The Court also concludes the claims period of eighteen months, which will not begin to run until this Order becomes final, is not short or confusing.  Doc. #138, at 15, 21; Doc. #180, at 26-27; Doc. #180-13, at 4.  At the earliest, the claims period will close eighteen months after the date of this Order.  At that point, class members will have had more than three years to submit a claim.  For these reasons, the Court overrules objections to the claims process and claims period.

### e.  Release

*Amici curiae* argue the release contained in the settlement agreement is overbroad because even though the release exempts personal injury and property damage claims, it covers claims that sound in tort or contract that may serve as grounds for personal injury or property damage actions.  Doc. #196, at 26.  For example, *amici curiae* contend a breach of merchantability claim is often the basis for a personal injury action even though it sounds in contract.  *Id.* (citing Doc. #138, at 28).  The Court previously raised concerns about a potential reading of the release to include personal injury or property damage claims.  Doc. #112; Doc. #142, at 24.  That concern was addressed with the parties removing certain paragraphs from the settlement agreement as well as removing a box on the claims form that class members were required to check.  Doc. #138.  The settlement expressly states "[r]eleased claims do not include claims for personal injury and personal property damage" regardless of the legal basis utilized to seeking redress for such a claim.  *Id.* at 28, ¶ 94.  It is clear that claims for personal injury or property damage are not released in the settlement agreement.  Doc. #138, at 28; Doc. #201, at 6.  Accordingly, the Court overrules this objection.

#### f. Differences Among State Laws

*Amici curiae* contend the settlement cannot be approved because the parties failed to show the applicable law in all states is significantly alike.  Doc. #196, at 30-36. *Amici curiae* argue the class claims are grounded in unique consumer protection, contract, and tort laws, which vary from state to state, and the parties failed to conduct a conflicts of law analysis pursuant to *In re St. Jude Medical, Inc.*, 425 F.3d 1116 (8th Cir. 2005).  Doc. #196, at 32-33.

*Amici curiae*'s reliance on *St. Jude Medical* is misplaced.  *St. Jude Medical* addressed choice-of-law in the context of class litigation, not settlement.  425 F.3d at 1118-21.  The parties have agreed to settle this matter, and in so doing, they have removed the differences among state laws by agreement.  For instance, while certain states' laws (e.g., statutes of limitations) may have prevented certain class members from bringing the claims asserted against Defendants, those variations in state law are resolved by the settlement.  *See*, *e.g.*, *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 304 (3d Cir. 2011) (citation omitted) (stating state law variations are largely irrelevant to certification of a settlement class); In *re Processed Egg Prods. Antitrust Litig.*, Case No. 08-2002, 2016 WL 3584632, at *8, 11-12 (E.D. Pa. June 30, 2016).  Accordingly, the Court overrules this objection.

For all the foregoing reasons, the Court overrules all objections to the settlement.


#### (2) Fairness, Reasonableness, and Adequacy of Settlement

A "class may be settled…only with the court's approval."  *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015 (citing Fed. R. Civ. P. 23(e)).  "If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable and adequate."  Fed. R. Civ. P. 23(e)(2); *see also DeBoer*, 64 F.3d at 1176.  According to the Eighth Circuit, the court must "ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned.  *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 934 (8th Cir. 2005) (citation omitted).

The Court must consider four factors when determining whether the settlement is fair, reasonable, and adequate:  (1) the merits of the plaintiffs' case weighed against the

terms of the settlement; (2) the defendants' financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement. *Marshall*, 787 F.3d at 508 (citations omitted). "The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement." *Id.* (citation omitted). A district court, in evaluating the strength of the plaintiffs' case, "need not undertake the type of detailed investigation that trying the case would involve." *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988); *Marshall*, 787 F.3d at 518.

### a. Balancing the Strength of Plaintiffs' Case Against the Settlement Terms

The chances of Plaintiffs, as a class, succeeding in this lawsuit are minimal. There are several obstacles standing in the way of their success.

First, due to statutes of limitations, the vast majority of firearms would not be part of this lawsuit, and their owners would not be entitled to any relief. The settlement provides relief for owners of firearms manufactured as far back as 1948. Yet, the vast majority of statutes of limitations for product liability claims range from two to six years, which would prevent most class members from pursuing their claims. *See, e.g.*, Ala. Stat. § 6-2-38 (2017) (two years); Ark. Code Ann. § 16-116-103 (2016) (three years); Colo. Rev. Stat. § 13-80-106 (2016) (two years); Fla. Stat. § 95.11(3)(e) (2016) (four years); Kan. Stat. Ann. § 60-513 (2017) (two years); Me. Stat. tit. 14, § 752 (2017) (six years); Minn. Stat. § 541.05 (2016) (four years); Mo. Rev. Stat. § 516.120 (2016) (five years); N.D. Cent. Code § 28-01-16 (2017) (six years); Or. Rev. Stat. § 30.905 (2016) (two years); S.D. Codified Laws § 15-2-12.2 (2017) (three years); Wash. Rev. Code § 7.72.060 (2016) (three years); Wyo. Stat. Ann. § 1-3-105 (2017) (four years); Doc. #220, at 109. At the final approval hearing, counsel noted the Model 700 is still made today, and roughly 110,000 of those firearms are manufactured annually. Doc. #220, at 95, 106-107. If the Court were to apply the lengthiest statute of limitations, there would be less than one million Model 700s at issue, not the more than five million firearms that are currently covered by settlement class A(1).

Second, Plaintiffs may have difficulty establishing defect and causation as evidenced by prior verdicts in favor of Defendants on claims of personal injury involving

alleged defect in the Walker trigger mechanism.  Doc. #166, at 7-8; Doc. #220, at 108.

Third, Defendants have vigorously challenged the merits of Plaintiffs' claims, and

maintain the firearms at issue are not defective.  Fourth, it is unlikely an individual class

member will incur enough damage to make pursuit of his or her claim worthwhile.[24]

      This settlement provides concrete benefits to potentially millions of individuals

who would not be entitled to benefits absent this settlement.  Owners of firearms that

are readily capable of a retrofit with a connectorless trigger mechanism are entitled to

that repair, at no cost to them.[25]  Owners of decades-old firearms that cannot be readily

retrofitted are entitled to a transferable voucher code that does not expire and can be

utilized at Remington's online store.[26]  Owners of firearms subject to the April 2014 X-

Mark Pro recall may also seek a retrofit or may participate in the recall.[27]  Additionally,

all settlement class members will receive an educational DVD about safe firearm

---

[24] According to class counsel, the cost of retrofitting a firearm ranges from $55.18 to $89.50, and if a class member has already replaced the trigger in certain models, the class member will receive a refund up to $119.  Doc. #92-13, at 12-13.

[25] Class A(1) members are entitled to their firearms being retrofitted with an X-Mark Pro at no cost to them.  Doc. #138, at 19.  More than five million firearms fall within this subclass.  Doc. #180, at 22.  Class A(2) members are entitled to their firearms being retrofitted with the current Model 770 Connectorless Trigger Mechanism at no cost to them.  Doc. #138, at 19.  Nearly 600,000 firearms fall within this subclass.  Doc. #180, at 23.

[26] Class A(3) members are entitled to a $12.50 voucher code, which is transferrable and does not expire, redeemable at Remington's online store.  Doc. #138, at 19.  Less than 300,000 firearms, which were manufactured between 1962 and 1982, fall within this subclass.  Doc. #138, at 19; Doc. #180, at 23.  Class A(4) members are entitled to a $10.00 voucher code, which is transferrable and does not expire, redeemable at Remington's online store.  Doc. #138, at 19-20.  Approximately 300,000 firearms, which were manufactured between 1948 and 1961, fall within this subclass.  Doc. #138, at 19-10; Doc. #180, at 24.

[27] Class B(1) members are eligible to retrofit their Model 700s and Sevens containing an X-Mark Pro trigger mechanism manufactured between May 1, 2006, and April 9, 2014, with an X-Mark Pro manufactured under the new assembly process at no cost to them.  Doc. #138, at 20.  Nearly 1.2 million firearms fall within this subclass, and these firearms are subject to the voluntary Product Safety Recall.  *Id.*; Doc. #180, at 25.  Class B(2) members are eligible for a refund up to $119 if they have, at their own cost, replaced their firearm's original Walker trigger mechanism with an X-Mark Pro mechanism manufactured between May 1, 2006, and April 9, 2014.  Doc. #138, at 20.  Class B(2) is largely consumed within Class B(1) with the refund under Class B(2) being an additional benefit on top of the X-Mark Pro retrofit under B(1).  Doc. #180, at 26.

handling practices. These benefits are uncapped. There is no limit to the number of class members who may receive benefits. The claims period will continue for eighteen months after this Order becomes final, as set forth in the settlement agreement. Further, the cost of the notice plans, any payment of attorneys' fees, and any class representative awards do not diminish the relief available to the class members. As a result of this settlement, the class members' economic loss due to the alleged defective firearms is rectified with repaired firearms, reimbursement for repairs, and/or vouchers for firearms that cannot be repaired. *See DeBoer*, 64 F.3d at 1177 (finding "virtually any benefit inuring to the class," which had an unlikelihood of success, "would be better than the prospect of an ultimately unsuccessful litigation.").

Furthermore, a firearm retrofitted with a new trigger – a trigger that Plaintiffs agree is far superior and not defective – is a benefit that cannot be quantified. That is, by replacing the triggers on the firearms that can be retrofitted, lives will be saved, injuries will be prevented, and property damage will be avoided. Fixing allegedly defective firearms is the ultimate benefit in this class action, and it is a benefit which cannot be quantified. Without approving this class action, these firearms would not be retrofitted. For these reasons, this factor weighs in favor of approving the settlement.

### b. Defendants' Financial Condition

Defendants represent they have the financial ability to comply with the terms of the settlement agreement. And although not named as a defendant in this lawsuit, Remington Outdoor Company, Inc., the parent company of Defendant Remington Arms Company, LLC, has signed the settlement agreement to guarantee the financial obligations of Remington arising under the terms of the settlement agreement. Doc. #180, at 31. This factor weighs in favor of approval.

### c. Complexity and Expense of Further Litigation

Generally, class actions "place an enormous burden of costs and expense upon [] parties." *Marshall*, 787 F.3d at 512 (quoting *Schmidt v. Fuller Brush Co.*, 527 F.2d 532, 535 (8th Cir. 1975)). When class members' claims "involve complex legal questions, conflicts of law analyses, the application of numerous states' laws, and

31

individualized damages for each class member that are speculative and difficult to estimate, the enormity of the burden is obvious." *Id.*

There is an inherent risk in litigation, including the possibility of an adverse outcome. Plaintiffs believe in the merits of their claims, and Defendants believe in the merits of their defenses. The legal issues are complex and disputed. There are many potential intricate factual and legal issues, and the results of litigation, including in this case, can never be predicted with absolute certainty. This factor also weighs in favor of approving the settlement.

### d. Opposition to Settlement

Given the potential number of class members, opposition to the settlement has been minimal. Eleven individuals opted out of the settlement, and four individuals submitted timely objections to the settlement. Doc. #210, at 6; Docs. #150, 157, 161. Another four individuals expressed concern about the allegedly defective firearms involved in this matter or informed the Court of experiences with the alleged defective firearms. Docs. #147, 149, 160, 167, 169. If the Court were to consider all of these individuals as opposing the settlement, there are only nineteen presumed class members who opposed or opted out of the settlement. Assuming there are 7.5 million potential class members, 0.000253% of potential class members oppose or opted out of the settlement. Even if the Court were to consider the opposition to the settlement in light of the 22,000 claims filed, 0.0864% of class members opposed or opted out of the settlement. Either way you look at it, the amount of opposition to the settlement is miniscule. *See In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d at 933 (finding an opposition rate was miniscule when the objection rate was 0.00067% and the opt-out rate was 0.0024%). The Court finds the small amount of opposition from purported class members weighs in favor of approving the settlement.

The Court finds the terms and provisions of the Fourth Amended Settlement Agreement (Doc. #180-1) have been reached and entered into following meaningful discovery and investigation conducted by class counsel in good faith and as a result of arm's length negotiations between the parties. The Court finds the settlement agreement is fully and finally approved as fair, reasonable and adequate, and in the

best interests of the parties and the settlement class members when balanced against the risks and benefits of further litigation.

Last, but importantly, if Plaintiffs are correct, people have been injured or killed by the rifles at issue. By approving this settlement, the Court facilitates remediation of the alleged defect. That result may save lives and reduce the risk of injury to others. And, that result compels the Court to approve this settlement. The Court grants final approval of the settlement, overrules the objections, and directs the parties to implement the settlement agreement according to its terms and provisions.

### C. Service Awards to Class Representatives

Plaintiffs ask the Court to approve service payments in the amount of $2,500 to each of the class representatives. Doc. #181, at 10-11. The class representatives gathered and communicated information to class counsel, protected the interests of the class members, acted as the public faces of this litigation, and helped achieve benefits for absent class members. *Id.* at 10. The class representatives also made their firearms available for inspection and testing. *Id.* And they assisted with the investigation and preparation of this matter, including the gathering of documents for production. *Id.* Courts have found class representative service awards are appropriate. *See In re U.S. Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (finding $2,000 awarded to five representative plaintiffs was appropriate); *Huyer v. Wells Fargo & Co.*, 314 F.R.D. 621, 629 (S.D. Iowa 2016) (awarding $10,000 to each named plaintiff); *Yarrington v. Solvay Pharms., Inc.*, 697 F. Supp. 2d 1057, 1068 (D. Minn. 2010) (awarding $5,000 to each class representative). These service awards will be paid by Defendants, and will not reduce the benefits available to class members. Doc. #181, at 3. Additionally, no one has objected to Plaintiffs' request. The Court finds the request is reasonable, and approves service award payments in the amount of $2,500 to each class representative.

### D. Plaintiffs' Motion for Attorneys' Fees and Costs

Plaintiffs seek an award of attorneys' fees and costs totaling $12,500,000. Doc. #181. When a district court has certified a class action, "the court may award

33

reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). The Court finds the request for attorneys' fees and costs as well as the attorneys' fees and costs requested are reasonable for the following reasons.

First, the time and work required to litigate this matter was extensive. Beyond the comprehensive discovery and lengthy settlement negotiations, the parties were forced back to the drawing board in December 2015 when the Court required them to propose a supplemental notice plan. At that juncture, the parties engaged another mediator to assist them in formulating a supplemental notice plan. The parties then pre-tested the targeted social media portion of the supplemental notice before proposing it to the Court. Needless to say, it is not surprising that Plaintiffs' counsel expended more than 19,000 hours in this matter. *See In re Life Time Fitness Inc., Tel. Consumer Prot. Act Litig.*, 847 F.3d 619, 623 (8th Cir. 2017) (affirming the district court's decision to award attorneys' fees in the amount of $2.8 million because, among other things, the attorneys assumed significant risk in taking on the lawsuit, obtained a substantial benefit for the class, the lawsuit presented difficult legal questions, and counsel devoted significant time to the lawsuit); *see also Huyer v. Buckley*, Case No. 16-1681, 2017 WL 640771, at *2-3 (8th Cir. Feb. 16, 2017) (affirming the district court's decision to award $8.5 million in attorneys' fees because the time and work required, the attorneys' preclusion from other work, the contingency nature of the fee, the results obtained, and the attorneys' experience, reputation, and ability of attorneys).

Second, Plaintiffs and their attorneys faced great risks in this litigation. As demonstrated by the other putative class actions that have since been dismissed and the defense verdicts received by Defendants, there was a considerable chance Plaintiffs would recover nothing in this matter. If Plaintiffs recovered nothing, their attorneys would receive nothing. And the attorneys' representation of Plaintiffs in this matter most certainly prevented them from working on other matters and/or taking on new matters. *See Huyer*, 2017 WL 640771, at *2; *see also Zilhaver v. UnitedHealth Group, Inc.*, 646 F. Supp. 2d 1075, 1083 (D. Minn. Aug. 20, 2009) (awarding attorneys' fees in the amount of more than $2 million based, in part, on the plaintiffs' counsel's assumption of risk in taking the matter).

34

Third, Plaintiffs' counsel obtained a concrete and substantial benefit for the class members.  The most important benefit received in this settlement is the opportunity to retrofit millions of potentially defective firearms.  *See Carter*, 2016 WL 3982489, at *14 (finding the settlement addressed a "public safety concern by removing potentially defective weapons from circulations," and approving and finding $9 million in attorneys' fees was reasonable).  This benefit cannot be quantified but is of utmost significance.  Further, for most class members, they are entitled to a benefit – a retrofitted trigger, voucher, safety DVD, and/or reimbursement for a replaced trigger – to which they would not be entitled otherwise due to applicable statutes of limitations.  *See Huyer*, 2017 WL 640771, at *2.

Fourth, the parties negotiated and proposed a fair, reasonable, and adequate settlement of class members' claims.  The fee award was mediated and agreed to by the parties but only after the substantive relief for the class members was agreed upon by the parties.  Doc. #181, at 13.  Any amount paid by Defendants to Plaintiffs' attorneys will not reduce any benefit to class members.  Doc. #138, at 22, 27.  The fee award was negotiated by attorneys experienced and knowledgeable in these types of matters.  *Id.*

Fifth, the attorneys involved in this matter on both sides were experienced and skilled.  Class counsel, in particular, has extensive involvement in litigating complex class actions.  Arsenault has more than thirty years of experience and has litigated hundreds of complex class action and mass tort cases across the United States.  Doc. #92-11, at 3-4; Doc. #92-13, at 2-3.  He has been appointed by federal courts in more than twenty complex matters.  *Id.* at 5-6.  Schaffer has extensive experience in prosecuting class actions, particularly with regard to consumer protection, products liability, and environment or toxic torts.  *Id.* at 8.  He has served in leadership positions in more than ten class action lawsuits, spanning from California to Vermont.  *Id.*  Lanier has more than thirty years' experience and has successfully tried several matters, resulting in hundreds of millions of dollars in verdicts.  *Id.* at 11-12.  Finally, Holland, who has more than twenty-five years' experience, has held leadership positions in class and mass tort actions across the country.  *Id.* at 15-16.  Collectively, the attorneys, through discovery in this matter and experiences in related matters, provided invaluable

35

insight into the firearms and mechanisms at issue in this matter. Doc. #92-13, at 4-7. Due to their experience and their technical proficiency, these attorneys' skill and expertise provided a great service to the Court, class representatives, and absent class members. *See Huyer*, 2017 WL 640771, at *2.

The Court finds an award of attorneys' fees is authorized by Rule 23(h) of the Federal Rules of Civil Procedure. Two principal methods are used by courts in exercising their discretion to award attorneys' fees: the lodestar method, and the percentage of the benefit method. *Galloway v. The Kan. City Landsmen, LLC*, 833 F.3d 969, 972 (8th Cir. 2016). The Court has discretion to choose what method to apply. *Id*. (citation omitted). The Court will consider Plaintiffs' request under both methods.

### (1) Lodestar Method

Under the "lodestar" method, "the hours expended by an attorney are multiplied by a reasonable hourly rate of compensation so as to produce a fee amount which can be adjusted, up or down to reflect the individualized characteristics of a given action." *Galloway*, 833 F.3d at 972 (quoting *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 244 (8th Cir. 1996)). From the commencement of this action through January 13, 2017, Plaintiffs' counsel billed 19,293.64 hours on this matter. Doc. #181, at 5-7, 14. These hours were dispersed among ten law firms. *Id*. The lodestar claimed by Plaintiffs is $11,499,027.50. *Id*. at 14. After the fee application was submitted, Plaintiffs' counsel also worked on finalizing the joint motion for approval of settlement, preparing for or participating in the final approval hearing, and responding to various filings. Those hours are not included in the figure provided to the Court. The breakdown of fees by firm, by dividing the lodestar listed by the number of hours worked by law firm, results in hourly rates ranging from $261 through $897. Doc. #181-1, at 6.

Although the best practice would have been for the parties to submit more detailed records of the costs and time expended in this matter, the Court is permitted to rely upon summaries and affidavits of counsel when considering a request for attorneys' fees. *See In re Genetically Modified Rice Litig.*, 764 F.3d 864, 871 (8th Cir. 2014) (citing *In re Diet Drugs*, 582 F.3d 524, 539 (3d Cir. 2009)). Class counsel has, under penalty of perjury, set forth the hours expended by each law firm, and provided each

36

law firm's lodestar.  Doc. #92-13, at 17-18; Doc. #181-1, at 4-7.  Additionally, counsel represented to the Court that they exercised billing judgment to exclude redundancies and avoid duplicative work.  Doc. #181, at 16.  No one has objected to the number of hours worked by Plaintiffs' attorneys or the hourly rates set forth in Plaintiffs' fee application.

The Court finds the more than 19,000 hours expended, which again does not include the hours spent by counsel after January 13, 2017, is reasonable based upon the circumstances and complexity of this matter.  In all likelihood, hundreds of additional hours were spent in the month after Plaintiffs' fee application was filed.  The Court also finds the average hourly fees, although some are on the high side, are not dissimilar to those hourly rates charged in the Kansas City area.  The hourly rates are also indicative of counsel's extensive national experience in class action lawsuits.  The Court finds it unwarranted to adjust the lodestar in these circumstances.  Under the lodestar method for awarding attorneys' fees, the Court approves Plaintiffs' request for attorneys' fees and costs in the amount of $12.5 million.

### (2) Percentage of the Benefit Method

Under the "percentage of the benefit" method, the attorney is awarded "some fraction of the common fund" the attorney obtained in the litigation, similar to a contingent fee arrangement.  *Id.* (quoting *Johnston*, 83 F.3d at 246).  Plaintiffs contend the benefits available to 7.5 million potential class members are valued at $487,958,400.  Doc. #92-13, at 13; Doc. #181, at 2.  This value is comprised of the following calculations:

- 1,194,237 Model 700s and Sevens with X-Mark Pro trigger mechanism multiplied by $69.08 (cost of retrofit) = $82,497,892

- 5,123,619 Model 700s, Sevens, Sportsman 78s, and 673s with trigger mechanism utilizing a trigger connector multiplied by $69.08 (cost of retrofit) = $353,939,601

- 347,780 Model 710s and 715s with trigger mechanism utilizing a trigger connector multiplied by $89.50 (cost of retrofit) = $31,126,310

- 246,160 Model 770s with a trigger mechanism utilizing a trigger connector multiplied by $55.18 (cost of retrofit) = $13,583,109

37

- 307,510 Model 721s, 722s, and 725s with trigger mechanism utilizing a trigger connector multiplied by $10.00 (amount of voucher) = $3,075,100

- 298,911 Model 600s, 660s, and XP-100s multiplied by $12.50 (amount of voucher) = $3,736,388

Doc. #91-13, at 13; Doc. #181, at 23.  Plaintiffs contend the monetary benefit available to the class members supports their fee request of $12.5 million.

Class counsel achieved a settlement that substantially benefits the class members, as discussed in detail, *supra.*  What bears repeating is, as a result of this litigation, at least 2,600 firearms that allegedly discharged without a trigger pull have been retrofitted.  Doc. #220, at 99.[28]  Those firearms, when properly maintained, should never discharge without a trigger pull again, likely saving countless lives and preventing numerous injuries.  *Id.*  Additionally, millions of other firearms may be retrofitted under the terms of the settlement agreement.

Class members' benefits are not tied to the reimbursement of fees or costs.  The attorneys' fees will be paid by Defendants, which are also providing benefits to the class members in the form of retrofits, vouchers, safety DVDs, and/or reimbursement for trigger mechanism replacements.  *See Johnston*, 83 F.3d at 245-46 (finding the percentage of the benefit approach could be utilized even when the attorneys' fees will not be taken from funds available to the plaintiffs).

Plaintiffs' attempt at calculating the total benefits available to the class members does not account for those firearms no longer in circulation.[29]  One cannot ascertain the number of firearms still in circulation, and the parties seem to agree not all 7.5 million firearms are in circulation.  If the Court were to cut the available benefits to one-fifth of the figure proposed by Plaintiffs, the total benefits available to class members would still exceed $97 million.  Attorneys' fees and costs in the amount of $12.5 million represent less than 12.9% of those benefits.  A fee award in this amount is reasonable and characteristic, if not less than, other awards in class actions.  *See, e.g., Huyer*, 2016 WL

---

[28] Objectors Frost and Denney object to the amount of attorneys' fees because of the little to no benefit available to class members.  Doc. #151, at 41.  The benefit available to class members is substantial.  The Court overrules this objection.

[29] If the Court were to rely solely on Plaintiffs' total benefits estimation, the attorneys' fees sought would equate to 2%.

640771, at *1-3 (finding the district court did not abuse its discretion in awarding attorneys' fees that equated to one-third of the total settlement fund); *In re Life Time Fitness, Inc.*, 847 F.3d at 622-24 (affirming district court's fee award of 28% of the settlement fund); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1157 (8th Cir. 1999) (finding a fee of 24% of the monetary benefits was reasonable); *In re Xcel Entergy, Inc., Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 997-99 (D. Minn. 2005) (awarding fees in the amount of 25% of the settlement fund). Under the percentage of the benefit method, the Court approves Plaintiffs' request for attorneys' fees and costs in the amount of $12.5 million.

### (3) Costs

Plaintiffs also seek reimbursement of costs and expenses in the amount of $474,892.75. Doc. #181, at 39. Costs and expenses include travel expenses; expert compensation; transcripts; third-party testing of firearms; mediation charges; copying documents; document hosting; telephone, postage, and delivery costs; making court appearances; and communicating with class members. *Id.*; Doc. #181-1. These expenses do not include any costs associated with the hearing held on February 14, 2017. *Id.* No one has objected to the recovery of Plaintiffs' costs. The Court finds these costs were reasonable and necessary, and awards Plaintiffs their costs and expenses in the amount of $474,892.75, which, as requested by Plaintiffs, shall be subtracted from the $12.5 million awarded to class counsel, and shall be used to reimburse Plaintiffs and Plaintiffs' counsel for expenses and costs. Doc. #181, at 39.

### III.    CONCLUSION

For the foregoing reasons, the Court finds and orders the following:

(1)    The parties' Joint Motion for Final Settlement Approval (Doc. #179) is granted;

(2)    The requirements of Rule 23 are met, and the case is certified, for settlement purposes, as a class action with the subclasses defined in Appendix A;

(3)    The settlement agreement is fair, reasonable and adequate;

39

(4)     The terms of the Fourth Amended Settlement Agreement (Doc. #180-1) are incorporated as the Order of this Court;

(5)     All objections to the settlement are overruled;

(6)     Plaintiffs Moodie, Waterman, Delperdang, Otis, Keesy, Barbre, Brown, Winterburn, Hardaway, Pollard, Anderson, Corsi, and Massie are appointed as class representatives as set forth in Appendix A;

(7)     Richard Arsenault, Charles Schaffer, Eric Holland, and W. Mark Lanier are appointed as class counsel;

(8)     Vincent Agnelli Jr., Leon Baily, Mike Blair, Carol Bonham, Leonard Bonham, David Harris Jr., John Hoober, Ronson Ibarra, Brad Sisneros, Timothy Tomlinson, and David Wight are excluded from the settlement;

(9)     Angeion is appointed as the class action settlement administrator to perform the duties assigned to it in the settlement agreement;

(10)    Plaintiffs' application for fees and expenses in the amount of $12.5 million is approved;

(11)    Plaintiffs' request for costs and expenses in the amount of $474,892.75 is approved, and that amount shall be subtracted from the $12.5 million awarded to class counsel;

(12)    Plaintiffs' request for service awards to class representatives in the amount of $2,500 each is granted;

(13)    Defendants shall publish a copy of this Order on the Settlement Website;

(14)    Pursuant to the terms of the Fourth Amended Settlement Agreement, the Court retains jurisdiction over the parties, including the settlement classes, in matters relating to the administration, consummation, validity, enforcement, and interpretation of the settlement agreement; and

(15)    Pursuant to the terms of the settlement agreement, this matter is dismissed with prejudice.

IT IS SO ORDERED.

                                        /s/ Ortrie D. Smith
                                        ORTRIE D. SMITH, SENIOR JUDGE
DATE:  March 14, 2017                   UNITED STATES DISTRICT COURT

40

# APPENDIX A

## Settlement Class A:

### Class A(1) – Class Representatives Moodie and Waterman:

All current owners of Remington Model 700, Seven, Sportsman 78, and 673 firearms containing a Remington trigger mechanism that utilizes a trigger connector. Excluded from the class are: (a) persons who are neither citizens nor residents of the United States or its territories; (b) any Judge or Magistrate Judge presiding over the action and members of their families; (c) governmental purchasers; (d) Remington Arms Company, LLC, Sporting Goods Properties, Inc., E.I. du Pont Nemours and Company, and each of their subsidiaries and affiliates (the "Trigger Connector Class").

### Class A(2) – Class Representative Delperdang:

All current owners of Remington Model 710, 715, and 770, firearms containing a Remington trigger mechanism that utilizes a trigger connector. Excluded from the class are: (a) persons who are neither citizens nor residents of the United States or its territories; (b) any Judge or Magistrate Judge presiding over the action and members of their families; (c) governmental purchasers; (d) Remington Arms Company, LLC, Sporting Goods Properties, Inc., E.I. du Pont Nemours and Company, and each of their subsidiaries and affiliates (the "Trigger Connector Class").

### Class A(3) – Class Representatives Otis and Keesy:

All current owners of Remington Model 600, 660, and XP-100 firearms containing a Remington trigger mechanism that utilizes a trigger connector. Excluded from the class are: (a) persons who are neither citizens nor residents of the United States or its territories; (b) any Judge or Magistrate Judge presiding over the action and members of their families; (c) governmental purchasers; (d) Remington Arms Company, LLC, Sporting Goods Properties, Inc., E.I. du Pont Nemours and Company, and each of their subsidiaries and affiliates (the "Trigger Connector Class").

### Class A(4) – Class Representative Barbre:

All current owners of Remington Model 721, 722, and 725 firearms containing a Remington trigger mechanism that utilizes a trigger connector. Excluded from the class are: (a) persons who are neither citizens nor residents of the United States or its territories; (b) any Judge or Magistrate Judge presiding over the action and members of their families; (c) governmental purchasers; (d) Remington Arms Company, LLC,

Sporting Goods Properties, Inc., E.I. du Pont Nemours and Company, and each of their subsidiaries and affiliates (the "Trigger Connector Class").

**Settlement Class B:**

**Class B(1) – Class Representatives Brown, Winterburn, Hardaway, Pollard, Anderson, Corsi, and Massie:**

All current owners of Remington Model 700 and Model Seven rifles containing an X-Mark Pro trigger mechanism manufactured from May 1, 2006, to April 9, 2014, who have not participated in the voluntary X-Mark Pro product recall. Excluded from the class are: (a) persons who are neither citizens nor residents of the United States or its territories; (b) any Judge or Magistrate Judge presiding over the action and members of their families; (c) governmental purchasers; (d) Remington Arms Company, LLC, Sporting Goods Properties, Inc., E.I. du Pont Nemours and Company, and each of their subsidiaries and affiliates (the "X-Mark Pro Class").

**Class B(2) – Class Representatives Pollard, Anderson, Corsi, and Massie:**

All current and former owners of Remington Model 700 and Model Seven rifles who replaced their rifle's original Walker trigger mechanism with an X-Mark Pro trigger mechanism manufactured from May 1, 2006, to April 9, 2014. Excluded from the class are: (a) persons who are neither citizens nor residents of the United States or its territories; (b) any Judge or Magistrate Judge presiding over the action and members of their families; (c) governmental purchasers; (d) Remington Arms Company, LLC, Sporting Goods Properties, Inc., E.I. du Pont Nemours and Company, and each of their subsidiaries and affiliates (the "X-Mark Pro Class").